# whitepages PREMIUM

BACKGROUND REPORT

**As of: May 05, 2018**



**NO MUGSHOT ON RECORD**

## MATCH INDICATORS

*These show how closely a court record matches with the identity of the person.*

| | |
|---|---|
| First Name | Exact Match |
| Middle Name | Not Matched |
| Last Name | Exact Match |
| Date Of Birth | Not Available On Record |
| Address | City No Match |
| | State No Match |
| | County No Match |
| | Zip Matched |
| SSN | Not Available On Record |

📅 **Criminal Record #20- Breach / Breach Of Trust With Fraudulent Intent (no Longer Used)(see 1185, 0420, 0421)**

CHARGE #1 - BREACH / BREACH OF TRUST WITH FRAUDULENT INTENT (NO LONGER USED)(SEE 1185, 0420, 0421)

CHARGE DATE: 07/06/1995

| | | | |
|---|---|---|---|
| Offense Code | 0032 | Crime County | Bamberg, Sc |
| Case Number | D704906WALDAV | Charges Filed Date | 07/06/1995 |
| Case Type | U | Court | Sc Bamberg County Circuit Court |
| Sentence | Dismiss-Civil Ca | Disposition | Nolle Prosequi |
| Disposition Date | 01/23/1996 | | |

*The records displayed in this report may or may not actually belong to the person you searched for, especially if the person you searched for has a common name. Please exercise caution when viewing court-related records, as they may not be accurate or complete.*

# whitepages PREMIUM

**BACKGROUND REPORT**

**As of: May 05, 2018**



**NO MUGSHOT ON RECORD**

### MATCH INDICATORS

*These show how closely a court record matches with the identity of the person.*

| | |
|---|---|
| First Name | Exact Match |
| Middle Name | Not Matched |
| Last Name | Exact Match |
| Date Of Birth | Not Available On Record |
| Address | City No Match |
| | State No Match |
| | County No Match |
| | Zip Matched |
| SSN | Not Available On Record |

---

📅 **Criminal Record #22- Dus / Driving Under Suspension, License Not Suspended For Dui - 2nd Offense**

**CHARGE #1 - DUS / DRIVING UNDER SUSPENSION, LICENSE NOT SUSPENDED FOR DUI - 2ND OFFENSE**

**CHARGE DATE: 02/06/1995**

| | | | |
|---|---|---|---|
| Offense Code | 0174 | Crime County | Bamberg, Sc |
| Crime Type | Misdemeanor | Case Number | 07850XIWALDAV |
| Charges Filed Date | 02/06/1995 | Case Type | Misdemeanor U |
| Court | Sc Bamberg County Circuit Court | Sentence | As Per Grant's P |
| Disposition | Nolle Prosequi | Disposition Date | 04/17/1994 |



**NO MUGSHOT ON RECORD**

### MATCH INDICATORS

*These show how closely a court record matches with the identity of the person.*

| | |
|---|---|
| First Name | Exact Match |
| Middle Name | Exact Match |
| Last Name | Exact Match |
| Date Of Birth | Exact Match |
| Address | City No Match |
| | State No Match |
| | County No Match |
| | Zip Matched |
| SSN | Not Available On Record |

---

📅 **Criminal Record #23- Unspecified**

**CHARGE #1 - UNSPECIFIED**

**CHARGE DATE: 09/28/1999**

| | | | |
|---|---|---|---|
| Crime County | Richmond, Nc | Case Number | 01760RICHMOND1999CRO 08111 |
| Charges Filed Date | 09/28/1999 | Case Type | Cr |

---

*The records displayed in this report may or may not actually belong to the person you searched for, especially if the person you searched for has a common name. Please exercise caution when viewing court-related records, as they may not be accurate or complete.*

# Whitepages PREMIUM

## LIENS & JUDGMENTS RECORD HISTORY

**i** *A lien is a form of interest for property to secure the payment of a debt or fulfillment of other obligations. A judgment lien is a type of nonconsensual lien, created when someone wins a lawsuit against you and then records the judgment against your property.*

**DAVID has 0 lien records and 1 judgment records.**

### Judgment #1: Small Claims Judgment

| | | | |
|---|---|---|---|
| Name | David D Walker | Address | 437 Capernaum Rd Bamberg, Sc |
| Filing Location | Bamberg, Sc | Filing Type | Small Claims Judgment |
| Filing Date | 04/13/2011 | Total Judgment Amount | $520.00 |
| Plaintiff Name | World Finance Company Bamberg | Court Phone | (803) 245-3025 |
| Court Case Number | 2011CV0510100136 | | |

*The records displayed in this report may or may not actually belong to the person you searched for, especially if the person you searched for has a common name. Please exercise caution when viewing court-related records, as they may not be accurate or complete.*

# whitepages PREMIUM

## OWNERSHIPS

### No Recent Properties Found

This person doesn't appear to have any properties associated with them*. Sometimes, it takes a while for property records to surface.



68.4%

**OF AMERICANS OWN PROPERTY**

*The records displayed in this report may or may not actually belong to the person you searched for, especially if the person you searched for has a common name. Please exercise caution when viewing court-related records, as they may not be accurate or complete.*

# EXHIBIT –P



**NYCDOC**
New York City
Department of
Correction



**Correctional
Health Services**

**Friday , December 4th, 2020**

## What is

# Coronavirus/COVID-19?

Coronavirus (COVID-19) is an illness caused by a virus that can spread from person to person.

COVID-19 symptoms can range from mild (or no symptoms) to severe illness (very sick).

# DID YOU KNOW?

- The United States has reported more than 13 million cases of COVID-19 since February, and the virus continues to spread globally, with about 63 million cases worldwide.
- The country is preparing to distribute the COVID-19 vaccine following authorization/approvals by the Federal Drug Administration.
- New York State recently reported a COVID-19 test positivity rate of over four percent – the highest rate since May. (The positivity rate is the number of positive tests for a length of time divided by the total number of tests for the same time period).
- New York City will reopen its school system to in-person learning with a phased approach beginning in early-December. When the schools reopen, students and faculty will undergo weekly COVID-19 testing.

### WHAT IS THE "SICK CALL PHONE LINE"?

The sick call phone line is a number you can call from your housing area to speak with a nurse.  To call the sick call phone line, enter your PIN, then press 614#.

### WHAT INFORMATION SHOULD I PROVIDE WHEN I CALL?

You should give your name, housing area, and book & case number when you call.

### CAN I MAKE CLINIC APPOINTMENTS THROUGH THE SICK CALL PHONE LINE?

Yes, you can call the sick call phone line to make an appointment at the clinic, including an appointment to get the flu shot. Clinic appointments are available from 10am-10pm.

You can also call to make an appointment for the dentist.



# EXHIBIT –Q

# NEW YORK STATE BAR ASSOCIATION
## COMMITTEE ON CIVIL RIGHTS

## REPORT TO THE HOUSE OF DELEGATES

# SOLITARY CONFINEMENT
# IN NEW YORK STATE

## PRESENTED TO AND APPROVED BY THE
## NEW YORK STATE BAR ASSOCIATION
## HOUSE OF DELEGATES

**January 25, 2013**





NEW YORK STATE BAR ASSOCIATION

# NYSBA

## Committee on Civil Rights
### Report to the House of Delegates
## Solitary Confinement in New York State

Presented to and approved by the New York State
Bar Association House of Delegates

January 25, 2013



NYSBA

# TABLE OF CONTENTS

**Resolution** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Report** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   B. Solitary Confinement in New York State . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   C. Long Term Solitary Confinement Frequently and Predictably
      Results in Psychological and Physical Damage, both temporary
      and permanent, to the Individual Being Confined . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   D. Long Term Solitary Confinement is Contrary to Human Dignity
      and Has Been Largely Abandoned by the International Community . . . . . . . . . . . . . . . . 14

   E. Long Term Solitary Confinement is Counterproductive to the Goals
      of Prisoner Protection, Discipline, Rehabilitation, and Reintegration,
      Which Can Be Achieved Through Other Means. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

   F. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## NEW YORK STATE BAR ASSOCIATION
## CIVIL RIGHTS COMMITTEE

**Diana Sagorika Sen, Esq.**
CHAIR
New York, NY

**Jeremy Benjamin, Esq.**
SECRETARY
Paul, Weiss, Rifkind, Wharton & Garrison LLP

---

**Report Author**
**Karen Murtagh, Esq.**
Prisoners Legal Services
Albany, NY


**Fernando A. Bohorquez, Jr., Esq.**
Baker & Hostetler LLP
New York, NY

**Patrick Thomas Campbell, Esq.**
Baker & Hostetler LLP
New York, NY

**Elizabeth Richer Chesler, Esq.**
New York, NY

**Matthew W. Daus, Esq.**
Windels Marx Lane & Mittendorf, LLP
New York, NY

**John Devaney, Esq.**
Pappalardo & Pappalardo
Washington, DC

**J. Soffiyah Elijah, Esq.**
Correctional Association of New York
New York, NY

**Elise Simon Feldman, Esq.**
Long Island City, NY

**Barbara Jeane Graves-Poller, Esq.**
MFY Legal Services
New York, NY

**Fearonce G. LaLande, Esq.**
Queens Village, NY

**Stephen Charles Lessard, Esq.**
Orrick, Herrington & Sutcliffe LLP
New York, NY

**Hanna F. Madbak, Esq.**
Baker Hostetler LLP
New York, NY

**Robert Gregory Magee, Esq.**
Legal Aid Society of Northeastern New York
Albany, NY

**Kevin C. Reilly, Esq.**
NYS Supreme Court (criminal)
Bronx, NY

**Jocelyn M.T. Rettic, Esq.**
Grant & Eisenhofer
New York, NY

**Suela Balili Sava, Esq.**
Franklin Park, IL

**Robert A. Seidenberg, Esq.**
Yonkers, NY

**Jude Volek, Esq.**
United States Department of Justice
Washington, DC

The committee is grateful for the assistance of Mr. Craig Mackey, Albany Law School Class of 2013, for his initial draft of the report's resolutions.

NEW YORK STATE BAR ASSOCIATION CIVIL RIGHTS COMMITTEE

REPORT TO THE HOUSE OF DELEGATES

# RESOLUTION

Whereas, on October 18, 2011, the United Nations Special Rapporteur on torture, Juan E. Méndez, called on all countries to ban the use of solitary confinement of prisoners except in very exceptional circumstances and for as short a time as possible. Noting that such confinement can amount to torture when used as punishment or for an indefinite or prolonged period of time because of the severe mental pain or suffering it may cause, the Special Rapporteur recommended that solitary confinement in excess of 15 days should be completely prohibited.

Whereas, on October 2, 2012, the New York Civil Liberties Union issued a 64-page report titled, "*Boxed In: The True Cost of Extreme Isolation in New York's Prisons*" on the use of solitary confinement in New York State's prisons. The report, based on a year of study and analysis, explored the history that led to the use of solitary confinement in New York State and compared New York's use of solitary confinement with that of other states. It analyzed both whether the use of solitary confinement violates current legal standards, and whether reforming solitary confinement in New York State would adversely impact prison or public safety. The report concluded that New York's use of solitary confinement is arbitrary and unjustified, harms prisons and corrections staff and negatively impacts prison and community safety.

Whereas, according to the report, last year alone, New York issued more than 13,500 extreme isolation sentences; about one for every four people incarcerated. Just over eight percent of New York's prison population is in isolation at any given time - the vast majority for non-violent offenses. Only 16 percent of isolation sentences from 2007 to 2011 were for assault or weapons. About half of the 4,500 prisoners in solitary confinement spend 23 hours a day in an isolation cell completely alone. The other half are confined in an isolation cell the size of a parking spot with another prisoner, a practice that forces two strangers into intimate, constant proximity for weeks, months and even years on end. A 2003 report by the Correctional Association of New York found that the average sentence in disciplinary segregation was 5.3 months but hundreds of inmates spent an average of three years in isolation and several prisoners in administrative segregation have been isolated for more than 20 years.

Whereas, extreme isolation is different than prisoner separation, which has long been an accepted corrections practice. Corrections officials can separate and remove violent or vulnerable prisoners from the general prison population without subjecting them to the punishing physical and psychological deprivation of extreme isolation - a point of consensus among corrections officials in other states, legal scholars and international human rights bodies.

Whereas, based upon the recommendations of the United Nations Special Rapporteur, the comprehensive report of the New York Civil Liberties Union and the plethora of historic and scientific evidence set forth in this report, all of which demonstrate the damage caused by prolonged solitary confinement and the ability to ensure prison and public safety without resorting to its use.

Whereas, the Committee on Civil Rights has prepared a report analyzing the use of solitary confinement and recommending that the use of solitary confinement be profoundly restricted; it is therefore

RESOLVED, that the New York State Bar Association hereby approves the report and recommendations of the Committee on Civil Rights.

FURTHER RESOLVED, that the New York State Bar Association calls upon all governmental officials charged with the operation of prisons and jails throughout New York State to profoundly restrict the use of long-term solitary confinement, by adopting clear and objective standards to ensure that prisoners are separated from the general prison population only in very limited and very legitimate circumstances and only for the briefest period and under the least restrictive conditions practicable.

FURTHER RESOLVED, that the New York State Bar Association calls upon such officials to adopt stringent criteria, protocols and safeguards for separating violent or vulnerable prisoners, including clear and objective standards to ensure that prisoners are placed in solitary confinement only in limited and legitimate circumstances for the briefest period and under the least restrictive conditions practicable; and auditing the current population in extreme isolation to identify people who should not be in the Special Housing Unit, transitioning them back to the general prison population, and reducing the number of Special Housing Unit beds accordingly.

FURTHER RESOLVED, that the New York State Bar Association urges that the imposition of long-term solitary confinement on persons in custody beyond 15 days be proscribed.

FURTHER RESOLVED, that the New York State Bar Association calls upon the State Legislature to hold public hearings to inquire into the harmful effects of long-term solitary confinement and to solicit both professional and academic commentary on the matter and comments from persons who have been placed in long-term solitary confinement, and to otherwise conduct these hearings in a manner that will best inform lawmakers and the public at large regarding the effects of long-term isolation and to adopt appropriate legislation to address the use of solitary confinement in New York facilities.

FURTHER RESOLVED, that the officers of the Association are hereby empowered to take such other and further action as may be required to implement this resolution.

# REPORT

*"Please torture me in the old way ... Here they destroy people mentally and physically without leaving marks."*

**Shaker Aamer, the last remaining British citizen detained at Guantanamo Bay.**

## A. Introduction

The origins of solitary confinement in the United States are often placed in the early nineteenth century, as an outgrowth of the prison reform movement led by Pennsylvania Quakers.[1] However, examples of solitary confinement in America range at least as far back as 1787.[2] Advocates for solitary confinement originally thought it was rehabilitative in nature.[3] The reasoning was that prisoners, left alone with only their conscience and a Bible, would have time to reflect on their bad deeds, and come to see the nature of their crimes; after which the prisoners would voluntarily reform themselves into normal, law-abiding citizens.[4] Indeed, reformers in 18th century Britain believed that solitary confinement provided "the most terrible penalty short of death that a society could inflict,"[5] while at the same time being the most humane.[6]

Over time, experience contradicted the conviction of the reformers. Jurists in the late 18th century came to recognize solitary confinement as a "greater evil than certain death."[7] It was reported in late 18th century American newspapers that prisoners housed in solitary confinement "[begged], with the greatest of earnestness, that they be hanged out of their misery[.]"[8] Similar results were had in Britain: the "rigid system of perfect order and perfect silence" in operation at Pentonville prison in London resulted in "twenty times more cases of mental disease than in any other prison in the country."[9] In the Netherlands, solitary confinement fared no better: "[a]gain and again reports of insanity, suicide, and the complete alienation of prisoners from social life seriously discredited the new form of punishment."[10] Prison reformers in Auburn, New York, who implemented their own "rigid system," encountered similar failures. The account of Beaumont and Tocqueville, who traveled to the prison as observers, was especially damning:

---

1. Christine Rebman, *The Eighth Amendment and Solitary Confinement: The Gap in Protection from Psychological Consequences*, 49 DePaul L. Rev. 567, 574 (1999).
2. *See* In re Medley, 134 U.S. 160, 168 (1890) (describing conditions in a Philadelphia Penitentiary circa 1787).
3. *Id.*
4. *See* Sharon Shalev, A Sourcebook on Solitary Confinement 2 (2008); *see, e.g.,* Craig Haney & Mona Lynch, *Regulating Prisoners of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 481—82 (1997).
5. Haney & Lynch, *supra* note 4, at 482.
6. *Id.*
7. *Id.* at 483. Haney & Lynch also note that "[e]arly modern judges had fewer scruples about meting out physical punishments, but they found solitary confinement an unbearable torment." *Id.* at 482 (quoting Dario Melossi & Massimo Pavarini, The Prison and the Factory: Origins of the Penitentiary System 150 (Glynis Cousin trans., Barnes & Noble Books) (1981)).
8. *Id.*
9. *Id.* at 481; *see, e.g.,* Martha Grace Duncan, *In Slime and Darkness: The Metaphor of Filth in Criminal Justice*, 68 Tul. L. Rev., 725, 788 (1994); Christopher Hibbert, The Roots of Evil: A Social History of Crime and Punishment 160 (1963).
10. Haney & Lynch, *supra* note 4, at 482 (quoting Herman Franke, *The Rise and Decline of Solitary Confinement: Socio-Historical Explanations of Long-term Penal Changes*, 32 Brit. J. Criminology 125, 128 (1992)).

This experiment, of which the favourable results had been anticipated, proved fatal for the majority of prisoners. It devours the victim incessantly and unmercifully; it does not reform, it kills. The unfortunate creatures submitted to this experiment wasted away. . . .[11]

Additionally, Charles Dickens, in 1842, described conditions of prisoners under solitary confinement in Pennsylvania: "[T]here is a depth of terrible endurance in it which none but the sufferers themselves can fathom . . . this slow and daily tampering with the mysteries of the brain [is] immeasurably worse than any torture of the body."[12] The nearly universal consensus of observers that solitary confinement was both inhumane and ineffective as a corrections tool led to its general abandonment in America for at least a century.[13] Only recently has it begun to come into regular use again as a tool for managing prison populations.[14]

Despite the seemingly unqualified failure of solitary confinement as a correctional tool during the 18th and 19th century, it nonetheless remains a common practice in America today.  The birth of the "supermax" prison, a correctional facility that utilizes the highest level of custodial restriction available in modern prisons, is perhaps the most relevant factor explaining solitary confinement's continued use in America.

The first modern supermax prison might be said to have "occurred" at a federal penitentiary in Marion, Illinois in 1983.[15] That year, an isolation wing of the penitentiary erupted into violence after an inmate managed to obtain a weapon and killed a correctional officer.[16]  Upon quelling the violence, prison administrators confined prisoners to their cell for twenty-three hours a day.[17] Inmates were served food in their cells, and were subject to "strict security measures."[18] Thereafter, supermax facilities began popping up in various states. As of 1999, thirty-four states either "had a supermax facility or were in the process of building one."[19]  Currently, there are at least 25,000 inmates in supermax facilities in the United States, with upwards of 80,000 being held in some form of segregated isolation.[20]

Supermax confinement is sometimes referred to by the acronym "SHU," which stands in most cases for Secure Housing Unit, or Security Housing Unit.[21]  One commentator defined a supermax prison as follows:

> [A] highly restrictive, high-custody housing unit within a secure facility, or an entire secure facility, that isolates inmates from the general prison population and from each other due to grievous crimes, repetitive assaultive or violent institutional behavior, the threat of escape or actual escape from high-custody facility(s), or inciting or threatening to incite disturbances in a correctional institution" ... It is assumed that such a facility would be operated with the majority of services and programs provided at cell front, that move-

---

11.  Haney & Lynch, *supra* note 4, at 483. Another commenter observed that the prison reforms at Auburn, New York were a "hopeless failure that led to a marked prevalence of sickness and insanity on the part of the convicts in solitary confinement." *Id.* at 484.

12.  New York City Bar Assoc., Comm. on Int'l Human Rights, Supermax Confinement in U.S. Prisons 6 (2011) (hereafter 'NYCBA Comm.').

13.  *Id.*

14.  *Id.; see also* discussion *infra* at 3.

15.  H. Daniel Butler et al., *Supermax Prisons: Another Chapter in the Constitutionality of the Incarceration Conundrum*, 9 Rutgers J.L. & Pub. Pol'y, 1, 25 (2012).

16.  *Id.* at 25.

17.  *Id.*

18.  *Id.*

19.  *Id.* at 27.

20.  NYCBA Comm., *supra* note 12, at 3, note 7; Atul Gawande, *Hellhole*, New Yorker (March 30, 2009), http://www.newyorker.com/reporting/2009/03/30/090330fa_fact_gawande.

21.  *Cf.* David C. Fathi, *The Common Law of Supermax Litigation*, 24 Pace L. Rev. 675, 675 (2004); Butler et al., *supra* note 15, at 30.

---

ment from the cell would be in restraints with multiple-officer escort, and that overall security would be the highest level available in an institution or the corrections system.[22]

A federal judge summarized conditions at a Wisconsin supermax thusly:

> Inmates on Level One at the State of Wisconsin's Supermax Correctional Institution in Boscobel, Wisconsin spend all but four hours a week confined to a cell. The "boxcar" style door on the cell is solid except for a shutter and a trap door that opens into the dead space of a vestibule through which a guard may transfer items to the inmate without interacting with him. The cells are illuminated 24 hours a day. Inmates receive no outdoor exercise. Their personal possessions are severely restricted: one religious text, one box of legal materials and 25 personal letters. They are permitted no clocks, radios, watches, cassette players or televisions. The temperature fluctuates wildly, reaching extremely high and low temperatures depending on the season. A video camera rather than a human eye monitors the inmate's movements. Visits other than with lawyers are conducted through video screens.[23]

The purpose of supermax confinement, then, is to reproduce the conditions that prison reformers sought to produce in the late 18th and early 19th century, but without the pretense of rehabilitating or "reforming" the prisoners. Today, supermax prisons exist chiefly for the ostensible purpose of isolating dangerous, problematic, or otherwise unmanageable inmates from the rest of the prison population. But extreme isolation and/or solitary confinement is different than prisoner separation, which has long been an accepted corrections practice. Corrections officials can separate and remove violent or vulnerable prisoners from the general prison population without subjecting them to the punishing physical and psychological deprivation of extreme isolation - a point of consensus among corrections officials in other states, legal scholars and international human rights bodies.

The question of why supermax facilities, as modern heirs to the isolation experiments of 18th and 19th century reformers, recently regained popularity is a subject of some debate; but many commentators have pointed to "mass incarceration" as one of the largest contributing factors to the renewed popularity of supermax prisons.[24] The United States, by far, incarcerates more of its own citizens than any other nation in the world.[25] As a result, prisons have become more crowded, and prison administrators with limited resources pursued harsh measures in an attempt to maintain control over the prison population.[26] At least one national survey of prison wardens showed that a majority of them believed supermax facilities increase "institutional safety, order and control."[27] However, the prison wardens acknowledged that "funding, correctional officer retention, and ensuring ethical behavior by prison staff" may inhibit the operation of supermax facilities.[28] The wardens also acknowledged that alternative means were available to deal with problematic inmates.[29]

---

22.   *Id.* (quoting Chase Riveland, U.S. Dep't of Justice, Supermax Prisons: Overview and General Considerations 5 (1999), *available at* http://nicic.org/pubs/1999/014937.pdf.

23.   Jones'El v. Berge, 164 F. Supp. 2d 1096, 1098 (W.D. Wis. 2001).

24    NYCBA Comm., *supra* note 12, at 7–9.

25    *Id.* at 8; *see, e.g.*, Adam Gopnik, *The Caging of America*, New Yorker (Jan. 30, 2012), http://www.newyorker.com/arts/critics/atlarge/2012/01/30/120130crat_atlarge_gopnik; American Civil Liberties Union, Mass Incarceration Problems 1 (2011), *available at* https://www.aclu.org/files/assets/massincarceration_problems.pdf.

26.   Haney & Lynch, *supra* note 4, at 480.

27.   Butler et al., *supra* note 15, at 27.

28.   *Id.* at 27–28.

29.   *Id.* at 28.

## B. Solitary Confinement in New York State

There are 60 state prisons in New York State that house approximately 56,000 prisoners.[30] There are solitary confinement cells, or what the Department of Corrections and Community Supervision refers to as "special housing units" or "SHUs" or as prisoners refer to it "the box," at all of these facilities but two of those facilities, Upstate, in Malone, NY and Southport, in Elmira, NY are entirely solitary confinement facilities.[31] Southport contains 789 SHU beds and Upstate has 1,040 beds. There are eight additional SHU buildings, referred to as SHU 200s because they each have 200 beds, located on the grounds of medium-security prisons. All SHU cells are single cells except for Upstate which was built to be a double-celled solitary confinement facility. Upstate, Southport and the SHU 200s were all built in the 1990s.

Currently there are approximately 4500 prisoners being held in solitary confinement in New York State's prisons."[32] Half of them are in single cells, the other half are in double cells. Single cell SHU's are generally 56 square feet.[33] Double celled SHU's are the size of a parking space.[34] SHU cells generally have solid steel doors or Plexiglas covered bars with a slot in the middle to push food through, a toilet and a cot. Double celled SHUs also have showers. Those prisoners in double cells have no privacy whatsoever even when it comes to using the toilet. All SHU prisoners are allowed one hour a day recreation which, for most, consists of exiting through a door in the back of the cell into another segregated secluded small cage. If a prisoner does leave his/her cell, he/she is typically restrained with handcuffs attached to a waist chain and leg shackles.[35] The Correctional Association of New York in its 2003 report entitled "Lockdown New York: Disciplinary Confinement in New York State Prisons," found that "[t]he enforced idleness and reduced environmental stimulation can last for months or years and lead to severe psychological debilitation."[36]

Prisoners' Legal Services of New York[37] (PLS), a state-wide agency created to provide legal representation and assistance to indigent prisoners regarding conditions of their confinement, often represents prisoners who are sentenced to periods of extreme isolation. A PLS client who has spent 6 and ½ years in solitary confinement describes solitary as follows: "[W]e are not allowed anything besides limited books and magazines. We are not allowed phone calls, or more than one visit a week. We are cuffed whenever we leave our cells, and are subjected to 3 small portions of food a day. We are only allowed one hour of outside recreation, which is similar to a cage at a zoo. We are not given any type of programs that may help us with our anger, drug, mental or behavior issues. We are simply placed in a cell, where we are subjected to extreme isolation for years. A place where we slowly deteriorate (some faster than others,) and become products of our environment. If the purpose of [solitary confinement] is to fix someone, then this purpose is defeated, because the only thing this environment breeds is hopelessness, depression, anger, loss of impulse control, anxiety, distorted thinking and mental illness. Spending years in extreme isolation and then being released back out to general population or society is similar to leaving a hungry dog in a cage and then releasing it. There is nothing beneficial or therapeutic regarding this confinement."   And yet, twenty-five thousand prisoners are released into our communities ever year and over 2000 of them are released directly into our communities from the

30.   http://www.doccs.ny.gov/
31.   New York Civil Liberties Union, *"Boxed In – The True Cost of Extreme Isolation in New York's Prisons"* p. 8. (Oct. 3, 2012) available at: http://www.nyclu.org/publications/report-boxed-true-cost-of-extreme-isolation-new-yorks-prisons-2012
32.   *Id.* at 1.
33.   The Correctional Association of New York, *"Mental health In The House of Corrections – A Study of Mental Health Care in New York State Prisons by the Correctional Association of New York"* p. 47 (June 2004).
34.   NYCLU *"Boxed In" supra* note 31, at p. 5.
35.   Correctional Association, *"Mental health In The House of Corrections" supra* note 33, at p. 47.
36.   Correctional Association, *"Lockdown New York: Disciplinary Confinement in New York State Prisons"* p. 2 (October 2003).
37.   PLS was founded in 1976 under the sponsorship of the New York State Bar Association in response to the 1971 devastating Attica riot, also referred to as "the bloodiest prison confrontation in U.S. history." The PLS founders sought to address one of the major reasons for the riot; the lack of access of prisoners to the courts and the almost complete absence of attorneys to present their complaints in a legal forum.

box without any transitional services, education or programming thus raising significant community health and safety issues.[38]

A person can end up in solitary confinement for disciplinary, prison security or even personal safety reasons.[39] Disturbingly, however, there is no limit on the amount of solitary confinement time that can be imposed and the length of isolation appears to be steadily increasing. In 1983, the average box SHU sentence was 2.5 months, it is now 5 months.[40] Over 2,782 incarcerated New Yorkers are currently serving more than a year in solitary confinement.[41] In speaking about solitary confinement at the New York State Bar Association Civil Rights Panel on Solitary Confinement in January 2012, DOCCS Commissioner Brian Fischer stated: "I'll be the first to admit – we overuse it."[42]

It is estimated that roughly 14% of those in isolation are on the NYS Office of Mental Health caseload, meaning that they have been diagnosed with a mental illness.[43] As noted in the NYCLU report, "the number of people in extreme isolation with mental health problems would likely be greater if DOCCS was not subject to an important limitation on who it can place in the SHU – prisoners diagnosed as "seriously mentally ill".[44] But there are many prisoners who suffer from mental illness but have slipped through the cracks and, as a result, have not yet been identified as suffering from a mental illness, and there are still others who have no history of mental illness prior to being placed in solitary confinement, but once there, begin to exhibit symptoms of mental illness. And yet, as was found in the NYCLU report, many of those prisoners are often neglected, ignored or labeled as manipulators.[45] In addition, the report noted that the provision of medical and mental health care to those in isolation is made even more difficult due to the lack of confidentiality and other barriers. When medical personnel come to the cells of prisoners who are being held in isolation, prisoners are required to talk to them through the steel door, within earshot of corrections personnel, and for those in double cells, their bunk mate.[46] Because of this, prisoners who need treatment, often fail to request it.

A short poem, written by a PLS client who has spent over 1200 days in solitary confinement highlights the mental deterioration and concomitant lack of rehabilitation caused by extreme isolation.

### FRACTURING

By Jeffrey B.

Haunted by specters of alternate selves
My mind begins to crumble.

Living on multiple planes of existence,
My thoughts fall to pieces.

Sitting on the ledge of the abyss,
My sanity shatters.

---

38. NYCLU "*Boxed In*" *supra* note 31, at p. 32.
39. See Title 7 New York Code, Rules & Regulations, Chapter VI.
40. NYCLU "*Boxed In*" *supra* note 31, at p. 21.
41. *Id.*
42. *Id.* at inside cover page.
43. *Id.* at p. 24.
44. *Id.* at p. 23. *See also,* infra, p 14 and *infra* note 95.
45. *Id.* at pp. 40–42.
46. *Id.*

Unable to distinguish fantasy from reality,
Shadows descend upon me.

Bear witness to my unraveling,
As the darkness I've brought forth consumes me.

In addition to those suffering from mental illness, juveniles and the elderly are also subjected to the same form of isolation as adult prisoners.[47] As far as juveniles are concerned, current scientific research suggests that juveniles lack the culpability of adults because they lack fully developed frontal lobes required for impulse control[48] and because their brain structure is fundamentally and significantly different from that of adults.[49] General principles of child development show that adolescents process thoughts, feelings and information in qualitatively different ways than adults and that they are psychologically very different from adults. Because juveniles lack a developed frontal lobe, they tend to process emotional decisions in the limbic system, the part of the brain responsible for instinctive (and often impulsive) reactions.[50] An adult's fully developed frontal lobe typically allows the adult to curb impulsive decisions coming from other parts of the brain such as the limbic system.[51] As such, normal juveniles cannot be expected to operate with the level of maturity, judgment, risk aversion or impulse control of an adult.[52] This is particularly true in stressful situations, where juvenile brain circuitry is not sufficiently established to sustain adult-level cognitive control of their behavior in the face of heightened states of affect or motivation.[53]

In the correctional setting, there is no harsher punishment than solitary confinement. Imposing solitary confinement on a child is particularly harsh. Because of how they experience time, juveniles subjectively perceive the duration of a sanction as lasting longer than an adult would experience a sanction of the same duration.[54] In practical terms, sentencing juveniles to prolonged isolation is harsher than an equivalent sentence is for an adult.

Moreover, from a developmental point of view, prolonged isolation is problematic because juveniles are undergoing developmentally important phases of life in an institutional setting with idiosyncratic demands particular to that setting.[55] Depriving them of normal developmental opportunities, such as social contact, physical exercise and intellectual stimulation for prolonged periods of time, will irreparably damage any prospect they may have for normal development.

Punishing a child whose brain is not fully developed by placing him in solitary confinement for any length of time clearly violates our contemporary standards of decency as evidenced by a plethora of data on child development. New York State has recognized the vulnerable stage of development of the adolescent by establishing standards for the treatment of juveniles in detention which include a prohibition on the use of solitary confinement in the discipline of children.[56] The American Correctional Association (ACA) standards for juvenile justice detention facilities limit the isolation of juveniles to a

---

47.   Id. at p. 22.
48.   David A. Arredondo, M.D., *Principles of Child Development and Juvenile Justice – Information for Decision-Makers*, Journal of the Center for Families, Children & the Courts, 2004, p. 129.
49.   Tracy Ritmer, *Arrested Development: Juvenile's Immature Brain's Make Them Less Culpable Than Adults*, 9 Quinnipiac Health L.J. 1, (2005) p. 4.
50.   Arrendondo *supra* note 48, at p.129.
51.   Ritmer *supra* note 49, at p.24.
52.   Id. at p.23.
53.   Id. at p.27.
54.   Arredondo *supra* note 48, at p.131.
55.   Id. at p.132.
56.   Title 9 New York Code Rules, Regulations §180.9(c )(10)(iii), Discipline of Children.

maximum of five days. These prohibitions and limits are in place because both New York lawmakers and the major national correctional organization in the U.S. recognize the unique physical and developmental status of juveniles and their concurrent needs.

In addition, the U.S. Department of Justice, Chief of the Special Litigation Section, Civil Rights Division has remarked that "the wholesale adoption of many adult practices without taking adequate account of the relevant differences between adults and adolescents, has often resulted in operational difficulties and violations of juvenile's federal rights. The use of extended isolation as a method of behavior control, for example, is an import from the adult system that has proven both harmful and counterproductive when applied to juveniles. It too often leads to increased incidents of depression and self-mutilation among isolated juveniles, while also exacerbating their behavior problems."[57]

But in New York State, juveniles can be sent to state prison and the regulations that apply to juvenile facilities will not apply to them while they are there. As of December 2010, there were 689 individuals in DOCCS custody between the ages of 16-18 and 2,064 between the ages of 19 and 20. Any of those individuals can be placed in prolonged isolation.

Those with substance dependency are also all routinely sentenced to extreme isolation.[58] Instead of providing treatment, New York turns to punishment. In a March 2009 report entitled "Barred From Treatment" Human Rights Watch found that while three out of four prisoners are in need of substance abuse treatment, DOCCS fails to ensure access to such treatment but instead pursues "a program of harsh punishment for drug use that bars prisoners from treatment as part of the disciplinary sanction."[59] The report found that:

> [P]unishment for drug use in the New York State prisons is severe and out of proportion to the seriousness of the offense. Thousands of New York State prisoners, many of them struggling with addiction, are sentenced to "the box"—a disciplinary sanction that removes them from the general population, restricts many activities of daily life, and where they have no access to drug dependence treatment. In New York State prisons, drug users are locked in "the box" for months, even years, barred from treatment. New York's severe punishment of drug use in prison, while delaying or denying access to treatment and harm reduction services, violates prisoners' right to health and the right to be free from cruel and inhuman treatment under international law.[60]

The NYCLU report highlights the lack of programming and treatment to address the underlying misbehavior[61] along with other disturbing facts regarding the use of solitary confinement in NYS prisons such as: "the lack of mandatory standards and little detailed guidance" on the type of rule infraction that can result in a sentence of solitary confinement;[62] the bias that can corrupt the disciplinary process;[63] the inconsistency in "box hits" penalties;[64] the difficulty in getting out of solitary confinement once you get in;[65] and the racial disparity that results in a disproportionate number of black prisoners in SHU resulting in a concurrent rise in racial tension in isolation settings.[66] While blacks represent about

---

57. Remarks of Steven H. Rosenbaum, Chief, Special Litigation Unit, Civil Rights Division, United States Department of Justice, before the Fourteenth Annual National Juvenile Corrections and Detention Forum at Long Beach , California, May 16, 1999.
58. *Id.* at pp. 22-24.
59. Human Rights Watch, *"Barred From Treatment - Punishment of Drug Users in New York State Prisons"* March 2009, p. 1.
60. *Id.* at p. 2
61. NYCLU, *"Boxed In" supra* note 31, at p. 21.
62. *Id.* at p. 18.
63. *Id.* at p. 19.
64. *Id.* at p. 20.
65. *Id.* at p. 22.
66. *Id.* at p. 24-25.

14 percent of the state's population, they account for nearly 50 percent of the prison population and 59 percent of the population in extreme isolation.[67] A similar disturbing statistic exists for Latino prisoners. While Latino's account for 17.6% of the New York State's population, they represent 24.6% of the general prison population and 24.7% of those held in extreme isolation.

Comparing these figures with those of whites who make up for 58.3% of New York State's population, 23.3% of the general prison population and only 14.6% of the extreme isolation population helps to explain the racial tension that exists in extreme isolation, but another statistic in this area is just as important: the disparity between the racial make-up of prisoners in solitary confinement and the staff who guard them.[68]  At Southport (a maximum security facility opened in 1998 dedicated solely to solitary confinement) and Upstate (a maximum security facility opened in late 1990s with only double-celled solitary confinement cells) Correctional Facilities, the staff is approximately 80% white and the prisoner population is about 12 percent white.[69] Black prisoners there report the use of "virulent racial epithets by corrections staff . . . [with] [s]everal Southport prisoners report[ing] that staff use the prison's internal public address system to broadcast racially charged insults or jokes." [70]

The majority of responses to the NYCLU report have been widespread and extremely supportive with the expressed hope by almost all who commented on it that the report would spur lawmakers in New York State and the DOCCS to severely limit the use of solitary confinement in New York's prisons.[71] While, as stated earlier, the Commissioner of DOCCS, Brian Fischer, has admitted to the overuse of solitary confinement by DOCCS[72] he does not agree that it is "arbitrary, inhumane and unsafe."[73] In a statement released on the same day as the NYCLU report, Commissioner Fischer asserted that those held in solitary confinement "see and interact with numerous facility staff who provide services . . . including: medical, mental health, religious counseling, education and person hygiene." [74]  In further defending the use of solitary confinement, Commissioner stated:

> As society removes those individuals who commit crimes, so too must we remove from general population inmates who violate the Department's code of conduct and who threaten the safety and security of our facilities. . . .
>
> It is our duty to protect those in our custody, as well as our employees. If we fail to protect everyone in our facilities, we fail to maintain the task that has been placed in our trust. The use of disciplinary segregation is important to the overall well-being of any of our prisons.[75]

---

67.  *Id.*
68.  *Id.* at p. 25.
69.  *Id.*
70.  *Id.*
71.  Casella & Ridgeway, *Unlock The Box: The Fight Against Solitary Confinement in New York,* THE NATION (Oct. 2, 2012) http://www.thenation.com/article/170276/unlock-box-fight-against-solitary-confinement-new-york# (noting that the release of the NYCLU report on solitary confinement in New York should provide a powerful boost to those concerned about the use of solitary confinement in our New York State prisons); NEWSDAY editorial, *NY Right to Review Solitary Confinement* (Oct. 16, 2012, 7:43 PM) http://www.newsday.com/opinion/editorial-ny-right-to-review-solitary-confinement-1.4122694 (the NYCLU report "makes a persuasive argument that it's time for the state to examine the costs and consequences of excessive use of extreme isolation as a disciplinary tool.") Mosi Secret, *Prisoners Letters Offer a Window Into Lives Spent Alone in Tiny Cells,* NEW YORK TIMES (Oct. 1, 2012) *http://www.nytimes.com/2012/10/02/nyregion/prisoner-letters-offer-glimpses-of-life-in-solitary-confinement.html* (providing an overview of "[l]etters written by New York State prisoners and sent to the New York Civil Liberties Union over several months vividly detail[ing] the psychological effects of long-term solitary confinement.")
72.  NYCLU, *"Boxed In" supra* note 31,  at inside cover.
73.  http://polhudson.lohudblogs.com/2012/10/02/corrections-department-responds-to-nyclu-report/
74.  *Id.*
75.  *Id.*

That being said, Commissioner Fischer acknowledged "the need to constantly review our policies to determine if what we're doing is effective and beneficial to everyone."[76] Along those lines, Commissioner Fischer disclosed that in September 2012, DOCCS created a SHU task force whose responsibility it is to review DOCCS's solitary confinement policies and provide recommendations "based upon sound penological principles, as well as practical experience, that will further the goal of ensuring a safe and humane correctional setting while enabling offenders to better themselves during their incarceration to increase the chances of them leading law abiding lives upon their release into the community."[77]

Hopefully the DOCCS's SHU task force will quickly come to the same conclusion that has been reached by numerous other states who have recently reviewed their use of solitary confinement and determined that loosening restrictions, rather than tightening them, results in improved behavior and rehabilitation and thus actually increases prison safety.[78] As a result of such findings, states such as Mississippi,[79] Colorado,[80] Illinois,[81] Maine,[82] Ohio[83] and Washington[84] have either significantly decreased or completely abandoned the use of solitary confinement without any negative consequences in terms of prison safety. (See pp. 19-21 Infra).

## C. Long Term Solitary Confinement Frequently and Predictably Results in Psychological and Physical Damage, both temporary and permanent, to the Individual Being Confined

The injury done to human beings by subjecting them to solitary confinement has been well documented across multiple forums. Aside from the historical accounts heretofore cited, courts of law, legal scholars, medical commentators, and independent observers have documented the wide range of deleterious effects that solitary confinement can have on the confined individual. "Just about everyone who has taken a serious look at long-term isolated confinement (as in supermaximum security or long-term administrative segregation) has concluded there is serious harm from long-term isolated confinement."[85] Craig Haney, a renowned expert in the area of the effects of solitary confinement on one's mental health has noted that:

> [T]here is not a single published study of solitary or supermax-like confinement in which nonvoluntary confinement lasting for longer than 10 days, where participants were unable to terminate their isolation at will, that failed to result in negative psychological effects. The damaging effects ranged in severity and included such clinically significant symptoms as hypertension, uncontrollable anger, hallucinations, emotional breakdowns, chronic depression, and suicidal thoughts and behavior.[86]

76. *Id.*
77. *Id.*
78. Erica Goode, *Rethinking Solitary confinement*, N.Y TIMES, Mar. 11, 2012, at A1. This article is available online under the title, "*Prisons Rethink Isolation, Saving Money lives and Sanity*," *available at* http://www.nytimes.com/2012/03/11/us/rethinking-solitary-confinement.html?pagewanted=all.
79. *Id.*
80. *Solitary Confinement Decreased by Hundreds in Colorado*, HUFFINGTON POST (June 5, 2012, 5:25 p.m.) http://www.huffingtonpost.com/2012/06/04/solitary-confinement-decr_n_1571919.html.
81. Goode, *supra* note 78.
82. The Crime Report, *Maine's Dramatic Reduction of Solitary Confinement* (July 20, 2011, 11:51 p.m.) http://www.thecrimereport.org/archive/2011-07-maines-dramatic-reduction-of-solitary-confinement.
83. Goode, *supra* note 78.
84. Axelis Krell, *Isolating Prisoners Less Common in Washington Than in Most Places*, THE NEWS TRIBUNE (July 10, 2012, 8:21 p.m.) http://www.the newstribune.com/2012/07/10/2210762/isolating-prisoners-less-common.html.
85. Stuart Grassian and Terry Kupers, *The Colorado Study vs. the Reality of Supermax Confinement*, CORRECTIONAL MENTAL HEALTH REPORT, Vol. 13, No. 1 (May/June 2011), at 1, 9.
86. Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQ. 124, 143 (Jan. 2003); *see, e.g.,* Butler et al., *supra* note 15, at 28–29 (quoting Haney).

Other afflictions include self-mutilation,[87] heightened neuroticism,[88] and dissociative episodes followed by amnesia.[89] A study published in April 2007 noted that almost all suicides that happen in state prison occur in single-unit isolation cells.[90] The study surveyed prisoners placed in "single-cell disciplinary housing" in New York State from 1993–2003. Over that period, thirty-two inmates in the single-cell disciplinary housing committed suicide.[91] The median time in confinement before inmates committed suicide was only sixty-three days.[92] The study also took note of a 1995 U.S. Department of Justice report, in which "[a] primary recommendation, based chiefly on overwhelming consistent research, [was] that isolation should be avoided whenever possible."[93]

The suicide issue cannot be overstated. "In 2010, twenty inmates committed suicide in state correctional facilities – twice the number of suicides that occurred in 2009 and the highest prison suicide rate since 1982. Eleven of these suicides were committed by inmates who had previously been diagnosed with a mental illness."[94] Although significant progress has been made over the last several years due to litigation and legislation that has limited DOCCS ability to place seriously mentally ill individuals in solitary confinement,[95] a special report on prison suicide rates in the Poughkeepsie Journal in April 2011 found that 33% of all prison suicides in New York State are committed by individuals who are in solitary confinement and less than 8% of the total prison population is in solitary confinement.[96]

It is difficult to convey the actual suffering that people placed in long term solitary confinement incur with sterile medical terminology and statistics. Anecdotes from individuals who have actually endured long term solitary confinement demonstrate just how profoundly injurious it can be and often is to those who are subjected to it. On March 30, 2009, The New Yorker published an article by Atul Gawande entitled, "Hellhole" where Gawande questioned whether solitary confinement is torture. In the article Gawande described the plight of Terry Anderson, a Chief Middle East Correspondent for

87. Rebman, *supra* note 1, at 577.
88. *Cf.* Gawande, *supra* note 20 (describing the solitary confinement experience of journalist Terri Anderson while in Lebanon) ("He observed himself becoming neurotically possessive about his little space, at times putting his life in jeopardy by flying into a rage if a guard happened to step on his bed.").
89. Rebman, *supra* note 1, at 577.
90. Bruce B. Way et al., *Inmate Suicide and Time Spent in Special Disciplinary Housing in New York State Prison*, 58 Psych. Serv's. 558 (2007), *available at* http://ps.psychiatryonline.org/data/Journals/PSS/3799/07ps558.pdf.
91. *Id.*
92. *Id.*
93. *Id.*
94. Assembly Sanding Committee on Correction & Assembly Standing Committee on Mental Health, Notice of Public Hearing, Dec. 6, 2011, http://assembly.state.ny.us/comm/Correct/20111031/.
95. Prisoners' Legal Services of New York (PLS) has worked on mental health issues for over thirty-five years and has been instrumental in improving the treatment of the mentally ill in our prisons. In the 1980s, PLS litigated a number of cases involving the issue of whether a prisoner's mental illness should be considered when imposing punishment for misconduct if that misconduct was a result of the prisoner's mental illness. In *Batthany v. Scully*, 139 Misc.2d 605 (Sup. Ct. Dutchess Co. 1988), we were successful in obtaining a court order holding that mental illness is evidence of mitigating circumstances and is "relevant in a prison disciplinary proceeding." That holding was made applicable to the entire State in 1990, when PLS brought the case *Huggins v. Coughlin*, 76 N.Y.2d 904 (1990), in which the Court of Appeals held that "...in the context of a prison disciplinary proceeding in which the prisoner's mental state is at issue, a Hearing Officer is required to consider evidence regarding the prisoner's mental condition." In *Eng v. Goord*, 80 CV 385S (W.D.N.Y.), we challenged the lack of adequate mental health treatment for prisoners in solitary confinement and the settlement in this case resulted in New York's first SHU treatment program, the Special Treatment Program ("STP"). In *Anderson v. Goord*, 87 CV 141 (N.D.N.Y.), PLS and the Prisoners' Rights Project (PRP) of The Legal Aid Society joined in litigating the issue of what relevance an inmate's mental condition should have in a prison disciplinary hearing. As a result, DOCCS agreed to amend its regulations governing when mental health must be considered and what a hearing officer must do if mental health is an issue at a disciplinary hearing. In 2002, PLS, together with PRP, Disabilities Advocates, Inc. (DAI) and the law firm of Davis, Polk, filed the case of *Disability Advocates, Inc. v. New York State Office of Mental Health*, S.D.N.Y. 02-CV-4002 (Lynch, J.), on behalf of prisoners with mental illness in New York. The lawsuit alleged that such prisoners are denied adequate mental health care, harshly punished for the symptoms of their mental illnesses and frequently confined under conditions amounting to cruel and unusual punishment. As a result, the suit charged, the mental health of mentally ill prisoners routinely deteriorates, sometimes to the point that the prisoners engage in self-mutilation or suicide. A private settlement agreement was reached in this case that included, *inter alia*, using diagnostic criteria to define serious mental illness (SMI), adding hundreds of treatment beds, offering the possibility of time cuts to SMI prisoners in long-term SHU or keeplock, and placing limits on the types of misconduct for which SMI prisoners may be punished.
96. Mary Beth Pfeiffer, *Special Report: Prison Suicides Rates Rise; Solitary Confinement Adds to Risk*, POUGHKEEPSIE JOURNAL (April 11, 2011, 11:49 a.m.) http://www.poughkeepsiejournal.com/article/20101017/NEWS01/112030002/SPECIAL-REPORT-Prison-suicide-rates-rise-solitary-confinement-adds-risk'

the Associated Press who was captured in March of 1985 in Beirut, Lebanon.[97] Anderson's experience demonstrates with vivid, descriptive clarity the lasting and unrelenting suffering that individuals in long term solitary confinement must cope with. Gawande describes Anderson's experience:

> [Anderson] was despondent and depressed…with time, he began to feel something more. He felt himself disintegrating. It was as if his brain were grinding down. A month into his confinement, he recalled in his memoir, "The mind is a blank. Jesus, I always thought I was smart. Where are all the things I learned, the books I read, the poems I memorized? There's nothing there, just a formless, gray-black misery. My mind's gone dead. God, help me."
>
> He was stiff from lying in bed day and night, yet tired all the time. He dozed off and on constantly, sleeping twelve hours a day. He craved activity of almost any kind. He would watch the daylight wax and wane on the ceiling, or roaches creep slowly up the wall. He had a Bible and tried to read, but he often found that he lacked the concentration to do so. He observed himself becoming neurotically possessive about his little space, at times putting his life in jeopardy by flying into a rage if a guard happened to step on his bed…[98]

Anderson was removed from solitary confinement for a brief time, only to find himself returned in September, 1986:

> In September, 1986, after several months of sharing a cell with another hostage, Anderson was, for no apparent reason, returned to solitary confinement, this time in a six-by-six-foot cell, with no windows, and light from only a flickering fluorescent lamp in an outside corridor. The guards refused to say how long he would be there. After a few weeks, he felt his mind slipping away again. . ."I find myself trembling sometimes for no reason," he wrote. "I'm afraid I'm beginning to lose my mind, to lose control completely."
>
> One day, three years into his ordeal, he snapped. He walked over to a wall and began beating his forehead against it, dozens of times. His head was smashed and bleeding before the guards were able to stop him.[99]

Gawande also wrote of then-Presidential hopeful John McCain's experience in solitary confinement as a prisoner of war in Vietnam where he spent five and a half years in isolation in a fifteen-by-fifteen-foot cell. McCain stated: "It's an awful thing, solitary . . . . [i]t crushes your spirit and weakens your resistance more effectively than any other form of mistreatment." Gawande commented saying, "And this comes from a man who was beaten regularly; denied adequate medical treatment for two broken arms, a broken leg, and chronic dysentery; and tortured to the point of having an arm broken again. A U.S. military study of almost a hundred and fifty naval aviators returned from imprisonment in Vietnam, many of whom were treated even worse than McCain, reported that they found social isolation to be as torturous and agonizing as any physical abuse they suffered."[100]

Another more recent account from a New York inmate confined to SHU housing is telling:

> I've been in the S.H.U. for over 6 1/2 years where I've been locked in a cell for 23 to 24 hour[s] a day 7 days a week. In March of 2002 I had a mental breakdown because of being in S.H.U. and I attempted suicide by swallowing 150 pills. I was saved and sent to Central

---

97. Gawande, *supra* note 20.
98. *Id.*
99. *Id.*
100. *Id.*

New York Psychiatric Center for treatment where I stayed for about 7 weeks. I was then discharged and sent to Wende Correctional Facility…

Upon my arrival at Wende I was put in an observation cell in the mental health unit where I was kept for 25 days in a strip cell. I was mistreated and denied everything. There was no heat in the place. I was put in a dirty, bloody cell. I was jumped and assaulted by correctional officers, and was left unattended to by the mental health staff. In the time I was there I continually requested to be sent back to CNYPC for further treatment because I went into a relapses [sic] and could not bare [sic] being locked in a cell 24/7 again. Instead the mental health staff took me off my mental health anti-depression medication and told me that they was not going to send me back to CNYPC no matter what I did or said.

In the course of the 25 days I spent in M.H.U. I attempted suicide 3 times. Twice I was rushed to Erie County Medical Center for treatment and sent back to Wende where I was again placed in M.H.U. and left without any kind of further medical or mental health care. I told the head mental health staff that I can't stay locked in a cell 24/7 anymore and that if they sent me back to S.H.U. that I'll kill myself. They said I'll just have to do that and they sent me back to S.H.U. and I was taken to E.C.M.C. for treatment again and then sent back to Wende and put back in S.H.U.

Right now I don't know what more to do. I'm writing this letter in hopes that someone will do something about the way these people in the mental health department here treats people, after I'm gone because I simply cannot carry on no more like this[.] I hope that my death will bring about some good, if not at least I'll finally find some peace.[101]

The anecdotes, scholarly material, and medical evidence presented in this report are hardly exhaustive.[102] But in conjunction with the historical accounts previously cited in this report, they paint a stark, consistent picture of solitary confinement as a frequent and predictable cause of significant, often severe psychological injury and suffering on the part of individuals so confined.

## D. Long Term Solitary Confinement is Contrary to Human Dignity and Has Been Largely Abandoned by the International Community

The Supreme Court of the United States has yet to speak with a firm voice on the constitutional boundaries of solitary confinement. However, there is currently consensus around the idea that seriously mentally ill prisoners may not be placed in solitary confinement. As of 2004, "every federal court to consider the question has held that supermax confinement of the seriously mentally ill is unconstitutional."[103] Federal courts have also held that the psychological harm visited upon prisoners in solitary confinement is no less cruel and unusual than 'conventional' physical torture. The United States District Court for the Southern District of Texas articulated the seriousness of psychological deprivation more than a decade ago:

---

101. NEW YORK STATE BAR ASSOC. COMM. ON CIVIL RIGHTS, ANNUAL MEETING, PROGRAM MATERIALS (Jan. 2012), at 82 (re-printing a letter from inmate "C.X.," written July 28, 2002) (hereafter "NYSBA COMM.").
102. The American Civil Liberties Union has an excellent resource page on its website, including state-specific materials. *See Stop Solitary – The Dangerous Overuse of Solitary Confinement in the United States* (last visited Mar. 15, 2012), https://www.aclu.org/stop-solitary-dangerous-overuse-solitary-confinement-united-states; *see also* SOLITARYWATCH.COM, *Voices from Solitary* (last visited Mar. 15, 2012), http://solitarywatch.com/solitary-voices/.
103. Fathi, *supra* note 21, at 676.

As the pain and suffering caused by a cat-o'-nine-tails lashing an inmate's back are cruel and unusual punishment by today's standards of humanity and decency, the pain and suffering caused by extreme levels of psychological deprivation are *equally, if not more, cruel and unusual*. The wounds and resulting scars, while less tangible, are no less painful and permanent when they are inflicted on the human psyche.[104]

The United States District Court for the Northern District of California, describing the conditions of inmates housed at Pelican Bay State Prison in California, noted in *Madrid v. Gomez* that:

[D]ry words on paper cannot adequately capture the senseless suffering and sometimes wretched misery that defendants' unconstitutional practices leave in their wake. The anguish of descending into serious mental illness, the pain of physical abuse, or the torment of having serious medical needs that simply go unmet is profoundly difficult, if not impossible, to fully fathom, no matter how long or detailed the trial record may be.[105]

While the *Madrid* court did not hold that solitary confinement violated the Eighth Amendment *per se*,[106] the court did hold that it was cruel and unusual for inmates with serious mental illnesses to be placed in solitary confinement.[107] The court also qualified its holding by noting that the conditions in the SHU at Pelican Bay State Prison "may well hover on the edge of what is humanly tolerable for those with normal resilience[.]"[108] The *Madrid* court's assessment of the law is typical of the current trend in federal courts that have considered the issue.[109]

While federal courts in America have been reluctant to declare that supermax confinement constitutes cruel and unusual punishment *per se*, the international community has not been as modest. Article Seven of the International Covenant on Civil and Political Rights (ICCPR), ratified by the U.S. in 1992,[110] prohibits "cruel, inhumane, or degrading treatment or punishment."[111] Article Ten states that "all persons deprived of their liberties shall be treated with humanity and with respect for the inherent dignity of the human person," and that "[t]he penitentiary system shall comprise treatment of prisoners the essential aim of which shall be their *reformation and social rehabilitation*."[112] The Convention Against Torture and Other Cruel, Inhumane or Degrading Treatment or Punishment (CAT), ratified by the United States in 1990,[113] defines torture as:

An act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . punishing him for an act he or a third person committed or is suspected of having committed or intimidating or coercing him or a third person . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.[114]

104. *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 914 (S.D. Tex. 1999).
105. *Madrid v. Gomez*, 899 F. Supp. 1146, 1280 (N.D. Cal. 1995).
106. *Id.*
107. *Id.* at 1265.
108. *Id.* at 1280.
109. *See* NYCBA COMM., *supra* note 12, at 2 ("Courts in recent years have largely deferred to prison administrators with regard to the implementation and expansion of supermax confinement, stretching the limits of constitutionality so that supermax is largely immunized from judicial review. Indeed, as long as a prisoner receives adequate food and shelter, the extreme sensory deprivation that characterizes supermax confinement will, under current case law, almost always be considered within the bounds of permissible treatment.")
110. 138 Cong. Rec. S4781-01 (daily ed., Apr. 2, 1992).
111. *See* International Covenant on Civil and Political Rights (ICCPR), art. 7, Dec. 16, 1966, 999 U.N.T.S. 171.
112. ICCPR, art. 10(3) (emphasis added).
113. *See* NYCBA COMM., *supra* note 12, at 18.
114. Convention Against Torture [and Other Cruel, Inhumane or Degrading Treatment or Punishment], art. 1, Dec. 10, 1984, 1465 U.N.T.S. 85.

In May of 2000, the U.N. Committee against Torture issued a report expressing concern over "[t]he excessively harsh regime of the 'supermaximum' prisons" in the United States."[115] In 2008, United Nations Special Rapporteur to the Human Rights Council on torture, Juan E. Mendez noted that "the use of prolonged solitary confinement may amount to a breach of article seven of the International Covenant on Civil and Political Rights,"[116] and that it "should be strictly and specifically regulated by law."[117] On October 18, 2011, the U.N. Special Rapporteur called on all countries to ban the use of solitary confinement of prisoners except in very exceptional circumstances and for as short a time as possible. Noting that such confinement can amount to torture when used as punishment, or for an indefinite or prolonged period of time because of the severe mental pain or suffering it may cause, the Special Rapporteur recommended that solitary confinement in excess of 15 days should be completed prohibited.

In Europe, solitary confinement has rarely been used since a 1982 decision from the European Commission stated that "[c]omplete sensory isolation coupled with total social isolation, can destroy the personality and constitutes a form of treatment which cannot be justified by the requirements of security or any other reason."[118] Conditions at supermax facilities in the United States have also allowed prisoners to successfully resist extradition to the United States from foreign nations.[119] Unfortunately, international treaties, most notably the ICCPR and CAT, have had little effect on prison litigation in the United States, in light of reservations adopted by the United States upon ratifying both treaties.[120]

Legal organizations in America have also begun to adopt stances critical of solitary confinement and supermax facilities. In 2011, the New York City Bar Association Committee on International Human Rights (NYCBA), whose work has been cited in multiple areas of this report, recognized that the state of the law is increasingly critical of solitary confinement, and took a strong stance against it:

> The policy of supermax confinement, on the scale which it is currently being implemented in the United States, violates basic human rights. We believe that in many cases supermax confinement constitutes torture under international law according to international jurisprudence...[t]he time has come to critically review and reform the widespread practice of supermax confinement.[121]

The authors of the NYCBA report took note of the Constitutional dimensions as well:

> Although the Constitution "does not mandate comfortable prisons," it does require humane prisons that comport with the Eighth Amendment's prohibition against punishments that are "incompatible with 'the evolving standards of decency that mark the progress of a maturing society" or which "involve the unnecessary and wanton infliction of pain."[122]

115. U.N. Comm. against Torture, *Report of the Committee against Torture*, Supp. No. 44, U.N. Doc. A/55/44, May, 2000, at 32, *available at* http://www.un.org/documents/ga/docs/55/a5544.pdf.
116. *See* NYCBA COMM., *supra* note 12, at 18.
117. *Id.*
118. *Id.* at 20 (quoting Krocher v. Switzerland, 34 Eur. Comm'n H.R. Dec. & Rep. 24, 53, P 62 (1982); *see, e.g.,* Elizabeth Vasiliades, *Solitary Confinement and International Human Rights: Why the U.S. Prison System Fails*, 21 AM. U. INT'L L. REV. 71, 93–94 (2005).
119. NYCBA COMM., *supra* note 12, at 20–21 ("In the 1989...the European Court refused extradition to the United States based on the extreme psychological effects of confinement on death row. . . . The European Court is also considering whether supermax conditions in US prisons violate Article 3 of the European Convention, which prohibits the extradition to a state where the prisoner is at risk of inhuman and degrading treatment. Babar Ahmad, a British citizen, and three others, were indicted in the US on terrorism charges. The Court blocked the extraditions and as of July 2011 was considering whether the defendants' post-trial confinement to the federal supermax prison amounts to a violation of Article 3 of the European Convention.") (internal citations omitted).
120. *Id.* at 19.
121. *Id.* at 2 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981); *Estelle v. Gamble*, 429 U.S. 97 (1976) (internal citations omitted)).
122. *Id.* at 5.

Other professional organizations, as well as numerous advocacy groups, both secular and religious, have followed suit.[123] Meanwhile, public opinion on the issue of solitary confinement has become decidedly negative, with numerous commentators from various backgrounds speaking out against it with greater frequency in recent years.[124] In June, 2012, this chorus of disapproval culminated in a hearing before the Senate Judiciary Subcommittee on the Constitution, Civil Rights and Human Rights regarding the use of solitary confinement in our prisons.[125] Although many had voiced concern about our nation's use of prolonged solitary confinement prior to the Senate Judiciary hearing, the testimony submitted by the 100 plus people and organizations at that hearing helped bring the issue to light nationally.[126]

The testimony from these individuals and groups, together with hundreds of published articles on the issue and the international law regarding the use of solitary confinement, as well as the customs of other civilized nations, make a compelling case that long term solitary confinement no longer falls within the ambit of "evolving standards of human decency that mark the progress of a maturing society."[127] Furthermore, it is becoming increasingly clear that long term solitary confinement is not only unnecessary, but counterproductive as a means of maintaining institutional protection, discipline and safety in correctional facilities (as laid out in Part C of this report). As such, the continued use thereof constitutes an "unnecessary and wanton infliction of pain," which ought to be rejected, both in law and morality.

## E. Long Term Solitary Confinement is Counterproductive to the Goals of Prisoner Protection, Discipline, Rehabilitation, and Reintegration, Which Can Be Achieved Through Other Means

The most common reason that prisoners are placed in solitary confinement is to remove them from the rest of the prison population for discipline or protection. Regardless of the reason, however, the deleterious effects of solitary confinement are the same and it is becoming increasingly clear that certain barriers must be drawn, and certain amenities must be provided, in some minimally decent com-

123.  *See, e.g.*, Nat'l Commc'n Assoc., Resolution Regarding Extended Solitary Confinement and Torture, Nov. 2010, *available at* http://www.natcom. org/uploadedFiles/About_NCA/Leadership_and_Governance/Public_Policy_Platform/PDF-PolicyPlatform-Resolution_Regarding_Extended_Solitary_Confinement_and_Torture.pdf; NAT'L RELIGIOUS CAMPAIGN AGAINST TORTURE (NRCAT), *Statement Against Prolonged Solitary Confinement* (last visited Mar. 15, 2012), http://www.nrcat.org/index.php?option=com_content&task=view&id=546&Itemid=396; Tanya Greene, *ACLU To United Nations: Solitary Confinement Violates Human Rights*, AMERICAN CIVIL LIBERTIES UNION (Mar. 5, 2012), http://www.aclu.org/blog/prisoners-rights/aclu-united-nations-solitary-confinement-violates-human-rights.
124  In addition to works already cited, *see, e.g.*, Locke Bowman, *Gov. Quinn's Proposal to Close Tamms Supermax Prison Got It Right*, HUFFINGTON POST (Mar. 13, 2012, 4:28 PM), http://www.huffingtonpost.com/locke-bowman/gov-quinns-tamms-supermax-prison_b_1342135.html (condemning conditions at Tamms Prison in Illinois); Bill Quigley, *Bradley Manning, Solitary Confinement, and Occupy 4 Prisoners*, HUFFINGTON POST (Feb. 23, 2012, 3:43 PM), http://www.huffingtonpost.com/bill-quigley/bradley-manning-solitary-_b_1296141.html (referring to solitary confinement of Bradley Manning as "torture"); James Ridgeway, *Bradley Manning's Tortuous Treatment Met by Growing Resistance*, MOTHER JONES (Mar. 18, 2011, 9:02 AM), http://motherjones.com/mojo/2011/03/bradley-mannings-solitary-confinement-meets-growing-resistance (describing protests against Bradley Manning's conditions of confinement); Susan Greene, *The Gray Box: An Investigative Look at Solitary Confinement*, DART SOCIETY (Jan. 24, 2012, 9:53 PM), http://www.dartsocietyreports.org/cms/2012/01/the-gray-box-an-original-investigation/; *The Abuse of Private Manning*, N.Y. TIMES (Mar. 14, 2011), http://www.nytimes.com/2011/03/15/opinion/15tue3.html?_r=1; Stephen F. Eisenman, *The Resistable Rise and Predictable Fall of the U.S. Supermax*, MONTHLY REVIEW (Nov. 2009), http://monthlyreview.org/2009/11/01/the-resistable-rise-and-predictable-fall-of-the-u-s-supermax (noting that some prisoners intentionally hurt themselves in order to be taken out of their isolation cells); Joseph B. Allen, *Applying Graham v. Florida to Supermax Prisons*, 20 WM. & MARY BILL RTS. J. 217 (2011) (seeking to expand the scope of the Eighth Amendment protection offered to prisoners in solitary confinement); Kiilu Nyasha, *America's Supermax Prisons do Torture*, OPEDNEWS.com (Nov. 22, 2009, 9:52 PM), http://www.opednews.com/articles/America-s-Supermax-Prisons-by-Kiilu-Nyasha-091122-501.html; *Supermax: A Clean Version of Hell*, CBS NEWS (Oct. 14, 2007), http://www.cbsnews.com/stories/2007/10/11/60minutes/main3357727.shtml?tag=contentMain;contentBody; Laura Sullivan, *As Populations Swell, Prisons Rethink Supermax*, NPR (July 27, 2006), http://www.npr.org/templates/story/story.php?storyId=5587644 (mentioning warden of Oregon State penitentiary); Maria Godoy, *Q&A: Solitary Confinement and Human Rights*, NPR (July 27, 2006), http://www.npr.org/templates/story/story.php?storyId=5586937 (interviewing Jamie Fellner of Human Rights Watch); Julia Dahl, *Is it Time to Ban Solitary Confinement?*, THE CRIME REPORT (Oct. 12, 2009), http://www.thecrimereport.org/archive/is-it-time-to-ban-solitary-confinement/#; Lance Tapley, *Torture in Maine's Prison*, Portland Phoenix (Nov. 11, 2005), http://www.portlandphoenix.com/features/top/ts_multi/documents/05081722.asp.
125.  http://www.judiciary.senate.gov/hearings/hearing.cfm?id=6517e7d97c06eac4ce9f60b09625ebe8
126.  http://solitarywatch.com/resources/testimony/
127.  *Gamble*, 429 U.S. at 102.

bination, in order to avoid inflicting harm on inmates that serves "no legitimate penological interest,"[128] and to avoid setting up a prison regime in which administrators inflict psychological harm on inmates that only makes them more erratic, more mentally unstable, and more dangerous to both themselves and others than they were prior to being segregated from the rest of the prison population.

These deleterious effects were long ago recognized by the Supreme Court of the United States as counter-productive from a corrections standpoint. In 1890, the Court recounted the profound psychological injury that manifested among prisoners who were substantially isolated and segregated from other human beings while in custody:

> The peculiarities of this system were the complete isolation of the prisoner from all human society, and his confinement in a cell of considerable size, so arranged that he had no direct intercourse with or sight of any human being, and no employment or instruction... experience demonstrated that...[a] considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; *while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.*[129]

The conditions of solitary confinement in today's prisons are not all that different from those that existed in 1890. Modern advances in technology, if anything, have only aggravated the conditions of solitary confinement by replacing *in personam* interactions with video-screen interactions.[130] This is problematic, in part, because not every prisoner who is subject to long term solitary confinement is serving a lengthy prison sentence. If these inmates are to be rehabilitated in any meaningful sense, subjecting them to conditions that may literally drive them crazy is in no one's best interest.

Although there is no national recidivism data on people who are released directly from solitary confinement to the community, there was one large study of a former prisoner in the state of Washington that indicates that the odds of successful rehabilitation in such circumstances are extremely poor:

> Researchers tracked rearrest rates among people released from prison in 1997 and 1998, a total of 8,000 former prisoners. Two hundred and forty-two of them had spent at least three continuous months in segregation, and most had been housed in segregation for much longer. Those who had been segregated were somewhat more likely than the others to commit new felonies. And among the repeat offenders, formerly segregated prisoners were much more likely to commit violent crimes. At first glance, this seems to make sense: People who are violent before being incarcerated, which is true of many but not all prisoners in segregation, may resume violent behavior after release. But an additional finding from the study throws that conclusion into doubt. People who were released *directly* from segregation had a much higher rate of recidivism than individuals who spent some time in the normal prison setting before returning to the community: 64 percent compared with 41 percent. That finding suggests a link between recidivism and the difficult living conditions in segregation, where good rehabilitative and transitional programming are less available.[131]

---

128  *Berge*, 164 F. Supp. 2d at 1117 (granting preliminary injunction to mentally ill inmates seeking relief from conditions of solitary confinement).
129  *Medley*, 134 U.S. at 168 (emphasis added).
130  *Berge*, 164 F. Supp. 2d at 1098 (noting that prisoners are monitored by video-camera rather than in person, and all other interactions take place through video screens).
131  Vera Institute, *From Solitary Confinement Straight to the Streets, available at:* http://www.vera.org/download?file=2845/Confronting_Confinement. pdf citing: Lovell & Johnson, *"Felony and Violent Recidivism Amount Supermax Prison Inmates in Washington State," available at:* http://www.son.washington. edu/faculty/fac-page-files/Lovell-SupermaxRecidivism-4-19-04.pdf.

When juxtaposed against the fact that over 2000 New York prisoners are released directly into our communities from solitary confinement annually[132], the projected 23% increase in recidivism for this population raises significant public safety issues.

In addition to making post-incarceration rehabilitation more difficult to achieve and thus increasing the threat to public safety, long term solitary confinement is also counter-productive from a standpoint of maintaining internal prison discipline and safety. The experience of Mississippi Commissioner of Corrections Christopher B. Epps demonstrates that locking prisoners down for extended periods often has the opposite effect it is intended to have. Among Commissioner Epps' charges, up until recently, was Unit 32, a supermax facility in Parchman, Mississippi.[133] As recently as 2007, conditions at Unit 32 were typical of a supermax facility:

> [Prison inmates were] kept in solitary confinement for up to 23 hours each day, allowed out only in shackles and escorted by guards, they were restless and angry — made more so by the excrement-smeared walls, the insects, the filthy food trays and the mentally ill inmates who screamed in the night, conditions that a judge had already ruled unacceptable.[134]

These conditions, far from keeping the inmates safe and secure, had the exact opposite effect. 2007 was marked at Unit 32 by a handful of violent incidents among the inmates, including two fatal stabbings, a suicide, and a gang-related killing, all of which occurred in a four-month time frame.[135]

After this string of violence, the reaction of the prison administrators at Unit 32, perhaps counter-intuitively, was to loosen restrictions on inmates.[136] The reforms were undertaken while Commissioner Epps was fighting an A.C.L.U. lawsuit targeting conditions of confinement at Unit 32.[137] Instead of being allowed only four hours a week outside their cell, the inmates were given hours-per-day outside their cell; a basketball court was constructed for the inmates to play on, along with a group dining area.[138] Rehabilitative services were provided, and prisoners were allowed to work towards greater privileges through good behavior.[139]

The results of these reforms at Unit 32 were universally positive. Incidents of violence decreased.[140] The number of prisoners in solitary confinement dropped by more than seventy percent.[141] In fact, so many prisoners at Unit 32 were moved into the general population of other correctional facilities that Unit 32 was closed in 2010, saving Mississippi taxpayers millions of dollars.[142] Other states are now looking to follow suit,[143] pursuing reforms that hold the promise of achieving the same kind of success that Commissioner Epps and his fellow prison administrators in Mississippi were able to achieve at Unit 32.[144]

---

132. NYCLU *"Boxed In" supra* note 31, at p. 2.
133. Goode, *supra* note 78.
134. *Id.*
135. *Id.*
136. *Id.*
137. *Id.; see, e.g.,* Butler et al., *supra* note 15, at 11.
138. Goode, *supra* note 78.
139. *Id.*
140. *Id.*
141. *Id.* ("The number of prisoners in isolation dropped to about 300 from more than 1,000.").
142. *Id.*
143. *Id.* ("Colorado, Illinois, Maine, Ohio and Washington State have been taking steps to reduce the number of prisoners in long-term isolation; others have plans to do so…officials in California [have also] announced a plan for policy changes that could result in fewer prisoners being sent to the state's three super-maximum-security units.").
144. It is of note that even Commissioner Epps was surprised by the positive results of his reforms, which took place while he was fighting an A.C.L.U. lawsuit challenging conditions at Unit 32. Epps summed up his change-of-heart with a fitting coda: "If you treat people like animals, that's exactly how they'll behave." *Id.*

The experience of Commissioner Epps in Mississippi demonstrates that even problematic inmates can be dealt with in a more productive fashion than placing them in long term solitary confinement. His experience with prisoner violence at Unit 32 is hardly unique.[145] As Dr. Gawande in his aforementioned 2009 article in the *New Yorker* notes:

> Perhaps the most careful inquiry into whether supermax prisons decrease violence and disorder was a 2003 analysis examining the experience in three states—Arizona, Illinois, and Minnesota—following the opening of their supermax prisons. The study found that levels of inmate-on-inmate violence were unchanged, and that levels of inmate-on-staff violence changed unpredictably, rising in Arizona, falling in Illinois, and holding steady in Minnesota.[146]

The growing body of evidence on supermax facilities and SHU-style detention points inexorably towards one conclusion: the security gained by isolating prisoners in long term solitary confinement is largely illusory. If it exists, it has yet to be documented in any convincing manner. And the great weight of the evidence demonstrates that alternative measures are not only adequate, but in some cases more effective at addressing the legitimate concerns of institutional safety, security and discipline in corrections facilities across the country.

Substance abuse treatment, mental health care, special needs wards and even pet therapy are successful alternatives to solitary confinement that have been tried by various prison administrators.[147] Additional alternatives include separating but not isolating a prisoner, taking away good time or privileges, such as commissary, phone and packages, or imposing penalties that are specifically related to the offense committed such as restitution for the offence of destruction of state property.[148] Finally, reviewing the cases of those prisoners who are currently being held in long term solitary confinement and assessing whether such continued confinement is necessary for prison safety is an alternative that has been used by a number of states that has resulted in a significant decrease in their solitary confinement population.[149]

## F. Conclusion

Long term solitary confinement is no longer a useful or productive tool for prison administrators seeking to deal with problematic inmates. Far from furthering legitimate penological objectives, it only serves to aggravate the very conditions it seeks to alleviate. Dangerous inmates are often made more erratic, weak and vulnerable inmates are made more so, and the prospect of meaningful rehabilitation and reentry into society is also rendered more difficult; and in some cases, functionally impossible.

---

145. *See* Lance Tapley, *How one State Dramatically Reduced Solitary Confinement*, NIEMAN WATCHDOG (Aug. 1, 2011), http://niemanwatchdog.org/index.cfm?fuseaction=background.view&backgroundid=00567; *see also* Sullivan, *supra* note 124 (mentioning warden of Oregon State penitentiary); CAROLINE ISAACS & MATTHEW LOWEN, AMERICAN FRIENDS SERVICE COMMITTEE - ARIZONA, BURIED ALIVE: SOLITARY CONFINEMENT IN ARIZONA'S PRISONS AND JAILS 35 (2007) (discussing Mississippi warden Don Cabana, who noted that "his biggest regret" was constructing the supermax facility at Parchman, Mississippi); *see also* Goode, *supra* note 78.

146. Gawande, *supra* note 20.

147 Brenna Davis, *Alternatives to Solitary Confinement, available at:* http://www.ehow.com/info_8720006_alternatives-solitary-confinement.html

148. Mark Mahoney, *All Agree Solitary Confinement Is Not An Ideal Solution*, State Bar News Annual Meeting, (March/April 2012) available at: http://www.doccs.ny.gov/NewsRoom/external_news/2012-03-15_Solitary_State_Bar_Annual_Meeting.pdf.

149. James Ridgeway and Jean Cassella, *New Resource: Solitary Confinement FAQ*, SOLITARY WATCH, (March 19, 2012), available at: http://solitary-watch.com/2012/03/19/new-resource-solitary-confinement-faq/. See also: *http://solitarywatch.com/faq/*. The efforts of the Colorado Department of Corrections along these lines is instructive. By reviewing all those cases where prisoners were being held in isolation for more than a year, a total of 870, Colorado found that 37% or 321 of those prisoners were found to be better suited for general population and released all of them into general population over the next two months with no reported increase in violence. Maine slashed its solitary confinement population in nearly half from 132 to 69 by engaging in a similar review and finding that many inmates initially placed in solitary confinement for minor infractions ended up increasing their time in solitary due to lashing out against the conditions of isolation..

For prison administrators and state officials looking to affect policy reforms, it must be remembered that the fulcrum of solitary confinement has less to do with the way the prisoner is treated, and more to with the way the prisoner is *not* treated. Solitary confinement is a condition of deprivation. Policy makers looking for guidance should first remember that "conditions of confinement that deprive prisoners of the minimal civilized measure of life's necessities" offend not just the conscience, but the U.S. Constitution.[150] It should be kept in mind that these conditions can easily, perhaps even reliably, lead to legal exposure for prison administrators and state officials who choose to employ it without strict guidelines and significant restrictions on the length of time that inmates can be placed in solitary confinement. In every relevant way, long term solitary confinement is counter-productive to the legitimate penological interests of both state officials and prison administrators and to the public safety interests of the public at large.

In light of the foregoing, solitary confinement, if used at all, should be measured in *days*, not years, months, or even weeks, ensuring that all prisoners, regardless of their conditions of confinement, have some minimal measure of interactive activity so that their psyche does not begin to deteriorate. Preventing psychological harm to inmates encourages institutional safety, security and discipline by preventing the development of serious mental illnesses which exacerbate the problems that supermax and SHU-style detention are intended to solve. Abandoning long term solitary confinement alleviates these problems while ensuring that the health and dignity of prison inmates remains intact.

A pressing need exists for stringent criteria, protocols and safeguards for separating violent or vulnerable prisoners, including clear and objective standards to ensure that prisoners are separated only in limited and legitimate circumstances for the briefest period and under the least restrictive conditions practicable. Further a comprehensive auditing of the current population in extreme isolation must be conducted to identify people who should not be in the SHU, transitioning them back to the general prison population, and reducing the number of SHU beds accordingly.

---

150. *Berge*, 164 F. Supp. 2d at 1117 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)) (internal quotation marks omitted).

# EXHIBIT –R

# NYC HEALTH+ HOSPITALS

CORRECTIONAL HEALTH SERVICES

## Notification of Request for Evaluation for Civil Commitment

Date: May 5, 2022

Inmate Name: ALEXANDER WILLIAMS

Book & Case #: 1411801632

Facility & Housing Loc: 2A; 2A

ATTENTION   ALL DEPARTMENT OF CORRECTION (DOC) STAFF:

It is my professional judgment that the above-named inmate may require civil psychiatric hospitalization pursuant to the Mental Hygiene Law, Section 9.39 or 9.43, inasmuch as he/she has conducted him/herself in a manner which is likely to result in serious harm to him/herself or to others, and this inmate appears to be mentally ill.

Pursuant to Section 9.41 of the Mental Hygiene Law, and based on the above, in the event the inmate is to be released form the Department of Corrections (DOC) custody, the inmate should be brought to the nearest psychiatric hospital. (See below.)

Signature of Clinician _____   Date 5/5/22

Print Name & Stamp _____

DISTRIBUTION:
1. Original to General Office, DOC
2. Copy to Medical Chart
3. Copy kept in MH binder
4. Copy to Director of Mental Health Services, CHS - Fax (212) 341-2490
5. Copy to Bureau Chief - Custody Management, DOC - Fax (718) 546-1710

# EXHIBIT –S



# CORRECTION DEPARTMENT
# CITY OF NEW YORK

## REFERRAL OF INMATES TO
## MENTAL HEALTH SERVICES



| Side 1 of 2 | FORM NO. 4018R EFF. 04/08/99 REF. DIR. 4018R |

| Inmate's Name: Alexander Williams | Book and Case Number: 1411801632 | Location: 2Q | Date: 3/7/2021 |

| Name/Shield Number of Reporting Officer: Adamczyk #13519 | Name/Shield Number of Supervisor Notified: Peters, CNDT # 423 |

### BEHAVIORAL CHECKLIST

Listed below are some of the behavioral traits that may indicate a need for Mental Health referral. (Circle the appropriate item[s]).

1. Showing radical changes in behavior;
2. Expressing a desire to commit suicide and/or attempting suicide;
3. Planning to inflict bodily harm, attempting or actually carrying out the act. (This may be expressed verbally or through written communication);
4. Unable to sleep, particularly at night, awakening at odd hours of the early morning and brooding;
5. Arranging personal belongings in order, after habitual disorder;
6. Any signs indicating a trip is being planned e.g., packing personal belongings, discussing travel arrangements etc., when such a trip is not feasible;
7. Giving away valued possessions, e.g., wearing apparel, books, pictures, cigarettes, commissary, etc.;
8. Continually refusing to lock-out during lock-out periods;
9. Hiding or attempting to hide, from view of the correction officer/observation aide;
10. Appearing to be talking to someone when , in fact, no one is present;
11. Frequent displays of shouting, crying and/or screaming;
12. Attempting to inflict self injury by banging parts of the body against the walls or fixtures;
13. Complaining of ailments(s), illness(es) and/or disease(s) that are nonexisting;
14. Expressing a belief that there are plots or plans against personal safety, believing that someone or everyone is watching, talking, spying or acting suspiciously;
15. Having hallucinations/delusions (seeing objects or hearing voices that do not exist);
16. Unusual loss of memory;
17. Showing poor personal hygiene or appearance, doesn't shave, wash or change clothes, etc.;
18. Exhibiting strong feelings of guilt;
19. Being depressed;
20. Constantly fighting and arguing with other inmates;
21. Being alarmed (frightened) or in a state of panic;
22. Any unusual action or behavior that should be brought to the attention of the Mental Health Staff.

Other: (explain) inmate Williams seems to slowly be slipping into an confused state of depression of some sort "screaming Sinister"

### SUPERVISING OFFICER'S ASSESSMENT AND RECOMMENDATION

| Supervisor's Name: Peters | Shield Number: 423 | Date: 3/07/21 |

# EXHIBIT –T



# CORRECTION DEPARTMENT
## CITY OF NEW YORK

### REFERRAL OF INMATES TO
### MENTAL HEALTH SERVICES

| Side 1 of 2 | FORM NO. 4018R EFF. 04/08/89 REF. DIR. 4018R |



| Inmate's Name: Alexander Williams | Book and Case Number: 1411706 32 | Location: 2a | Date: 4|11|201 |

Name/Shield Number of Reporting Officer: Lawrence, Cro, #60381

Name/Shield Number of Supervisor Notified: Peters # 427

## BEHAVIORAL CHECKLIST

Listed below are some of the behavioral traits that may indicate a need for Mental Health referral. (Circle the appropriate item[s]).

1. Showing radical changes in behavior;
2. Expressing a desire to commit suicide and/or attempting suicide;
3. Planning to inflict bodily harm, attempting or actually carrying out the act. (This may be expressed verbally or through written communication);
4. Unable to sleep, particularly at night, awakening at odd hours of the early morning and brooding;
5. Arranging personal belongings in order, after habitual disorder;
6. Any signs indicating a trip is being planned e.g., packing personal belongings, discussing travel arrangements etc., when such a trip is not feasible;
7. Giving away valued possessions, e.g., wearing apparel, books, pictures, cigarettes, commissary, etc.;
8. Continually refusing to lock-out during lock-out periods;
9. Hiding or attempting to hide, from view of the correction officer/observation aide;
10. Appearing to be talking to someone when , in fact, no one is present;
11. Frequent displays of shouting, crying and/or screaming;
12. Attempting to inflict self injury by banging parts of the body against the walls or fixtures;
13. Complaining of ailments(s), illness(es) and/or disease(s) that are nonexisting;
14. Expressing a belief that there are plots or plans against personal safety; believing that someone or everyone is watching, talking, spying or acting suspiciously;
15. Having hallucinations/delusions (seeing objects or hearing voices that do not exist);
16. Unusual loss of memory;
17. Showing poor personal hygiene or appearance, doesn't shave, wash or change clothes, etc.;
18. Exhibiting strong feelings of guilt;
19. Being depressed;
20. Constantly fighting and arguing with other inmates;
21. Being alarmed (frightened) or in a state of panic;
22. Any unusual action or behavior that should be brought to the attention of the Mental Health Staff.

Other: (explain) This inmate has decreased drastically sence arriving to 2a he constantly talk to hinself daily

## SUPERVISING OFFICER'S ASSESSMENT AND RECOMMENDATION

| Supervisor's Name: Peter | Shield Number: 427 | Date: 4/12/21 |

# EXHIBIT –U



# CORRECTION DEPARTMENT
# CITY OF NEW YORK



| REFERRAL OF INMATES TO MENTAL HEALTH SERVICES | Side 1 of 2 | FORM NO. 4018R EFF. 04/08/99 REF. DIR. 4018R |
|---|---|---|

| Inmate's Name: Alexander Williams | Book and Case Number: 14118016332 | Location: 2a | Date: 12-8-2001 |
|---|---|---|---|

| Name/Shield Number of Reporting Officer: LAWRENCE #10351 | Name/Shield Number of Supervisor Notified: Peters #423 |
|---|---|

## BEHAVIORAL CHECKLIST

Listed below are some of the behavioral traits that may indicate a need for Mental Health referral. (Circle the appropriate item[s]).

1. Showing radical changes in behavior;
2. Expressing a desire to commit suicide and/or attempting suicide;
3. Planning to inflict bodily harm, attempting or actually carrying out the act. (This may be expressed verbally or through written communication);
4. Unable to sleep, particularly at night, awakening at odd hours of the early morning and brooding;
5. Arranging personal belongings in order, after habitual disorder;
6. Any signs indicating a trip is being planned e.g., packing personal belongings, discussing travel arrangements etc., when such a trip is not feasible;
7. Giving away valued possessions, e.g., wearing apparel, books, pictures, cigarettes, commissary, etc.;
8. Continually refusing to lock-out during lock-out periods;
9. Hiding or attempting to hide, from view of the correction officer/observation aide;
10. Appearing to be talking to someone when, in fact, no one is present;
11. Frequent displays of shouting, crying and/or screaming;
12. Attempting to inflict self injury by banging parts of the body against the walls or fixtures;
13. Complaining of ailments(s), illness(es) and/or disease(s) that are nonexisting;
14. Expressing a belief that there are plots or plans against personal safety; believing that someone or everyone is watching, talking, spying or acting suspiciously;
15. Having hallucinations/delusions (seeing objects or hearing voices that do not exist);
16. Unusual loss of memory;
17. Showing poor personal hygiene or appearance, doesn't shave, wash or change clothes, etc.;
18. Exhibiting strong feelings of guilt;
19. Being depressed;
20. Constantly fighting and arguing with other inmates;
21. Being alarmed (frightened) or in a state of panic;
22. Any unusual action or behavior that should be brought to the attention of the Mental Health Staff.

Other: (explain) This inmate has changed drastically and has been heard by this Writer Screamin the range "thomas Handley you will not kill me"

## SUPERVISING OFFICER'S ASSESSMENT AND RECOMMENDATION

| Supervisor's Name: Peli | Shield Number: 423 | Date: 12/05/21 |
|---|---|---|

# EXHIBIT –W



# CORRECTION DEPARTMENT
# CITY OF NEW YORK



## REFERRAL OF INMATES TO
## MENTAL HEALTH SERVICES

| | | Side 1 of 2 | FORM NO. 4018R EFF. 04/08/99 REF. DIR. 4018R |
|---|---|---|---|

| Inmate's Name: Alexander William | Book and Case Number: 141-180132 | Location: 2a | Date: 2/8/22 |
|---|---|---|---|

| Name/Shield Number of Reporting Officer: Lawerenc CD #10751 | Name/Shield Number of Supervisor Notified: |
|---|---|

### BEHAVIORAL CHECKLIST

Listed below are some of the behavioral traits that may indicate a need for Mental Health referral. (Circle the appropriate item[s]).

1. Showing radical changes in behavior;
2. Expressing a desire to commit suicide and/or attempting suicide;
3. Planning to inflict bodily harm, attempting or actually carrying out the act. (This may be expressed verbally or through written communication);
4. Unable to sleep, particularly at night, awakening at odd hours of the early morning and brooding;
5. Arranging personal belongings in order, after habitual disorder;
6. Any signs indicating a trip is being planned e.g., packing personal belongings, discussing travel arrangements etc., when such a trip is not feasible;
7. Giving away valued possessions, e.g., wearing apparel, books, pictures, cigarettes, commissary, etc.;
8. Continually refusing to lock-out during lock-out periods;
9. Hiding or attempting to hide, from view of the correction officer/observation side;
10. Appearing to be talking to someone when, in fact, no one is present;
11. Frequent displays of shouting, crying and/or screaming;
12. Attempting to inflict self-injury by banging parts of the body against the walls or fixtures;
13. Complaining of ailments(s), illness(es) and/or disease(s) that are nonexisting;
14. Expressing a belief that there are plots or plans against personal safety; believing that someone or everyone is watching, talking, spying or acting suspiciously;
15. Having hallucinations/delusions (seeing objects or hearing voices that do not exist);
16. Unusual loss of memory;
17. Showing poor personal hygiene or appearance, doesn't shave, wash or change clothes, etc.;
18. Exhibiting strong feelings of guilt;
19. Being depressed;
20. Constantly fighting and arguing with other inmates;
21. Being alarmed (frightened) or in a state of panic;
22. Any unusual action or behavior that should be brought to the attention of the Mental Health Staff.

Other: (explain) this writer heard + witnessed inmate williams acting devired wellen conditing Rand william was in his cell beggers for his life fron

### SUPERVISING OFFICER'S ASSESSMENT AND RECOMMENDATION

# EXHIBIT –V

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS:  CRIMINAL TERM:  PART 7
 2   -------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
 3

 4
                                  Indictment No.
 5          - against -            2146/2018
                                  Calendar Call
 6
     ALEXANDER WILLIAMS,
 7
                          Defendant.
 8   -------------------------------------------X
                          320 Jay Street
 9                        Brooklyn, New York 11201
                          February 13, 2019
10

11   B E F O R E:

12          THE HONORABLE VINCENT M. DEL GIUDICE,
                     J U S T I C E
13

14
     A P P E A R A N C E S:
15

16
     For the People:
17
            OFFICE OF THE DISTRICT ATTORNEY
18          District Attorney, Kings County
                 BY:  ERNEST CHIN, ESQ.,
19               Assistant District Attorney

20

21   For the Defendant:

22          JEFF CHABROWE, ESQ.

23

24
                          SUSIE SANCHEZ-SMITH
25                        Senior Court Reporter
```

1          THE COURT CLERK:  On the Part 7 calendar,

2     number five, 2146 of 2018, Alexander Williams.  Defendant

3     produced before the Court.

4          Appearances, please.

5          MR. CHABROWE:  Jeff Chabrowe for Mr. Williams.

6     Good morning, your Honor.

7          THE COURT:  Good morning, sir.

8          MR. CHIN:  Ernest Chin for the People.

9     Good morning, Judge.

10          THE COURT:  Good morning.

11          All right, gentlemen, be seated.

12          Officers, can you have the defendant sit down.

13          MR. CHABROWE:  Judge, could we approach briefly?

14          THE COURT:  Sure.

15          (Whereupon, an off-the-record discussion was held

16     at the bench.)

17          MR. CHABROWE:  Your Honor, pursuant to the

18     conversation that we had at the bench, I don't believe

19     we've appeared in front of your Honor since the lockdown

20     you signed against Mr. Williams.  He was moved to the

21     Manhattan Detention Center; he is on 23 and one.  There was

22     a lockdown signed by your Honor, then there was something

23     added to it by Judge Chun, because I believe your Honor was

24     away, for the 23 and one portion of it.

25          Judge, I'm somewhat flying blind here because I

1   don't know what the allegations are against my client in

2   terms of any sort of threats or I guess allegations of

3   money being offered to people to come forward as witnesses.

4   All I have is one letter that was allegedly sent out by the

5   client.  I have a good amount of evidence to disprove this

6   letter, and obviously we'll be getting into that.

7           But my biggest concern is that my client has been

8   denied access to his wife, Krista Rodriguez, who not only

9   is power of attorney for him, but has also been

10  coordinating a number of different experts and a number of

11  different investigators, both in terms of contacting them,

12  providing them information.  She has been invaluable to me

13  in terms of providing information to me, and also

14  coordinating all finances.  This is not something that I

15  can do because it's really paying people that have been

16  working to prepare for this case.  I think most

17  importantly, that she was also a witness to admissions made

18  by another person.  She met with the District Attorney's

19  Office; I think that they promised they would protect her

20  as a witness.  In fact, her identity was then revealed.

21  And I believe that part of this lockdown order is really an

22  attempt to just discredit her as a witness.

23          I understand the Court's concern based upon what

24  your Honor told me.  I don't know what's out there because

25  obviously this is not being shared with me.  But I've been

1    told by Mr. Chin that he intends to potentially pursue

2    charges against -- additional charges against my client or

3    perhaps against his wife.  If that's the case, I can

4    understand why she would be barred from seeing him.  But if

5    that's not the case, and we could revisit this issue, I

6    think that he should be allowed access to her and perhaps

7    her alone because it's very important for her to be

8    coordinating all efforts for trial.  We're not able to

9    adequately prepare for trial without her to be available to

10   speak to him to coordinate experts and investigators and so

11   forth.

12          So if your Honor is not inclined to at least allow

13   Mr. Williams access to her now, if perhaps we could revisit

14   this when the People have had more time to investigate.

15          THE COURT:  Mr. Chin.

16          MR. CHIN:  I'll address some concerns, but yes, I

17   have no concerns about revisiting this at a later date.  I

18   am investigating a number of things.  She is involved with

19   witnesses.  But for the moment to kind of put an end to it,

20   that's why I initiated the lockdown procedure.  That's just

21   one piece of a number of different things that were going

22   on involving witnesses or potential witnesses, or the

23   deceased's family members or things like that.

24          With regards to that, though, Judge Chun did ask

25   for the lockdown order to be amended and I was awaiting the

1    information from Mr. Chabrowe, which he finally gave me

2    last week.  I had the flu, so I had amended it so I could

3    come bring it in today.  So the defendant now has access to

4    two of his investigators in addition to Mr. Chabrowe, they

5    can freely act as go-betweens.  I also have to verify that

6    these individuals were indeed private investigators because

7    one of the issues was there was an individual who was

8    purporting to be a private investigator who was not, trying

9    to talk to the deceased's family and other individuals.  So

10   along the line with that, we can revisit it.

11          I am investigating, I'm awaiting a whole bunch of

12   different records, as your Honor is aware because you just

13   signed a lot of my subpoenas for a lot of them.  I am

14   investigating fully whether or not she has any involvement,

15   the depth of the involvement, and if there is.  If not, we

16   can revisit it in a month or two.

17          THE COURT:  How long do you anticipate your

18   investigation will take?

19          MR. CHIN:  I would estimate at least about six to

20   eight weeks because a lot of it involves phone data, cell

21   site data and I think I've subpoenaed maybe 13 or 14

22   different numbers and cell phones.  So I have to wait for

23   all the results and then kind of break it down.

24          THE COURT:  Okay.  So let me just try and flesh

25   out the record.  We did have a conference at the bench when

1    the defendant was brought out, and counsel for the defense

2    had indicated what he just placed on the record.

3         Now I was given the ex-parte application for the

4    lockdown order and I found it of sufficient gravity to

5    grant that, all right, based upon the information provided

6    by the People in their written submission to the Court.

7         In addition, a colleague, Justice Chun, also

8    reviewed the application and agreed with me that the

9    lockdown order should be included, but amended it, that I

10   just signed now, to allow two investigators who have been

11   verified as licensed investigators to also communicate with

12   the defendant either in person or by phone.

13        I am reluctant at this time to change the lockdown

14   order based the representation of the People that

15   there is an active investigation regarding the defendant's

16   wife, who may be a party to witness tampering; I don't

17   know, we'll see.

18        The request of the People for a six-to-eight-week

19   adjournment to continue their investigation is not unduly

20   restrictive on the defendant.  I will certainly grant the

21   defense's application to revisit this issue when new

22   information comes forth; that could be that the People find

23   that there is no bad conduct on the part of defendant's

24   wife, and I would lift that portion of the order.  But I'm

25   reluctant to do it at this time, so I'm going to maintain

1   it as it stands with leave to reargue.

2       Now, also counsel for the defense had filed

3   subpoenas regarding information to the Department of

4   Corrections, and I refuse to sign those, regarding an

5   inmate, Adam Franco.  And I give counsel the opportunity,

6   if he wishes, to reargue the denial of these subpoenas now

7   if he wants to.

8       MR. CHABROWE:  Sure.  Well, your Honor, I believe

9   our understanding is this:  Mr. Franco would be cooperating

10  to say that he was approached by my client to provide, I

11  guess, a friend of his or a female friend of his to testify

12  for my client.  Mr. Franco was then stopped with contraband

13  being brought in by a female friend of his, he was indicted

14  on the contraband case with a corrections officer here at

15  Brooklyn house.

16      It's our understanding that after that and after

17  agreeing to cooperate, he has had a number of disciplinary

18  issues while in the Department of Corrections, including

19  another contraband case, a number of assaults, and

20  obviously, your Honor, the fact that that would have some

21  bearing on his credibility at trial if he's going to be

22  testifying.  Furthermore, we also ask for all of his

23  visitation records and for phone records.  We believe that

24  he is a high-ranking Blood member, that he is having a

25  number of conversations with people upstate in organizing

1    gang activities, and that he is also regularly getting

2    visits from other people in regards to continuing efforts

3    in contraband and gang activities.  And certainly,

4    your Honor, his disciplinary records would be something, at

5    least something that we should have access to, his

6    corrections disciplinary records.

7            THE COURT:  Your request in the subpoena was for

8    all phone logs and records since Franco's commitment, all

9    records of visitation including individuals visiting

10   Franco, and all recorded infractions.

11           People would like to respond to that?

12           MR. CHIN:  Judge, the only thing that I think

13   would be relevant in terms of impeachment would be any kind

14   of infractions or disciplinary records.  However I would

15   ask for it to be in camera inspection.  I'm not sure if any

16   of those records would contain any kind of personal

17   information relating to relatives or even just phone

18   numbers or addresses to anyone else connected to this

19   individual, that I would worry might lead to other issues

20   that we've already been dealing with.

21           But in terms of the visitation and the phone

22   calls, sounds like a giant fishing expedition at this

23   point.  Also it would also lead to lots of personal

24   information, family members, things like that that I would

25   have an issue with given what's been going on in this case.

1          MR. CHABROWE:  Judge, I would like at least an

2     opportunity perhaps -- I don't see how disciplinary records

3     can't be relevant, but we could certainly amend any

4     subpoenas as your Honor sees fit.  But there are a number

5     of people who I believe with whom he has had visitation or

6     phone contact, who we could submit to the Court that we

7     would like to have any records of those contacts by

8     Mr. Franco.  And that's not a fishing expedition, that's

9     based on -- I could submit something to the Court in the

10     form of an affirmation based on our own investigation of

11     who he is coordinating with.

12          THE COURT:  Regarding the infractions, I see no

13     problem with defense being given that, all right.  The

14     People have to turn it over in any event since he may be

15     their witness.  But I don't know if he's going to testify

16     yet, I don't know if he is going to be a witness, all

17     right.  And I'm just not going to willy-nilly invade his

18     personal privacy, even though he is incarcerated, to give

19     copies of his phone logs.

20          MR. CHABROWE:  I understand, Judge.

21          THE COURT:  Or likewise with records of his

22     visitation.  If in fact he does become a witness and if in

23     fact this becomes relevant, then I will grant the

24     defendant's request and I will grant any reasonable

25     adjournment to research the material that you get.  But I

1    think it's premature at this time.  I'm sure, based upon

2    your representation, the prosecution, if this man is under

3    a cooperation agreement, I don't know, all right.  If he

4    is, I'm sure the People are going to want to know all this

5    in any event to make sure he hasn't violated the

6    cooperation agreement.

7            And if you find out there may be Brady or Giglio,

8    you are on notice now, a specific request by counsel for

9    this information, and puts you in the hot seat and takes me

10   off the hot seat, okay.  So you are pretty much going to

11   get what you want without me having to sign anything.

12           MR. CHABROWE:  Judge, that's fine.  All I know

13   about for sure about the investigation that resulted in the

14   lockdown order, I have a letter that was given to me, was

15   allegedly written by Mr. Williams, reaching out to someone

16   about testifying on his behalf.  I've been told very

17   definitively by Mr. Chin that that was a letter that was

18   recovered by Mr. Franco.  And I believe that that is one of

19   the main pieces of the lockdown order.  How that could ever

20   be used against Mr. Williams without Mr. Franco testifying

21   as to where he got it is beyond me.  So I don't see how he

22   would not be a witness here, or at least his credibility is

23   not at issue.

24           THE COURT:  They might decide not to call him,

25   he's not a witness.  I can't foretell what the evidence is

1      going to be in this case.  I'm not going to preclude the

2      prosecution from developing their case; it's still in the

3      investigatory stage, all right.

4                  So I could understand your zealous desire to get

5      this information as quickly as possible, but rest assured,

6      if you do get this information, I will give you a

7      reasonable period of time to continue your investigation.

8      I'm not going to rush you to trial, I just won't do that,

9      okay.

10                 Now I have several letters here from Mr. Williams

11     that I sent to your office, Mr. Chabrowe --

12                 MR. CHABROWE:  Yes.

13                 THE COURT:  -- for your discussions.  I'm just

14     going to put them in the court file because we've already

15     gone over them already.

16                 MR. CHABROWE:  That's fine.

17                 THE COURT:  That being the case, why don't we put

18     this case over to March 28th.

19                 MR. CHIN:  Can I also put one thing on the record?

20     I'm also making a reciprocal discovery demand of counsel.

21     There is a number of videos and reports from these experts

22     that I have not received copies of.  In particular, I am

23     making a demand of a video that defendant repeatedly claims

24     on his Rikers phone calls, that he claims he has in his

25     possession, that he gave to Mr. Chabrowe, which purports to

1    show the defendant with the two alleged shooters in a

2    surveillance video.  Just so you are aware, Judge, this

3    homicide is from like seven years ago.  But he claims he

4    has in his possession a video of himself with the two

5    alleged shooters on a surveillance video, that on his phone

6    calls he insists that --

7                THE COURT:  He said he gave it to his lawyer?

8                MR. CHIN:  Gave it to his lawyer and they did not

9    give it to me.

10               THE COURT:  What about the Sixth Amendment?  He

11   gets the material to his attorney, so I'm going to tell his

12   attorney to open up the files and give it to you?

13               MR. CHIN:  Judge, he also claims he has this

14   video, it's a video that's intended to be used at trial.

15               THE COURT:  We haven't gotten to that stage yet.

16   If counsel wants to give it to you, fine, but I'm not going

17   to order him at this point to give his defense over to you.

18               MR. CHIN:  That's fine, Judge, I just want to put

19   on the record that I have made a demand for it at this

20   point.  And if later on at the time of trial it becomes an

21   issue, I want it at least on the record.

22               THE COURT:  Okay.  And that call was to a third

23   party?

24               MR. CHIN:  Yes.

25               THE COURT:  Where he indicated that he gave it to

1       counsel?

2             MR. CHIN: Yes.

3             MR. CHABROWE: Judge, to be clear, for Franco,

4       your Honor is not inclined to turn over even the

5       disciplinary records or to sign a subpoena for disciplinary

6       records at this time?

7             THE COURT: Don't you think it's premature? Don't

8       you want him to have some more infractions before you get

9       it? Why a rush for it? I'm not going to give them a

10      continuing order that every time the guy gets a ding, they

11      got to send you another record.

12            MR. CHABROWE: I understand.

13            THE COURT: This case is comparatively new, it's

14      less than a year old.

15            MR. CHABROWE: I know.

16            THE COURT: Anything else, gentlemen?

17            MR. CHABROWE: That's it.

18            MR. CHIN: No.

19            THE COURT: March 28th. Thank you.

20       *     *     *     *     *     *     *     *

21

22      CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF THE
       ORIGINAL MINUTES TAKEN OF THIS PROCEEDING.

23

24            *Susie Sanchez-Smith*
           SUSIE SANCHEZ-SMITH
           Senior Court Reporter

25

# EXHIBIT –X

## Ending the Practice of Solitary Confinement: Recommendations for Federal Reform

June 3, 2021

Dear President Biden and Vice President Harris:

As representatives of organizations working in public health and medicine, civil and human rights, religion and ethics, mental health, law and criminology, and immigration, often in collaboration with communities directly impacted by solitary confinement, we applaud the Biden-Harris administration's pledge to ensure humane prison conditions and to "start by ending the practice of solitary confinement, with very limited exceptions such as protecting the life of an imprisoned person."[i] To that end, we urge you to begin implementing plans necessary to end the practice of solitary confinement on day one of your administration.

Prolonged solitary confinement is considered a form of torture by the United Nations and leading medical and public health experts. Yet, on any given day before the COVID-19 pandemic, of the 2.3 million people incarcerated in the United States, at least 80,000 people were being held in solitary confinement for a period of more than two weeks. The COVID-19 pandemic has resulted in further use of solitary confinement (rather than medical isolation) as a containment strategy within correctional and youth facilities. The result has been nearly a 500% increase in the use of solitary confinement in 2020, with an estimated 300,000 people in solitary at any one time.

Solitary confinement generally involves the placement of a person, alone or with a cellmate, in a locked room or cell for 22 hours or more per day without meaningful access to others, for any reason, with or without the person's consent, and can occur in pretrial or post-conviction detention. Access to exercise and family visitation are either greatly curtailed or completely denied. Permanent psychological harm can result from placement in solitary confinement for even a few days or weeks. In the United States, about 20% of all incarcerated people spend time in prolonged isolation, for months, years, or even decades at a time.

The United Nations Standard Minimum Rules for the Treatment of Prisoners, known as the "Nelson Mandela Rules," adopted in 2015, offer guidelines for ending the inhumane practice of prolonged isolation.[ii] The Mandela Rules call for UN member states to prohibit indefinite or prolonged solitary confinement (beyond 15 consecutive days) for all incarcerated people, and ban solitary altogether for vulnerable groups, including children and people with mental illnesses.

We offer the following recommendations in order to achieve your administration's goal of ensuring humane prison conditions by ending solitary confinement:

### General Recommendations:

1. Appoint a *Working Group for Humane Alternatives to Solitary Confinement,* directly answerable to the Attorney General, to develop a plan to bring all federal and auxiliary

**Recommendations Specific to U.S. Immigration and Customs Enforcement (ICE):**

1. Select a Director of Immigration and Customs Enforcement with a commitment to humane practices and charge the Director with instituting a ban on the use of solitary confinement in ICE facilities (whether for administrative, protective, or disciplinary reasons).

2. Empower a senior-level position within the Department of Homeland Security to investigate and oversee all ICE detention facilities, including implementation of the *Working Group for Humane Alternatives to Solitary Confinement*'s plan to reduce the use of solitary confinement.

**Recommendations Specific to the Federal Bureau of Prisons:**

1. Create a new senior-level position within the USDOJ to investigate and oversee the federal Bureau of Prisons, including the implementation of the *Working Group for Humane Alternatives to Solitary Confinement*'s plan to reduce the use of solitary confinement.

2. Select a Director of the federal Bureau of Prisons who has a track record of reform, respect for evidence-based practices, and a commitment to culture change within the BOP. Charge the Director with initiating internal measures to immediately reverse the increase in the use of solitary confinement that took place in the BOP during the Trump administration.[ix]

3. Appoint a prison ombudsperson within the Department of Justice but outside the Bureau of Prisons, to receive complaints and concerns regarding the federal system directly from incarcerated people and their loved ones and recommend and oversee responses.

**In conclusion,** ending the practice of solitary confinement would end the pain, torture, and trauma of tens of thousands of people languishing in harsh and harmful conditions. We call on you to deliver on the promise of the Biden-Harris "Strengthening America's Commitment to Justice" plan by ending solitary confinement by executive, congressional, and administrative action.

Thank you for your leadership. We look forward to working with you to make this vision a reality.

Sincerely,

We the undersigned:

**National Organizations**
African American Ministers In Action
Alliance of Baptists
American Civil Liberties Union
American Friends Service Committee
American Humanist Association
Americans for Immigrant Justice
Architects / Designers / Planners for Social Responsibility (ADPSR)

3

National Crittenton
National Disability Rights Network (NDRN)
National Immigration Law Center
National Immigration Litigation Alliance
National Immigration Project of the National Lawyers Guild (NIPNLG)
The National Incarceration Association, Inc.
National Juvenile Defender Center
National Juvenile Justice Network
National Religious Campaign Against Torture
NETWORK Lobby for Catholic Social Justice
Pax Christi USA
Physicians for Human Rights
Presbyterian Church (U.S.A.)
Prison Law Office
Prison Policy Initiative
Refugee and Immigrant Center for Education and Legal Services (RAICES)
Rights4Girls
Robert F. Kennedy Human Rights
Roderick and Solange MacArthur Justice Center
The Sentencing Project
Social Workers & Allies Against Solitary Confinement (SWASC)
Sojourners
Solitary Watch
Southern Center for Human Rights
SPLC Action Fund
T'ruah: The Rabbinic Call for Human Rights
Tzedek Association
Union for Reform Judaism
Unitarian Universalist Service Committee
United Church of Christ, Justice and Witness Ministries
The United Methodist Church, General Board of Church and Society
Unlock the Box Campaign
W. Haywood Burns Institute
Washington Office on Latin America
Youth Advocate Programs (YAP), Inc.

**Regional Organizations**
Advocate Visitors with Immigrants in Detention
Advocates for Basic Legal Equality, Inc.
Alabama Justice Initiative
Aldea - The People's Justice Center
American Friends and Service Committee Prison Watch Program
Bay Area Asylum Support Coalition
Breaking the Chains Of Your Mind
BronxConnect
Brooklyn Defender Services
California Collaborative for Immigrant Justice
California Families Against Solitary Confinement
Center for Disability Rights

**Individual Signatories** *(titles for identification purposes only)*

Brie Williams M.D., M.S., Professor of Medicine, University of California San Francisco, Director, Amend at UCSF, Co-Director, the ARCH (Aging Research in Criminal Justice Health) Network

Terry A. Kupers, M.D., M.S.P., Professor, The Wright Institute

Corey Weinstein, M.D., Private Consulting Correctional Medical Expert

Pablo Stewart, M.D., Correctional Psychiatric Consultant

Judith Resnik and Anna VanCleave, Founder and Director of the The Liman Center at Yale Law School

Kristin Henning, Professor of Law, Director, Juvenile Justice Clinic & Initiative, Georgetown Law

Andrea Armstrong, Professor of Law, Loyola University New Orleans

Michele Deitch, J.D., M.Sc., Distinguished Senior Lecturer, Lyndon B. Johnson School of Public Affairs, University of Texas at Austin

Vanessa Drummond, Assistant Project Director of Anti-Torture Initiative, American University Washington College of Law Center for Human Rights & Humanitarian Law

Juan Mendez, Anti-Torture Initiative, American University Washington College of Law Center for Human Rights & Humanitarian Law

Professor Amit Prakash, No Politics at the Dinner Table - Podcast

Colin Dayan, Professor of Law, Vanderbilt University

---

[i] *The Biden Plan for Strengthening America's Commitment to Justice* (2020), https://joebiden.com/justice/#.
[ii] UN Office on Drugs and Crime, Justice Section, *The United Nations Standard Minimum Rules for the Treatment of Prisoners (The Nelson Mandela Rules)*, Rules 43-45, pp. 13-14 (2015),
http://www.unodc.org/documents/justice-and-prison-reform/GA-RESOLUTION/E_ebook.pdf.
[iii] The working group should include all stakeholders, including elected officials, civil servants, incarcerated people's rights advocates, scholars, corrections professionals, healthcare professionals, and people directly impacted by incarceration. The new plan should draw upon, but go well beyond, the report and recommendations produced at the direction of President Barack Obama and Attorney General Loretta Lynch. *See* U.S. Department of Justice, *Report and Recommendations Concerning the Use of Restrictive Housing* (Jan. 2016), https://www.justice.gov/archives/dag/report-and-recommendations-concerning-use-restrictive-housing.
[iv] Solitary confinement has dire health consequences. *See* Craig Haney et al., *Consensus Statement from the Santa Cruz Summit on Solitary Confinement and Health*, 115 Nw. U. L. Rev. 335 (2020), https://scholarlycommons.law.northwestern.edu/nulr/vol115/iss1/9; *see also* Medical Isolation and Solitary Confinement: Balancing Health and Humanity in US Jails and Prisons During COVID-19. J Gen Intern Med. 2020 09; 35(9):2738-2742. Cloud DH, Ahalt C, Augustine D, Sears D, Williams B. PMID: 32632787 (The Santa Cruz Summit on Solitary Confinement and Health found that "solitary confinement has been linked to a host of negative psychological and physical symptoms and problematic behaviors, including: anxiety, depression, ruminations, irritability and anger, paranoia, disturbed sleep and appetite, cognitive impairment, social withdrawal, cardiovascular disease, impaired vision, self-harm, and suicide.").
[v] People in quarantine should be separated from others who have not been exposed, sometimes with a cohort group; people in medical isolation should be separated from those they could infect while they receive proper medical care, necessities including regular food and hygiene, and access to family through phone calls; people in solitary confinement are deprived of all social contact, receive no information or

# EXHIBIT –Y



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES

Form.: 7102R
Eff.: 8/23/19
Ref.: Dir. 3376R-A

### DISPOSITION FORM

| Grievance Reference # 583516 | Date Filed: 09/13/22 | Facility: GRVC 2A |
|---|---|---|
| Inmate Name: Williams, Alexander | Book and Case: 1411801632 | Category: Medical |

From OCGS Inmate Statement Form, print or type short description of grievance:

3-02 (B) (8) States that I should be able to request a second medical opinion. I would like to request a 2nd opinion in regard to my medical injury on my right shoulder and wrist. stemming from my Jan 13,2022 extraction, from use of force. I have requested this from medical personal numerous occasions.

Action Requested by Inmate: Please allow me to get my second opinion.

## STEP 1: FORMAL RESOLUTION

Check one box: ☑ Grievance     ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

The person in custody has been informed his complaint has been forwarded to the Medical unit for review.

## CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
### *(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date:09/13/22 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature: | Date: 09/13/22 |
|---|---|

ATTACHMENT -B-1

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
## INMATE STATEMENT FORM

Form: 7101R-A
Eff.: 9/14/18
Ref.: Dir. 3376R-A

| Inmate's Name: Alexander Williams | Book & Case #: 141180 1632 | NYSID #: 01897858C |
|---|---|---|

| Facility: GRVC | Housing Area: 2A | Date of Incident: 9/3/2022 | Date Submitted: 9/3/2022 |
|---|---|---|---|

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** 3-02 (A)(8) states that I should be able to Request a Second medical opinion I would like to Request a 2nd opinion in regards to my medical enjury on my Right sheelder and wrist stemming from my Jan 13, 2022 extraction for use of force I have Reported this from medical personel on serveral occaision

**Action Requested by inmate:** please allow me to get a Second ? opinion

### Please read below and check the correct box:

Do you agree to have your statement edited for clarification by OCGS staff?  Yes ☐  No ☐

Do you need the OCGS staff to write the grievance for you?  Yes ☒  No ☐

Have you filed this grievance with a court or other agency?  Yes ☐  No ☐

Did you require the assistance of an interpreter?  Yes ☐  No ☐

| Inmate's Signature: | Date of Signature: 9/3/2022 |
|---|---|

### FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

| TIME STAMP | Grievance Reference #: 58 3516 | Category: medical |
|---|---|---|
| | Office of Constituent and Grievances Services Coordinator/Officer Signature: CO Byrne 18049 | |

53

41

# EXHIBIT –Z

# NYC HEALTH+ HOSPITALS | Bellevue

BELLEVUE HOSPITAL CENTER
462 1st Ave
New York NY 10016

Patient: Williams, Alexander
MRN: 4035700,
DOB: 2/8/1981,
Sex: M

## Patient Demographics

| Patient Name | Legal Sex | DOB | Address | Phone |
|---|---|---|---|---|
| Williams, Alexander (4035700) | Male | 2/8/1981 | 125 White Ave NEW YORK NY 10013 | 000-000-0000 (Home) 000-000-0000 (Mobile) *Preferred* |

# Nursing Communication (Order 413413601)                     Nursing

Date: 9/22/2022 Department: Bellevue IP 19S PRISON HEALTH Ordering/Authorizing: Somil Chugh, MD

## Standing Order Information

| Remaining Occurrences | Interval | Last Released |
|---|---|---|
| 0/1 | Until discontinued | 9/22/2022 |

## Order History                                                         Inpatient

| Date/Time | Action Taken | User | Additional Information |
|---|---|---|---|
| 09/22/22 2048 | Sign | Somil Chugh, MD | Modify from Order: 413413599 |
| 09/22/22 2048 | Release Instance | Somil Chugh, MD (auto-released) | Released Order: 413413602 |
| 09/22/22 2048 | Acknowledge | Prakritee Thapa, RN | New Order |

## Order Details

| Frequency | Duration | Priority | Order Class |
|---|---|---|---|
| Until discontinued | Until Specified | Routine | Hospital Performed |

## Reference Links

## ·der Questions

| ·stion | Answer |
|---|---|
| ·ent: | okay to cuff to sides given injuries FOR TRANSPORT |

## ·ment Info

| | Acknowledged By | Acknowledged On |
|---|---|---|
| ·/22 2048 | Prakritee Thapa, RN | 09/22/22 2048 |

## ·tion

·der #413413601) on 9/22/22

**NYC
HEALTH+
HOSPITALS**

| PATIENT NAME: ALEXANDER WILLIAMS | FACILITY:  BHPW |
|---|---|
| NYSID:      01897858L | BOOKCASE#:  1411801632 |

### DEPARTMENT OF CORRECTION COPY

### RECEIPT OF NOTIFICATION OF PATIENT NEED FOR SECURITY CONSIDERATIONS

#### Type of Restraint Modifications required:

Front cuff only

#### Type of Magnetometer Alert:

_____
*Signature*

Ordering Provider: **Benjamin Okonta MD**
Print Name/Date/Time: **September 22, 2022 10:13 PM**
Printed By: Okonta MD/Benjamin

_____
DOC Signature/Shield Number

#### If MO Housing Required:

_____
*Facility*

Dorm: _____    Cell: _____

_____
Date

EXHIBIT -1

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION



## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
### DISPOSITION FORM

Form.: 7102R
Eff.: 9/14/18
Ref.: Dir. 3376R-A

| Grievance Reference #: 574792 | Date Filed: August 12, 2022 | | Facility: GRVC |
|---|---|---|---|
| Inmate Name: Alexander Williams | Book and Case#: 141-18-01632 | | Category: Medical |

From OCGS Inmate Statement Form, print or type short description of grievance: **Today I suffered an asthma attack due to heat exhaustion and was not afforded medical attention when I requested it.**

Action Requested by Inmate: **Please provide me with a asthma pump and a ventilation treatment, place me in heat sensitive housing unit.**

### STEP 1: FORMAL RESOLUTION

Check one box: ☑ Grievance  ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process.

**OCGS informed the grievant that his complaint was forwarded to Medical for further investigation.**

### CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☑ Yes, I accept the resolution  ☐ No  ☐ I request to appeal the resolution of this grievance to the Commanding officer.

Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies.

| Inmate's Signature: | Date: 8/29/25 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature: CJS | Date: August 12, 2022 |
|---|---|

ATTACHMENT -B-1

# CITY OF NEW YORK - DEPARTMENT ~~OF CORRECTION~~
## OFFICE OF CONSTITUENT AND GRIEVANCE S~~ERVICES~~
### INMATE STATEMENT FORM

Form.: 7101R-A
Eff.:9/14/18
Ref.: Dir. 3376R-A

NYSID #: 01897858

| Inmate's Name: Alexander Williams | Book & Case #: M118016 92 | | Date Submitted: 8/7/2020 |
|---|---|---|---|
| Facility: CNVC | Housing Area: 40 | Date of Incident: 8/7/2020 | |

All grievances must be submitted within ten business days after the incident ~~occurred, unless it's a sexual abuse or~~ harassment allegation. The inmate filing the grievance must personally prep~~are this statement. Upon collection by the Off~~ of Constituent and Grievance Services (OCGS) staff, OC GS staff will time ~~stamp and issue it a grievance reference numb~~ OCGS staff shall provide the inmate with a copy of this form as a record of ~~receipt.~~

**Grievance:** Today I suffered an ~~asthma attack~~ due to heat exhaustion ~~as I was~~ here to heat exhaustion ~~as I was~~ not affected medica~~l~~ I requested it

**Action Requested by Inmate:** please provide me with a ~~treatment, plac~~ pump and a ventilation ~~in heat~~ structure housing

Please read below and check the correct box: ~~in heat~~

| | Yes | No |
|---|---|---|
| Do you agree to have your statement edited for clarification by OCGS st~~aff~~? | ☐ | ☐ |
| Do you need the OCGS staff to write the grievance for you? | ☐ | ☐ |
| Have you filed this grievance with a court or other agency? | ☐ | ☐ |
| Did you require the assistance of an interpreter? | ☐ | ☐ |

Inmate's Signature: Alexander Williams

Date of Signature: 8/7/20

### FOR DOC OFFIC~~E~~ USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM ~~TO~~ THE INMATE AS A RECORD OF RECEIPT

THIS FORM IS INVALID UNLESS SIGNED BY THE INMA~~TE~~ AND GRIEVANCE COORDINATOR

| TIME STAMP | Grievance Reference # 574_____92 | Category: Medic |
|---|---|---|
| | Office of Constituent and Grievan~~ces~~ Services Coordinator/Officer | |
| | CJS | |

EXHIBIT NO - 2

ATTACHMENT - C



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

| OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES | Form.: 7102R<br>Eff.: 8/23/19<br>Ref.: Dir. 3376R-A |
|---|---|
| **DISPOSITION FORM** | |

| Grievance Reference #:<br>**575771** | Date Filed:<br>**August 13, 2022** | Facility:<br>**GRVC – 2a** |
|---|---|---|

| Inmate Name:<br>**Williams, Alexander** | Book and Case#:<br>**141-18-01632 NYSID 01897858L** | Category:<br>**Medical** |
|---|---|---|

From OCGS Inmate Statement Form, print or type short description of grievance:

*"After a detailed review of my medical records I have discovered that I have over 100 medical appointments that I was not produced for by DOC staff."*

Action Requested by Inmate:

*"Please produce me to all medical appointments."*

## STEP 1: FORMAL RESOLUTION

Check one box: ■Grievance      ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

<u>OCGS informed Williams, Alexander as per NYCH&H Correctional Health Services this matter has been forwarded to Patient Relations for review and handling. In addition, this matter has been forwarded to the GRVC Medical Team. Additionally, this matter has been forwarded to the Warden's office for review and resolution.</u>

### CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date:<br>8/29/2022 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature:<br>*Ms. Nelson* | Date:<br>August 16, 2022 |
|---|---|



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
### INMATE STATEMENT FORM

Form.: 7101 R-A
Eff.:9/14/18
Ref.: Dir. 33-76R-A

| Inmate's Name: | Book & Case #: | NYS ID #: |
|---|---|---|
| ALEXANDER WILLIAMS JR | 1411801632 | 01897858L |

| Facility: | Housing Area: | Date of Incident: | Date Submitted: |
|---|---|---|---|
| G.R.V.C. | 2A | 8/13/2022 | 8/13/2022 |

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** AFTER A DETAIL REVIEW OF MY MEDICAL RECORDS I HAVE DISCOVERED THAT I HAVE OVER 100 MEDICAL APPOINTMENT STHAT I WAS NOT PRODUCED FOR BY DOC STAFF

**Action Requested by Inmate:** Please produce me to all medical appointments

**Please read below and check the correct box:**

| | Yes | No |
|---|---|---|
| Do you agree to have your statement edited for clarification by OCGS staff? | | ☑ |
| Do you need the OCGS staff to write the grievance for you? | | ☑ |
| Have you filed this grievance with a court or other agency? | | ☑ |
| Did you require the assistance of an interpreter? | | ☑ |

**Inmate's Signature:**

**Date of Signature:** 8/13/2

### FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

| TIME STAMP | Grievance Reference # | Category: |
|---|---|---|
| 2022 AUG 16  P 12:48 | 575771 | Medical Doc Related |
| | Office of Constituent and Grievances Services Coordinator/Officer Signature: | |

EXHIBIT - 3

**ATTACHMENT - C**

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES

Form.: 7102R
Eff.: 8/23/19
Ref.: Dir. 3376R-A

## DISPOSITION FORM

| Grievance Reference #:<br>**580177** | Date Filed:<br>**August 30, 2022** | Facility:<br>**GRVC – 2a** |
|---|---|---|
| Inmate Name:<br>**Williams, Alexander** | Book and Case#:<br>**141-18-01632 NYSID 01897858L** | Category:<br>**Medical (DOC Related)** |

From OCGS Inmate Statement Form, print or type short description of grievance:

*After a diligent review of my my medical records I have reviewed multiple medical treatment refusal form that are 1. Not signed by myself 2. or displays that I refused treatment or Bellevue when in fact I was never even asked or notified of the treatment or medical trip.*

Action Requested by Inmate:

*Please investigate this matter, ensure that I am on camera whenever afforded medical as per policy.*

### STEP 1: FORMAL RESOLUTION

Check one box: ■ Grievance      ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

OCGS informed Mr. Williams, Alexander as per NYCH&H Correctional Health Services this matter has been forwarded to Patient Relations for review and handling. In addition, this matter has been forwarded to the GRVC Medical Team.

### CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐ I request to appeal the resolution of this grievance to the Commanding officer.

Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.

| Inmate's Signature: | Date: |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature:<br>*Mr. Nelson* | Date:<br>August 31, 2022 |
|---|---|

ATTACHMENT -B-1



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
### INMATE STATEMENT FORM

Form.: 7101R-A
Eff.:9/14/18
Ref.: Dir. 3376R-A

**Inmate's Name:** Alexander Williams

**Book & Case #:** 141/1801632

**NYSID #:** 01897858C

**Facility:** G.R.V.C

**Housing Area:** 2a

**Date of Incident:** 8/25/2022

**Date Submitted:** 8/25/2022

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** after a diligent Review of my medical Records I've have reviewed multiple Medical Treatment Refusal forms that was 1) that not signed by myself 2) or desplayed that I Refused treatment or belliver, either In fact I even never ever asked or notified of the treatment of medical Injuip

**Action Requested by Inmate:** please investigate this matter, ensure that I am on camera whenever offered medical

**Please read below and check the correct box:** as pr policy

Do you agree to have your statement edited for clarification by OCGS staff?   Yes ☐   No ☑

Do you need the OCGS staff to write the grievance for you?   Yes ☐   No ☐

Have you filed this grievance with a court or other agency?   Yes ☐   No ☑

Did you require the assistance of an interpreter?   Yes ☐   No ☑

**Inmate's Signature:** alexu ellilles

**Date of Signature:** 8/25/2022

### FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

**TIME STAMP**

**Grievance Reference #** 580177

**Category:** Medical DOC Related

**Office of Constituent and Grievances Services Coordinator/Officer Signature:**

EXHIBIT - 4

**ATTACHMENT - C**



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION



| OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES | Form.: 7102R<br>Eff.: 8/23/19<br>Ref.: Dir. 3376R-A |
|---|---|
| **DISPOSITION FORM** | |

| Grievance Reference # 582115 | Date Filed: 09/08/22 | Facility: GRVC 2A |
|---|---|---|

| Inmate Name: Williams, Alexander | Book and Case: 1411801632 | Category: Mental Health |
|---|---|---|

From OCGS Inmate Statement Form, print or type short description of grievance:

On the above date at approximately 10:30 am Captain Mitchell was escorting me to Mental Health as an emergency also suicide attempt. SRT team lead by a Captain Fernandez came to 2 building gate and made statement —————— to " you are the guy with the lawsuit". "I'm going to fuck you up now" This ____/MOS was 6'4" brown skin with dreads, no body, no shield, or no name tag visible. This MOS with dreads advanced towards me with his hands protruded upwards in a strike like position. While my back was turn.

Action Requested by Inmate:   Please provide Mental Health treatment....

## STEP 1: FORMAL RESOLUTION

Check one box: ☑ Grievance     ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

The person in custody was informed his submission has been forwarded to the mental health unit for review.

## CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: *[signature]* | Date: 09/08/22 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature:<br>CO. *Byrne* 18029 | Date: 09/08/22 |
|---|---|

ATTACHMENT -B-1



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION
## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
### INMATE STATEMENT FORM

Form.: 7101R-A
Eff.:9/14/18
Ref.: Dir. 3376R-A

**Inmate's Name:** Alexander Williams

**Book & Case #:** 1411801672

**NYSID #:** 08978580

**Facility:** CNVC

**Housing Area:** 7a

**Date of Incident:** 8/31/2022

**Date Submitted:** 8/31/2022

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OC GS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** on the above date at approximately 10:30a cpt mitchell was escorting me to mental health as an emergency after suicide attempt. SRT team lead by a captian Fernandez. came to 2 Building gate and made statement indictive to "you are the guy with the law suit" "I'm going to fuck you up now" This ofc/Mos was 6'4 Brown skin with dreads, no body, no shield or name tag visible. this mos with dreads advanced toward me with his hands protruded towards in a strike like position. while my back was turn

**Action Requested by Inmate:** please provide mental health treatment in accordance. deseth State, Federal and Local Law including mental health treatment in an appropiate Area

### Please read below and check the correct box:

Do you agree to have your statement edited for clarification by OCGS staff?  Yes ☐  No ☑

Do you need the OCGS staff to write the grievance for you?  Yes ☐  No ☑

Have you filed this grievance with a court or other agency?  Yes ☐  No ☐

Did you require the assistance of an interpreter?  Yes ☐  No ☐

**Inmate's Signature:** [signature]

**Date of Signature:** 8/31/2022

### FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

**TIME STAMP:** 2022 ... 9 ... 10:52

**Grievance Reference #:** 58 2115

**Category:** Mental Health

**Office of Constituent and Grievances Services Coordinator/Officer Signature:** C. BYRNE #18049

R. 7

EXHIBIT - 5

ATTACHMENT - C

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

| **OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES** | Form.: 7102R<br>Eff.: 8/23/19<br>Ref.: Dir. 3376R-A |
|---|---|
| **DISPOSITION FORM** | |

| Grievance Reference # 582595 | Date Filed: 09/09/22 | Facility: GRVC 2A |
|---|---|---|

| Inmate Name: Williams, Alexander | Book and Case: 1411801632 | Category: Medical |
|---|---|---|

From OCGS Inmate Statement Form, print or type short description of grievance:

I have been reporting to DOC and medical that I have a constant sharp pain in my stomach area and believe that I have a gallbladder infection because this has occurred to me in the past.

Action requested by inmate: Please allow me to be examined.

Action Requested by Inmate:   Please allow me to be examined.

---

### STEP 1: FORMAL RESOLUTION

Check one box:  ☐ Grievance     ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

The OCGS staff has informed the individual his submission has been forwarded to the medical unit for review.

---

### CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐ I request to appeal the resolution of this grievance to the Commanding officer.

Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.

| Inmate's Signature: | Date:09/09/22 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature: | Date: 09/09/22 |
|---|---|

ATTACHMENT -B-1



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
### INMATE STATEMENT FORM

Form: 7101R-A
Eff.:9/14/18
Ref.: Dir. 3376R-A

**Inmate's Name:** Alexander Willow

**Book & Case #:** 141150632

**NYSID #:** 01892885C

**Facility:** GRVC

**Housing Area:** 2a

**Date of Incident:** 8/31/2022

**Date Submitted:** 8/31/2022

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OC GS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** I have been Reporting to Doc and medical that I have a constant sharp pain in my stomach area and believe that I have a gallbladder infection, because this has occurred to me in the past

**Action Requested by Inmate:** please allow me to be observed

**Please read below and check the correct box:**

Do you agree to have your statement edited for clarification by OCGS staff?   Yes ☐   No ☒

Do you need the OCGS staff to write the grievance for you?   Yes ☐   No ☒

Have you filed this grievance with a court or other agency?   Yes ☐   No ☐

Did you require the assistance of an interpreter?   Yes ☐   No ☒

**Inmate's Signature:**

**Date of Signature:** 8/31/2022

### FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

**TIME STAMP**

**Grievance Reference #** 582595

**Category:** Medical

**Office of Constituent and Grievances Services Coordinator/Officer Signature:** CO Byrne 18029

41

EXHIBIT- 6

**ATTACHMENT - C**



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

| **OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES** | Form.: 7102R<br>Eff.: 8/23/19<br>Ref.: Dir. 3376R-A |
|---|---|
| **DISPOSITION FORM** | |

| Grievance Reference # 582147 | Date Filed: 09/08/22 | Facility: GRVC 2A |
|---|---|---|

| Inmate Name: Williams, Alexander | Book and Case: 1411801632 | Category: Medical |
|---|---|---|

From OCGS Inmate Statement Form, print or type short description of grievance:

The medical doctor has been coming in housing 2A between 6 am-7 am for sick call which myself and the other inmate are sleep which leads to not being able to voice the sick call issues. This is since the facility stopped seeing sick call request slip. I am told that this is the policy for court ordered lock down inmates.

Action Requested by Inmate: Please come on 8-3 tour, please provide me with copy of sections of policies...

## STEP 1: FORMAL RESOLUTION

Check one box: ☑Grievance        ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

The person in custody was informed his submission will be forwarded to the medical unit for review.

## CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
### *(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date:09/08/22 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature: | Date: 09/08/22 |
|---|---|



# CITY OF NEW YORK – DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
### INMATE STATEMENT FORM

Form.: 7101R-A
Eff.:9/14/18
Ref.: Dir. 3376R-A

**Inmate's Name:** Alexander Williams

**Book & Case #:** 141180/632

**NYSID #:** 01897858L

**Facility:** GRVC

**Housing Area:** 29

**Date of Incident:** 8/3/2022

**Date Submitted:** 8/31/2022

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** The Medical doctor has been coming to housing 29 between 6 am – 7 am for sick-call which myself and the other inmate are sleep which leads to not being able to voice the sick-call issue. This is since the facility stopped giving sick-call request slip. I am told that this is the policy for court ordered Lockdown Inmates

**Action Requested by Inmate:** Please come on 8-3 hour, please provide me with copy of section of policy that

**Please read below and check the correct box:** states dr walk to offer sick-call

Do you agree to have your statement edited for clarification by OCGS staff? Yes ☐ No ☐

Do you need the OCGS staff to write the grievance for you? Yes ☐ No ☑

Have you filed this grievance with a court or other agency? Yes ☐ No ☐

Did you require the assistance of an interpreter? Yes ☐ No ☐

**Inmate's Signature:**

**Date of Signature:** 8/31/2022

### FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

**TIME STAMP** 2022 SEP -8 A 11:26

**Grievance Reference #** 582147

**Category:** Medical

**Office of Constituent and Grievances Services Coordinator/Officer Signature:** C.O. Byrne #18079

EXHIBIT- 7

Copy

ATTACHMENT - C

 **CITY OF NEW YORK - DEPARTMENT OF CORRECTION**

| **OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES** | Form.: 7102R<br>Eff.: 8/23/19<br>Ref.: Dir. 3376R-A |
|---|---|
| **DISPOSITION FORM** | |

| Grievance Reference # 582040 | Date Filed: 09/08/22 | Facility: GRVC 2A |
|---|---|---|

| Inmate Name: Williams, Alexander | Book and Case: 1411801632 | Category: Medical |
|---|---|---|

From OCGS Inmate Statement Form, print or type short description of grievance:

Since my Jan 13, 2022, extraction I have a constant pain on my right wrist and shoulder and have had issues moving my bowels due to unauthorized body cavity search that led to tear in anal tissue.

Action Requested by Inmate:  Please examine my medical for this pain.

### STEP 1: FORMAL RESOLUTION

Check one box:  ☑ Grievance      ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

The OCGS staff has notified the inmate his submission has been forwarded to the medical unit for review.

### CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date:09/08/22 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature:<br>Co - Byrne 18049 | Date: 09/08/22 |
|---|---|

ATTACHMENT -B-1

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
### INMATE STATEMENT FORM

Form.: 7101R-A
Eff.:9/14/18
Ref.: Dir. 3376R-A

**Inmate's Name:** Alexander Mullen

**Book & Case #:** 141180/632

**NYSID #:** 01897850C

**Facility:** GRVC

**Housing Area:** 2a

**Date of Incident:** 8/31/2022

**Date Submitted:** 8/31/2022

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** Sence my Jan 13, 2022 Extraction I have a consistent pain on my Right Wrist and Shoulder and have had issues moving my bowels due to unauthorized body cavity search that lead to tear in Anal tissue.

**Action Requested by Inmate:** please examine me medical for this pain

**Please read below and check the correct box:**

Do you agree to have your statement edited for clarification by OCGS staff?   Yes ☐  No ☒

Do you need the OCGS staff to write the grievance for you?   Yes ☐  No ☒

Have you filed this grievance with a court or other agency?   Yes ☐  No ☒

Did you require the assistance of an interpreter?   Yes ☐  No ☒

**Inmate's Signature:** Alex Mullen

**Date of Signature:** 8/31/2022

### FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

**TIME STAMP**

**Grievance Reference #** 58 20 40

**Category:** Medical *

**Office of Constituent and Grievances Services Coordinator/Officer Signature:**
C.O. Byrane #18049



EXHIBIT-8

ATTACHMENT - C

 

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES

Form.: 7102R
Eff.: 8/23/19
Ref.: Dir. 3376R-A

## DISPOSITION FORM

| Grievance Reference # 583515 | Date Filed: 09/13/22 | Facility: GRVC 2A |
|---|---|---|

| Inmate Name: Williams, Alexander | Book and Case: 1411801632 | Category: Medical |
|---|---|---|

From OCGS Inmate Statement Form, print or type short description of grievance:

I have my 5th surgery appointment coming up and DOC officials have failed to produce me to the last 4 appointments. I beg that I am produced now because I am in sever pain.

Action Requested by Inmate: Please produce me to my surgery appointment.

### STEP 1: FORMAL RESOLUTION

Check one box: ☑ Grievance        ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

Mr. Williams has been informed his complaint has been forwarded to the medical unit for review.

### CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: *[signature]* | Date: 09/13/22 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature: CO Byrne 18024 | Date: 09/13/22 |
|---|---|



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
## INMATE STATEMENT FORM

Form.: 7101 R-A
Eff.:9/14/18
Ref.: Dir. 33 76R-A

| Inmate's Name: Alexander William | Book & Case #: 141170167 | NYS ID #: 01897858C |
|---|---|---|

| Facility: GRVC | Housing Area: 7c | Date of Incident: 9/1/2022 | Date Submitted: 9/1/2022 |
|---|---|---|---|

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Offi of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference numb OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

Grievance: I have my 5th Surgey appeentmet komeing ep and Doc offereas have failed to prodvce me to there last 4. appantmets. I beg that I am produced now bereuse I am in serve pein

Action Requested by Inmate: please produce me to my Surgy appeentmet

Please read below and check the correct box:

| | Yes | No |
|---|---|---|
| Do you agree to have your statement edited for clarification by OCGS staff? | ☐ | ☐ |
| Do you need the OCGS staff to write the grievance for you? | ☐ | ☑ |
| Have you filed this grievance with a court or other agency? | ☐ | ☐ |
| Did you require the assistance of an interpreter? | ☐ | ☑ |

| Inmate's Signature: | Date of Signature: 9/1/2022 |
|---|---|

### FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

| TIME STAMP | Grievance Reference #: 58305 | Category: medical |
|---|---|---|
| | Office of Constituent and Grievances Services Coordinator/Officer Signature: CO Byrne #18049 | |

4)

9

**EXHIBIT-9**

**ATTACHMENT - C**



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES

### DISPOSITION FORM

Form.: 7102R
Eff.: 8/23/19
Ref.: Dir. 3376R-A

| Grievance Reference # 583519 | Date Filed: 09/13/22 | Facility: GRVC 2A |
|---|---|---|

| Inmate Name: Williams, Alexander | Book and Case: 1411801632 | Category: N.G. Staff Complaint |
|---|---|---|

From OCGS Inmate Statement Form, print or type short description of grievance:

On the 3-11 tour Saturday September, my suicide watch officer was shift reduced from 3:30pm- 7:30pm.

Action Requested by Inmate: Please stop shift reducing suicide watch.

### STEP 1: FORMAL RESOLUTION

Check one box: ☐ Grievance      ☑ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

Mr. Williams has been informed his complaint has been forwarded to the facility leadership for review.

### CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date: 09/13/22 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature: | Date: 09/13/22 |
|---|---|

ATTACHMENT -B-1



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
### INMATE STATEMENT FORM

Form.: 7101R-A
Eff.:9/14/18
Ref.: Dir. 3376R-A

| Inmate's Name: Alexander Williams | Book & Case #: 7411841632 | NYSID #: 01897885C |
|---|---|---|

| Facility: CRVC | Housing Area: 2a | Date of Incident: 9/3/2022 | Date Submitted: 9/3/2022 |
|---|---|---|---|

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** on the 3-11 tear Saturday September my Scicide watch officer was Shifted Redeced From 3:30 pm to 7:30pm

**Action Requested by Inmate:** please Stop Shift Redecing sucide watch

### Please read below and check the correct box:

| | Yes | No |
|---|---|---|
| Do you agree to have your statement edited for clarification by OCGS staff? | ☐ | ☑ |
| Do you need the OCGS staff to write the grievance for you? | ☐ | ☑ |
| Have you filed this grievance with a court or other agency? | ☐ | ☑ |
| Did you require the assistance of an interpreter? | ☐ | ☐ |

| Inmate's Signature: Alexander Williams | Date of Signature: 9/3/2022 |
|---|---|

### FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR    NG

| TIME STAMP | Grievance Reference # 583519 | Category: STAFF Complaint |
|---|---|---|
| | Office of Constituent and Grievances Services Coordinator/Officer Signature: CoByrne 18549 | |

**EXHIBIT-10**

**ATTACHMENT - C**



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES

### DISPOSITION FORM

Form.: 7102R
Eff.: 8/23/19
Ref.: Dir. 3376R-A

| Grievance Reference # 583490 | Date Filed: 09/13/22 | Facility: GRVC 2A |
|---|---|---|

| Inmate Name:  Williams, Alexander | Book and Case: 1411801632 | Category: Medical |
|---|---|---|

From OCGS Inmate Statement Form, print or type short description of grievance:

I have a serve pain in gall bladder area of my stomach.

Action Requested by Inmate:     Provide me with adequate medical treatment to address this issue/medical complaint.

## STEP 1: FORMAL RESOLUTION

Check one box: ☑Grievance      ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

Mr. Williams has been informed his complaint has been forwarded to the medical unit for review.

## CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution  ☐ No   ☐I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date:09/13/22 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature: | Date: 09/13/22 |
|---|---|
| co Byrne 18048 | |



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
### INMATE STATEMENT FORM

Form.: 7101 R-A
Eff.:9/14/18
Ref.: Dir. 33-76R-A

| Inmate's Name: Alent Lelelleen | Book & Case #: 14170632 | NYS ID #: 0189788 52 |
|---|---|---|

| Facility: CU-VC | Housing Area: 2a | Date of Incident: 9/1/2022 | Date Submitted: 9/1/2022 |
|---|---|---|---|

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** I have a serve pain in gall bladder area of my stomach

**Action Requested by Inmate:** please provide me with adequate medical treatment to address this issue of medical complain

### Please read below and check the correct box:

| | Yes | No |
|---|---|---|
| Do you agree to have your statement edited for clarification by OCGS staff? | ☐ | ☑ |
| Do you need the OCGS staff to write the grievance for you? | ☐ | ☑ |
| Have you filed this grievance with a court or other agency? | ☐ | ☑ |
| Did you require the assistance of an interpreter? | ☐ | ☑ |

| Inmate's Signature: Alent Lelellen | Date of Signature: 9/1/22 |
|---|---|

### FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

| TIME STAMP | Grievance Reference # 583496 | Category: Medical |
|---|---|---|
| | Office of Constituent and Grievances Services Coordinator/Officer Signature: | |

41

EXHIBIT-11

Alexander  Williams,Jr. NYSID:01897858L
B&C No. 1411801632
09-09 Hazen Street
George R. Vierno Center
East Elmhurst, NY 11370

--------------------------------------------------

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
ALEXANDER WILLIAMS, JR.,

                       Plaintiff,

              -against-

CITY OF NEW YORK, et al.,

                    Defendants.
-------------------------------------------------------X

                        **REPORT AND RECOMMENDATION**

                        21-CV-1083 (PGG) (KHP)

**TO: THE HONORABLE PAUL G. GARDEPHE, UNITED STATES DISTRICT JUDGE**
**FROM: KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

     *Pro se* Plaintiff Alexander Williams, Jr. ("Williams" or "Plaintiff") commenced this action

seeking damages and injunctive relief under 42 U.S.C. §§ 1983, 1985, and 1986 alleging that

Defendants violated his constitutional rights while he was housed as a pre-trial detainee at the

George R. Vierno Center ("GRVC") at Rikers Island.[1] The Court previously dismissed Plaintiff's

claims under Sections 1985 and 1986, as well as Section 1983 claims asserted against 16 of the

66 defendants named in the Second Amended Complaint ("SAC").[2]

     Plaintiff's remaining claims, contained in an extraordinarily lengthy complaint, pertain to

several different causes of action including alleged mistreatment due to his religion,

interference with access to his attorneys and the law library, unsanitary and unhealthy

conditions of confinement, improper provision of medical services, denial of substantive and

---

[1] Plaintiff twice amended his complaint. All citations herein refer to the Second Amended Complaint ("SAC"), which is the operative complaint. (ECF No. 36.) When accepting this complaint, the Court directed that no further amendments or joinder would be permitted. (ECF No. 47.)

[2] The dismissed defendants are New York City Health & Hospital, Doctor K, Captain Ferber, CO Simms, Unknown ESU Officer, Doctor Bryan Burns, Doctor Saidu Jimoh, Mrs. V., Shawn Fishler, Mr. Roman, ADW Lacroix, Captain Ballah, CO Adamchez, CO Edmunds, CO Figoriua, and CO Pierce. (ECF Nos. 60, 96.)

procedural due process in connection with being subjected to enhanced restraints, retaliation

for his numerous complaints about his treatment at Rikers, and negligent hiring, retention, and

supervision of the prison officers with whom he interacted.  He also contends that the City

should be liable for the violations of his constitutional rights based on the prison officials'

implementation of an order governing his confinement (i.e., *Monell* claim).

In light of Plaintiff's *pro se* status, the Court construes the complaint as asserting the

following causes of action: (1) violations of the Board of Corrections' ("BOC") Minimum

Standards; (2) violations of Plaintiff's First Amendment right to free exercise of religion and

rights under the Religious Land Use and Institutionalized Persons Act of 2000, pursuant to 42

U.S.C. § 2000cc *et seq.*, ("RLUIPA") because he was not provided with a Torah for a period of

time, not always provided Kosher meals, and not permitted to meet with a Rabbi for a period of

time; (3) a violation of Plaintiff's rights under the Equal Protection Clause of the Fourteenth

Amendment insofar as a prison Command Level Order ("CLO") mandated he be given a Bible

rather than allowing for a Torah; (4) violations of his Fourteenth Amendment rights related to

conditions of his confinement related to hygiene and denial of recreation and medical services;

(5) violations of his right to medical privacy; (6) violations of his right to meaningful access to his

counsel and the courts; (7) excessive force in violation of the Fourteenth Amendment in

connection with use of handcuffs/enhanced restraints; (8) violations of his substantive and

procedural due process rights under the Fourteenth Amendment related to his classification as

a centrally monitored case ("CMC") inmate and imposition of enhanced restraints (i.e., leg

irons, waist chains, and mitts) pursuant to a CLO issued by the prison warden;[3] (9) retaliation

for bringing complaints about his conditions of confinement and lack of access to counsel and

the courts in violation of the First Amendment; (10) municipal liability pursuant to *Monell v.*

*Dep't of Soc. Servs.*, 436 U.S. 658 (1978); (11) negligent hiring, retention and supervision and

failure to train in violation of state law; (12) false imprisonment in violation of state law in

connection with being placed in restrictive housing pursuant to the Lockdown Order (as defined

below); and (13) a violation of his Fifth Amendment right against self-incrimination insofar as he

was forced to handwrite requests to the Law Library which allowed the state prosecutor to

obtain a handwriting exemplar helpful to the prosecution in his underlying criminal case. (ECF

No. 36-2, p. 15).[4] Defendants seek dismissal of the SAC in its entirety for failure to state a claim

and have moved to dismiss the complaint against certain individual defendants because the

SAC fails to contain sufficient allegations of their personal involvement in any deprivation of

Plaintiff's rights.

For the reasons set forth below, I recommend that the motion be granted in part and

denied in part.

---

[3] Plaintiff uses the term "fraud" in connection with the issuance and application of the CLO to him. The Court construes those allegations to be in the nature of due process claims addressed herein. Plaintiff also mentions the Fourth and Eleventh Amendments once (ECF No. 36-2 p. 21) but makes no factual allegations implicating rights thereunder. As such, the Court does not construe the complaint as asserting claims under these constitutional provisions.

[4] Plaintiff cites the Eighth Amendment in his SAC. However, as discussed below, the Fourteenth Amendment rather than the Eighth Amendment governs claims relating to the conditions of confinement of pretrial detainees like Plaintiff. Therefore, in light of Plaintiff's *pro se* status, the Court construes the claims as falling under the Fourteenth Amendment.

## FACTUAL ALLEGATIONS

The following facts, taken from the SAC, are presumed true for purposes of this motion and all reasonable inferences are drawn in Plaintiff's favor. In January 2019 while Plaintiff was awaiting trial on felony murder charges, a New York State Court judge issued a Lockdown Order directing that Plaintiff be subject to certain restrictions in prison because of his assessment that Plaintiff posed a significant risk to the safety of persons he perceived to be potential witnesses for the prosecution against him. (ECF No. 36-7, pp 10-11.)

### 1. Lockdown Order

The Lockdown Order imposed restrictions on Plaintiff's housing, visits, phone calls, and transportation – all to minimize his ability to communicate with or pass information to others who might carry out instructions to harm potential witnesses. The Lockdown Order, stated, in pertinent part:

- The . . . defendant is to be housed in a highly secure area designated by the Department of Correction, preferably the lockdown area, on lock-in, to be separated from all other inmates in the area, in such a manner as to prevent him, to the extent possible, from communicating with or passing material to other inmates.

- Defendant is barred from having any visits other than with his attorney . . . .

- Defendant is precluded from making any telephone calls other than to his attorney. . . . A correction officer or captain shall dial such telephone number . . . using the defendant's PIN number. Moreover, the defendant's PIN number shall be changed weekly and shall not be given to the defendant. The correction officer or captain placing the call shall verify that attorney . . . has answered the phone and, only after verifying that said attorney is on the line, shall permit the defendant in question to speak on the phone. Additionally, in order to avoid any claim by this defendant that the Department of Corrections has not permitted him to speak with his attorney in accordance with this order, the Department of

4

Correction[s] will maintain a log of each attorney call by this defendant, whether completed or not, such log shall detail the following Information for each attempted call: a) date and time call requested, b) time call placed, c) whether or not contact was made with the attorney, [d]) the time call ended.

• While in a court detention facility, this defendant will be housed in a similar manner [as the above].

(ECF No. 36-7, p. 10-11, SAC Ex. 19.)

The Lockdown Order was later amended to allow two investigators hired by Plaintiff's counsel and another attorney to have visits and calls with Plaintiff. (ECF Nos. 74-3, Ex. B; 74-4, Ex. C.)

### 2. Plaintiff's Arrival at GRVC and the Command Level Order

Pursuant to the court's Lockdown Order, on January 17, 2019, New York City Correction Department, Operation Security Intelligence Unit, designated Plaintiff as a centrally monitored inmate to be placed in a CMC housing unit with waist chains and leg irons to be worn when outside the facility and during transport. (ECF No. 36-5, p. 2-3, SAC Ex. 1.) On November 2, 2020, Plaintiff was transferred from the Manhattan Detention Complex ("MDC") to GRVC housing unit 1a. (SAC ¶¶ 1-2.) Defendant Warden Dunbar issued a Command Level Order, CLO 370.20, setting forth the procedures and restrictions applicable to Plaintiff and other pretrial detainees subject to similar lockdown orders.

CLO 370.20 states that its purpose is "to establish policy and procedures for the Care, Custody and Control of the inmates under Court Ordered lockdown status." (ECF No. 36-5, p. 10-15, SAC Ex. 3.) It provides that the inmates housed in court-ordered lockdown status shall be in "[t]wenty-three (23) hour lock-in, feed-in status" and shall be allowed to possess in their cell one Bible, three magazines, three books, one bar of soap, one container of shampoo, one

5

toothbrush, one toothpaste, one plastic cup, one towel and a deodorant. (*Id.*) It also provides,
*inter alia*, that: (1) "[i]nmates in lock-down status shall not be removed from their cells unless a
Captain is present;" (2) "[w]henever a Court Ordered Lock-Down Inmate is removed from the
housing area, he shall be restrained in leg irons, waist chains and mitts" and "shall be under
one-on-one observation of a Correction Officer to assure no communication with any other
inmate(s), verbally, in writing or through hand signs;" (3) "these inmates shall be strip-searched,
and their property carefully searched on a daily basis;" (4) "[i]nmates will make all requests for
Law Library materials in writing," which "will be forwarded to the Security Office who will
obtain copies of the requested materials and place same in the inmate blue storage bin;" (5)
"[t]he assigned Captain will collect all letters written by the inmate" and "will turn them over to
the Security Office," and no inmates in court-ordered lockdown status will be permitted to send
out any written or other type of communication; (6) "[t]he court ordered inmates are barred
from Visits and Telephone calls to anyone other than their attorney of record," and "[a]ll calls
will be placed between the hours of 1330 -1430 hours and 1630-1730 hours;" (7) "[i]nmates will
be afforded a ten-minute shower, three (3) times per week," and "a Captain shall be present
when the inmate is removed from his cell to the shower and again when he is returned from
the shower to his cell;" (8) no incoming mail shall be forwarded to the inmates housed in the
court-ordered areas until first forwarded to the GRVC Security Office and "approved by the
Commanding Officer of (sic) his/her designee;" (9) "[i]f these inmates request religious services,
the Chaplain will be called to visit them;" (10) "[a]ny necessary medical or mental health
services are to be provided to these inmates in the housing area," and they "will not be
removed to go to the Clinic unless it is physically impossible to provide them with necessary

6

medical services in the cell/housing area.  Mental Health services, if required, will be provided

to them in the housing area, not in the Clinic;" and (11) inmates "may be afforded recreation in

accordance with the details delineated in the court order or as amended in a separate memo,"

and they "will be restrained in waist chains handcuffs and mitts whenever they are out of their

cells for recreation." (*Id.*)  Plaintiff learned about CLO 370.20 on November 3, 2020.  (SAC ¶ 3.)

### 3. Minimum Standards

Plaintiff asserts that subjecting him to CLO 370.20 violates the BOC's Minimum

Standards, which provide that: (i) "all prisoners shall be permitted to shave daily" (SAC ¶ 41,

Minimum Standard 1-03(c)(1)); (ii) "all prisoners shall be granted access to facility law library for

a period of at least two hours each day the library is open[ ]" (SAC ¶ 44, Minimum Standard 1-

08(f)(4)); (iii) "all prisoners shall have reasonable access to type writer (sic), dedicated word

processor and photocopies for the purpose of preparing legal documentation" (SAC ¶ 44,

Minimum Standard 1-08(g)(2)); (iv) "recreation shall be at least one hour; recreation must be

made available seven days a week in the outdoor recreation area" (SAC ¶ 46, Minimum

Standard 1-06(c)); (v) "all out-going mail for prisoners shall be sealed by the prisoner and

deposited in a locked receptacle box" (SAC ¶ 49, Minimum Standard 1-11(c)(4)); (vi) "all

prisoners are entitled to reasonable observance of dietary laws or fasts established by their

religion" (SAC ¶ 50, Minimum Standard 1-07(f)); (vii) "correctional personnel shall never

prohibit delay or cause to prohibit or delay inmates access to care or appropriate treatment.

All decisions regarding medical attention needs shall be made by health care personnel" (SAC ¶

51, Minimum Standard 3-02(b)(4)); (viii) "all medical treatment or physical examination shall

occur inside of appropriate treatment areas . . . except as needed in the event of an acute

emergency" (SAC ¶¶ 51, 106 Minimum Standards 3-02(b)(4), 3-06(b)(5)); (ix) "the department shall make available to prisoners an adequate amount of equipment during the recreation period" (SAC ¶ 110, Minimum Standard 1-06(d)(1)); (x) the "law library will be kept opened for prisoners use all holidays except New Years, July 4, Thanksgiving and Christmas" (SAC ¶ 151, Minimum Standard 1-08(f)(iv)); and (xi) "each law library shall be open[] for a minimum of five days per week including at least one (1) weekend day" (SAC ¶ 151, Minimum Standard 1-08(2)).

### 4.  Plaintiff's Complaints

#### a.  *Violations Based on Religion*

Plaintiff asserts that he is Jewish and has been classified as such since he entered the New York City Department of Correction ("DOC"), on March 15, 2018. (SAC ¶ 78.) Nonetheless, Plaintiff alleges that despite informing Defendants numerous times that he is Jewish, he was not provided a kosher meal on various days in his first month at Rikers and then on several other occasions thereafter when the facility was in "alarm" status, which resulted in Plaintiff not eating on those days. (SAC ¶¶ 12, 13, 18, 38, 58, 79, 80, 83, 100, 123, 125, 131, 136, 140, 144, 145, 260, 262.) On November 27, 2020, Plaintiff was informed by a prison staff member that there had been an error in the system regarding his meals, which was corrected, and that the Plaintiff would begin receiving kosher meals. (SAC ¶ 149.) Plaintiff received his first kosher meal on that day. (SAC ¶ 150.)

On November 24, 2020, Plaintiff was informed by CO Day that he would never see a Rabbi because he was not classified as Jewish. (SAC ¶ 141.) On November 27, 2020, Plaintiff requested to call the Rabbi to engage in religious services and prayer, but his request was denied without reason. (SAC ¶ 153.) On several other occasions, Plaintiff was not allowed to

8

see a Rabbi when he requested—although it appears that Plaintiff was sometimes provided access to a Rabbi. (SAC ¶¶ 54, 182, 213, 255.) Plaintiff also requested a Torah on several occasions but was not provided with one. (SAC ¶¶ 34, 38, 190.) It was not until a Rabbi intervened that Plaintiff received a copy of the Torah on January 9, 2021. (SAC ¶ 215.) The explanation given for not previously being provided a Torah was that Plaintiff was on restricted status. (SAC ¶¶ 213, 215.) Some of the limitations on access to religious services also appear to have been related to COVID-19 pandemic lockdowns. (ECF Nos. 36-3, p. 10; 36-4, p. 18.) Notwithstanding the explanations provided, Plaintiff contends that he was not advised that any restrictions or deprivations of his religious requests were for a valid penological purpose. (ECF No. 36-4, p. 17.)

Plaintiff complains that some of the Defendants denied his religious identity, insulted, and intimidated him. (SAC ¶¶ 78, 82.) For example, ADW Carter stated on November 11, 2020: "And all that Jewish shit cut it we don't care what you are here you eat what we feed you and you read a Bible not a Tora[h] per CLO 370.20." (SAC ¶ 67.) When Plaintiff informed Warden Dunbar that he is Jewish and requested a copy of the Torah, on November 6, 2020, she responded: "Since when do they make Jews that look like you," and "You are not Jewish Mr. Williams I know your pedigree and that is how I know that you are enhance restraint." (SAC ¶ 38.)

The following Defendants are mentioned in connection with Plaintiff's claims regarding interference with the practice of his religion: Carter (SAC ¶¶ 4, 34, 67, 79, ECF Nos. 36-2, p. 28-29; 36-3, p. 2), Dunbar (SAC ¶¶ 12, 82, ECF Nos. 36-2, p. 29; 36-1, p. 2-3, 36-3, p. 2), Vallejo (SAC

9

¶ 50), CO Sherma (SAC ¶ 78), CO Ramirez (SAC ¶ 18, 23), CO Sherman and Captain Blake (ECF No. 36-3, p. 93).[5]

### b. Denial of Access to Counsel, Law Library and Court

#### i. Denials and Limitations of Phone Calls to Attorneys

Plaintiff asserts that, although his Lockdown Order does not limit phone calls to his attorneys, the CLO limits them to the time periods between 1:30 and 2:30 p.m. and 4:30 and 5:30 p.m. Nonetheless, Plaintiff's numerous requests to make phone calls to his attorneys were denied, including for example, on November 3rd, 4th, 5th, 8th, 13th, 15th, 23rd, 2020 (SAC ¶¶ 5, 10, 20, 56, 81, 108, 132-33), December 24th, 27th, 28th, 2020 (SAC ¶¶ 205, 208-09), January 3rd, 10th, 11th, 18th, 2021 (SAC ¶ 210, 216, 222), February 8th, 2021 (SAC ¶ 231), and April 11th and 12th, 2021 (SAC ¶ 263).

#### ii. Denials of Attorney Visits

Plaintiff alleges that on November 9, 2020, he was denied a visit with his attorney when the attorney's entry was refused due to an alarm. (SAC ¶ 62.) On April 1, 2021, Plaintiff's attorney attempted to meet with him, but his request was denied because the facility officials did not escort Plaintiff to a legal counsel room despite his attorney waiting for two hours. (SAC ¶ 261.)

#### iii. Lack of Confidentiality in Communications with Attorneys

Plaintiff alleges that prison officials listened to his confidential conversations with his attorneys, including on November 6, 2020, when CO McNeil instructed Plaintiff to ensure he

---

[5] It is unclear to the Court whether CO Sherma and CO Sherman are the same person (i.e., whether "Sherma" is simply a typo).

correctly spelled his name in Plaintiff's complaint, after a phone call with his attorney (SAC ¶ 40); on November 7, 2020, when CO Ritter stood directly in front of Plaintiff's door and gave him a short phone line to speak with his attorney (SAC ¶ 47); and on December 15, 2020, when CO Hickson also gave Plaintiff a short phone line, allowing CO Hickson to eavesdrop while standing in front of the door (SAC ¶ 189).  During a November 11, 2020 visit with his attorney, while Plaintiff was pointing out correctional personnel responsible for denying him showers as they were passing by, ADW Carter saw this, interrupted the visit and attempted to inform Plaintiff's attorney that he allowed Plaintiff to shower that day.  (SAC ¶ 73.)  According to Plaintiff, the lack of confidentiality had a deterring effect on him and affected how he communicated with his defense team, ultimately affecting how they marshaled the defense in his criminal case.  (SAC ¶ 189.)

### iv.   *Denial of Access to the Courts*

On November 12, 2020, Plaintiff had a video court appearance in the criminal action against him, but CO Sherma informed him that Plaintiff's video court session had been denied by Warden Dunbar.  (SAC ¶ 77.)

### v.   *Denial of the Law Library Access, Removal of Legal Papers, and Handling of Legal Mail*

In support of his allegations concerning denial of access to the law library, Plaintiff included in the SAC Exhibit 14, which is an October 26, 2020 BOC Central Officer Review Committee Recommendation that was issued following Plaintiff's appeal from the denial of his August 30, 2020 grievance seeking a tablet to conduct legal research.  (ECF No. 36-6, p. 13-17.) In that recommendation, BOC noted that Plaintiff's Lockdown Order does not limit his access to law library or legal research materials and recommended that Plaintiff be provided access to

the law library or, if that was not possible, access to Lexis Nexis in his housing area via a kiosk or a tablet. (*Id.*) It was noted in the recommendation that, in restrictive housing areas, a law library kiosk is located in a vacant cell in the housing area. (*Id.*) Moreover, it stated the DOC should ensure that Plaintiff has access to the law library when he is moved to another jail. (*Id.*)

Plaintiff alleges that his requests for law library services were denied numerous times, including on November 4th and 7th, 2020. (SAC ¶¶ 10, 43-44). On November 17, 2020, Plaintiff requested access to the law library to review his discovery via a thumb drive and laptop, but that request was denied because the facility could not locate his discovery speculating it was not mailed from MDC. (SAC ¶ 114.) The same day, Plaintiff's request to use a spare cell with a typewriter and dedicated word processor was denied because the facility did not have such a cell and did not allow Plaintiff to travel to the law library. (SAC ¶ 115.) Plaintiff's access to the library was also denied on November 27, 2020, which was the Friday after Thanksgiving and not a recognized holiday. (SAC ¶ 152.) Plaintiff also asserts that he learned from his attorneys that the prosecutor in his case was attempting to obtain his handwriting to be used as an exemplar against a crucial piece of evidence. Thus, by denying him the right to use the facility Law Library, he was required to use pen and paper when corresponding back and forth, which ultimately forced him to give up a sample of his handwriting. (ECF No. 36-2, p. 15).

On November 7, 2020, Plaintiff released his court-addressed legal mail to CO Hickson, who informed Plaintiff that his legal mail will be treated as provided in the CLO. (SAC ¶¶ 48-49.) On November 13, 2020, Plaintiff was informed that all his law library requests have to pass security first, both going out and coming in. (SAC ¶ 85.) On November 29, 2020, Plaintiff's cell

12

was searched and legal papers, including multiple grievances, were removed. (SAC ¶ 166).

During a December 23, 2020 search of the Plaintiff's cell, the first draft of his complaint in this

action along with 52 stamps were confiscated, and Plaintiff did not receive a receipt for same.

(SAC ¶ 199.)

### c. *Being Placed in Enhanced Restraints*

Plaintiff alleges that his Lockdown Order does not require enhanced restraints, which

were imposed on him under the CLO, in violation of his due process rights, and he was treated

worse than an animal. (SAC pp. 108-09.) On November 9, 2020, Plaintiff was taken to his

medical appointment at the mini-clinic in enhanced restraints, which was kept on his body

while medical staff examined him. (SAC ¶ 61.) On November 11, 2020, Plaintiff was placed in

enhanced restraints during his legal visit despite his protests. (SAC ¶ 71.)

On November 16, 2020, Plaintiff was also informed that, if he wanted to go to

recreation, he would have to be handcuffed for the entire recreation period. (SAC ¶¶ 109-10.)

On November 29, 2020, Plaintiff alleges that he was locked in his cell for almost 22 hours while

handcuffed. (SAC ¶ 165.) On January 21, 2021, Captain Merenych ordered that Plaintiff be

placed in enhanced restraints to attend his video court appearance, which Plaintiff protested.[6]

(SAC ¶ 218.) However, CO McNeil informed Captain Merenych to take Plaintiff to his video

court appearance without enhanced restraints because "they did not want the plaintiff seen by

City Lawyers in Enhance Restraint." (*Id.*)

---

[6] Plaintiff spells this Defendant's name as Mervich. The Court uses the spelling provided by Defendants because it assumes the Defendants have provided the correct spelling of their own names.

13

### d. *Denial of Showers, Recreation, Recreational Equipment and Request to Clean His Cell*

At some point Plaintiff was moved to housing unit 2 (SAC ¶ 8) and, upon inspection of his cell, he saw that the toilet seat and cell walls were covered with what looked and smelled like human feces (SAC ¶ 9). Plaintiff requested materials to clean his cell, which was denied. (SAC ¶¶ 9-10.) Defendants repeatedly denied his requests to take showers and for shaving razors. (SAC ¶¶ 2-4, 16, 41, 64, 135, 142.) Similarly, Plaintiff's requests for recreation were denied, including on November 8, 2020 (SAC ¶ 53), March 5th, 6th, 9th, 11th, 12th, 16th, 18th, and 21st, 2021 (SAC ¶ 250), and April 1st, 4th, 8th, 2021 (SAC ¶ 258). When Plaintiff requested recreation equipment, he was informed that the recreation area did not contain a dip bar or a pull up bar. (SAC ¶¶ 110, 220, 221.)

### e. *Violations Based on Medical Care and Lack of Privacy*

Plaintiff alleges that he was denied medical examination and treatment numerous times. On November 5, 2020, Plaintiff was denied his daily dose of mental health medication. (SAC ¶ 31.) On November 8, 2020, instead of medical personnel, CO K. Young gave Plaintiff his nightly mental health medication. (SAC ¶ 57.) When Plaintiff asked Dr. Blackmore to examine him in connection with ankle pain on November 9, 2020, Dr. Blackmore informed Plaintiff that he had prescribed him painkillers and that a physical examination would be impossible due to his current lockdown court order status. (SAC ¶ 60.)

On November 13, 2020, around 7:50 p.m., Plaintiff had a gallbladder attack and experienced issues breathing and suffered severe chest pain. (SAC ¶ 90.) Despite requesting urgent help, Plaintiff did not receive medical attention until 11:45 p.m., when Captain Campbell discovered him on the floor barely conscious. (*Id.*) When medical personnel arrived, Plaintiff

14

was rear-cuffed, assisted from his cell to a gurney and shackled to a pole on the gurney before

being transported to the facility clinic. (SAC ¶ 91.) Plaintiff was informed by a nurse that he

needed to go to a hospital. (SAC ¶ 93.) During his time at the clinic, Plaintiff was shackled and

handcuffed from 12:15 a.m. to 5:30 a.m. and was not allowed to go to a hospital although the

medical staff informed Captain Palmer-Campbell of his condition. (SAC ¶ 94.) Despite being

contacted, Warden Dunbar also did not permit Plaintiff to be taken outside of the facility for

any reason. (Id.)

On the morning of November 15, 2020, Plaintiff complained to Dr. Blackmore that he

was in pain due to prolonged handcuffing and needed to be examined. (SAC ¶ 102.) In the

afternoon, Dr. Blackmore returned to Plaintiff's cell and examined him through the cell door by

asking Plaintiff to lift his hand up to the glass window. (Id.) Dr. Blackmore explained that he

reviewed the Plaintiff's medical records, recognized he had arthritis and that he had been

handcuffed for a few hours, and would prescribe Plaintiff medication that required him to eat

beforehand. (SAC ¶ 104.) After Dr. Blackmore left, the inmate in the next cell began to laugh at

Plaintiff about his arthritis and the medication he was prescribed, which Plaintiff felt was a

violation of his privacy. (SAC ¶ 105.)

On November 16, 2020, when Plaintiff requested that Dr. Blackmore examine him

because he had unbearable pain, Dr. Blackmore responded that Plaintiff needed to give the

medication a chance to work, and there was no need to be examined. (SAC ¶ 109.) The same

day, Plaintiff was feeling suicidal but was reluctant to express this information with the mental

health clinician due to the lack of privacy. (SAC ¶ 113.) On November 23, 2020, Plaintiff

informed Dr. Blackmore that he had a headache and believed he might have a sinus infection. (SAC ¶ 128.) Dr. Blackmore responded that he would prescribe Sudafed. (*Id.*)

On November 24, 2020, Plaintiff had another gallbladder attack and asked for emergency assistance, but he was informed that a captain must be present to call a medical emergency under the CLO. (SAC ¶ 137.) Plaintiff laid on the floor of his cell hoping to alleviate the pain and was later provided a shower that allowed him to relax and catch his breath. (SAC ¶ 138.) Thereafter, Plaintiff alleges he overheard prison personnel stating they would make sure his cell was sprayed with pepper spray during an upcoming extraction of a neighboring inmate. (*Id.*) When the extraction commenced, pepper spray was sprayed under Plaintiff's cell door, but Plaintiff's request go to the clinic for decontamination was denied. (SAC ¶ 139.)

On November 26, 2020, due to a fire in the housing unit, smoke spread into Plaintiff's cell and began to affect his breathing. (SAC ¶ 146.) Plaintiff informed CO Lawrence that he had chest pain and breathing difficulties, but CO Lawrence explained that a captain needed to be present before calling for a medical emergency under the CLO. (*Id.*) Plaintiff received no medical assistance until four hours later when Captain Charles escorted him to the clinic. (SAC ¶ 148.) On November 29, 2020, during an extraction of Plaintiff, guards deployed a pepper-based chemical grenade into his cell, causing Plaintiff to suffer from smoke inhalation before opening the cell door. (SAC ¶ 165.)

On December 9, 2020, Plaintiff discussed confidential matters with the mental health staff, including current mental health drugs and Plaintiff's feelings coping with depression, through his cell door in the presence of two corrections officers and five inmates. (SAC ¶ 185.) When the mental health staff left, another inmate told Plaintiff that he should kill himself since

he was depressed.  (*Id.*)  On December 21, 2020, Plaintiff was again forced to discuss

confidential mental health concerns through his cell door.  (SAC ¶ 196.)  On December 27, 2020,

Plaintiff was seen by a mental health clinician in the housing area day room where discussion

about his mental health occurred without any privacy, in the presence of other inmates and

correctional officers.  (SAC ¶ 207.)  Similarly, on March 2, 2021, when Plaintiff requested a

COVID-19 vaccine, he was forced to discuss his medical information in the presence of five

inmates and two correctional officers.  (SAC ¶ 245.)

   *f. Allegations of Retaliation*

   Plaintiff asserts that he was transferred to GRVC and has been subjected to Defendants'

retaliatory conduct based solely on his civil litigation and complaints against prison officials.

(SAC ¶ 244.)  Defendants told Plaintiff on numerous occasions that his mistreatment at GRVC

was due to his lawsuit against Captain Mathis and complaints he made since his arrival at GRVC,

that he would "go through hell" at GRVC (SAC ¶¶ 23, 49), and he better get used to denials of

kosher meals, showers, razors (SAC ¶ 79), and phone calls to his attorneys (SAC ¶ 81).

Defendants also informed Plaintiff numerous times that his problems would stop if he would

drop his lawsuits and stop complaining.  (SAC ¶¶ 97, 101, 116, 133, 139, 158, 161.)  On

November 19, 2020, CO Hickson told Plaintiff, "I don't care how many law suits (sic) you put in

per my Warden we are going to squeeze you until you suffocate like George Floyd then your

law suit [sic] wont [sic] mean shit when you are dead."  (SAC ¶ 119.)  On November 20, 2020,

Warden Dunbar told Plaintiff, "You are going to not be satisfied until you get fucking killed

messing around with me boy, I do what I do cause I can get away with it."  (SAC ¶ 121.)  On

November 29, 2020, Plaintiff was placed naked inside the shower area for a few hours because he refused to reveal how he obtained a copy of CLO 370.20. (SAC ¶ 167.)

## LEGAL STANDARD

### 1. Motion to Dismiss Under Rule 12(b)(6)

When considering a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all inferences in the Plaintiff's favor. *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015). To survive a motion to dismiss, the complaint must contain "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While detailed factual allegations are not required, the complaint must contain more than mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555, 557). As the Supreme Court explained in *Iqbal*, the "plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate only when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir. 2000).

"It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they *suggest.*'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)).

18

At the motion to dismiss stage, the Court may consider any document "attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference," as well as "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit[.]" *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citations omitted).

### 2.  Claims Under 42 U.S.C. § 1983

Section 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured[.]"  42 U.S.C. § 1983.  Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).  To state a claim under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citation omitted).

Failing to allege that a defendant was personally involved in, or responsible for, the conduct complained of renders a Section 1983 claim "'fatally defective' on its face." *Alfaro Motors, Inc.* v. *Ward*, 814 F.2d 883, 886 (2d Cir. 1987) (quoting *Black v. United States*, 534 F.2d 524, 527-28 (2d Cir. 1976)).  Equally, "group pleading," which "fail[s] to differentiate as to which defendant was involved in the alleged unlawful conduct," is insufficient to state a claim under

19

Section 1983. *Myers* v. *Moore*, 326 F.R.D. 50, 60 (S.D.N.Y. 2018) (quoting *Leneau v. Ponte*, 2018

WL 566456, at *15 (S.D.N.Y. Jan. 25, 2018)). To prevent dismissal, a plaintiff must make specific

factual allegations against each defendant. *Thomas* v. *Venditto*, 925 F. Supp. 2d 352, 363

(E.D.N.Y. 2013) (citation omitted).

To establish a *Monell* claim to hold a municipality "liable under [Section] 1983 for the

unconstitutional actions of its employees, a plaintiff is required to plead and prove three

elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a

denial of a constitutional right." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983). The

plaintiff may show the existence of such a policy or custom by identifying any of the following:

(i) an express policy or custom; (ii) an authorization of a policymaker of the unconstitutional

practice; (iii) failure of the municipality to train its employees, which exhibits a "deliberate

indifference" to the rights of its citizens; or (iv) a practice of the municipal employees that is "so

permanent and well settled as to imply the constructive acquiescence of senior policymaking

officials." *Corley* v. *Vance*, 365 F. Supp. 3d 407, 438 (S.D.N.Y. 2019) (quoting *Biswas v. City of

New York*, 973 F. Supp. 2d 504, 536 (S.D.N.Y. 2013)), *aff'd sub nom. Corley* v. *Wittner*, 811 F.

App'x 62 (2d Cir. 2020); *see also Outlaw* v. *City of Hartford*, 884 F.3d 351, 372-73 (2d Cir. 2018)

(discussing what constitutes official municipal policy and deliberate indifference).

### 3. Qualified Immunity

"Qualified immunity shields government officials from liability for civil damages as a

result of their performance of discretionary functions, and serves to protect government

officials from the burdens of costly, but insubstantial, lawsuits." *Lennon v. Miller*, 66 F.3d 416,

420 (2d Cir. 1995) (citation omitted). "Government actors performing discretionary functions

20

are 'shielded from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have

known.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *City of Tahlequah v. Bond*,

142 S. Ct. 9, 11 (2021).  "[T]he qualified immunity defense protects a government actor if it was

'objectively reasonable' for him to believe that his actions were lawful at the time of the

challenged act." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).  "The objective

reasonableness test is met—and the defendant is entitled to immunity—if 'officers of

reasonable competence could disagree' on the legality of the defendant's actions." *Id.* (quoting

*Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  The doctrine protects "all but the plainly

incompetent or those who knowingly violate the law." *City of Tahlequah*, 142 S. Ct. at 11 (citing

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)).

In the context of a motion to dismiss, "[t]he defendant 'must . . . show not only that the

facts supporting the defense appear on the face of the complaint, but also that it appears

beyond doubt that the plaintiff can prove no set of facts in support of his claim that would

entitle him to relief.'" *Horn v. Stephenson*, 11 F.4th 163, 170 (2d Cir. 2021) (quoting *Brown v.

Halpin*, 885 F.3d 111, 117 (2d Cir. 2018)).

## DISCUSSION

### 1. RULE 8(A)(2) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Defendants argue that Plaintiff's complaint should be dismissed for failure to comply

with Federal Rule of Civil Procedure 8(a)(2).  Rule 8(a)(2) requires that a pleading "contain . . . a

short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R.

Civ. P. 8(a)(2).  Dismissal of a complaint for failure to comply with Rule 8(a)(2) "is usually

21

reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).

The SAC already has been reviewed under 28 U.S.C. §1915(e)(2)(B) and certain defendants and claims were dismissed from the action. (ECF Nos. 60, 96.) Although the SAC is lengthy and contains unnumbered paragraphs in which Plaintiff alleges his injuries and identifies his causes of action (ECF Nos. 36-2, p. 9 to 36-4, p. 29, SAC p. 64-139), those paragraphs are clear, delineated and, for the most part, short or conclusory not requiring any discerning. Its mere length and multiple causes of action are not a basis to dismiss under Rule 8(a)(2). *Salahuddin*, 861 F.2d at 43 ("Despite its length, however, Salahuddin's complaint is neither vague nor incomprehensible."). Thus, dismissal of the SAC pursuant to Fed. R. Civ. P. 8 is not warranted in the circumstance of this case.

To the extent that the unnumbered paragraphs require any response, Defendants may number them by continuing Plaintiff's paragraph numbering or in any other reasonable fashion.

2. **MINIMUM STANDARDS AND LOCKDOWN ORDER VIOLATIONS**

As a threshold matter, when evaluating each of Plaintiff's claims, they must be analyzed bearing in mind that he was subject to a court issued Lockdown Order which precipitated the CLO. Thus, a penological purpose for the restrictions are presumptively valid, at least insofar as the CLO's requirements are consistent with the state court's Lockdown Order. *See Avery v. Turn Key Health Clinics, LLC*, 2020 WL 714176, at *9 (W.D. Ark. Feb. 12, 2020), aff'd, 839 F. App'x 26 (8th Cir. 2021) (noting that "Security of the criminal justice process, enforcement of a court's orders, protection of victims and witnesses are legitimate penological interests"); *see*

22

also *Hubbard v. Johnson*, 2019 WL 5579507, at *4 (N.D. Cal. Oct. 29, 2019); *Pickford v. Lake Cnty. Cmty. Correction*, 2015 WL 3822262, at *2 (N.D. Ind. June 19, 2015).

Defendants argue that, to the extent Plaintiff's claims are based on a violation of the Board of Corrections' Minimum Standards, no claim under Section 1983 can lie insofar as the Minimum Standards do not set the constitutional standard.

Although the Second Circuit does not appear to have ruled on the issue, district courts in this Circuit consistently have found that BOC's Minimum Standards do not, standing alone, establish a violation of a federally guaranteed right for purposes of Section 1983. *Winters v. City of New York*, 2020 WL 4194633, at *5 (S.D.N.Y. July 21, 2020); *Knight v. Mun. Corp.*, 2016 WL 4030632, at *6 n.7 (S.D.N.Y. July 26, 2016); *Walker v. Shaw*, 2010 WL 2541711, at *6 (S.D.N.Y. June 23, 2010). The rationale for these decisions is that the Minimum Standards, set by state law, are tantamount to procedural guidelines for prisons that the state chooses to require. *Korkala v. N.Y.C. Dep't of Corr.*, 1986 WL 9798, at *4-5 (S.D.N.Y. Sept. 4, 1986) (citations omitted). Thus, to the extent they require more than what is required by the Constitution, they do not form the basis of a claim under Section 1983. To the extent that the Minimum Standards align with Constitutional standards, those are addressed separately below when addressing the Constitutional claims. Accordingly, as violation of the Minimum Standards in and of themselves do not establish the basis for the deprivation of Constitutional right, I recommend that Plaintiff's claims for violation of the Minimum Standards be dismissed.

### 3. VIOLATIONS BASED ON RELIGION

Plaintiff complains that he was not provided with kosher meals in November when he first arrived at Rikers and occasionally on other days thereafter when there was an "alarm"

23

status.  Plaintiff alleges that on a few occasions he was also not permitted to talk with a Rabbi

and participate in Jewish services.  Additionally, Plaintiff alleges that he was initially denied

provision of a Torah and only provided a Christian Bible—a situation that lasted for

approximately three months and only resolved after intervention by the Rabbi—and that he

was ridiculed and questioned about the sincerity of his religious beliefs by prison staff.

Although Plaintiff asserts that in late November he was informed that there had been an error

in the system as to his religious dietary needs and that the situation would be rectified, there is

no allegation that such an error actually existed.  However, there is an allegation that Plaintiff

has been classified as Jewish since entering the DOC system on March 15, 2018, and Plaintiff

asserts that he informed Defendants numerous times that he is Jewish.

Defendants argue that these allegations fail to state a claim for violation of Plaintiff's

First Amendment rights.  In the main, they argue none of the alleged deprivations amounted to

a substantial burden on Plaintiff's religion or prevented him from exercising his religious beliefs.

As to the meals, Defendants argue that there was simply a mistake in the computer system,

meaning that any deprivation in November was unknowing, and that any failure to deliver

kosher meals during an "alarm" status was safety-related and thus justified.  They also assert

they are entitled to qualified immunity as to the initial denial of meals based on the computer

system error.[7]

_____

[7] Plaintiff also asserts claims under RLUIPA based on the same allegations on which he bases his First Amendment Free Exercise Clause claims.  RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson,* 544 U.S. 709, 721 (2005).  RLUIPA ensures "greater protection for religious exercise than is available under the First Amendment." *Ramirez v. Collier,* 142 S. Ct. 1264, 1277 (2022) (quoting *Holt v. Hobbs,* 574 U.S. 352, 357 (2015)).  Defendants do not advance any argument for dismissal of Plaintiff's RLUIPA claims.  Accordingly, Plaintiff's RLUIPA claims remain in the action.  The Court also construes the SAC as

24

"The First Amendment, applicable to the States by reason of the Fourteenth Amendment," *Cruz v. Beto*, 405 U.S. 319, 322 (1972), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (citation omitted).

Courts consider the following factors in determining the reasonableness of a regulation or conduct burdening religious exercise: (1) whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it;" (2) "whether there are alternative means of exercising the right that remain open to [the] prison inmate;" (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and (4) "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Turner v. Safley*, 482 U.S. 78, 89-91 (1987) (citations omitted). Assuming that the required burden on religious exercise under the Free Exercise Clause must be substantial, the Second Circuit stated that "establishing a substantial burden is 'not a particularly onerous task.'" *Brandon v. Kinter*,

---

stating a claim for denial of equal protection under the Fourteenth Amendment insofar as it asserts the CLO provided for Bibles to be given to detainees but not Torahs. Defendants have not made a specific argument for dismissal of this claim, so it too remains in the action.

938 F.3d 21, 32 (2d Cir. 2019) (quoting *McEachin v. McGuinnis*, 357 F.3d 197, 202 (2d Cir. 2004)).

The Second Circuit also has noted that "courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin*, 357 F.3d at 203. Nonetheless, "incidents that are isolated, or few in number, involving a denial of religiously-mandated food, do not give rise to a First Amendment claim." *Maldonado v. Westchester County*, 2021 WL 356155, at *5 (S.D.N.Y. Feb. 2, 2021) (quoting *Washington v. Afify*, 968 F. Supp. 2d 532, 538 (W.D.N.Y. 2013) (collecting cases); *see also Wright v. Bibens*, 2018 WL 5724009, at *6 (D. Conn. Nov. 1, 2018) (holding that "[n]o reasonable jury could conclude that the denial of eight common fare meals over a four-day period substantially burdened the plaintiff's ability to practice his religion.").

Similarly, a prison must permit a "reasonable opportunity for an inmate to engage in religious activities but need not provide unlimited opportunities." *Van Wyhe v. Reisch*, 581 F.3d 639, 657 (8th Cir. 2009); *see also Czekalski v. Hanks*, 2020 WL 7231358, at *22 (D.N.H. Dec. 8, 2020). At least one court within this District has recognized that the state was not required to provide an inmate with the spiritual counselor of his choice. *Graham v. Coughlin*, 2000 WL 1473723, at 6 (S.D.N.Y. Sept. 29, 2000) (granting summary judgment after finding there was a legitimate penological purpose for restrictions where Plaintiff who was in administrative segregation for security reasons complained about not being provided with a Rabbi or allowed to attend Jewish services with the general prison population). Failure to provide a Torah may or may not violate a prisoner's rights depending on the reasons for the failure. See *Yahtues v. Dionne*, 2020 WL 1492877, at *12-13 (D.N.H. Mar. 27, 2020) (finding plaintiff's claim of not

26

being provided a Torah lacked merit because there was no evidence it was available to be provided to inmates in the restricted housing unit and no evidence of disparate treatment in provision of religious texts).

Plaintiff's allegations give rise to a plausible claim of a violation of his free exercise rights under the First Amendment with regard to the initial denial of kosher meals and the failure to be provided a Torah. The allegations that Defendants Carter, Vallejo, Day, and Dunbar questioned the sincerity of Plaintiff's Jewish beliefs notwithstanding being told by Plaintiff that he was Jewish give rise to a plausible inference that they intentionally deprived Plaintiff of his kosher meals, a Torah, and/or requests to see a Rabbi. Other Defendants, including Blake, Hickson, Ramirez, and Sherman, are alleged only to have failed to provide a kosher meal on various days. It is unclear from the pleading why they did not provide the kosher meals. However, because Plaintiff asserts that he informed them he was Jewish and they nevertheless failed to provide kosher meals, the complaint plausibly states a claim.

Finally, the allegations with respect to Defendant Shoclink and Nezma are insufficient to state a Free Exercise claim against them. Plaintiff only alleges that Shoclink informed the Rabbi that Plaintiff was not provided a Torah because he was in lockdown status per the CLO. Shoclink is not alleged to have done anything to actually interfere with Plaintiff's exercise of his religion. As to Nezma, Plaintiff only alleges that on the evening of November 19, 2020, Nezma told him he was ordered not to allow Plaintiff to eat that evening or take a shower. Here, Plaintiff does not allege that he was not given any meals earlier in the day. Failure to provide a kosher meal on one occasion absent more is not sufficient to state a claim against this Defendant. See Maldonado, 2021 WL 356155, at *5.

27

Defendants' argument that they are entitled to qualified immunity because they reasonably relied on a computer system error indicating that Plaintiff was not Jewish is beyond the scope of the instant motion because the existence of a computer error cannot be inferred in Defendants' favor from the face of Plaintiff's complaint. *See Littlejohn*, 795 F.3d at 306-07 (the court must accept all factual allegations in the complaint as true and draw all inferences in the Plaintiff's favor). Further, Plaintiff pleads plausibly and sufficiently the Defendants' knowledge of his religious identity and that he has been classified as Jewish since entering the DOC system on March 15, 2018. Accordingly, Defendants are not entitled to qualified immunity as to this cause of action. *See Sabir v. Williams*, -- F. 4th --, 2022 WL 2183439, at 9 (2d. Cir. June 17, 2022) (holding that the wardens were not entitled to dismissal of the SAC based on qualified immunity because case law and the text of a similar statute clearly established substantially burdening religious exercise without justification violated the law).

In sum, I recommend that the motion to dismiss the Free Exercise claims be denied as to Defendants Carter, Vallejo, Dunbar, Blake, Ramirez, Day, Hickson and Sherman but granted as to Shoclink and Nezma.

4. **CONDITIONS OF CONFINEMENT**

    *a.  Hygiene and Exercise*

Plaintiff asserts that Defendants denied his request to clean feces from his cell on one occasion, as well as numerous requests for shower, razor, recreation, and recreation equipment. Defendants argue that there is no constitutional right to a daily shower, and sporadic denials of razor and outdoor recreation do not rise to the level of a constitutional violation.

28

The Constitution requires that prison officials "provide humane conditions of confinement" and "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones[.]" *Id.* (internal quotation marks and citation omitted). When a plaintiff is a pretrial detainee, as here, claims related to conditions of confinement are analyzed under the Due Process Clause of the Fourteenth Amendment. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). When evaluating such a claim, courts look to "contemporary standards of decency." *Id.* at 30 (internal citation omitted).

To state a claim for deliberate indifference to conditions of confinement, a plaintiff must show that the deprivation was both objectively serious and that the defendant official acted with sufficient mens rea (the "subjective" prong of the test). *Id.* at 29. Under the objective prong, the deprivation must be sufficiently serious where "the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id.* at 30 (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)).

Under the subjective prong, the plaintiff must show that the defendant was deliberately indifferent to any objectively serious condition of confinement. *Id.* at 32. Under the Fourteenth Amendment, this can be shown with evidence that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35.

Numerous courts have held that unpleasant or unsanitary conditions only rise to the level of a constitutional violation if they amount to an objectively and sufficiently serious denial of the minimal civilized measure of life's necessities. *Id.* at 30-32. Furthermore, a plaintiff must proffer facts to show "an official's deliberate indifference to those conditions, or that that those conditions are punitive." *Id.* at 34 n.12.

"[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" *Id.* at 30 (citing *Walker,* 717 F.3d at 125). To properly assess whether conditions are sufficiently serious, the plaintiff must include information about their duration and severity; otherwise, they may be dismissed. *See, e.g., Figueroa v. County of Rockland,* 2018 WL 3315735, at *7 (S.D.N.Y. July 5, 2018) (dismissing conditions-of-confinement claim alleging lack of ventilation, insect infestation, and feces/bodily fluids on the walls because plaintiff did not provide details as to duration of conditions); *Jackson v. Sullivan County,* 2018 WL 1582506, at *4 (S.D.N.Y. Mar. 27, 2018) (dismissing conditions-of-confinement claim in absence of allegations regarding severity and duration).

In this case, the allegations in the SAC do not rise to the level of a constitutional violation, either alone or in the aggregate, as they suggest episodic deprivations that were short in duration and not sufficiently severe. Plaintiff asserts that showers and razor were denied on various dates, but also concedes that showers and razors were otherwise afforded. For example, on November 4, 2020, his request for a shower was denied in the morning, but he was afforded a shower later in the day. (SAC ¶ 11.) Moreover, Plaintiff fails to assert how

30

denials of a shower or razor on occasion posed an objective risk of serious harm to him. *See Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003) ("Deprivation of other [than toilet paper] toiletries for approximately two weeks—while perhaps uncomfortable—does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference.'") (citation omitted); *Thorpe v. Vill. of Greenwich*, 2014 WL 788816, at *10 (N.D.N.Y. Feb. 25, 2014) ("Courts are reluctant to consider even a temporary deprivation of showers a constitutional violation.").

Plaintiff likewise fails to assert how being denied the ability to clean his cell when there was fecal matter on the wall on a single occasion posed an objective risk of harm. He does not provide any information as to the duration of time he was deprived of being able to clean his cell. Similarly, the sporadic denial of the opportunity to exercise does not rise to a constitutional violation.[8] While the Court is sympathetic to the no-doubt harsh conditions at Rikers, similar allegations have been found insufficient to state a claim. *See, e.g., Reid v. City of New York*, 2021 WL 3477243, at *11-12 (S.D.N.Y. Aug. 6, 2021) (recommending dismissal of claims of pretrial detainee who complained about unsupportive mattress, denial of indoor exercise, denial of adequately warm footwear for outdoor recreation in winter), *report and recommendation adopted*, 2021 WL 4177756 (S.D.N.Y. Sept. 14, 2021); *Washington v. Falco*, 2021 WL 797658, at *5 (S.D.N.Y. Mar. 1, 2021) (dismissing pretrial detainee's conditions of confinement claim after finding refusal to provide recreational equipment and allotting only

---

[8] As further discussed below, although the sporadic denial of recreation alleged by Plaintiff is insufficient to state a claim, Plaintiff adequately alleges that being placed in enhanced restraints while exercising violates his constitutional rights.

one to three hours for exercise were non-punitive conditions and defendants were not

deliberately indifferent); *Grant-Cobham v. Martinez*, 2020 WL 2097807, at *3 (E.D.N.Y. May 1,

2020) (dismissing claim alleging dirty conditions at Rikers, including that other inmates threw

feces at or near plaintiff because plaintiff failed to provide information about duration of

condition and whether fecal matter built up to such an extent that plaintiff's health was placed

at risk); *Trimmier v. Cook*, 2020 WL 5231300, at *5 (D. Conn. Sept. 2, 2020) ("The conditions [of]

limited daily telephone calls and recreation, restrictions on commissary spending to $40.00 a

day, visits only with family members, lack of access to a law library and a toilet brush and

ineligibility for good time credit, parole release, halfway house placement, transitional

supervision and vocational or educational programs-- do not constitute deprivations of . . . basic

human needs, such as food, clothing, shelter, medical care or safety.").

Thus, I recommend granting the motion to dismiss with respect to Plaintiff's claims

based on denials of shower, recreation, recreational equipment, and request to clean his cell.

As to these claims, Plaintiff names Defendants Shivraj, Taylor, Quinnones, Emebu, Dychese,

Drumwright[9], and Loiseau; therefore, these Defendants should be dismissed. (*See* SAC ¶ 3, 5,

64-65, 110, 135, 142.)

### b. Medical Claims

Plaintiff alleges that: (1) his requests for medical examination were denied by Dr.

Blackmore when he prescribed pain medication for Plaintiff's severe pain due to prolonged

restraint and Sudafed for Plaintiff's headache without examining him due to the CLO; (2) Dr.

---

[9] Plaintiff also alleges that Defendant Drumwright did not allow Plaintiff to visit the law library or call his attorney. As discussed below, I recommend those claims be dismissed, which leaves no pending claims as to this Defendant.

32

Gemo only examined him through his cell door; (3) his mental health medication was delivered to him by non-medical personnel; (4) he was not allowed to go to a hospital when he had a gallbladder attack on November 13, 2020; (5) he was denied medical assistance for his gallbladder attack and left in his cell with chest pain on November 24, 2020; (6) his request for decontamination from pepper spray was denied; (7) medical assistance was delayed four hours when he had chest pain and difficulties breathing after the fire in the unit; (8) and a pepper-based grenade was deployed to his cell causing him to suffer.

When evaluating a claim of deliberate indifference to medical needs by a pretrial detainee, the same basic two-prong test described above applies. That is, the deprivation must be sufficiently serious, and the defendant must act with a sufficiently culpable state of mind. *Darnell*, 849 F.3d at 29; *Charles v. Orange County*, 925 F.3d 73, 87 (2d Cir. 2019) ("Although *Darnell* did not specifically address medical treatment, the same principle applies here."). However, the inquiry is slightly different on the first prong. The Court assesses (1) whether the detainee "was actually deprived of adequate medical care" and (2) whether the inadequacy in medical care is sufficiently serious, which in turn "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006).

The Second Circuit has set forth a non-exhaustive list of factors for courts to consider when undertaking the inquiry on the first prong including "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003)

33

(quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). To be sufficiently serious to pose a risk of damage to inmate's health, there must exist "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)). Further, "prison officials and medical officers have wide discretion in treating prisoners, and Section 1983 is not designed to permit federal courts to interfere in the ordinary medical practices of state prisons." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citation omitted).

If there has been a total failure to provide treatment, the Court assesses whether the medical condition is sufficiently serious. *Davis v. McCready*, 283 F. Supp. 3d 108, 120 (S.D.N.Y. 2017). But if some treatment has been provided, the court focuses on any delay or interruption in treatment in assessing the seriousness of the deprivation, rather than the underlying medical condition itself, and injuries attributable to the delay or interruption in treatment. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003).

When assessing the subjective, or mens rea prong, the court assesses whether "an objectively reasonable person in [d]efendant's position would have known, or should have known, that [d]efendant's actions or omissions posed an excessive risk of harm" to the plaintiff. *Davis*, 283 F. Supp. 3d at 120 (citing *Darnell*, 849 F.3d at 35). "[S]omething more than negligence is needed to elevate a claim of medical misconduct to a constitutional tort." *Id.* at 121 (citing *Darnell*, 849 F.3d at 36).

34

### i. Allegations Against Dr. Blackmore and Dr. Gemo

Plaintiff's allegations against Dr. Blackmore are insufficient to state a claim of deliberate indifference to his medical needs because Plaintiff alleges that Dr. Blackmore provided treatment for his severe pain and headache, and Plaintiff does not allege that the treatment failed to remedy his medical conditions. Rather, Plaintiff only complains that the treatment was provided to him without examination or examination through a cell door because of the CLO. However, Plaintiff has no right to the treatment of his choice. *See Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986) ("[T]he essential test is one of medical necessity and not one simply of desirability.") (quoting *Woodall v. Foti*, 648 F.2d 268, 272 (5th Cir. 1981)); *see also Sonds*, 151 F. Supp. 2d at 311 ("Federal courts are generally hesitant to second guess medical judgments and to constitutionalize claims which sound in state tort law.").

There are also no allegations that Dr. Blackmore acted with sufficient mens rea to satisfy the second prong of the inquiry. Further, there are no allegations to suggest that the CLO prevented Dr. Blackmore from exercising his independent professional judgment about what medical services were necessary and directing that Plaintiff be moved to a health clinic or hospital if medically warranted. Similarly, as Plaintiff only alleges that Dr. Gemo acted similarly to Dr. Blackmore, those claims also fail as to him. (*See* SAC ¶ 53.) Thus, the claims against Dr. Blackmore and Dr. Gemo should be dismissed.[10]

---

[10] Although Dr. Gemo has yet to appear in this action, he may be dismissed *sua sponte* as the allegations are substantially similar to those alleged against Dr. Blackmore. *See Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 26 (2d Cir. 1990) (affirming *sua sponte* dismissal of all defendants, despite one defendant not appearing in the case or joining the motion to dismiss because the issues against that defendant were substantially the same as those concerning the other defendants); *see also Frein v. Feinstein*, 2021 WL 2715799, at *3 (W.D.N.Y. July 1, 2021).

35

### ii.    Allegations Regarding Method of Delivering Medication and Pepper Spray

Plaintiff's allegations that Defendants delivered his mental health medication instead of medical personnel, denied his request for decontamination, and deployed a pepper-based grenade to extract him from his cell are insufficient to state a claim. Although Plaintiff complains that non-medical personnel delivered his mental health medication, his own allegations indicate that he received adequate care for his mental health needs. Thus, this complaint does not support a sufficiently serious condition. Similarly, Plaintiff's conclusory allegations that he was denied his right to go to the clinic for decontamination "after being exposed to chemical agents," (SAC ¶ 139), without factual allegations of any symptoms he experienced or their extent and duration, is insufficient to support a sufficiently serious medical need. Lastly, Plaintiff's conclusory allegation that he suffered unspecified harm when Defendants employed a pepper-spray grenade to extract him from his cell on November 29, 2020, (SAC ¶ 165), is also lacking, without more, to assert a sufficiently serious medical need. Thus, claims related to these incidents should be dismissed.

### iii.    Allegations About Gallbladder Attacks and Smoke Inhalation

Plaintiff's remaining claims of indifference to his medical needs relate to two gallbladder attacks and treatment for smoke inhalation after a fire in his housing unit. These allegations, as discussed below, are sufficient to state a claim.

Plaintiff alleges that on two occasions he had a gallbladder attack. On November 13, 2020, around 7:50 p.m., he experienced severe chest pain and breathing issues. (SAC ¶ 90.) When Plaintiff did not receive medical assistance after informing Defendant CO Coulthurst about his medical emergency, he started banging on the door, which attracted the attention of

36

Defendant CO Pierce who informed Plaintiff he would call a medical emergency. (*Id.*) Plaintiff

did not receive medical attention until 11:45 p.m., when the clinic nurse informed him and

Captain Palmer-Campbell that he needed to go to a hospital "for gall bladder (sic) removal

and/or gall bladder infection due to stones inside his gall bladder." (SAC ¶ 93.) Plaintiff was

rear-cuffed, placed on the medical gurney and shackled to its pole by CO Graves (SAC ¶ 91-92),

but Defendants did not allow Plaintiff to go to a hospital that day. (SAC ¶ 94.) On November

24, 2020, Plaintiff had another gallbladder attack and "laid on the floor in his cell trying to

maintain from chest pain while CO Day just sat there at the door and watched the plaintiff

while he was in pain," until sometime later he "was allowed to take a shower where he relaxed

and caught his breath." (SAC ¶¶ 137-38.) Insofar as Plaintiff alleges that a nurse advised that

his condition required treatment in a hospital and that he was in severe pain, his allegations are

sufficient to meet the objective prong of the test that his condition was sufficiently serious.

With regard to the mens rea prong, the SAC similarly sufficiently alleges that Defendants

Warden Dunbar, CO Coulthurst, CO Graves, CO Day and Captain Palmer-Campbell knew or

should have known of a risk of harm because Plaintiff stated he was in severe pain, was lying on

the floor in pain, and a nurse advised them Plaintiff needed treatment in a hospital but they did

not arrange for his transfer to the hospital. Moreover, it took Defendants about four hours

before they took Plaintiff to the clinic for his gallbladder attack on November 13, 2020

notwithstanding his severe pain and never provided medical assistance on November 24, 2020,

instead merely providing Plaintiff the opportunity to shower. At the pleading stage, these

allegations are sufficient to raise a plausible inference that these Defendants acted with

deliberate indifference to Plaintiff's serious medical needs. *Darnell*, 849 F.3d at 30; *see also*

37

*Davison v. Rios,* 2017 WL 1843308, at *2 (W.D. Okla. May 5, 2017) (denying motion to dismiss a deliberate indifference claim where the plaintiff alleged that he "experienced two debilitating gallbladder attacks, suffered continuing extreme pain, was advised by a physician that he would continue to have attacks until he had surgery" but "was not operated on for seven months after surgery was recommended).

As for the smoke inhalation claim, Plaintiff asserts that a fire broke out and smoke spread through the housing unit causing him chest pain and problems breathing. He asked CO Lawrence to go to the clinic but had to wait four hours to be transported there. He admits that he maintained consciousness the entire time. (SAC ¶¶ 146, 148.) A reasonable person would find that prolonged exposure to smoke inhalation significantly affects an individual's breathing and, consequently, daily activities and has the potential to inflict substantial chest pain and death. *See Gumora v. City of New York*, 2018 WL 736018, at *5 (S.D.N.Y. Feb. 5, 2018) ("Courts in this district have consistently held that conditions of confinement that expose inmates to unreasonable levels of smoke satisfy the objective prong."). Thus, the Plaintiff's allegations are sufficient to plead that his medical needs related to smoke inhalation were sufficiently serious. As for mens rea, Plaintiff alleges that CO Lawrence explained to him that "he knew the policy" concerning medical emergency, "but at G.R.V.C. they did things different," and he needed to wait for a captain to be present before calling for a medical emergency. (SAC ¶¶ 146-147.)

Allegations that the Defendants were aware of the smoke and Plaintiff's complaints that he was having trouble breathings coupled with a four-hour delay in providing medical treatment give rise to a plausible inference that Defendants were deliberately indifferent to Plaintiff's medical needs on this occasion. *See Garcia v. Fischer*, 2016 WL 297729, at *7

(S.D.N.Y. Jan. 22, 2016) (finding that where the smoke condition was apparent at 2:00 a.m., but defendants failed to call the fire department until 3:17 a.m. or begin evacuating plaintiffs until 4:00 a.m., this "could give rise to the inference that defendants knew plaintiffs were being exposed to unreasonably dangerous heavy smoke, yet deliberately chose not to alleviate this for two or more hours.").

Thus, I recommend denying the motion to dismiss with regard to Plaintiff's claims against Warden Dunbar, CO Coulthurst, CO Graves, CO Day, Captain Palmer-Campbell, CO Pierce, and CO Lawrence for deliberate indifference to his medical needs in connection with the alleged delay and denial of medical assistance during Plaintiff's gallbladder attacks and delay in medical assistance for smoke inhalation.

## 5. LACK OF MEDICAL PRIVACY

In addition to complaining about indifference to his medical needs, Plaintiff asserts a claim for violation of his right to medical privacy. He alleges that: (1) on November 15, 2020, an inmate overheard his conversation with Dr. Blackmore through the cell door and laughed at the fact that Plaintiff had arthritis; and (2) on December 9, 2020, after Plaintiff discussed his current depression with the clinician through the cell door in the presence of correctional officers and proximity of other inmates, another inmate told Plaintiff that he should kill himself.

A prisoner's right to privacy in his medical information is protected by the Fourteenth Amendment. *Hancock v. County of* Rensselear, 882 F.3d 58, 65 (2d Cir. 2018). However, the right is not unqualified. *Rush v. Artuz*, 2004 WL 1770064, at *11 (S.D.N.Y. Aug. 6, 2004). "[T]he interest in the privacy of medical information will vary with the condition." *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999). For example, courts have recognized a right to privacy in an

39

inmate's transsexualism and HIV positive status because in the prison context these conditions may provoke hostility and intolerance from others. *Id.*

Courts within the Second Circuit have declined to recognize a claim for violation of medical privacy with regard to disclosure of mental health disorders because such disclosure is not likely to expose an inmate to discrimination or intolerance. *Ruple v. Bausch*, 2010 WL 3171783, at *4 (N.D.N.Y. July 21, 2010) (declining to extend Fourteenth Amendment protection where the plaintiff suffered from depression and possible liver damage). Magistrate Judge Cott recently determined that "bipolar disorder is likely not such a condition demanding confidentiality under the Fourteenth Amendment." *Dash v. Doe*, 2020 WL 3057133, at *3 (S.D.N.Y. June 9, 2020) (finding Magistrate Judge Cott's determination correct and adopting his Report).

Further, even if a medical condition is one demanding privacy under the Fourteenth Amendment, prison officials can impinge that right if their actions are reasonably related to legitimate penological interests. *See, e.g.*, *Gibson v. Rosati*, 2016 WL 11478234, at *5 (N.D.N.Y. May 19, 2016) (finding that any privacy interest in plaintiff's mental health history, recent mental health diagnosis, and compliance with psychiatric medications may be impinged upon if reasonably related to penological interests); *Dash*, 2020 WL 3057133, at *3. The law is also clear that "gratuitous disclosure of an inmate's confidential medical information as humor or gossip . . . is *not* reasonably related to a legitimate penological interest, and it therefore violates the inmate's constitutional right to privacy." *Powell*, 175 F.3d at 112.

Plaintiff's claim that discussion of his arthritis and request for a COVID vaccine in front of others violated his right to medical privacy is without merit. (SAC ¶¶ 105, 245.) Neither of

these discussions relate to conditions likely to expose an inmate to discrimination or intolerance. Further, in all of the situations about which Plaintiff complains, including discussion of his mental health, the circumstances of the discussions were related to Plaintiff's treatment and occurred in the housing unit because of Plaintiff's restricted housing status and, thus, the circumstances related to a legitimate penological purpose. (See SAC Ex. 3.) No disclosure was gratuitous or disclosed through humor or gossip. Accordingly, these disclosures do not give rise to a constitutional claim. Powell, 175 F.3d at 111-112.

Thus, I recommend dismissing Plaintiff's claim for a violation of his right to medical privacy. This includes dismissing Defendant Islam who is only alleged to be present when Plaintiff was speaking to medical staff.[11]  (See SAC ¶ 24.)

## 6.  COMMUNICATIONS WITH COUNSEL/ACCESS TO COURT

Plaintiff complains that his access to counsel was unduly restrictive insofar as he was limited in the times that he could speak with his criminal defense counsel over the phone or in person and sometimes denied a call or visit. He also complains that at times he was not given complete privacy when he met with his attorney and that, on one occasion, he was not permitted to attend a court proceeding in his underlying criminal case by video. He also complains about various other impediments he faced in pursuing legal claims, including that he was not provided adequate access to the law library, that his legal papers and 52 stamps were removed from his cell on two occasions, that his legal outgoing mail to the court and all his law library requests were censored under the CLO.

---

[11] Plaintiff also alleges that Defendant Islam denied him his phone call and a shower pursuant to the CLO. As I have recommended those claims be dismissed, there are no other viable claims against Defendant Islam.

41

Plaintiff's claims implicate his Sixth Amendment right to counsel in connection with his defense of the criminal charges against him as well as his right of access to the courts in connection with his challenge to his conditions of confinement, which is grounded in various constitutional provisions including the right to due process and equal protection. *Bourdon v. Loughren*, 386 F.3d 88, 95 (2d Cir. 2004). Prison regulations restricting a pretrial detainee's contact with his attorney may give rise to a Constitutional claim if the restrictions "unreasonably burdened the inmate's opportunity to consult with his attorney and to prepare his defense." *Benjamin v. Fraser*, 264 F.3d 175, 187 (2d Cir. 2001) (quoting *Wolfish v. Levi*, 573 F.2d 118, 133 (2d Cir. 1978), *rev'd on other grounds*, *Bell v. Wolfish*, 441 U.S. 520 (1979)). Prison regulations or conditions that interfere with a prisoner's access to court in connection with challenging conditions of confinement require an evaluation of whether the prisoner has meaningful access to the tools needed to present those claims for formal adjudication by the court. *Bourdon*, 386 F.3d at 92-93. I first address complaints related to Plaintiff's Sixth Amendment rights and then address the other access-related complaints.

### a. Restrictions on Access to Counsel

A pretrial detainee's Sixth Amendment rights are violated when a prison regulation unjustifiably obstructs, infringes, unreasonably burdens, or significantly interferes with his access to counsel. *Patterson v. Ponte*, 2017 WL 1194489, at \*3 (S.D.N.Y. Mar. 30, 2017), *report and recommendation adopted*, 2017 WL 1405753 (S.D.N.Y. Apr. 17, 2017) (citation omitted). To the extent access is restricted based on an institutional rule, the court must evaluate the restriction considering the goal of institutional security. *Bell*, 441 U.S. at 547; *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015). Courts also have recognized that prisoners do not have

a right to unlimited telephone calls to counsel and that day and time limitations may be imposed. *See, e.g., Bellamy v. McMickens*, 692 F. Supp. 205, 214 (S.D.N.Y. 1988); *Pino v. Dalsheim*, 558 F. Supp. 673, 675 (S.D.N.Y. 1983); *Patterson*, 2017 WL 1194489, at *4 (postponement of one phone call and inability to speak with a paralegal on one occasion did not unreasonably burden right to counsel). "Correctional officials may regulate contact with attorneys to a point" to, for example, keep staff, detainees and witnesses safe and prevent escape. *J.B. v. Onondaga County*, 401 F. Supp. 3d 320, 336 (N.D.N.Y. 2019). But, regulations must be reasonably necessary to address these legitimate penological concerns. *Id*.

Plaintiff's allegations fail to establish that his access to counsel was unreasonably burdened. Although he asserts that his requests to call his attorney were denied entirely on seven days in November 2020, four days in December 2020, four days in January 2021, one day in February 2021, and two days in April 2021, he does not allege that he was unable to communicate with his attorney by using alternative means of communication such as mail correspondence and visits. He also does not allege that there was any specific impact on his defense of his underlying criminal case as a result of not having visits on these occasions.

Additionally, it appears from the face of the SAC that on at least some occasions, the reason for the denial of the visit was an institutional concern. For example, on November 9, 2020, Plaintiff states that his attorney visit was denied due to a safety alarm. (SAC ¶ 62.) A security concern is a reasonable basis to deny an attorney visit, and the number of visits denied are not alleged to have impacted Plaintiff's criminal defense. *See Williams v. Ramos*, 2013 WL 7017674, at *5 (S.D.N.Y. Dec. 23, 2013).

Similarly, the CLO's temporal restrictions of Plaintiff's phone calls to his attorneys are reasonably related to legitimate penological interests, namely keeping witnesses safe as noted in the Lockdown Order, and did not foreclose Plaintiff's communications with his attorney. Plaintiff fails to allege that temporal restrictions of phone calls to his attorney imposed by the CLO were sufficiently serious or burdensome to constitute objective deprivations of his right to due process.

While Plaintiff's claims regarding denial of occasional visits and calls with his defense counsel do not rise to the level of a constitutional violation, his allegations regarding denial of private consultations with his counsel are sufficient to state a claim.  The Sixth Amendment right to counsel includes the right to communicate with counsel in confidence. *Weatherford v. Bursey*, 429 U.S. 545, 554 n. 4 (1977) ("[T]he Sixth Amendment's assistance-of-counsel guarantee can be meaningfully implemented only if a criminal defendant knows that his communications with his attorney are private and that his lawful preparations for trial are secure against intrusion by the government, his adversary in the criminal proceeding."); *United States v. Rosner*, 485 F.2d 1213, 1224 (2d Cir. 1973) ("[T]he essence of the Sixth Amendment right is, indeed, privacy of communication with counsel."); *see also J.B.*, 401 F. Supp.3d at 336 (granting class certification in action challenging state interference with right to counsel and injunction requiring prison to allow private meeting spaces and recognizing that forcing prisoners to consult attorneys in the presence of other prisoners or guards compromises their Sixth Amendment right to counsel).

Defendants appear to concede that the allegations regarding lack of privacy with counsel are sufficient to state a claim, as they did not make a specific argument to dismiss this

aspect of Plaintiff's complaint. Accordingly, I recommend that the motion to dismiss Plaintiff's claims relating to denial of occasional attorney visits and phone calls and temporal limitations on them be dismissed for failure to state a claim. This includes dismissing Captain Smith, as Plaintiff only alleges Smith denied him the right to call his attorney on a single occasion due to an alarm. (*See* SAC ¶ 56.) This leaves only the Sixth Amendment lack of privacy claims against CO McNeil, CO Ritter, CO Hickson, and ADW Carter.

### b. Video Court Appearance

Plaintiff alleges that Defendants denied him the ability to attend his November 12, 2020 video court appearance in his criminal case. However, Plaintiff does not allege the nature and purpose of the video conference or that he suffered any actual injury or adverse impact from his lack of attendance. (SAC ¶ 77; p. 85.) Here, Plaintiff's right to attend court conferences and hearings are not unqualified, and his attendance is not required "in circumstances involving matters of law or procedure that have no potential for meaningful input from a defendant." *Ponzo on behalf of Inmates of Jefferson Cnty. v. County of Jefferson*, 2019 WL 4573249, at *3 (N.D.N.Y. Sept. 20, 2019), *report and recommendation adopted,* 2019 WL 5883684 (N.D.N.Y. Nov. 12, 2019) (quoting *DePallo v. Burge*, 296 F. Supp. 2d 282, 289 (E.D.N.Y. 2003)). By failing to allege the nature of the proceeding of the video court conference, Plaintiff's pleading is factually deficient. *See id.*

Additionally, to the extent Plaintiff was denied attendance at a specific proceeding in his underlying criminal case, that is an issue to raise through his criminal defense attorney in that case, not in the instant action brought under Section 1983. *See Younger v. Harris*, 401 U.S. 37,

41 (1971) (federal court should abstain from interfering with a pending state prosecution);
*Trump v. Vance*, 941 F.3d 631, 637 (2d Cir. 2019) (same).

Accordingly, any allegation pertaining to denial of participation in this particular court conference should be dismissed.

### c. Restrictions on Use of Law Library, Legal Mail and Removal of Legal Papers

An inmate's rights to mail, packages, law library, and telephone calls and communications may be restricted if the restrictions employed are reasonably related to legitimate penological interests such as security. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *Thornburgh v. Abbott*, 490 U.S. 401, 409, 413 (1989); *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 210 (N.D.N.Y. 2015). Further, "prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Lewis v. Casey*, 518 U.S. 343, 351 (1996) (quoting *Bounds v. Smith*, 430 U.S. 817, 825 (1977)). Law library facilities are merely "one constitutionally acceptable method to assure meaningful access to the courts," and alternative means may also achieve the goal of access to the courts. *Id.* To state a claim for denial of access to the courts, a plaintiff must allege facts showing that the defendant's conduct "was deliberate and malicious, and that the "defendant's actions resulted in actual injury to the plaintiff." *Banks v. County of Westchester*, 168 F. Supp. 3d 682, 692 (S.D.N.Y. 2016) (quoting *Bellezza v. Holland*, 730 F. Supp. 2d 311, 314 (S.D.N.Y. 2010). To demonstrate actual injury, a plaintiff must allege: (1) a valid underlying cause of action separate from the right-of-access claim; and (2) frustration or hindrance of the litigation caused by the defendant's actions. *See Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

Plaintiff's denial of court access claims relating to removal of his legal papers, regulation and censorship of mail, and access to the law library relating to his underlying criminal case fail to state a claim because Plaintiff, represented by retained counsel in that case, has not alleged that any of these actions impacted his defense of the criminal charges against him. *See Lewis*, 518 U.S. at 351 (holding that to assert a violation of access to the courts based on denial of law library services, a prisoner must show that "the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim"). Notably, Plaintiff did not assert any facts explaining how Defendants' denials of his requests to use the law library or the lack of a library kiosk in his housing unit prejudiced him or hindered his efforts to assist his counsel in representing him in his underlying criminal case or in prosecuting this or any other action. *See Gamble v. City of New York ex rel. NYC Dep't of Corr.*, 2009 WL 3097239, at *6 (S.D.N.Y. Sept. 25, 2009) ("The Constitution . . . 'does not require unlimited and unrestricted access to a law library at the demand of a prisoner'" and "prison officials may place reasonable restrictions on inmates' use of facility law libraries as long as those restrictions do not interfere with inmates' access to the courts.").

The Court notes that Plaintiff's complaints about access to the law library are premised on the fact that Rikers restricted his access more than recommended by the BOC Central Officer Review Committee. That Committee recommended that Plaintiff be provided with access to the law library or a library kiosk located in a vacant cell within the unit. (ECF No. 36-6, p. 13-17.) However, the Warden at Rikers was not required to adopt this recommendation and was free to institute other regulations aimed at addressing institutional concerns—i.e., safety. *See Legal Aid Soc. v. Ward*, 457 N.Y.S.2d 250, 252 (1st Dep't 1982). To the extent that Plaintiff

47

complains that prison guards "censored" his library requests, this "censorship" appears to be limited to ensuring Plaintiff did not use the library service to communicate with others in a way prohibited by the state court Lockdown Order to ensure safety of witnesses slated to testify against him. (SAC Ex. 3.) Plaintiff does not allege that he was impeded in the prosecution of any legal claims or that his underlying criminal defense was negatively impacted by this alleged censorship.

Similarly, Plaintiff asserts that Defendants removed legal papers from his cell on two occasions, including multiple grievances and the first draft of the complaint in this action along with 52 stamps. (SAC ¶ 199.) Here again, however, Plaintiff fails to allege what, if any, injury he suffered as a result of these incidents or how such removal actually impeded his meaningful access to the courts or prejudiced his pending proceedings. Thus, he fails to state a claim based on these restrictions/actions.

With regard to alleged interference with his mail, the Second Circuit has recognized that "[i]nterference with legal mail implicates a prison inmate's rights [of] access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). To state a claim for denial of access to the courts based on interference with legal mail a plaintiff must assert "that the defendant took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.'" *Id.* (quoting *Monsky v. Moraghan*, 127 F. 3d 243, 247 (2d. Cir 1997)). "Restrictions on prisoners' mail are justified only if they 'further[ ] one or more of the substantial governmental interests of security, order, and rehabilitation . . . [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.'" *Id.* (quoting *Washington v.*

*James*, 782 F.2d 1134, 1139 (2d Cir. 1986)). "[C]ourts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Id.* (citation omitted). In *Davis*, the district court dismissed the plaintiff's allegations of two instances of tampering with his mail on the ground that he had "not alleged that the interference with his mail either constituted an ongoing practice of unjustified censorship or caused him to miss court deadlines or in any way prejudiced his legal actions," *Id.* at 352, and the Second Circuit affirmed the dismissal. *Id.* at 354.

Plaintiff asserts that his legal outgoing mail to the court was censored under the CLO. In light of the state court Lockdown Order finding that Plaintiff posed a danger to prosecution witnesses and that Plaintiff should be limited in his communication with others, there is a legitimate governmental interest in monitoring Plaintiff's mail. Further, Plaintiff's allegation that his legal mail to this Court was censored is insufficient to state a cognizable claim insofar as Plaintiff does not allege he suffered any prejudice by the censorship. (*See* SAC ¶¶ 48-49.)

In sum, I recommend that Plaintiff's claims of denial of access to the courts be dismissed. This includes dismissing CO White, as Plaintiff only alleges that CO White informed him that he was not allowed to send any mail outside of the facility.[12] (*See* SAC ¶ 43).

### 7. FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION

To the extent that Plaintiff asserts a claim for violation of his Fifth Amendment right not to incriminate himself in connection with his handwritten requests for law library materials, it fails as a matter of law. The privilege against self-incrimination does not protect a defendant

---

[12] Plaintiff also alleges that CO White placed him in enhanced restraints once (SAC ¶ 6) which, as discussed below, is without merit.

from being compelled to provide a handwriting exemplar because such an act is not testimonial. *See U.S. v. Greer*, 631 F.3d 608, 612 (2d Cir. 2011) (citing *U.S. v. Hubbell*, 530 U.S. 27 (2000)). Thus, this claim should be dismissed.

### 8.  **EXCESSIVE FORCE FROM HANDCUFFS AND ENHANCED RESTRAINTS**

Plaintiff alleges that he was subjected to excessive force in violation of the Fourteenth Amendment when he was placed in and taken out of enhanced restraints. For example, he says on one occasion when removing handcuffs, Defendant Captain Le Fleur bent Plaintiff's wrist and another time the handcuffs caused severe wrist pain. (SAC ¶¶ 156, 172.) To establish a claim of excessive force, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable" given the facts and circumstances at the time. *Kingsley*, 576 U.S. at 396-97; *Edrei v. Maguire*, 892 F.3d 525, 534 (2d Cir. 2018). Courts consider several factors when determining objective reasonableness, including: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *Edrei*, 892 F.3d at 534.

Where injuries are *de minimis*, such as pain or abrasions from a handcuffing like that alleged by Plaintiff here, courts have found the allegations insufficient to give rise to a constitutional claim of excessive force. *See Johnson v. City of New York,* 2020 WL 3100197, at *3 (S.D.N.Y. June 11, 2020) (dismissing plaintiff's unnecessary handcuffing Section 1983 excessive force claim where handcuffs caused bruises on plaintiff's left and right wrists, and numb wrists); *McGarrell v. Arias*, 2019 WL 2528370, at *4 (S.D.N.Y. Mar. 1, 2019), *report and*

*recommendation adopted*, 2019 WL 1254880 (S.D.N.Y. Mar. 19, 2019) ("*De minimis* injuries from handcuffing such as numbness or inflammation are insufficient to sustain an excessive force claim," and "[m]inor cuts from handcuffing do not support an excessive force claim, even if the cuts result in some bleeding.").

In this case, Plaintiff cites no specific injury from the handcuffing other than short-term pain. (SAC ¶¶ 156, 172.) No factual details are provided to suggest there was any intent to apply more force than required to attach or remove the restraints. This is insufficient to state a claim. Thus, I recommend that the excessive force claim be dismissed. This includes a recommendation to dismiss Defendant Peters, as Plaintiff only alleges that he took an opportunity to show other officers how to apply enhanced restraints when returning Plaintiff to his unit. (*See* SAC ¶ 74.)

### 9. DUE PROCESS CLAIMS RELATED TO REQUIREMENT OF ENHANCED RESTRAINTS

Plaintiff claims that his procedural and substantive due process rights were violated by being designated a CMC inmate and placed in enhanced restraints without a hearing. The CLO required enhanced restraints whenever he was outside of his cell. (SAC Ex. 3.) He was placed in enhanced restraints during legal visits and medical examinations, he was shackled and handcuffed for over five hours while lying on the gurney in the facility clinic when he had a gallbladder attack, and he was handcuffed during recreation. His complaints implicate his substantive and procedural due process rights under the Fourteenth Amendment, addressed in turn below.

### a.  *Fourteenth Amendment Substantive Due Process*

"In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law," the Supreme Court held that "the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell*, 441 U.S. at 535.  "[I]in determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word," courts "must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538.  The Supreme Court explained that, "in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" *Kingsley*, 576 U.S. at 398 (quoting *Bell*, 441 U.S. at 541-43)); *Edrei*, 892 F.3d at 535.  Accidental or negligent harm is not actionable as a constitutional due process claim. *Kingsley*, 576 U.S. at 396.

In *Hunter v. City of New York*, the plaintiff challenged his placement in a segregated housing unit and being subjected to additional restrictions including enhanced security restraints.  2015 WL 5697218, at *1 (S.D.N.Y. Sept. 28, 2015).  The court granted summary judgment finding that there was no evidence that any of the conditions, including the enhanced restraints, were intended to punish him or imposed for any purpose other than the prison's legitimate goal of complying with a state court order mandating that Plaintiff be prevented from making phone calls except to his attorney and prevented from writing or directing others to write to the victim of Plaintiff's crime due to Plaintiff's prior harassing conduct toward the

victim. *Id.* at 9-16.; *see also Brown v. Doe*, 2014 WL 5461815, at *7 (S.D.N.Y. Oct. 28, 2014) (pretrial detainee failed to state claim for a substantive due process violation when conditions of confinement imposed were to enforce a court order).

Because the implementation of the CLO implicates other constitutional protections, namely the free exercise of religion and access to counsel, as discussed above, the analysis below focuses on Plaintiff's allegations related to being placed in enhanced restraints, which is assessed under the Fourteenth Amendment as Plaintiff is a pretrial detainee. Here, the CLO imposed security restrictions on all inmates under court ordered lockdown status, including Plaintiff, and established policy and procedures for the care, custody, and control of those inmates. Specific to Plaintiff, the purpose of the Lockdown Order is

> to protect the integrity of the criminal proceedings against [Williams] and others and to assure the safety of potential witnesses and their families, and its mandate, that Plaintiff be housed in the lockdown area, on lock-in, to be separated from all other inmates in the area, in such a manner as to prevent him, to the extent possible, from communicating with or passing material to other inmates[.]

(SAC Ex. 19.) This Lockdown Order was found necessary by the state court to achieve that purpose. Other cases have found that orders similar to the CLO are generally applicable and not issued to punish a particular detainee and are rationally related to a legitimate governmental objective of complying with the mandates of orders similar to Williams' Lockdown Order. *See e.g., Hunter*, 2015 WL 5697218.

The Court recognizes that Plaintiff has asserted that CO Ramirez, CO Hickson, Warden Dunbar, ADW Carter, Captain Blake, CO K. Young, CO Rodriguez, Captain Le Fleur, CO Reid, and CO McNeil made statements suggesting Plaintiff was subject to the CLO due to his complaints

about prison conditions. However, the CLO by its terms is generally applicable to individuals

subject to a Lockdown Order issued by the State Court. Thus, whatever these CO's may have

thought or said does not change the fact that the CLO would not have applied but for the State

Court Lockdown Order. Thus, their statements are irrelevant to the analysis of the substantive

due process claim, at least to the extent the CLO's mandate of enhanced restraints was

consistent with the goal of the Lockdown Order to prevent communication, including by hand

signals, with others who might assist Plaintiff in harming witnesses. (*See* SAC ¶¶ 23, 49, 61, 82,

97, 101, 119, 121, 122, 127, 133, 157-58, 161, 163, 167, 170, 190, 203-04, 208-09, 222; SAC p.

104.)

However, to the extent the CLO's mandate is overbroad and inconsistent with the goal

of the Lockdown Order, there may be a valid due process claim. For example, it is unclear how

placing Plaintiff in enhanced restraints during exercise/recreation, while strapped to a medical

gurney or in a private room with his attorney is necessary to achieve the mandate of the State

Court's Lockdown Order.

"Courts have recognized that some opportunity for exercise must be afforded to

prisoners." *McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020) (quoting *Anderson v. Coughlin*, 757

F.2d 33, 34–35 (2d Cir. 1985)). Here, Plaintiff alleges that on November 16, 2020, he was

afforded recreation, but CO Dychese told Plaintiff that if he wanted to go to recreation, he

would have to be handcuffed for the entire recreation period pursuant to the CLO. (SAC ¶¶

110.) Courts in this circuit, including the Second Circuit have noted that requiring enhanced

restraints may deprive a prisoner a meaningful opportunity to exercise and that such law is

clearly established. *See Edwards v. Quiros*, 986 F.3d 187, 192 (2d Cir. 2021) ("we conclude that

54

there was sufficient evidence for the jury to find that [the warden] had the requisite state of

mind for the entire six-month period during which Edwards was required to exercise in

restraints when outside of his cell"); *McCray*, 963 F.3d at 120 ("In this Circuit the rights of

prisoners to a meaningful opportunity for physical exercise had been clearly established nearly

three decades [ago]"); *see also Brown v. Venettozi*, 2021 WL 323264, at *6 (S.D.N.Y. Feb. 1,

2021). Thus, Plaintiff has plausibly alleged a violation of his rights in regard to the use of

enhanced restraints while exercising. *See Paul v. LaValley*, 712 F. App'x 78, 79 (2d Cir. 2018)

("Accordingly, we have agreed with other Circuits that some opportunity for exercise must be

afforded to prisoners, and we have held that this right was clearly established for qualified

immunity purposes by no later than 1985[.]") (internal citations and quotation marks omitted).

Defendants are not entitled to qualified immunity on Plaintiff's meaningful exercise claim

because there is clearly established law that placing an inmate in enhanced restraints during

exercises infringes on the right to meaningful exercise. *See Edwards*, 986 F.3d at 195 ("The jury

reasonably determined, upon sufficient evidence, that Quiros knowingly violated Edwards's

clearly established right to meaningful exercise under the circumstances and lacked a sufficient

justification for doing so. We will not disturb the jury's finding that Quiros was not entitled to

qualified immunity.").

    While Plaintiff's allegations that he was placed in enhanced restraints while in a private

room with his attorney and while strapped to a medical gurney raise a plausible claim that the

restraints were excessive for their purpose, Defendants are entitled to qualified immunity with

regard to their use of enhanced restraints in these circumstances because there is no clearly

55

established law that an inmate under a Lockdown Order may not be placed in restraints during meetings with an attorney or receiving medical care. *See Lennon*, 66 F.3d at 416.

Accordingly, I recommend that the motion to dismiss the substantive due process claim be denied as to requiring enhanced restraints while exercising.

### b. *Fourteenth Amendment Procedural Due Process*

To the extent that Plaintiff asserts a liberty interest in not being classified as a CMC inmate, such a claim warrants dismissal because no liberty interest exists in avoiding prison classification. *See Pugliese v. Nelson*, 617 F.2d 916, 925 (2d Cir. 1980) ("[J]udicial intervention into the classification of prisoners for monitoring and control purposes would almost inevitably involve the federal courts in the day-to-day operations of our prison system, which are better left to the expertise of prison administration authorities"); *see also Hunter*, 2015 WL 5697218, at \*12 (collecting cases).

However, this does not end the inquiry as to whether Plaintiff was entitled to some procedural due process prior to being designated for placement in enhanced restraints. The level of procedural protection required differs according to the purpose of the confinement. *Benjamin*, 264 F.3d at 190. If the restraint is imposed for disciplinary reasons, a prisoner must be provided written notice, adequate time to prepare a defense, a limited ability to present witnesses and evidence, and a written statement of the reasons for the discipline. *Id.* (citing *Wolff v. McDonnell*, 418 U.S. 539, 561-70 (1974)). If the restraint is for administrative purposes such as to mitigate a security threat or to segregate pending a completion of a misconduct investigation, an inmate "must merely receive some notice of the charges against him and an opportunity to present his views." *Id.* (citing *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)); *see*

56

also *Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017) (administrative segregation is permitted if necessary to incapacitate a detainee who poses a security threat or to investigate misconduct).

Prison officials also must conduct periodic reviews to determine whether an individual remains a security risk warranting the liberty restriction—a case-by-case factual assessment coupled with the prison conditions and tensions at the time. *Parson v. Miller*, 2018 WL 4233810, at *5 (N.D.N.Y. May 25, 2018), *report and recommendation adopted*, 2018 WL 4228427 (N.D.N.Y. Sept. 5, 2018). Prison officials are accorded substantial deference in the adoption of policies and procedures to ensure institutional security. *Proctor*, 846 F.3d at 610.

The purpose of the CLO is to comply with the State Court Lockdown Order, which is not disciplinary or purely administrative. (SAC Ex. 3.) This Court was unable to identify any Supreme Court or Circuit case setting forth the procedure for assessing or re-assessing restrictions imposed to implement a court order. A detainee could of course challenge a State Court order issued in his underlying criminal case through his defense attorney and notify the prison if and when the State Court order is lifted, at which time the prison presumably would cease subjecting the detainee to the internal prison procedures implemented solely to enforce the State Court order. But, to the extent a prison order was issued to implement a Court Order, the prison order presumably would remain in effect without review until the Court Order is lifted or modified. A prison could afford a hearing in advance of subjecting a detainee to such an order so that the detainee could challenge its scope to the extent it exceeded the dictates of the State Court order; however, the detainee could also go back to the state judge who issued

the order to seek clarification of the restrictions required. Again, this Court could find no cases on point.

Since no clearly established law exists establishing that a pretrial detainee, such as Plaintiff, has a right to a hearing prior to or after imposition of enhanced restraints implemented purportedly for purposes of implementing a court-issued Lockdown Oder, the individual Defendants Louis, Captain Moodie, Captain Merenych are entitled to qualified immunity on the Plaintiff's claim of violation of the procedural Due Process Clause of the Fourteenth Amendment. *See Wills v. Microgenics Corp.*, 2021 WL 3516419, at *5 (E.D.N.Y. Aug. 10, 2021) (finding defendants were entitled to qualified immunity because former inmate's due process claim was not clearly established). Accordingly, dismissal of this claim is warranted.

### 10. **FIRST AMENDMENT RETALIATION**

Plaintiff asserts that, since his transfer to GRVC, he has been subjected to Defendants' retaliatory conduct. Defendants stated to Plaintiff, on numerous occasions, that his mistreatment at GRVC was due to his lawsuit against Captain Mathis and complaints he made since his arrival at GRVC. (SAC ¶¶ 23, 49.)

"[I]t is well established that 'retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.'" *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (quoting *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir.1996)). A plaintiff asserting First Amendment retaliation claims must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Id.*

(quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)). The filing of a prison grievance is protected activity. *Id.* To constitute an adverse action, the retaliatory conduct has to be of a nature that it would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights[.]" *Davis*, 320 F.3d at 353 (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir.2001)).

"[T]o satisfy the causation requirement, allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 354 (cleaned up). When determining a causal connection, courts may infer a retaliatory motive in the adverse action from: (1) "the temporal proximity of the filing to the grievance and the disciplinary action"; (2) "the inmate's prior good disciplinary record"; (3) "vindication at a hearing on the matter"; and (4) "statements by the defendant regarding his motive for disciplining the plaintiff." *Thomas v. DeCastro*, 2019 WL 1428365, at *9 (S.D.N.Y. Mar. 29, 2019) (quoting *Barnes v. Harling*, 368 F. Supp. 3d 573, 600 (W.D.N.Y. 2019)); *see also Espina*, 558 F.3d at 129.

Defendants did not make any specific argument for dismissal of Plaintiff's First Amendment retaliation claim, which is aimed at Defendants CO Ramirez, CO Hickson, Warden Dunbar, ADW Carter, Captain Blake, CO K. Young, CO Rodriguez, Captain Le Fleur, CO Reid, CO McNeil, and Captain Mathis. (SAC ¶¶ 6, 12-23, 49, 82, 89, 97, 101, 119, 127, 133, 157-58, 161, 163, 167, 170, 186, 190, 199, 203-04, 208-09, 222.) Further, the allegations are sufficient at this stage to raise a plausible claim of retaliation given the statements allegedly made suggesting that Plaintiff was denied religious accommodations and other deprivations because of filing lawsuits and grievances. Thus, the motion should be denied as to this claim.

59

## 11. MUNICIPAL LIABILITY

A municipality cannot be held liable under Section 1983 under a respondeat superior

theory. *City of Canton v. Harris*, 489 U.S. 378, 392 (1989). Rather, it can be liable only if the

constitutional violations are caused by execution of a government policy or custom, "whether

made by its lawmakers or by those whose edicts or acts may fairly be said to represent official

policy[.]" *Monell*, 436 U.S. at 691, 694. "Official municipal policy includes the decisions of a

government's lawmakers, the acts of its policymaking officials, and practices so persistent and

widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61

(2011). A plaintiff may demonstrate that such a policy or custom exists by introducing evidence

of one of the following:

> (1) a formal policy officially endorsed by the municipality; (2)
> actions taken by government officials responsible for establishing
> the municipal policies that caused the particular deprivation in
> question; (3) a practice so consistent and widespread that,
> although not expressly authorized, constitutes a custom or usage
> of which a supervising policy-maker must have been aware; or (4)
> a failure by policymakers to provide adequate training or
> supervision to subordinates to such an extent that it amounts to
> deliberate indifference to the rights of those who come into
> contact with the municipal employees.

*Jones v. Westchester County*, 182 F. Supp.3d 134, 158 (S.D.N.Y. 2016) (quoting *Brandon v. City*

*of New York*, 705 F. Supp.2d 261, 276-77 (S.D.N.Y. 2010)).

When alleging an affirmative municipal policy, "a plaintiff must make factual allegations

that support a plausible inference that the constitutional violation took place pursuant either to

a formal course of action officially promulgated by the municipality's governing authority or the

act of a person with policymaking authority for the municipality." *Missel v. County of Monroe*,

351 F. App'x 543, 545 (2d Cir. 2009). The action of a single decisionmaker who has final

60

authority may be sufficient to support *Monell* liability. *Montero v. City of Yonkers*, 890 F.3d

386, 403 (2d Cir. 2018). To determine whether an official has final decisionmaking authority,

the official need not be a policymaker for all purposes, rather, "with respect to the conduct

challenged, he must be responsible under state law for making policy in that area of the

municipality's business." *Graham v. City of New York*, 2009 WL 909620, at *2 (E.D.N.Y. Mar. 31,

2009) (quoting *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir.2000)) (internal quotation marks and

alterations omitted). Courts have noted that it is often unclear whether wardens may be

policymaker to support a *Monell* claim. *See Id.* (denying summary judgment and noting it is

unclear whether Warden Curcio is a policymaker under state law); *Pembaur v. City of Cincinnati*,

475 U.S. 469, 483 n.12 (1986) (plurality opinion) (noting in dicta that a county sheriff, for

example, may serve as an official policymaker for municipal-liability purposes with respect to

some actions but not others); *Elliott v. Mgmt. & Training Corp.*, 2017 WL 3089693, at *7 (N.D.

Miss. July 19, 2017) (accepting on summary judgment that the warden may be an official

policymaker); *Sugamosto v. Emerald Corr. Mgmt., LLC*, 2013 WL 12333651, at *3 (D.N.M. Feb.

13, 2013) (denying motion to dismiss because plaintiff sufficiently alleged that the warden

possessed the authority to craft official prison policy requiring that plaintiff be shackled).

      To prevail on a *Monell* claim, a plaintiff must also show that "there is a direct causal link

between [the] municipal policy or custom and the alleged constitutional deprivation" he

suffered. *City of Canton*, 489 U.S. at 385. "When a municipality chooses a course of action

tailored to a particular situation, this may also represent an act of official government policy as

that term is commonly understood." *Montero*, 890 F.3d at 403 (citing *Amnesty Am. v. Town of

W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004)) (internal quotation marks omitted).

At this stage of the litigation, it is premature to definitively determine whether Warden Dunbar is a final decisionmaker to support municipal liability, thus dismissal is unwarranted. Here, Plaintiff alleges and provides documentation that Warden Dunbar drafted and enforced the CLO, a course of action supposedly tailored to the State Court Lockdown Order. (*See* SAC ¶ 168; SAC Ex. 3.) To the extent the CLO is overbroad and not tailored for the purpose of implementing the Lockdown Order, there is a plausible *Monell* claim. For example, the Lockdown Order says nothing about restricting access to religious texts, yet the CLO restricts Plaintiff and other inmates to a Bible (rather than a religious text corresponding to the inmate's religion). The SAC demonstrates that the CLO's restrictions were read literally. Plaintiff alleges that he was told that a Torah would not be provided to him because the CLO only permitted him to have a Bible. (*See* SAC ¶¶ 38, 67, 215.) Similarly, the Lockdown Order did not specifically mandate enhanced restraints during exercise. Insofar as the Second Circuit has indicated that enhanced restraints during recreation time may unconstitutionally burden a detainees's right to engage in meaningful exercise, the CLO was overbroad. Thus, a plausible *Monell* claim is stated as to this aspect of the CLO as well.

The same is not true for Plaintiff's claim that his Fourteenth Amendment rights were violated when he was placed in enhanced restraints during his medical treatment and legal visit under a deliberate indifference theory. The individual Defendants are alleged to have construed the CLO as mandating enhanced restraints in these circumstances, even though the CLO does not expressly state this (in contrast to mandating enhanced restraints for exercise). Thus, it is unclear whether the CLO was intended to cover these circumstances. The applicable *Monell* theory here would be that the Warden was deliberately indifferent to the manner in

62

which individual officers were implementing the CLO.  "To establish deliberate indifference a

plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of

constitutional injury, but failed to take appropriate action to prevent or sanction violations of

constitutional rights." *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012).  Here,

Plaintiff does not allege that any policymaker (i.e., Warden Dunbar) was actually aware that

subordinates were enforcing the CLO to require enhanced restraints while in a private meeting

with an attorney or while on a hospital gurney.  He only alleges that correctional officers told

him they were following orders as provided in the CLO.  (*See* SAC ¶¶ 61, 71, 218.)  Personal

knowledge cannot be imputed to Warden Dunbar because the CLO does not explicitly state that

prisoners should be handcuffed when receiving medical attention or consulting their attorneys.

Thus, Plaintiff has not plausibly alleged that Dunbar was deliberately indifferent and failed to

take appropriate corrective action.  The same cannot be said for Plaintiff's claim concerning his

right to exercise because the CLO clearly states "inmates will be restrained in waist chains[,]

handcuffs[,] and mitts whenever they are out of their cells for recreation."  (SAC Ex. 3.)  In other

words, Dunbar wrote the CLO with that restriction and had knowledge of it notwithstanding

applicable case law stating that such restraints constitute an infringement of the right to

meaningfully exercise.

Accordingly, I recommend denying Defendants' motion to dismiss Plaintiff's municipal

liability claim with respect to the equal protection claims relating to the provision of religious

texts and being placed in enhanced restraints when exercising.  To the extent Plaintiff is raising

other municipal liability claims, I recommend that those claims be dismissed for failure to state

a claim because the other practices about which Plaintiff claims do not stem from any official

policy and the allegations do not otherwise plausibly demonstrate widespread violations of

Constitutional rights sanctioned by policymakers or resulting from a lack of training. This

results in the dismissal of Defendant Omiblu who is only mentioned in claims related to *Monell*

and negligent hiring. (*See* SAC pp. 117, 124.)

### 12. NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION

In addition to constitutional claims, Plaintiff asserts state law negligent hiring, retention,

training, and supervision claims. To state such a claim, a plaintiff must first demonstrate an

employee was negligent. *Mena v. City of New York*, 2019 WL 1900334, at *5 (S.D.N.Y. Apr. 29,

2019). Once this is established, a plaintiff must allege:

> (1) that the tort-feasor and the defendant were in an employee-
> employer relationship; (2) that the employer knew or should have
> known of the employee's propensity for the conduct which caused
> the injury prior to the injury's occurrence; and (3) that the tort was
> committed on the employer's premises or with the employer's
> chattels.

*Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir.2004) (cleaned up). In addition, "a claim

for negligent hiring or retention cannot proceed against an employer for conduct of an

employee acting within the scope of employment." *Id.*; *Mena*, 2019 WL 1900334, at *6; *De'Bey

v. City of New York*, 2022 WL 909790, at *8 (S.D.N.Y. Mar. 29, 2022).

Here, Plaintiff does not allege that the Defendants acted outside of the scope of their

employment; rather, he alleges that Defendants stated to him repeatedly that their actions

were based on CLO 370.20 and the restrictions contained therein. Given that Plaintiff does not

allege that Defendants acted outside of the scope of their employment, no basis exists for his

negligent hiring, retention, training, and supervision claims under New York law. Hence, I

recommend that these claims be dismissed.

## 13. FALSE IMPRISONMENT

To the extent that Plaintiff attempts to assert a false imprisonment claim, its dismissal is warranted because Plaintiff is confined pursuant to the Lockdown Order. *Holmberg v. County of Albany*, 738 N.Y.S.2d 701, 703 (3d Dep't 2002) ("Generally, where a facially valid order issued by a court with proper jurisdiction directs confinement, that confinement is privileged and everyone connected with the matter is protected from liability for false imprisonment.") (citation omitted).

## 14. PERSONAL INVOLVEMENT

Defendants seek dismissal of Plaintiff's allegations as to Defendants Grossman, Jennings, Rene, Stukes, and Scott because they are not alleged to have personally engaged in any deprivation of Plaintiff's constitutional rights and/or the allegations are conclusory or based on hearsay.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir.1991)).

> [T]here is no special rule for supervisory liability. Instead, a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution. The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary. The violation must be established against the supervisory official directly.

*Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (internal citations and quotations omitted).

### a. *Grossman and Jennings*

Plaintiff alleges that Grossman and Jennings had knowledge of the BOC's recommendations concerning Plaintiff's access to the law library (SAC ¶ 45; No. ECF 36.2, p. 14, SAC p. 69), but failed to ensure that violations of the Lockdown Order listed in the BOC's recommendation do not continue (ECF No. 36-2, p. 26-27, SAC p. 80-81). When Grossman, who was responsible for reviewing complaints (ECF No. 36-2, p. 9, SAC p. 64), was notified by Plaintiff's attorney about the way Plaintiff was treated (SAC ¶ 229), she "responded back acknowledging the complaint from the Plaintiff's attorney and informing her that her department was not the correct department to take complaints of this nature [and] that the plaintiff could file a grievance if he believed he was being mistreated." (SAC ¶ 230).

Grossman and Jennings were not required to adopt the BOC's recommendations. *See Legal Aid Soc.,* 91 A.D.2d at 533. Thus, no basis for liability exists based on their failure to adhere to the recommendations. Further, Plaintiff's conclusory allegation that Grossman failed to ensure that violations of the Lockdown Order listed in that recommendation do not continue, without more, is insufficient to state a claim against Grossman. Plaintiff also fails to articulate the basis for his claim that Grossman's response to his attorney violated his constitutional rights.

Thus, dismissing claims against Grossman and Jennings for lack of personal involvement is warranted.

### b. *Rene*

Plaintiff alleges that Warden Rene: (1) "was well aware of the fact that Correctional Personnel around the facility were continuing to wrongfully place the plaintiff in enhanced

restraint" and "that the facility was willing to use force against plaintiff to enforce [the wrong] pedigree" (SAC ¶ 208); (2) failed "to correct the issue of plaintiff['s] phone time being restricted to twice a day when his supreme court lockdown order did not list a restriction in how many times a day that [he] could contact his attorney" (ECF No. 36-3, p. 4, SAC p. 88); (3) failed to respond to his appeal concerning Plaintiff's refusal to attend the December 7, 2020 hearing (SAC ¶¶ 191-192); and (4) failed to properly investigate Plaintiff's grievances involving the Wardens (ECF No. 36-3, p.5, SAC p. 89).

Plaintiff's conclusory allegations that Warden Rene failed to correct the restrictions imposed by CLO 370.20 and the use of force against Plaintiff to enforce his classification, and to investigate properly Plaintiff's grievances are insufficient to show *how* Warden Rene's individual actions violated Plaintiff's constitutional rights. Further, Warden Rene's failure to respond to Plaintiff's appeal is not a basis for a constitutional claim under Section 1983. *See Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) ("Prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment."). Thus, dismissing Plaintiff's claims against Warden Rene for lack of personal involvement is warranted.

### c. Stukes and Scott

The conspiracy claims against Stukes and Scott were dismissed prior to the instant motion. With regard to his Section 1983 claim, Plaintiff asserts that in connection with the November 29, 2020 search of his cell, "Warden Dunbar and Chief Stokes manipulated the situation so they could utilize Emergency Services Unit ("ESU") (Department of Corrections Personnel) against the Plaintiff in efforts of advancing their own personal agenda." (SAC ¶ 166.)

Plaintiff does not state how Stukes "manipulated the situation" or what right was violated by

the search of his cell, which was mandated by the CLO. This is not sufficient to plead Stukes'

personal involvement in a violation of Plaintiff's rights.

Similarly, as to Defendant Scott, Plaintiff's allegations are conclusory, fail to show

personal involvement, and the alleged actions do not rise to any constitutional violation.

Plaintiff alleges that Defendant Scott ordered that he be transferred to GRVC by ESU rather

than the transportation division (SAC p. 80), and that other correction officers told Plaintiff that

Scott had their back (SAC ¶¶ 73, 190). Thus, dismissing Plaintiff's claims against Stukes and

Scott for lack of personal involvement is warranted.

### 15. OPPORTUNITY TO AMEND

Plaintiff has now had two opportunities to amend his pleadings. While the Court is

sympathetic to the concerns he has raised, nothing in his SAC (or his opposition papers)

suggests that he possesses additional facts that would cure the deficiencies described in this

Report and Recommendation. Therefore, I recommend that at this juncture the deficient

claims be dismissed with prejudice. *See, e.g., Palompelli v. Smith*, 2022 WL 624421, at *6

(dismissing *pro se* plaintiff's complaint with prejudice when there was no suggestion that

plaintiff possessed facts that would cure deficiencies in previous complaints) (collecting cases);

*Dash v. Mayers*, 2020 WL 1946303, at *9 (S.D.N.Y. Apr. 23, 2020) (dismissing complaint with

prejudice when plaintiff already had one opportunity to amend complaint and court liberally

construed opposition in a way that effectively amounted to another pleading).

**CONCLUSION**

For the foregoing reasons, I recommend granting the motion to dismiss (ECF No. 73) as to all claims **except** the claims based on: (1) the First Amendment Free Exercise of Religion Clause against Defendants Carter, Vallejo, Dunbar, Blake, Hickson and Sherman; (2) RLUIPA against Defendants Carter, Vallejo, Dunbar, Blake, Hickson and Sherman; (3) the Fourteenth Amendment Equal Protection Clause against Defendant Dunbar; (4) the Sixth Amendment claim in connection with lack of confidentiality in communication with attorneys against Defendants McNeil, Ritter, Hickson and Carter; (5) the Fourteenth Amendment Due Process deliberate indifference to serious medical needs against prison officials in connection with smoke inhalation and gallbladder attacks against Defendants Coulthurst, Graves, Day and Palmer-Campbell; (6) the Fourteenth Amendment Due Process conditions of confinement in connection with being placed in enhanced restraints during exercise against Dychese and Dunbar; (7) the First Amendment retaliation against Defendants Ramirez, Hickson, Dunbar, Carter, Blake, K. Young, Rodriguez, Le Fleur, Reid, and McNeil; and (8) the municipal liability claim as to Defendants City of New York and Dunbar with regard to the policy restriction on provision of religious texts other than Bibles and being placed in enhanced restraints during recreation.

Given the length of this report and recommendation and to avoid any confusion, as noted above, I recommend that the following Defendants be dismissed from the action:

| | | |
|---|---|---|
| • Peters | • Quinnones | • Captain Merenych |
| • Shivaj | • Emebu | • Grossman |
| • Smith | • Drumwright | • Jennings |
| • Islam | • Dr. Gemo | • Rene |
| • Taylor | • Nezma | • Stukes |
| • Loiseau | • Louis | • Scott |
| • White | • Shoclink | |
| • Omiblu | • Captain Moodie | |

**The Clerk of Court is directed to mail a copy of this Report and Recommendation to Plaintiff.**

Date:   August 5, 2022
      New York, New York

Respectfully submitted,

*Katharine H Parker*

KATHARINE H. PARKER
United States Magistrate Judge

## NOTICE

Plaintiff shall have seventeen days, and Defendants shall have fourteen days, from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)). A party may respond to another party's objections after being served with a copy. Fed. R. Civ. P. 72(b)(2).

Plaintiff shall have seventeen days to serve and file any response. Defendants shall have fourteen days to serve and file any response. Any objections and any responses to such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul G. Gardephe at the United States Courthouse, 40 Foley Square, New York, New York 10007, and served on the other parties. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Gardephe. The failure to file timely objections shall result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).

EXHIUBIT-12



| | THE CITY OF NEW YORK<br>DEPARTMENT OF CORRECTION<br>**GEORGE R. VIERNO CENTER**<br>**COMMAND LEVEL ORDER** |  |
|---|---|---|

| ☒ NEW | ☐ INTERIM | ☐ REVISED | ☐ ADMINISTRATION | ☒ SECURITY | ☐ PROGRAMS |
|---|---|---|---|---|---|

| EFFECTIVE DATE<br>**11/02/20** | ORDER NO.<br>**370.20** | SUBJECT<br>**COURT ORDERED LOCKDOWN INMATES** | |
|---|---|---|---|
| SECTION:<br>**SECURITY** | PAGE 1 OF 6 | REFERENCE:<br>**SUPREME COURT ORDER** | AREAS<br><br>**ALL STAFF** |
| AUTHORIZED BY THE COMMANDING OFFICER<br>**SHERMA DUNBAR, WARDEN** | SIGNATURE | | |

## I. PURPOSE

This command level order is promulgated to establish policy and procedures for the Care, Custody and Control of the inmates under Court Ordered lockdown status.

## II. POLICY

It shall be the policy of the George R. Vierno Center to comply with the mandates of all Court Orders dealing with inmates housed in this facility. Additionally, the restrictions imposed on "Lockdown Status" inmates by the Court supersedes any rights these inmates may ordinarily have under the Minimum Standards.

## III. PROCEDURES

The inmates housed in Court Ordered lock-down areas shall be governed by the following:

a. Twenty-three (23) hour lock-in, feed-in status.

b. Inmates housed in Court Ordered Lock-Down areas will be allowed to possess the following property in their cell:

1. One (1) Bible
2. Three (3) Magazines
3. Three (3) Books
4. One (1) Bar of Soap
5. One (1) Container of shampoo
6. One (1) Toothbrush
7. One (1) Toothpaste
8. One (1) Plastic Cup
9. One (1) Towel
10. Deodorant



| EFFECTIVE DATE | SUBJECT | |
|---|---|---|
| **11/02/20** | **COURT ORDERED LOCKDOWN INMATES** |  |
| ORDER NO. | | |
| **370.20 - GRVC** | PAGE   2   OF   6   PAGES | |

## III.   PROCEDURES (CONTINUED)

### Special Security Procedures

a.   Inmates in lock-down status shall not be removed from their cells unless a Captain is present. <u>AT NO TIME WILL MORE THAN ONE (1) INMATE BE ALLOWED OUT OF HIS CELL AT ANY ONE TIME.</u>

b.   Whenever a Court Ordered Lock-Down Inmate is removed from the housing area, he shall be restrained in leg irons, waist chains and mitts.   The Inmate shall be under one-on-one observation of a Correction Officer to assure no communication with any other inmate(s), verbally, in writing or through hand signs.

c.   During the day tour (0700x1500 hours) and under the supervision of a Captain these inmates shall be strip-searched, and their property carefully searched on a daily basis.   These searches will be recorded on a Random Search Form.

d.   Inmates shall dress in jumpsuits at all times, unless going to court for trial.

e.   Inmate housed in Court Ordered Lock-In areas shall not be allowed to refuse to be produced in court.

f.   The Court Ordered inmates shall not be permitted to refuse to attend court because of complaints of health problems unless the physician examining this defendant certifies in writing that the attendance of this defendant in court would likely result in serious impairment to this defendant's health.   In this event, this information shall be immediately transmitted to the Central Operations Desk At (718) 546-1384.

g.   The Court Ordered inmate's accompany card shall be kept in the CMC box in the General Office.

### Program/Inmate Services

#### Law Library/Outgoing Mail

Inmates will make all requests for Law Library materials in writing.   These requests will be forwarded to the Security Office who will obtain copies of the requested materials and place same in the inmate' blue storage bin.

1.   The assigned Captain will collect all letters written by the inmate.   The Captain will turn the mail over to the Security Office.   Under no circumstances will any inmate in Court Ordered Lockdown status be permitted to send out any written correspondence or any other type of communication.





| EFFECTIVE DATE | SUBJECT |
| --- | --- |
| **11/02/20** | **COURT ORDERED LOCKDOWN INMATES** |
| ORDER NO. | |
| **370.20 - GRVC** | PAGE   **3**   OF   **6**   PAGES |

## III.    PROCEDURES (CONTINUED)

**Telephone Calls and Visit Privileges:**

1.  The court ordered inmates are barred from Visits and Telephone calls to anyone other than their attorney of record.  These numbers are listed in each inmate's court order folder.

2.  All calls will be placed between the hours of 1330 – 1430 hours and 1630 – 1730 hours.

3.  The Correction Officer assigned to the post shall make the telephone call using a P.I.N.  Number which will be changed weekly by Security.   Inmates are not allowed to know the P.I.N. numbers.  The Correction Officer shall maintain a log of each attorney called.  Such a log will detail the following information for each attempted call:

    a.   Date and Time call requested
    b.   Time call was placed
    c.   Whether or not contact was made with the Attorney
    d.   Time call ended.

**Inmate Showers**

Inmates will be afforded a ten-minute shower, three (3) times per week.  The showers are to be recorded in a shower logbook.  As stated earlier, a Captain shall be present when the inmate is removed from his cell to the shower and again when he is returned from the shower to his cell. All shower activity shall be logged in the Housing Area Logbook.

**Incoming Mail**

Any incoming mail for the inmates housed in court ordered areas will be forwarded to the GRVC Security Office. No mail shall be forwarded to these inmates until approved by the Commanding Officer of his/her designee.

**Commissary**

The only items inmates housed in Court Ordered areas may purchase from commissary are:

|   |   |   |   |
| --- | --- | --- | --- |
| 1. | Soap | 4. | Toothpaste |
| 2. | Shampoo | 5. | Paper |
| 3. | Deodorant | | |

Custodial staff assigned to the housing area will complete the Commissary request form for the inmate.  This shall prevent subject from communicating with commissary help.  All commissary products will be thoroughly searched prior to giving them to the intended inmate.  Appropriate logbook entries shall be made relative to the delivery of this service.



| | EFFECTIVE DATE **11/02/20** | SUBJECT | |  |
|---|---|---|---|---|
| | ORDER NO. **370.20 - GRVC** | **COURT ORDERED LOCKDOWN INMATES** | | |
| | | PAGE  **4**  OF  **6**  PAGES | | |

## III.    PROCEDURES (CONTINUED)

### Social Service

All requests for Social Services shall be forwarded to the Security Office. At not time will these inmates have any contact with Social Service personnel. Additionally, at no time will interview slips be forwarded to any Service area.

### Religious Services

If these inmates request religious services, the Chaplain will be called to visit them. However, the Chaplain will first be instructed that he/she may not:

1.   Communicate on the inmate's behalf with anyone other that the Warden, the Security Office, or the Court-appointed Special Master.
2.   Convey any written messages from these inmates to anyone else.
3.   May not give anything to or receive anything from these inmates.

### Medical/Mental Health Services

Any necessary medical or mental health services are to be provided to these inmates in the housing area. They will not be removed to go to the Clinic unless it is physically impossible to provide them with necessary medical services in the cell/housing area. Mental Health services, if required, will be provided to them in the housing area, not in the Clinic.

If the inmate must be removed to the Clinic for medical services, he shall be escorted by a Correction Officer and a Captain and kept separate from all other inmates in such a manner as to assure that he is unable to communicate, in any manner, with other inmates.

Medical staff who come to see these inmates in the housing area should first be instructed that they may not:
1.   Communicate on the inmate's behalf with any one other than the Warden or the Security Office.
2.   Convey any written messages.
3.   May not give anything to or receive anything from these inmates unless the item is necessary to provide medical services (i.e., medical supplies, medication).



| EFFECTIVE DATE | SUBJECT |
|---|---|
| **11/02/20** | **COURT ORDERED LOCKDOWN INMATES** |
| ORDER NO. | |
| **370.20 - GRVC** | PAGE   **5**   OF   **6**   PAGES |



### III.   PROCEDURES (CONTINUED)

**Hospital Runs**

In the event that the inmate requires hospitalization, he is to be treated and outposted at Bellevue Hospital absent a medical emergency. In the event of a medical emergency, the inmate is to be transported to the nearest hospital.

**Inmate Recreation**

Inmates housed in the Court Ordered area may be afforded recreation in accordance with the details delineated in the court order or as amended in a separate memo. These stipulations shall be reflected in the posted "Recreation Schedule". A Captain shall be present when the inmate is removed from his cell and returned to this cell, following the recreation period. <u>While at recreation, these inmates shall be separated from all other inmates in such a manner as to assure that they cannot communicate with any other inmates verbally, in writing or through hand signals. These inmates will be restrained in waist chains handcuffs and mitts whenever they are out of their cells for recreation.</u>

Appropriate logbook entries shall be made relative to delivery of this service.

### CELL AREA ACCESS AND SUPERVISION

1. Civilian personnel (i.e. Chaplain and Medical Staff) must enter the cell area accompanied by a Supervisor at all times.

2. The Area Captain will conduct at least three (3) tours of inspection in the court ordered inmates cell area during each tour of duty.

3. The on-duty Tour Commander will conduct at least one (1) tour of inspection during each tour of duty. He/she is responsible for ensuring that the provisions of this order are fully complied with.

### IV.   LEGAL JUSTIFICATION

1. This order is justified as per Supreme Court Order.



| EFFECTIVE DATE | SUBJECT |
|---|---|
| **11/02/20** | **COURT ORDERED LOCKDOWN INMATES** |
| **ORDER NO.** | |
| **370.20 - GRVC** | PAGE **6** OF **6** PAGES |

**PREPARED BY:**

_____

**JONELLE SHIVRAJ, Deputy Warden for Security**

**REVIEWED BY:**

_____

**TIFFANY MORALES, Deputy Warden for Administration**

**REVIEWED BY:**

_____

**TIFFANY MORALES, Deputy Warden for Programs**

**REVIEWED BY:**

_____

**JOANNE MATOS, Deputy Warden for Operations**

EXHIBIT-13

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON  (1946-1991)
RANDOLPH E. PAUL  (1946-1956)
SIMON H. RIFKIND  (1950-1995)
LOUIS S WEISS  (1927-1950)
JOHN F. WHARTON  (1927-1977)

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

WRITER'S DIRECT DIAL NUMBER
(212) 373-3312

WRITER'S DIRECT FACSIMILE
(212) 492-0312

WRITER'S DIRECT E-MAIL ADDRESS
dbeller@paulweiss.com
dbrown@paulweiss.com

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
SCOTT A. BARSHAY
JOHN F. BAUGHMAN
J. STEVEN BAUGHMAN
LYNN B. BAYARD
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
DAVID M. BERGMAN
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L. BROCHIN
DAVID W. BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JESSICA S. CAREY
JEANETTE K. CHAN
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
LESLIE GORDON FAGEN
ROSS A. FIELDSTON
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
ANDREW J. FORMAN*
HARRIS B. FREIDUS
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
NEIL GOLDMAN
ROBERTO J. GONZALEZ*
CATHERINE L. GOODALL
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
ALAN S. HALPERIN
JUSTIN G. HAMILL
CLAUDIA HAMMERMAN
BRIAN S. HERMANN
MICHELE HIRSHMAN
MICHAEL S. HONG
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
JAREN JANGHORBANI
BRIAN M. JANSON
JEH C. JOHNSON
MEREDITH J. KANE

JONATHAN S. KANTER
BRAD R. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
BRIAN KIM
DAVID M. KLEIN
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
GREGORY F. LAUFER
BRIAN C. LAVIN
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. McCOLM
ALVARO MEMBRILLERA
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG K. OH
BRAD R. OKUN
KELLEY D. PARKER
VALERIE E. RADWANER
CARL L. REISNER
LORIN L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
CHARLES F. "RICK" RULE*
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
AUDRA J. SOLOWAY
SCOTT M. SONTAG
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
RICHARD C. TARLOWE
MONICA K. THURMOND
DANIEL J. TOAL
LIZA M. VELAZQUEZ
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA MASON WOOD
JENNIFER H. WU
BETTY YAP*
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

September 8, 2022

*By Express Mail*

Alexander Williams
Book & Case Number: 1411801632
George R. Vierno Center
09-09 Hazen Street
East Elmhurst, NY 11370

*Supplemental Engagement Letter as Pro Bono Counsel*

Dear Mr. Williams:

This Supplemental Engagement Letter supplements and amends our existing Engagement Letter, dated June 16, 2022. In addition to all of the terms and conditions set forth in that existing Engagement Letter, which remain in force, the following additional terms and conditions modify our representation of you.

Through this letter, we agree to provide you limited legal services with respect to settlement negotiations in *Williams* v. *City of New York, et al.*, 1:22-cv-03819-PGG-KHP (S.D.N.Y.) and *Williams* v. *City of New York, et al.*, 1:21-cv-01083-PGG-KHP (S.D.N.Y.), which are currently pending before Judge Gardephe (together, the "Gardephe Matters"). For the avoidance of doubt, our representation of you in the Gardephe Matters

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2

will be for the limited purpose of advising on and engaging in settlement negotiations with the defendants in those cases. By agreeing to represent you in settlement negotiations in the Gardephe Matters, we are not representing that such negotiations will be successful or that it will possible to reach a negotiated resolution in those matters.

For the avoidance of doubt, we are not agreeing to advise or represent you in connection with the Gardephe Matters in any phase of litigation other than in settlement negotiations, including but not limited to discovery, summary judgment, or trial. In all matters in which we represent you, we will provide services of a strictly legal nature, and it is understood that you will not be relying on us for business, investment, or accounting advice, nor to assess or vouch for the character or creditworthiness of any third person.

\*\*\*

We ask that you review the foregoing terms and conditions of our representation. We encourage you to discuss with us any questions you might have concerning these matters. Please signify your acceptance of the foregoing Letter of Engagement by signing the enclosed copy of this letter and returning it to me. Please note that your instructing us or continuing to instruct us on the matter discussed above will constitute your full acceptance of the terms set out above.

Again, we are pleased to have the opportunity to work with you.

Very truly yours,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: /s/ *Daniel J. Beller* _____
Daniel J. Beller
David W. Brown

AGREED: *Alexander Williams*
Alexander Williams

**EXHIBIT-14**

# TRACIE A. SUNDACK & ASSOCIATES, LLC
## ATTORNEYS AT LAW

180 SOUTH BROADWAY
SUITE 306
WHITE PLAINS, NEW YORK 10605

TRACIE A. SUNDACK

JEFFREY R. POLLACK
ALBERT PIZZIRUSSO

E-MAIL: SUNDACKLLC@GMAIL.COM

TEL: (914) 946-8100
FAX: (914) 946-9585

September 15, 2022

Mr. Alexander Williams
Book & Case No. 141-18-01632
George R. Vierno Center (GRVC)
09-09 Hazen Street
East Elmhurst, NY  11370

Claim No. 2022PI002930

Dear Mr. Williams:

Enclosed please find the original 50H transcript from your recent hearing.  Please sign where indicated and have your signature notarized.

Please read the transcript carefully.

If any changes or corrections are to be made they should be made on the Errata Sheet according to page and line number.  If used, please have the Errata Sheet signed and notarized as well and return to my office.

The entire transcript with Errata Sheet should be returned together as soon as possible. A self-addressed envelope has been included for your convenience.

Please contact my office if you have any questions.

Very truly yours,

Tracie A. Sundack

EXHIBIT-15



◆ Positive
As of: October 28, 2022 5:13 PM Z

## *Johmanni Anduze v. City of New York*

United States District Court for the Southern District of New York

August 8, 2022, Decided; August 8, 2022, Filed

21-CV-519 (PGG) (KHP)

**Reporter**

2022 U.S. Dist. LEXIS 140929 *; 2022 WL 4586967

JOHMANNI ANDUZE, Plaintiff, -against- CITY OF NEW YORK, et al., Defendants.

**Subsequent History:** Adopted by, Claim dismissed by *Johmanni Anduze v. City of New York, 2022 U.S. Dist. LEXIS 177927 (S.D.N.Y., Sept. 29, 2022)*

**Prior History:** *Anduze v. City of New York, 2021 U.S. Dist. LEXIS 37667, 2021 WL 795472 (S.D.N.Y., Feb. 26, 2021)*

## Core Terms

mail, alleges, inmate, recreation, shower, restrictions, enhanced, courts, constitutional right, Lockdown, deprivation, outgoing, phone call, cell, prison, constitutional violation, retaliation, food, commissary, conditions, asserts, rights, razor, prison official, detainee, qualified immunity, motion to dismiss, pretrial detainee, policymaker, recommend

**Counsel:** [*1] Johmanni Anduze, Plaintiff, Pro se, East Elmhurst, NY USA.

For City of New York, Defendant: Alan Howard Scheiner, LEAD ATTORNEY, NYC Law Department, New York, NY USA; Andrew B. Spears, Andrey Udalov, Rachel Amy Seligman, LEAD ATTORNEYS, New York City Law Department, New York, NY USA.

For Hazel Jennings, Becky Scott, Hedt Grossman, Jonelle Shivarj, Tiffany Morales, Joane Matos, Warden Jean Rene, CO Hickson, Captain Bernard Mathis, CO Drumwright, ADW Henry, CO Nezma, CO Ramirez, CO Edmunds, CO White, Captain Vallejo, Capt. Carter, CO McNiel, Captain Moodie, CO Montinegro, CO Ritter, Capt. Dallah, CO Taylor, Capt. Loiseau, CO Keys, Capt. Blake, C.O. Dychese, Capt. Law, C. O. K. Young, C.O. Lawrence, Kenneth Stukes, C. O. W. Rodriguez, Cynthia Brann, Defendants: Andrew B. Spears, LEAD ATTORNEY, New York City Law Department, New York, NY USA.

For DR Blackmore, Defendant: Andrew B. Spears, Andrey Udalov, LEAD ATTORNEYS, New York City Law Department, New York, NY USA.

No. 56.) Plaintiff did not oppose the motion. For the reasons set forth below, I recommend that the motions to dismiss the SAC be granted in part and denied in part.

## FACTUAL ALLEGATIONS

The following facts, taken from the SAC, are presumed true for purposes of this motion and all reasonable inferences are drawn in Plaintiff's favor. Plaintiff brings this case complaining about various conditions of confinement and treatment he received while he was a pretrial detainee at Rikers Island. While Plaintiff was in the custody of the New York Department of Correction ("DOC"), Justice Donald Leo of the Supreme Court of the State of[4] New York, Kings County, issued a Judicial Lockdown Order ("JLO") on May 15, 2020, directing that Plaintiff be subject to certain restrictions because of his assessment that Plaintiff posed a significant risk to the safety of potential witnesses against him. (ECF No. 32-2.)

### 1. JLO

McNeill, Shield No. 12557; Captain Kishna Molina, Shield No. 593; Former CO Jennifer Montenegro; Captain Paul Moodie, 1165; Deputy Warden Tiffany Morales, Shield No. 4; CO Victor Nzeama, Shield No. 6774; CO Johanny Ramirez, Shield No. 15685; Warden Jean Rene, Shield No. 627; CO Preston Ritter, Shield No. 7994; CO Wilson Rodriguez, Shield No. 9665; Chief of Operations Becky Scott, Shield No. 25; Stukes, Shield No. 19; CO Shanell Taylor, Shield No. 8644; Deputy Warden Jonelle Shivral, Shield No. 604; Chief Kenneth Captain Fanny Vallejo, Shield No. 924; CO Kevin White, Shield No. 8507; CO Kevin Young, Shield No. 11268.

The JLO, as amended, imposed restrictions on Plaintiff's housing, visits and phone calls, movement and transportation, property, mail, shower, recreation, and services. (ECF No. 32-2.) More specifically, the JLO directed, inter alia, that: (1) Plaintiff be housed in a highly secured 23-hour lockdown area, on lock-in, feed-in status, be separated from other inmates in the area in such a manner to prevent him from communicating with or passing materials to other inmates; (2) Plaintiff's telephone calls be permitted only to his attorneys, mother and grandmother, and no visitation privileges excepted by his attorney; (3) Plaintiff be searched each time he is removed or returned to his cell and treated the same way when in a court facility; (4) Plaintiff be restrained in handcuffs when transported outside of the detention facility; (5) Plaintiff and his cell be searched each day and he not be permitted to possess [*5] any envelopes or postage stamps or to purchase them from the commissary; (6) Plaintiff not be permitted to send out any mail and/or his outgoing mail be inspected to determine if it contain any threats or an attempt to have others convey threats, his incoming mail be screened weekly and prohibited letters be kept for Plaintiff unopened, whereas permitted letters be read to him; (7) Plaintiff be afforded regular showers as outlined by the DOC and, to the extent that DOC can arrange a mutually agreeable procedure, be provided with a period of recreation daily; and (8) if requested, Plaintiff be provided law library, commissary, and religious services inside his cell and permitting Plaintiff to be removed from his cell only for medical services, for which a log

"Commanding Officer or his/her designee;" (9) "[t]he only items inmates housed in Court Ordered areas may purchase from commissary are: 1. Soap 2. Shampoo 3. Deodorant 4. Toothpaste 5. Paper;" (10) "[i]f these inmates request religious services, the Chaplain will be called to visit them;" (11) "[a]ny necessary medical or mental health services are to be provided to these inmates in the housing area," and they "will not be removed to go to the Clinic unless it is physically impossible to provide them with necessary medical services in the cell/housing area;" and (12) inmates "may be afforded recreation in accordance with the details delineated in the court order or as amended in a separate memo," and they "will be restrained in waist chains handcuffs and mitts whenever they are out of their cells for recreation." (ECF No. 9, p. 55-59, SAC Ex. A.)

A.

### 3. Minimum Standards

Plaintiff asserts that subjecting him to CLO 370.20 violates the BOC's Minimum Standards, which provide that: (i) "all prisoners shall be permitted to shave daily" and "to shower daily" (SAC ¶ 28, Minimum Standard [¶] 1-03(c)(1)-(2)); (ii) "recreation "shall be at least one hour" and shall "be available seven days a week in the outdoor recreation area" (SAC ¶ 30, Minimum Standard 1-06(c); (iii) all prisoners "shall be granted access to facility law library for a period of at least two hours on each day that the law library is open]" (SAC ¶ 32, Minimum Standard 1-08(f)(4)); (iv) "all prisoners shall have reasonable access to type writer [sic], dedicated word processors and photocopies for the purpose of preparing legal documentation" (SAC ¶ 32, Minimum Standard 1-08(g)(2)); (v) "correctional personnel shall never prohibit delay or cause to prohibit or delay inmates access to care or appropriate treatment. All decisions regarding need for medical attention shall be made by health [c]are personnel." (SAC ¶ 36, Minimum Standard 3-02(b)(4)); and (vi) "medical treatment or physical examination shall not occur outside of appropriate treatment areas . . . except as needed in the event of an acute medical emergency." (SAC ¶ 36, Minimum Standards 3-06(b)(5)).

### 4. Plaintiff's Complaints

#### a. Denials of Phone Calls, Showers, Razor, Typewriter, Recreation, Commissary, and Serving Cold Food and Without a Certificate [¶10]

Plaintiff alleges that his requests to call his mother and grandmother were denied on November 3, 2020. (SAC ¶ 2.) However, Plaintiff does not identify which prison official denied his request. On November 4, 2020, Plaintiff again requested to make phone calls, but was denied by CO Drumwright and ADW Henry. (SAC ¶ 7-8.)

On November 3, 2020, Deputy Warden Jonelle Shivraj ("Shivral") and ADW Henry denied Plaintiff's request to shower. (SAC ¶ 3-4.) On November 4, 2020, Plaintiff

43, 45.) On November 15, 2020, CO K. Young denied Plaintiff's outgoing mail to both his attorney and mother. (SAC ¶ 49.) On November 20, 2020, Warden Dunbar informed Plaintiff that [*13] the Deputy Warden of Security Shivraj makes decisions concerning inmates' mail and that the staff will adhere to CLO 370.20's restrictions concerning his mail. (SAC ¶ 54.)

According to Plaintiff, CO K. Young stated that Plaintiff's packet to his attorneys that Plaintiff handed him on December 22, 2020, would not be sent unless Plaintiff handled "that business" with inmate Williams. (SAC ¶¶ 67-68.) Capt. Molina, CO K. Young and CO W. Rodriguez "admitted on Jan. 5, 2021" that his mail to his attorney" was held since Dec. 22, 2020," and opened and inspected without notifying him. (SAC ¶ 87.) Plaintiff admits that on January 5, 2021, CO Harris sent out Plaintiff's packet to his attorneys after he reviewed Plaintiff's JLO and discovered there were no mail restrictions.

### c. Medical Claims

Plaintiff alleges that his mental health medication was denied on November 5, 2020 by an unidentified prison official, and on November 6 by CO Ramirez (SAC ¶ 22) and Captain Carter (SAC ¶ 24). On November 8, CO K. Young brought Plaintiff his mental health medication instead of medical personnel. (SAC ¶ 38.) On November 27, Plaintiff asked to see the medical staff for left shoulder pain after being assaulted [*14] by CO Lawrence the previous night because Plaintiff set a fire in in his cell. This request was denied by an unidentified prison official, who advised Plaintiff to ask medical staff directly. (SAC ¶ 60.)

### Dr. Blackmore and Dr. Gemo

On November 9, 2020, Dr. Blackmore, when completing his rounds in Plaintiff's housing unit, refused to examine Plaintiff for shoulder pain because of CLO 370.20. On November 16, 2020, Plaintiff informed Dr. Blackmore that he needed mental health personnel to discuss suicidal thoughts but was informed that permission was needed from the Warden due to the CLO 370.20. (SAC ¶ 50.) On November 19, 2020, Plaintiff asked Dr. Gemo to be examined due to constant pain in his shoulder despite pain medication, but Dr. Gemo explained that Plaintiff would have to be examined through his cell door due to CLO 370.20. (SAC ¶ 53.)

### d. Allegations of Retaliation

Plaintiff asserts that CO Ramirez denied his request to file a grievance on November 6, 2020. (SAC ¶ 23.) CO K. Young insulted Plaintiff calling him "Lil Nigga" and stated that medical staff is never allowed inside the unit "for your little rapist ass" because of CLO 370.20. (SAC ¶ 36.) CO McNeil stated to Plaintiff when [*16] he allowed a phone call; "Okay so this is the rapist mother-fucker Dunbar was talking about" and asked Plaintiff how he would like it if he "raped your mother." (SAC ¶

subsequently attacked by CO Lawrence when he was hanging off the railing of the top tier. (SAC ¶ 107.)

## LEGAL STANDARD

### 1. Motion to Dismiss Under Rule 12(b)(6)

When considering a motion to dismiss for failure to state a claim upon which relief can be granted under *Rule 12(b)(6)*, the Court must accept all factual allegations in the complaint as true and draw all inferences in the Plaintiff's favor. *Littlejohn v. City of New York, 795 F.3d 297, 306-07 (2d Cir. 2015)*. To survive a motion to dismiss, the complaint must contain "sufficient factual matter . . . to state a claim [*18] to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 663, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*). While detailed factual allegations are not required, the complaint must contain more than mere "labels and conclusions." *Iqbal, 556 U.S. at 678*. It must contain more than "naked assertion[s] devoid of further factual enhancement" and a "formulaic recitation of the elements of a cause of action." *Id.* (internal citation and quotation marks omitted). As the Supreme Court explained in *Iqbal*, the "plausibility standard" asks for "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to

support the claims." *Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995)*. Dismissal is appropriate only when it "appears beyond a doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir. 2000)*.

"It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.'" *Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006)* (quoting *Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006)*). At the motion to dismiss stage, the Court may consider any document "attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference," as well as "documents . . . [*19] that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)* (citations omitted).

### 2. Claims Under 42 U.S.C. § 1983

*Section 1983* provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured[.]" *42 U.S.C. § 1983*. *Section 1983* "is not itself a source of substantive rights,

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)); *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11, 211 L. Ed. 2d 170 (2021). The immunity protects a government actor if it was "objectively reasonable" for him to believe that his actions were lawful at the time of the challenged act." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). "The objective reasonableness test is met—and the defendant is entitled to immunity—if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 340-41, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *City of Tahlequah*, 142 S. Ct. 11 (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018)).

It is well settled in this Circuit that a defendant's ability to rely on qualified immunity is a question of law for the court to decide only when the facts are not in dispute. *Lennon*, 66 F.3d at 421 (2d Cir. 1995). In the context of a motion to [*22] dismiss, it must be clear from the face of the pleading that conduct of the officer was objectively reasonable as a matter of law. Cf. *Iqbal*, 556 U.S. at 671-672 (recognizing that denial of claim of qualified immunity on *Rule 12(b)(6)* motion can fail "within the narrow class of appealable orders despite the absence of a final judgment"); *Ford v. Miller*, 2019 U.S. Dist. LEXIS 144760, 2019 WL 6831640, at *14 (S.D.N.Y. Aug. 23, 2019), report and recommendation adopted, 2019 WL 4673445 (S.D.N.Y. Sept. 25, 2019) (on motion to dismiss, finding officers entitled to qualified immunity because plaintiff failed to state a claim for violation of his constitutional rights; law was clear that plaintiffs' complaints did not constitute a protectable liberty interest).

## DISCUSSION

## 1. RULE 8(A)(2) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Defendants argue that Plaintiff's SAC, consisting of 152 paragraphs and seven exhibits and containing "plaintiff's personal opinions, recitation of alleged arguments with Correction Officers," his "personal conversations," and alleged conversations between other inmates and CO's, should be dismissed for failure to comply with *Federal Rule of Civil Procedure 8(a)(2)*, which requires that a pleading "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*.

Dismissal of a complaint for failure to comply with *Rule 8(a)(2)* "is usually reserved for those cases in which the complaint is so confused, [*23] ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo*, 861 F.2d 40, 42

Constitutional rights. As to Blair, Plaintiff only alleges that, while touring the housing unit on January 8, 2021, she informed him that his court order "was modified to include 8 or 16 hour[s] of rec a day," but Chief Scott stated that Plaintiff will not be moved unless the judge comes to G.R.V.C. and moves Plaintiff himself. (SAC ¶ 73.) However, Plaintiff fails to allege that Blair violated his Constitutional rights. Although Rodriguez is mentioned in several paragraphs, such as informing Plaintiff that the mail of inmates in his housing unit had to be verified pursuant to the CLO, Plaintiff includes no facts or conduct by Rodriguez that rise to a Constitutional violation.[4] (See SAC ¶¶ 54, 57, 72, 74.) Accordingly, I recommend dismissing the claims against Scott, Jennings, Grossman, Morales, Matos, Blair, Keys, Rodriguez, Stukes, Brann and Rene for lack of personal [*26] involvement. Alfaro Motors, Inc., 814 F.2d at 886.

3. MINIMUM STANDARDS VIOLATIONS

As a threshold matter, when evaluating each of Plaintiffs claims, they must be analyzed bearing in mind that he was subject to a court issued Lockdown Order which precipitated the CLO. Thus, a penological purpose for the restrictions — the implementation of a state court lockdown order — is presumptively valid, at least insofar as the CLO's requirements are consistent

[4] Plaintiff also alleges that Rodriguez failed to come to the unit thereby denying him the ability to make a phone call. As discussed below, this alleged violation does not amount to a Constitutional violation.

with the state court's Lockdown Order. See Avery v. Tum Key Health Clinics, LLC, 2020 U.S. Dist. LEXIS 24053, 2020 WL 714176, at *9 (W.D. Ark. Feb. 12, 2020), aff'd, 839 F. App'x 26 (8th Cir. 2021) (noting that "Security of the criminal justice process, enforcement of a court's orders, protection of victims and witnesses are legitimate penological interests"); see also Hubbard v. Johnson, 2019 U.S. Dist. LEXIS 187668, 2019 WL 5579507, at *4 (N.D. Cal. Oct. 29, 2019); Pickford v. Lake Cnty. Cmty. Correction, 2015 WL 3822262, at *2 (N.D. Ind. June 19, 2015).

Defendants argue that to, the extent Plaintiff's claims are based on a violation of the BOC's Minimum Standards, no claim under Section 1983 can lie insofar as the Minimum Standards do not set the Constitutional standard.

Although the Second Circuit does not appear to have ruled on the issue, District Courts in this Circuit consistently have found that BOC's Minimum Standards do not, standing alone, establish a violation of a federally guaranteed right for purposes of Section 1983. Knight v. Mun. Corp., 2016 WL 4030632, at *6 n.7 (S.D.N.Y. July 26, 2016); Winters v. City of New York, 2020 WL 4194633, at *5 (S.D.N.Y. July 21, 2020); Walker v. Shaw, 2010 U.S. Dist. LEXIS 62664, 2010 WL 2541711, at *6 (S.D.N.Y. June 23, 2010) (collecting cases). The rationale for these decisions is that the Minimum Standards, set [*27] by state law, are tantamount to procedural guidelines for prisons that the state chooses to require. Korkala v. N.Y.C. Dep't of

Plaintiff's claim of unconstitutional conditions of his confinement. Thus, dismissing the SAC based on the argument that Defendants are entitled to qualified immunity because they acted at the direction of a facially valid directive is not warranted.

*b. Denials of Phone Calls, Showers, Razor, Recreation, Commissary and Serving Food Cold and Without a Certificate*

Defendants argue that there is no Constitutional right to a daily shower, and sporadic denials of razor and outdoor recreation do not rise to the level of a Constitutional violation.

The Constitution requires that prison officials "provide humane conditions of confinement" and "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones[.]" *Id.* (internal quotation marks and citation omitted). [*30] When a plaintiff is a pretrial detainee, as here, claims related to conditions of confinement are analyzed under the *Due Process Clause of the Fourteenth Amendment.* When evaluating such a claim, courts look to "contemporary standards of decency." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).

To state a claim for deliberate indifference to conditions of confinement, a plaintiff must show that the deprivation was both objectively serious and that the defendant official acted with sufficient mens rea, (the "subjective" prong of the test). Under the subjective prong, the plaintiff must show that the defendant was deliberately indifferent to any objectively serious condition of confinement. *Id. at 32.* Under the *Fourteenth Amendment*, this can be shown with evidence that the "defendant official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id. at 35.*

Numerous courts have held that unpleasant or unsanitary conditions only rise to the level of a Constitutional violation if they rise to an objectively and sufficiently serious denial of the minimal civilized measure of [*31] life's necessities. *Id. at 30-32.* Furthermore, a plaintiff must proffer facts to show "an officials' deliberate indifference to those conditions, or that that those conditions are punitive." *Id. at 34 n.12.*

"[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" *Id. at 30* (citing *Walker*, 717 F. 3d at 125). To properly assess whether conditions are sufficiently serious, the plaintiff must include information about the duration and severity of them,

Plaintiff also asserts that the recreation yard did not have any recreation equipment for him to use (SAC ¶ 52), and he had to wake up early in the morning to place himself on the recreation list for each day, which was a form of punishment (SAC ¶ 76). However, Plaintiff does not allege that the lack of recreation equipment in the yard deprived [*34] him of an opportunity to exercise. Additionally, prisoners are not Constitutionally guaranteed recreational equipment. *Anderson v. Coughlin*, 757 F.2d 33, 34-36 (2d Cir. 1985). Further, Plaintiff's conclusory allegation that waking up early in the morning to place himself on the recreation list was a punishment is insufficient to state a claim insofar as there was no objectively serious risk to his health of having to wake up at 6:00 a.m. Thus, Plaintiff's allegations against CO Ramirez and Captain Vallejo concerning denials of exercise do not state a claim that his Constitutional rights were violated.

*iii. Television, Commissary, and Food*

Plaintiff alleges he was denied a television in his cell and his access to the commissary cell or access to the commissary was restricted. (SAC ¶ 77.) However, Plaintiff has no Constitutional right to a television in his *New York ex rel. NYC Dept of Correction, 2009 U.S. Dist. LEXIS 88562, 2009 WL 3097239, at *5 (S.D.N.Y. Sept. 25, 2009)* (holding that "[s]poradic infringement of the right to exercise does not rise to the level of to a constitutional deprivation."), was restricted. (SAC ¶ 77.) However, Plaintiff has no Constitutional right to a television in his commissary. See *Rosales v. LaValley*, 2014 WL 991865, at *11 (N.D.N.Y. Mar. 13, 2014) ("It is well established that prison inmates do not have a constitutional right to watch television because the amenity is not considered a necessity for inmates."); *Wingate v. City of New York, 2014 U.S. Dist. LEXIS 103130, 2014 WL 3747662, at *1 (E.D.N.Y. July 25, 2014)* ("Prisoners, including pretrial detainees, do not have . . . a constitutional right to the use of a prison commissary."). Moreover, Plaintiff failed to assert any injury caused by denials of television in his cell and access to the commissary, or that watching television or accessing the commissary were entirely [*35] denied. Thus, Plaintiff's allegations concerning denials of television in his cell and access to the commissary do not state a claim that his Constitutional rights were violated.

Plaintiff alleges that his lunch was served cold and without a food handling certificate by CO Drumwright (SAC ¶ 9), CO Nzeama (SAC ¶ 11), and CO Ramirez (SAC ¶ 14), which violated DOC directives. However, such allegations are not Constitutional violations. *Smith v. Westchester County*, 2021 WL 2856515, at *8 (S.D.N.Y. July 7, 2021) ("[F]ood merely served cold or in an unpleasing manner is too frivolous or in constitute a constitutional violation."). Plaintiff does not allege that his food was undercooked, rotten, or presented a serious health hazard. But see *Hall v. Westchester County*, 2021 WL 795165, at *5 (S.D.N.Y. Mar. 1, 2021) (Plaintiff adequately pleaded serious

penological interests of the limitations put in place, namely the CLO. To the extent that Plaintiff's claim of censorship and delay concerns his outgoing non-privileged mail and in light of the JLO finding that Plaintiff posed a danger to prosecution witnesses and that mail monitoring was necessary to protect the safety of witnesses, there is a legitimate governmental interest in monitoring Plaintiff's non-privileged mail. Thus, Plaintiff's allegations concerning the monitoring of his non-privileged outgoing mail are insufficient to state a claim that his Constitutional rights [*38] were violated.

Lastly, Plaintiff's claim is also deficient because he does not allege any injury from the denials of making phone calls and sending mail to his mother and grandmother. See *Fair v. Weiburg,* 2006 U.S. Dist. LEXIS 70183, 2006 WL 2801999, at *7 (S.D.N.Y. Sept. 28, 2006) ("Nothing in Plaintiff's Complaint provides any basis for finding that the temporary denial of his desire to use the phone to call his mother constituted an urgent condition that might approach the "serious injury" requirement[.]"). Thus, Plaintiff's allegations concerning denial of phone calls to his mother and grandmother are insufficient to state a claim that his Constitutional rights were violated.

Allegations concerning conditions of confinement similar to those of Plaintiff have been found insufficient to state a claim. See, e.g., *Reid v. City of New York,* 2021 WL 3477243, at *11-12 (S.D.N.Y. Aug. 6, 2021), report and recommendation adopted, 2021 WL 4177756 (S.D.N.Y. Sept. 14, 2021) (recommending dismissal of claims of pretrial detainee who complained about unsupportive

mattress, denial of indoor exercise, denial of adequately warm footwear for outdoor recreation in winter); *Washington v. Falco,* 2021 WL 797658, at *5 (S.D.N.Y. Mar. 1, 2021) (dismissing pretrial detainee's conditions of confinement claim alleging refusal to provide recreational equipment and allotting only one to three hours for exercise were conditions imposed on all individuals in restricted housing area [*39] and not punitive); *Trimmier v. Cook,* 2020 WL 5231300, at *5 (D. Conn. Sept. 2, 2020) (finding in relevant part that the limited daily telephone calls and recreation, and restrictions on commissary spending do not constitute deprivations of Trimmier's basic human needs, such as food, clothing, shelter, medical care or safety).

Thus, I recommend granting the motion to dismiss with respect to Plaintiff's claims based on denials of showers, razor, recreation, television, commissary, phone calls to his mother and grandmother, and serving food cold and without a certificate.

## 5. ACCESS TO COUNSEL AND THE COURTS

### a. Communication

A pretrial detainee's Sixth Amendment rights are violated when a prison regulation unjustifiably obstructs, infringes, unreasonably burdens or significantly interferes with his access to counsel. *Patterson v. Ponte,* 2017 U.S. Dist. LEXIS 48016, 2017 WL 1194489, at *4 (S.D.N.Y. Mar. 30, 2017), report and

insufficient to state a claim. *Bellamy, 692 F. Supp. at 214* ("Although prisoners have a right to access counsel from prison, they have no right to unlimited telephone call" and "restrictions on inmates' access to counsel via the telephone may be permitted as long as prisoners have some other manner of access to counsel."). For these reasons, Plaintiff's allegations concerning [*42] denial of a phone call to his attorney are insufficient to state a claim that his Constitutional rights were violated.

As to communicating in confidence, Plaintiff sufficiently states a claim based on his allegations that CO Ritter and CO Hickson purposely stood in front of his cell door when he was discussing his criminal and civil cases with his attorney. (SAC ¶ 31.) "Courts in this Circuit have held that forcing pretrial detainees to consult with counsel in non-private areas where their conversations may be overheard by correctional staff or other inmates is violative of the pretrial detainees' *Sixth Amendment* right to counsel." *Demuth v. Chenango Cnty. Sheriff's Off.,* 2020 WL 929736, at *8 (N.D.N.Y. Jan. 24, 2020), *report and recommendation adopted sub nom. Demuth v. Cutting,* 2020 U.S. Dist. LEXIS 32588, 2020 WL 918739 (N.D.N.Y. Feb. 26, 2020). Here, both CO Ritter and CO Hickson were in a position to overhear Plaintiff's conversation with his attorney, thus violating his right to counsel. Accordingly, I recommend denying Defendants' motion to dismiss this claim as to Defendants CO Ritter and CO Hickson.

### b. Legal Mail

"[A] prisoner's right to the free flow of incoming and outgoing mail is protected by the *First Amendment,*" and courts "have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming [*43] mail." *Traore v. Rikers Island C-95 & C-76,* 2022 WL 1556946, at *3 (S.D.N.Y. May 16, 2022) (citations omitted). Under the *First Amendment,* "[r]estrictions on prisoners' mail are justified only if they "further[ ] one or more of the substantial governmental interests of security, order, and rehabilitation [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir. 2003) (citation omitted). The Second Circuit has held that prison officials can only open an inmate's outgoing legal mail if there is a "rational justification" for doing so. *Davidson v. Scully,* 694 F.2d 50, 54 (2d Cir. 1982) (citing *Wolfish,* 573 F.2d at 130).

While a prisoner has a right to be present when his legal mail is opened, an isolated incident of mail tampering is usually insufficient to establish a Constitutional violation. *Wolff v. McDonnell,* 418 U.S. 539, 574-76, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974). The Second Circuit has found that "two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation

"will promptly place them in an envelope, *unread*, and promptly provide these materials to the jail security office[.]" (*Id.*) (emphasis added). The security office was then to "inspect each piece of mail to determine if it contains any threats or represents an attempt to have others convey threats, or otherwise presents any possible security concerns." (*Id.*)

Defendants have failed to articulate any legitimate penological interest in the need for reading Plaintiff's privileged, outgoing legal mail to his attorney. Despite the JLO providing that Plaintiff's mail should be inspected, it also makes clear that his legal mail was to be unread. Further, courts have noted there is greater protection for legal mail. *See Wolff,* 418 U.S. at 577; *Davis,* 320 F.3d at 352 (2d Cir. 2003) (noting Plaintiff's outgoing legal mail is subject to greater Constitutional protection because of the lesser security concerns presented). *Cancel v. Goord,* 2001 U.S. Dist. LEXIS 3440, 2001 WL 303713, at 7 (S.D.N.Y. Mar. 29, 2001) (The Second Circuit has held that prison officials can only open an [*47] inmate's outgoing legal mail if there is a rational justification for doing so); *Smith v. City of New York,* 2015 U.S. Dist. LEXIS 40247, 2015 WL 1433237, at *6 (S.D.N.Y. Mar. 30, 2015) (noting that Defendant's contention that its policy is necessary to ensure that the mail is for Plaintiff and not another court-ordered lock-down inmate, does not constitute a sufficient justification for the prison to inspect legal mail).

Accordingly, to the extent that Plaintiff alleges his privileged, outgoing legal mail to his attorney was censored and delayed for inspection, at this stage of the litigation, Plaintiff's allegations against CO Hickson, CO K. Young, Capt. Molina, and CO W. Rodriguez are sufficient to state a claim that his Constitutional rights under the *First* and the *Sixth Amendments* were violated.

### c. Access to Courts

Although Plaintiff alleges that his request for a typewriter to write to the judge in his state court action was denied by an unidentified person because the housing unit did not have one (SAC ¶ 32), he fails to assert that he could not have handwritten his correspondence. This dooms his access to courts claim. *See Means v. Rockland Cnty. Corr. Facility,* 2019 WL 1596489, at *7 (S.D.N.Y. Apr. 15, 2019) (finding that plaintiff's assertion that correction officials denied him access to the courts by failing to provide him law books, paper, typewriter, and free telephone calls insufficient [*48] to support a claim of denial of access to courts because plaintiff had access to materials to submit to the Court his handwritten complaint); *see also Fusco v. Westchester Cnty. Dep't of Corr.,* 2021 WL 1254215, at *4 (S.D.N.Y. Apr. 1, 2021).

### 6. MEDICAL CLAIMS

When evaluating a claim of deliberate indifference to medical needs by a pretrial detainee, the same basic two-prong test described above applies. That is, the

Similarly, that Dr. Blackmore merely informed him of a procedure regarding mental health treatment does not state a claim for a violation of Constitutional rights. Further, Plaintiff does not allege that Dr. Blackmore subjectively believed he was a suicide risk to support a medical indifference claim. *See Fontaine v. Cornwall,* 2019 U.S. Dist. LEXIS 152907, 2019 WL 4257136, at *7 (N.D.N.Y. Sept. 9, 2019) ("Without establishing [the social worker's] subjective awareness that plaintiff was an active suicide risk, his deliberate indifference claim against her must be dismissed.").

As to Dr. Gemo, Plaintiff does not allege that Dr. Gemo denied treatment to him, only that Dr. Gemo [*51] informed him that he would have to examine him through the cell door. This too is insufficient to give rise to a Constitutional violation. Accordingly, Plaintiff's allegations against Dr. Blackmore and Dr. Gemo are not sufficient to state a claim of deliberate indifference to his medical needs and should be dismissed.[6]

**7. FIRST AMENDMENT RETALIATION**

"[I]t is well established that retaliation against a prisoner for pursuing a grievance violates the right to petition

___

[6] Although Dr. Gemo has yet to appear in this action, he may be dismissed *sua sponte* as the allegations are substantially similar to those alleged against Dr. Blackmore. *See Hecht v. Com. Clearing House, Inc.,* 897 F.2d 21, 26 (2d Cir. 1990) (affirming *sua sponte* dismissal of all defendants, despite the defendant not appearing in the case or joining the motion to dismiss because the issues against that defendant were substantially the same as those concerning the other defendants); *see also Fein v. Feinstein,* 2021 WL 2715799, at *3 (W.D.N.Y. July 1, 2021).

government for the redress of grievances guaranteed by the *First* and *Fourteenth Amendments* and is actionable under § 1983." *Dolan v. Connolly,* 794 F.3d 290, 294 (2d Cir. 2015) (quoting *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996)). A plaintiff asserting *First Amendment* retaliation claims must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Id.* (quoting *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir. 2009)). The filing of a prison grievance is protected activity. *Id.* To constitute an adverse action, the retaliatory conduct has to be of a nature that it would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights[.]" *Davis,* 320 F.3d at 353 (quoting *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001)).

"[T]o satisfy the causation requirement, [*52] allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 354 (cleaned up). When determining a causal connection, courts may infer a retaliatory motive in the adverse action from: (1) "the temporal proximity of the filing to the grievance and the disciplinary action"; (2) "the inmate's prior good disciplinary record"; (3) "Vindication at a hearing on the matter"; and (4) "statements by the defendant regarding his motive for disciplining the plaintiff." *Thomas v. DeCastro,* 2019 U.S. Dist. LEXIS 55153, 2019 WL 1428365, at *9

inmate Williams in January 2021, he filed a grievance in connection with that matter, the SAC is devoid of any allegations that CO K. Young or any other Defendant took adverse action because of that grievance. To the extent that Plaintiff claims that restrictions were [*55] imposed on him by Defendants after they were lifted in December 2020 (SAC ¶¶ 67, 73), the JLO restrictions were lifted by the state court on June 8, 2021, not in December 2020. (ECF No. 32-4). Plaintiff does not allege that any restrictions were imposed on him or any adverse action taken against him by any Defendant after they were lifted on June 8, 2021. Thus, these allegations are insufficient to state a claim for retaliation under the *First Amendment.*

Likewise, to the extent Plaintiff alleges that comments made to him by prison staff are retaliatory in nature, those are insufficient to state a claim. Specifically, Plaintiff alleges that CO K. Young insulted Plaintiff calling him "Lil Nigga" and a "rapist" (SAC ¶ 36), and CO McNeil called him a rapist and asked him how he would like it if he "raped your mother?" (SAC ¶ 37). Allegations of verbal abuse and threats unaccompanied by physical injury do not suffice to state a claim of Constitutional violations under *42 U.S.C. § 1983.* See *Cole v. Fischer, 379 F. App'x 40, 43 (2d Cir. 2010)* ("Verbal harassment, standing alone, does not amount to a constitutional deprivation."); *Cuoco v. Moritsugu, 222 F.3d 99, 109 (2d Cir. 2000)* (noting that "rudeness and name-calling does not rise to the level of a constitutional violation"); *Hudson v. Lockhart, 554 F.*

*Supp.2d 494, 497 (S.D.N.Y. 2008).* Thus, even if taken as true, that CO K. Young and CO McNeil used such abhorrent language, that alone, with no additional allegations of retaliation or physical injury, fails to implicate a Constitutional violation.

## 8. DUE PROCESS CLAIMS RELATED TO REQUIREMENT OF ENHANCED RESTRAINTS

Plaintiff claims that his procedural and substantive due process rights were violated by being designated a CMC case and placed in enhanced restraints without a hearing, including when he was taken to shower or recreation. CLO 370.20 required enhanced restraints when Plaintiff was outside of his cell. Plaintiff was placed in restraints during recreation and when being transported to the shower. Plaintiff's complaints implicate his substantive and procedural due process rights under the *Fourteenth Amendment,* addressed below.

### a. *Fourteenth Amendment* Substantive Due Process

"In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law," the Supreme Court held that "the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell, 441 U.S. at 535.* "[I]n determining whether particular restrictions and conditions accompanying pretrial detention amount to

1985)). Here, Plaintiff alleges that on November 17, 2020, he was afforded recreation, but Captain Law and CO Dychese told Plaintiff he had to stay in enhanced restraints during the entire period which deterred him from going again on November 27, 2020. (SAC ¶¶ 52, 59.). The Second Circuit has noted that requiring enhanced restraints may deprive a prisoner a meaningful opportunity to exercise and that such law is clearly established. See *Edwards v. Quiros*, 986 F.3d 187, 192 (2d Cir. 2021) ("we conclude that there was sufficient evidence for the jury to find that [the warden] had the requisite state of mind for the entire six-month period during which Edwards was required to exercise in restraints when outside of his cell"); *McCray*, 963 F.3d at 120 ("In this Circuit the rights of prisoners to a meaningful opportunity for physical exercise had been clearly established nearly three decades [ago]"); see also *Brown v. Venettozi*, 2021 WL 3232264, at *6 (S.D.N.Y. Feb. 1, 2021). Thus, Plaintiff has plausibly alleged a violation of [*60] his rights regarding the use of enhanced restraints while exercising. See *Paul v. LaValley*, 712 F. App'x 78, 79 (2d Cir. 2018) ("Accordingly, we have agreed with other Circuits that some opportunity for exercise must be afforded to prisoners, and we have held that this right was clearly established for qualified immunity purposes by no later than 1985[.]") (internal citations and quotation marks omitted).

Accordingly, I recommend that the motion to dismiss the substantive due process claim be denied as to the claim that enhanced restraints were improperly imposed while exercising, but granted in all other respects.

**b. Fourteenth Amendment Procedural Due Process**

To the extent that Plaintiff asserts a liberty interest in not being classified as a CMC inmate, such a claim warrants dismissal because no liberty interest exists in avoiding prison classification. See *Pugliese v. Nelson*, 617 F.2d 916, 925 (2d Cir. 1980) ("[j]udicial intervention into the classification of prisoners for monitoring and control purposes would almost inevitably involve the federal courts in the day-to-day operations of our prison system, which are better left to the expertise of prison administration authorities"); see also *Hunter*, 2015 WL 5697218, at *12 (collecting cases).

However, this does not end the inquiry as to whether Plaintiff was entitled to some procedural [*61] due process before being designated for placement in enhanced restraints. The level of procedural protection required differs according to the purpose of the confinement. *Benjamin*, 264 F.3d at 190. If the restraint is imposed for disciplinary reasons, a prisoner must be provided written notice, adequate time to prepare a defense, a limited ability to present witnesses and evidence, and a written statement of the reasons for the discipline. *Id.* (citing *Wolff*, 418 U.S. at 561-70). If the restraint is for administrative purposes such as to mitigate a security threat or to segregate pending a completion of a misconduct investigation, an inmate

To establish a claim of excessive force, a pretrial detainee "must show only that the force purposefully or knowingly used against him" was "objectively unreasonable" given the facts and circumstances at the time. *Kingsley, 576 U.S. 389, 396-97, 403, 135 S. Ct. 2466, 192 L. Ed. 2d 416; Edrei, 892 F.3d at 534.* Courts consider several factors when determining objective reasonableness, including: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to [*64] limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *Edrei, 892 F.3d at 534; see also Barnes v. Harling, 368 F. Supp. 3d 573, 592 (W.D.N.Y. 2019)* (discussing factors).

Plaintiff alleges that CO Lawrence used excessive force against him on November 26, 2020, when "the plaintiff was stuck in the cell while a fire was in his cell and then attacked the plaintiff[.]" (SAC ¶ 107.) However, Plaintiff does not allege any facts specifying what CO Lawrence did that resulted in any injury. *But see Doe v. NYS Off. of Child. & Fam. Servs., 2021 WL 2826457, at *10 (N.D.N.Y. July 7, 2021)* (Plaintiff's allegations that defendant "pressed his knees on C.P.'s back, yanked her] arms in a violent fashion behind [her] back and tightly handcuff[ed] them," punched and kicked her, held her down on a hard floor, and spit on her" were sufficient to state a claim under substantial due process that Defendant "knowingly" used an objectively

unreasonable degree of force."). Thus, Plaintiff's conclusory allegations that CO Lawrence used excessive force is insufficient to state a claim and should be dismissed.

## 10. MUNICIPAL LIABILITY

A municipality cannot be held liable under *Section 1983* under a respondeat superior theory. *City of Canton v. Harris, 489 U.S. 378, 392, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989).* Rather, it can be liable only if the [*65] Constitutional violations are caused by execution of a government policy or custom, "whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy[.]" *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).* "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson, 563 U.S. 51, 61, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011).* A plaintiff may demonstrate that such a policy or custom exists by introducing evidence of one of the following:

(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a

dismissal is unwarranted. Here, Plaintiff alleges and provides documentation that Warden Dunbar drafted and enforced the CLO, a course of action supposedly tailored to the State Court Lockdown Order. (See SAC ¶ 168; SAC Ex. 3.) To the extent the CLO is overbroad and not tailored for the purpose of implementing the Lockdown Order, there is a plausible *Monell* claim. For example, the Lockdown Order says nothing about requiring Plaintiff to be placed in [*68] enhanced restraints during recreation, yet this was included in the CLO restrictions. Insofar as the Second Circuit has indicated that enhanced restraints during recreation time may unconstitutionally burden a detainee's right to engage in meaningful exercise, the CLO was overbroad. Thus, a plausible *Monell* claim is stated as to this aspect of the CLO.

Plaintiff also sufficiently alleges a *Monell* claim as to violations of his *Fourteenth Amendment* rights when his legal mail was refused by CO Ritter, CO Hickson, and CO White who were following orders from Warden Dunbar. "To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights." *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012). Here, Plaintiff alleges that Warden Dunbar was aware of the risk that he had issues with his mail where on November 13, 2020?, he attempted to talk to her about this issue and she said "I don't have to talk to you about

anything[.]" (SAC ¶ 44.) Although, the CLO only stated that the "assigned Captain will collect all letters written by the inmate . . . will turn the mail over to the Security [*69] Office" and that no inmate subject to the CLO will be permitted to send out any written correspondence, the implementation by the officers appears to be overbroad and Warden Dunbar was aware of that risk. (See SAC Ex. A.)

Accordingly, I recommend denying Defendants' motion to dismiss Plaintiff's municipal liability claim only with respect to the equal protection claims relating to being placed in enhanced restraints when exercising and denying him the ability to send mail. To the extent Plaintiff is raising other municipal liability claims, I recommend that those claims be dismissed.

**11. NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION**

In addition to Constitutional claims, Plaintiff asserts state law negligent hiring, retention, training and supervision claims. To state a claim for negligent hiring, retention, training and supervision, a plaintiff must first demonstrate an employee was negligent. *Mena v. City of New York*, 2019 U.S. Dist. LEXIS 71752, 2019 WL 1900334, at *5-6 (S.D.N.Y. Apr. 29, 2019). Once this is established, a plaintiff must allege:

(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the

2022 U.S. Dist. LEXIS 140929, *71

Plaintiff's claims **except** (1) under the *First* and *Sixth*
*Amendments* against CO Hickson, CO K. Young, Capt.
Molina, and CO W. Rodriguez for censoring Plaintiff's
privileged, outgoing legal mail to his attorney; (2) under
the *Sixth Amendment* against CO Ritter and CO
Hickson in connection Plaintiff's right to confidentially
communicate with his attorney; (3) under the [*72] *First*
*Amendment* against CO K. Young for retaliating against
Plaintiff; (4) the *Fourteenth Amendment* Due Process
conditions of confinement in connection with being
placed in enhanced restraints during exercise against
Captain Law and CO Dychess; and (5) the municipal
liability claim as to Defendants City of New York and
Dunbar with regard to the policy restriction on provision
of being placed in enhanced restraints during recreation
and restricting his access to mail.

**The Clerk of Court is directed to mail a copy of this**
**Report and Recommendation to Plaintiff.**

Date: August 8, 2022

New York, New York

Respectfully submitted,

/s/ Katharine H. Parker

KATHARINE H. PARKER

United States Magistrate Judge

_____

End of Document

EXHIBIT-16

Form 111RB 2/04 Property Receipt/City of New York Department of Correction

# Property Receipt

A Nº 1831898 21 year

Inmate Willions, Alexandre
Last First

Institution GRVC

Date 6/26/21

☐ NYSID # ______
☐ Book and Case # 14118-01632
☐ Sentence # ______

CONTROL/CUFFLOCK# ______

**WHERE WAS PROPERTY TAKEN:**
☐ Admission ☐ Housing Area - Specify: ______ ☐ Other - Specify: ______
Was this property taken on a search: ☐ Yes / ☐ No

**I. Personal Items**

| No. | Articles |
|---|---|
| | Radio |
| | Personal papers |
| | Pocketbook |
| | Gloves |
| | Glasses |
| | Wig |
| | Wallet |
| | Keys |

**II. Clothing**

| No. | Articles | Color Blue |
|---|---|---|
| 2 | Coat/(Jacket) Suit | Grey/Bl |
| 1 | Pants | Black/Blue |
| 1 | Belts | Black Gucci Belt |
| 1 | Shoes/(Sneakers) | Black Gucci |
| 2 | Shirt/Blouse | Blue/Grey |
| | Skirt | |
| | Boots | |
| | Hat | |

**III. Jewelry**

| No. | Article | Description Y | W | CS |
|---|---|---|---|---|
| | [redacted] | | | |
| | Tooth Cap | | | |
| | Neck Chain | | | |
| | Earring | | | |
| | Charm | | | |
| | Bracelet | | | |
| | Watch | | | |
| | Ring | | | |

**Identification:** ☐ Yes ☐ No

| | On Person | Same Name? Y | N |
|---|---|---|---|
| U.S. Passport | | | |
| Green Card | | | |
| Driver's License | | | |
| Other Government-issued photo ID | | | |
| Birth Certificate | | | |
| Social Security Card | | | |
| Other: | | | |

****Please Note:**
Description Color:
Y-Yellow Metal
W-White Metal
CS-Color of Stone

**INSTRUCTIONS**
1. If you receive more than one (1) item on a line, (e.g., coat/jacket) circle appropriate item then enter the number.

**IV. Miscellaneous**

| No. | Article |
|---|---|
| 1 | Black Gucci Belt. |
| | |
| | |
| | |
| | |

☐ NO PROPERTY

**The above item(s) has been received from you because:** Court Clothes
☐ It is not on the list of items which are permitted in this facility
☐ The quantity is in excess of that allowed in this facility.
☐ It may create a health, safety or security hazard, and therefore, you are not permitted to have it in your possession.
☐ You have submitted the item to us voluntarily for safekeeping.
☐ Other ______

Gordon — Signature of person taking property
8363 — Shield ID #
Gordon — Print Name

______ Signature of Inmate
______ Date
______ Time

**SEE APPEAL AND DISPOSAL PROVISIONS ON OTHER SIDE.**

Distribution:
**White** - Inmate Copy **Yellow** - Duplicate (TO BE SECURED WITH PROPERTY)
**Green** - Inmate Legal Folder **Blue** - Discharge Planning Center (UPON CITY SENTENCING)

EXHIBIT-17

ATTACHMENT - C



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION



## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES

### DISPOSITION FORM

Form: 7102R
Eff: 8/23/19
Ref: Dir. 3376R-A

| Grievance Reference # 596572 | Date Filed: 10/28/22 | Facility: GRVC 2A |
|---|---|---|

| Inmate Name: Williams, Alexander | Book and Case: 1411801632 | Category: Religion |
|---|---|---|

From OCGS Inmate Statement Form, print or type short description of grievance:

On Oct. 26, 2022, at approximately 2:20am ESU Officer with #254 on his vest while conducting a cell search the officer picked up my Tora and opened a black satchel, that was attached to his leg to place "Tora" inside of and switched it for a bible.
(See Attached).

Action Requested by Inmate:  Please give me a receipt for Tora. Please return Tora, please investigate.

## STEP 1: FORMAL RESOLUTION

Check one box:  ☑ Grievance    ☐ Submissions is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below.
Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process.

A review of the IIS-Inmate identification screen has indicated your religion is listed as Jewish. The person in custody has been informed his complaint has been forwarded to the Warden's office for review.

## CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE

(Failure to sign forms will forgo your right to appeal the proposed resolution.)

☑ Yes, I accept the resolution    ☐ No    ☐ I request to appeal the resolution of this grievance to the Commanding officer.

Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (5) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.

| Inmate's Signature: _[signature]_ | Date: 10/28/22 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature: _[signature]_ | Date: 10/28/22 |
|---|---|



2A copy

ATTACHMENT -B-1

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
## INMATE STATEMENT FORM

Form.: 7101 R-A
Eff.:9/14/18
Ref.: Dir. 3376R-A

| Inmate's Name: | Book & Case #: | NYS ID #: |
|---|---|---|
| alexander Williams | 1411806632 | 01897858L |

| Facility: | Housing Area: | Date of Incident: | Date Submitted: |
|---|---|---|---|
| GRVC | 20 | 10/26/22 2:20am | 10/26/22 |

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** On Oct 26 2022 at approximately 2:20 am ESU officer with number # 281 on his Vest, while conducting a cell Search this officer picked up my Tora up and opened a black Sheetel that was attached to his leg to place "TORA" inside of and Switched it for a bible blue giddeons print stating the policy for having 13/21 States I am only allowed a bible and no other Religious book

**Action Requested by Inmate:** please give me a Receipt for TORA, please Return TORA, please Investigate "In Jewish"

**Please read below and check the correct box:**

| | | |
|---|---|---|
| Do you agree to have your statement edited for clarification by OCGS staff? | Yes ☐ | No ☑ |
| Do you need the OCGS staff to write the grievance for you? | Yes ☐ | No ☑ |
| Have you filed this grievance with a court or other agency? | Yes ☐ | No ☑ |
| Did you require the assistance of an interpreter? | Yes ☐ | No ☑ |

Inmate's Signature: alexander Williams
Date of Signature: 10/26/22

FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

| TIME STAMP | Grievance Reference # | Category: |
|---|---|---|
| 2022 | 596572 | Religion |

Office of Constituent and Grievances Services Coordinator/Officer Signature: C.O. Byrne #18049

EXHIBIT-18

# PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (812) 373-3000

DANIEL J. BELLER

TELEPHONE (212) 373-3312
FACSIMILE (212) 492-0312

E-MAIL: dbeller@paulweiss.com

October 22, 2022

The Honorable Lewis J. Liman
United States District Court
Southern District of New York
500 Pearl St.
New York, NY 10007

Re: *Williams v. City of New York et al.*, No. 19-cv-3347

Dear Judge Liman,

    We write because we have just learned new facts that place our client, Alexander Williams, and us, in fear for his life. We are taking the unusual step of communicating with the Court on a Saturday because the need for relief is urgent, and we are certain that none of the Court, the New York City Department of Correction ("DOC"), the City of New York, and Paul, Weiss will want to be accused of failing to respond immediately to threats of violence against a defenseless man incarcerated on Rikers Island.

    We annex hereto a letter we received on Thursday, October 20, from our client recounting abhorrent threats and attacks against him as recently as this past Tuesday, October 18.[1] (Exhibit A.) These threats were explicitly made against Mr. Williams based on his maintenance of his action before the Court against Defendant Bernard Mathis. While the letter from Mr. Williams speaks for itself in its entirety, in short, it makes clear that DOC officers continue to threaten our client with physical harm on account of his lawsuit against Defendant Mathis, a Captain in the SRG unit that is a part of DOC. (*See, e.g.*, threats in Ex. A at 3–4, including *"SRG or ESU [will] violate your cell and your property until … Mathis is out of that situation and your suit is dropped"*, and *"I … can't wait to fuck you up."*)

    We believe this Court has authority to order relief to protect Mr. Williams in the current circumstances and to ensure that the conditions of his confinement do not violate his constitutional rights, including his right to pursue his litigation against Defendant Mathis in this Court.

---

[1] We have redacted certain portions of Mr. Williams's letter that are unrelated to the subject of this writing.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2

In order to comply with Rule 65, we are working diligently to obtain an affidavit from our client asserting that Exhibit A is a letter that he wrote and that the facts asserted therein are true. Given that he is incarcerated, this may take some time, and we will promptly seek to contact DOC to obtain permission to visit Mr. Williams as soon as possible. When we are able to meet with our client and receive the affidavit, we will promptly forward it to the Court. At that time, given the immediate risk of harm, we will also seek an Order from the Court that takes steps to ensure Mr. Williams's safety, including but not limited to: (1) prohibiting DOC employees from threatening Mr. Williams; and (2) transferring Mr. Williams to a location within Rikers or to a different facility where he could be protected from violence and other threats from Defendant Mathis and his colleagues in the SRG.

We have sent a draft of this letter and attachment to Daniel Braun, Senior Counsel at the New York City Law Department, and counsel of record for the Defendants. He is a decent person and we hope that he will join in this request or, at a minimum, take all appropriate steps to assure that our client's safety will be preserved. He has not yet responded to our inquiry but, in view of the severity and urgency of the matter, and uncertain of Mr. Braun's availability over the weekend, we believed it best to bring it to the Court's attention as soon as possible. We will report Mr. Braun's position as soon as he notifies us.

In light of the immediate risk to our client's safety and the urgent need for relief, if the Court is willing to treat this submission as a pre-motion letter stating an intention by us to seek an Order from the Court, we respectfully request that the Court set a date at the Court's earliest convenience for the parties to appear before it to address this matter.

Respectfully submitted,

/s/ Daniel J. Beller
_____
Daniel J. Beller
Robert J. O'Loughlin
Shimeng Xu
Hillary Black
Eric Abrams

cc: Christie Ho Lam Wan (Law Clerk - not yet admitted)
All counsel of record (by ECF)

EXHIBIT-19

ORDER granting 223 Letter Motion for Conference re: 223 EMERGENCY LETTER MOTION for Conference re:
EMERGENCY RELIEF REQUESTED TO PROTECT CLIENT FROM THREATS OF IMMINENT HARM addressed
to Judge Lewis J. Liman from Daniel J. Beller dated October 22, 2022. Defendants shall file a response by 5:00 p.m. on
Tuesday, October 25, 2022 that includes the measures they are taking to protect Plaintiff against retaliation. An in-
person conference is set for October 27, 2022 at 04:00 PM in Courtroom 15C, 500 Pearl Street, New York, NY 10007
before Judge Lewis J. Liman. (HEREBY ORDERED by Judge Lewis J. Liman)(Text Only Order) (rhk) (Entered:
10/23/2022)

EXHIBIT-20



DISABILITY RIGHTS NEW YORK

www.drny.org   mail@drny.org   800-993-8982

George R. Vierno Center (GRVC)
09-09 Hazen Street
East Elmhurst, NY 11370
Attn: ADA/Disabilities Coordinator

Cc: Office of Counsel
New York City Department of Correction
75-20 Astoria Blvd
Queens, NY 11370

October 11, 2022

*Introduction.*

I am a staff attorney at Disability Rights New York (DRNY), Protection and Advocacy for
People with Mental Illness Unit (PAIMI). DRNY is the Protection and Advocacy (P&A) system
for people with disabilities in New York State, designated by the governor and pursuant to its
statutory authority. N.Y. Exec. Law § 558(b); 42 U.S.C. § 10801 *et seq.*; 42 U.S.C. § 15041 *et
seq.*; 29 U.S.C. § 794e.

*Client: Kwaine Thompson, BC #3491901145.*

I am writing to you regarding legal rights and health and safety related matters raised by
an incarcerated individual, currently housed at GRVC, named Mr. Kwaine Thompson (BC#
3491901145). Upon information and belief, Mr. Thompson is a person with mental health and
physical disabilities, as defined by the American Disabilities Act of 1990 (ADA). Mr. Thompson
specifically reports a history of suicidal ideations and chronic asthma.

*Concerns.*

Below are a list of concerns reported by Mr. Thompson. DRNY urges that these concerns
be investigated immediately.

**1. Isolation/Solitary Confinement**

During my last conversation with Mr. Thompson, he indicated that he remains confined in
solitary confinement for 23 hours a day. As you are aware, the New York State HALT Solitary
Act, signed into law in March 2020, limits isolation of inmates for more than 15 consecutive days
or 20 out of 60 days, and prohibits segregated confinement for people with mental or physical
disabilities in solitary confinement for any length of time, for any reason.

**2. Denial of Rights re: Disability Coordinator**

Mr. Thompson states that he requested to speak with the ADA/Disabilities Coordinator at GRVC. He reports that this request was denied.

### 3. Cell Temperatures

Mr. Thompson states that he experienced a number of medical incidents related to the extreme temperature conditions of his cell. He particularly noted that the cell temperatures during the summer rose dangerous high, and that as someone with chronic asthma and heat-sensitivity, he suffered heat related illness on numerous occasions. Mr. Thompson reports going to the clinic several times, and reports being taken to Bellevue Hospital this year due to a heat related illness.

### 4. Monkey Pox Testing & Vaccine

Mr. Thompson also informed DRNY that he has developed blisters and a rash for over a month, which he is concerned is the viral disease known as monkey pox. It is my understanding, based on my conversations with Mr. Thompson (who represents himself pro se in his criminal matter; and the criminal defense attorney who is serving as an advisor to Mr. Thompson in his trial matter, that the court has ordered Mr. Thompson to be tested for monkey pox, but that testing was unreasonably delayed.

### 5. Lack of Mental Health Support

Mr. Thompson is concerned that he is not receiving proper mental health support while housed at GRVC.

### 6. Law Library Access

Mr. Thompson has indicated that he has not received access to the law library. As he is pro-se, it is imperative that he is able to have access to the legal research he needs to properly defend himself in his criminal matter.

### DRNY's Requests on Behalf of Mr. Thompson:

On behalf of Mr. Thompson, DRNY requests that Mr. Thompson be put into contact with the ADA Coordinator immediately. Moreover, the above concerns must be immediately investigated to ensure that:

1. Mr. Thompson is not being held in isolation and/or solitary confinement in violation of the HALT Act;
2. Mr. Thompson is not denied access to the ADA/Disabilities Coordinator;
3. Mr. Thompson is not subjected to extreme heat and/or cold temperatures in his cell;
4. Mr. Thompson is tested for the monkey pox disease;
5. Mr. Thompson receives the monkey pox vaccine if deemed medically eligible;
6. Mr. Thompson is assessed and provided access to proper mental health support at GRVC.

7.   Mr. Thompson is provided full and appropriate access to the law library.

*Conclusion.*

Please note, I have sent Mr. Thompson HIPAA forms to sign. I will provide the signed copies immediately upon receipt.   I can be contacted at 929-699-3578 and/or Sabina.Khan@dmv.org.

Thank you for your time and attention to this matter.

Sincerely,

*Sabina Khan*

Sabina Khan



279 Troy Road, Ste 9
PMB 236
Rensselaer, NY 12144

DRNY has office locations in
Albany | Brooklyn | Rochester

| Fax | TTY | Phone |
|---|---|---|
| 518-427-6561 | 518-512-3448 | 518-432-7861 |

EXHIBIT-21

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART TAP A
----------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

-against-

Kwaine Thompson,

                    Defendant.
----------------------------------------------------------------------X

Affirmation in Support of
Amending ORDER to
Monitor and Restrict
Defendant's Telephone Calls

IND. NOS.:   00794/2019
00800/2019
01421/2019

HARLAN GREENBERG, ESQ., an attorney duly licensed in the State of New

York, and legal adviser to Pro Se Defendant Kwaine Thompson, hereby affirms under the

penalties of perjury, pursuant to C.P.L.R. § 2106, that the facts set forth herein are true:

1. I am the legal adviser to Pro Se Defendant Kwaine Thompson (hereinafter

"Defendant") in this criminal proceeding.

2. I make this affirmation in support of the relief sought in Defendant's Motion to

Amend the Order to Monitor and Restrict Defendant's Telephone Calls.

3. Defendant's phone restrictions allow him to only call Harlan Greenberg, Esq.,

who is legal adviser. Upon information and belief said phone calls are or have been made on

behalf of Mr. Thompson by a Corrections Office to me. Upon further information and belief that

once it has been confirmed that I am the recipient of the monitored phone calls that a speaker

phone has been used during the conversations. Thus, not providing defendant with the cloak of

confidentiality with me. Furthermore, other phone calls to me that were not using speaker phone

a corrections officer was within earshot and able to hear, the conversation between Mr. Thompson and myself.

4.     With respect to either of the situations defendant has not been afforded the ability to have a confidential conversation with me. It is hereby requested that the New York City Department of Corrections provide defendant with a proper environment to have the security that his conversations with his legal adviser are not listened to by any third party.

5.     Defendant also seeks to have Philip Hines Esq., from Held & Hines LLP 2004 Ralph Avenue, Brooklyn, New York 11234, with the telephone number (718) 531-9700, be added to the Amended Order. Mr. Hines is defendant's attorney in a civil lawsuit that has been filed in the Southern District of New York. The SDNY Docket number is 1:22-cv-01458-CM, I have attached a copy of the PACER printout indicating the caption of the case and the attorneys for the parties. Attached hereto as Exhibit "A". Mr. Hines is clearly the attorney for Mr. Thompson in that matter and should be afforded the same confidential environment as me when speaking with Defendant.

6.     Defendant also seeks to have Tracie Sundack, Esq., from Tracie A. Sundack & Associates, LLC, 180 South Broadway, Suite 306, White Plains, New York 10605, (914)946-8100. Ms. Sundack informed me that she represents Mr. Thompson in a pending civil matter with the caption, Kwaine Thompson v. City of New York, Supreme Court/New York County: Index No.: 156622/20.

7.     Therefore, I request that Mr. Philip Hines's telephone number, (718) 531-9700, and Ms. Tracie Sundack's telephone number, (914)946-8100, be added to the Amended ORDER to, Monitor and Restrict Defendant's Telephone Calls.

WHEREFORE, it is respectfully requested that this Court grant the relief sought herein

and that the motions be granted, for all the foregoing reasons, in all respects and for such further

relief as this Court may deem just and proper that favors the defendant.

Affirmed under penalty of perjury pursuant to CPLR 2106.

Dated: New York, New York
October 26, 2022

Respectfully Submitted,

/s/ *Harlan Greenberg*

HARLAN GREENBERG, ESQ.
Attorney for Defendant
20 VESEY STREET, SUITE 400
NEW YORK, NEW YORK 10007
212-964-0503
harlangreenberg@gmail.com

TO:

Alvin Bragg
New York County
District Attorney's Office
1 Hogan Place
New York, New York 10013

EXHIBIT-22

ATTACHMENT - C



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION



## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES

| | |
|---|---|
| **DISPOSITION FORM** | Form: 7102R<br>Eff: 8/23/19<br>Ref. Dir. 3376R-A |

| Grievance Reference #595201 | Date Filed: 10/24/22 | Facility: GRVC 2A |
|---|---|---|

| Inmate Name: Williams, Alexander | Book and Case: 1411181632 | Category: Law Library |
|---|---|---|

From OCGS Inmate Statement Form, print or type short description of grievance:

On Wednesday at approx. 10:45 while on cell 7 on to law library ESU conducted a law library and searched my discovery and law library tablet. Which I use to review my discovery. (SEE ATTACHED).

Action Requested by Inmate: Please return USB discovery which was already approved by DOC legal dept.

## STEP 1: FORMAL RESOLUTION

Check one box:   ☑ Grievance     ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below.
Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process.

The grievant has been notified his complaint has been forwarded to the Warden's office for review.

## CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE

*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐ I request to appeal the resolution of this grievance to the Commanding officer.

Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.

| Inmate's Signature: | Date: 10/24/22 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature: (C.) Bykmeatski | Date: 10/24/22 |
|---|---|

ATTACHMENT -B-1

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
## INMATE STATEMENT FORM

Form.: 7101 R-A
Eff.:9/14/18
Ref.: Dir. 3376R-A

| Inmate's Name: | Book & Case #: | NYS ID #: |
|---|---|---|
| alexander ocasio [illegible] | 1411800632 | 01897858L |

| Facility: | Housing Area: | Date of Incident: | Date Submitted: |
|---|---|---|---|
| GMVC | 2a | 10/12/2022 | 10/12/2022 |

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

Grievance: on wednesday at approx 10:45 While on Cell 7 on the Law Library ESU Conducted a search and Siezed my discovery and Law Library tablet which I use to review my discovery, DOC Legal division already approved my discovery on Sat at the Law Library at GRVC, my DOC approved perms Sneakers was taken as well [illegible] reciept

Action Requested by Inmate: please Return USB discovery which was already approved by DOC legal dept

**Please read below and check the correct Box:**

| | Yes | No |
|---|---|---|
| Do you agree to have your statement edited for clarification by OCGS staff? | ☐ | ☒ |
| Do you need the OCGS staff to write the grievance for you? | ☐ | ☒ |
| Have you filed this grievance with a court or other agency? | ☐ | ☒ |
| Did you require the assistance of an interpreter? | ☐ | ☒ |

41

Inmate's Signature: [signature] | Date of Signature: 10/12/22

FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

| TIME STAMP | Grievance Reference #: | Category: |
|---|---|---|
| 2022 [illegible] 14 P 3:00 | 595201 | LAW LIBRARY |
| | Office of Constituent and Grievances Services Coordinator/Officer Signature: CO Byrne 18024 | |

EXHIBIT-23

ATTACHMENT - C

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES

Form.: 7102R
Eff.: 8/23/19
Ref. Dir. 3376R-A

## DISPOSITION FORM

| Grievance Reference #594225 | Date Filed: 10/20/22 | Facility: GRVC 2A |
|---|---|---|

| Inmate Name: Williams, Alexander | Book and Case: 1411181632 | Category: N.G. Staff Complaint |
|---|---|---|

From OCGS Inmate Statement Form, print or type short description of grievance:

On the above date and time of 11:30am security captain Gaines entered the housing unit 2A and when approaching the grievant cell stated that I cannot stand you. She then went downstairs to the desk and began shouting on her body camera and genetic camera I am going to make sure that Kenol and Graham write a statement saying that you threatened me and take it to the D.A office. (SEE ATTACHED).

Action Requested by Inmate: Investigate this incident as a threat by DOI.

## STEP 1: FORMAL RESOLUTION

Check one box: ☐ Grievance    ☑ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below.
Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process.

The grievant has been notified his complaint has been forwarded to the investigation unit and Warden's office for review.

### CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution  ☐ No  ☐ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (5) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

Inmate's Signature: _____  Date: 10/20/22

☐ Preliminary Review Requested

Grievance Coordinator/Officer Signature: _____  Date: 10/20/22

ATTACHMENT -B-1

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
### INMATE STATEMENT FORM

Form.: 7101R-A
Eff.:9/14/16
Ref. Dir. 3376R-A

| Inmate's Name: | Book & Case #: | NYSID #: |
|---|---|---|
| Miranda | 141-1801727 | 8825873810 |

| Facility: | Housing Area: | Date of Incident: | Date Submitted: |
|---|---|---|---|
| Orleans | 2A 16 | 10/10/2022 | 10/16/22 |

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** ON THE ABOVE DATE AND TIME OF 11:30AM SECURITY CAPTAIN GAINES ENTERED THE HOUSING UNIT 2A AND WHEN APPROACHING THE GRIEVANT'S CELL STATED THAT I CAN NOTR STAND YOU. SFE THAN WENT DOWN STAIRS TO THE DESK AND BEGAN SHOUT ING ON HER BODY CAMERA AND GENTIC CAMERA I AM GOING TO MAKE SURE THAT REN AND GRAHAM WRITE A STAMENT SAYING THAT YOU THREATHENED ME AND TAKE IT TO THE DA OFFICE. SHE THAN TOLD THE HOUSING UNIT OFFICER TO MAKE SURE THAT I DO NOT GET A SHOWER, OR RECREATION NEVER MONDAY - FRIDAY AND THAT IF SHE FOUND OUT THAT THEY DID GIVE ME THESE SERVICES SHE WOULD HAVE THIER POST

**Action Requested by Inmate:** INVESTIGATE THIS INCIDENT AS A THREAT . BY DOI. PLACE A SEPERATION BETHWEEN MYSEKLF AND THIS CAPTIAN AND PERSEVE GENTIC FOOTAGE FOR LEGAL MATTERS AND MY ATTORNEY

**Please read below and check the correct box.**

Do you agree to have your statement edited for clarification by OCGS staff?    Yes ☐    No ☐

Do you need the OCGS staff to write the grievance for you?    Yes ☐    No ☐

Have you filed this grievance with a court or other agency?    Yes ☐    No ☐

Did you require the assistance of an interpreter?    Yes ☐    No ☐

| Inmate's Signature: | Date of Signature: |
|---|---|
| | 10/16/2022 |

**FOR DOC OFFICE USE ONLY**

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR    N5-

**TIME STAMP**

| Grievance Reference # | Category: STAFF COMPLAINT |
|---|---|
| 94025 | |

Office of Constituent and Grievances Services Coordinator/Officer Signature:

LUL 20 9 '22

THIS CAPATIN ALSO WAS OVEWR HEARD BY WITNESS THAT WILL BECOME KNOWN LATER OR WI UPON REQUEST THAT SHE HAD AN ISSUE WITH THE PLAINTIFF OVER USING HER NAME IN A BOOK, (SPEAKING IN REGARDS TO THE BOOK TITLED THE TRUE UNTOLD STORY OF NEW YORK CITY'S NOTORIOUS RIKERS ISLAND)

THIS LEVEL OF RETLAIATION IS SERIOUS AND PLACES THE PLAINTIFF/GRIEAVNT LIFE IN DANGER ESPECIALLY WHEN THIS CAPTAIN "GAINES" IS WILLING TO DEMAND FROM OTHER CORRECTIONAL OFFICERS TO LIE/PERJURE THEMSELVES ON REPORTS IN ORDER TO FUTHER HER AGENDA AND USE HER POSITION AS A SECURITY CAPTIN AS LEVERAGE IN REMOVING THOSE OFICERS WHO ARE NOT WILLING TO FOLLOW HER ~~ILLGAL-DEMN~~-ILLEGAL DEMANDS . IT ALSO PLACES THE GRIEVANT IN A PERGULAR POSITION IN REGARDS TO THE OFFICER WHO ARE WILLING TO FOLLOW HER UNLAWFUL ORDERS IN RETALIATING AGAINST THE GRIEVA

26/2.

Staff Complaint

C.O. Byrne 1849

8/

2022 ... 23 ... 1:02

EXHIBIT-24

ATTACHMENT - C

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES

Form: 7102R
Eff: 8/23/19
Ref. Dir. 3376R-A

## DISPOSITION FORM

| Grievance Reference #595396 | Date Filed: 10/4/22 | Facility: GRVC |
|---|---|---|

| Inmate Name: Williams, Alexander | Book and Case: 1411801632 | Category: Medical |
|---|---|---|

From OCGS Inmate Statement Form, print or type short description of grievance:

On Oct. 12, 2022, at approximately 11:30 I was rear cuffed by ESU for reasons unknown. I currently have 2 front cuff medical orders 1) from Bellevue hospital, and 1) front GRVC, this order is pursuant to recently having stomach surgery. As a result, my stomach has been in severe pain & have been vomiting and diarrhea.

Action Requested by Inmate: To be handled in accordance with medical orders.

### STEP 1: FORMAL RESOLUTION

Check one box:  ☑ Grievance        ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below.
Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process.

The grievant has been notified his complaint has been forwarded to the medical unit for review.

### CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☑ Yes, I accept the resolution ☐ No ☐ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (2) business days or the appeal will proceed or you exhausted administrative remedies. Grievance is not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date: 10/14/22 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature: | Date: 10/14/22 |
|---|---|



Cop 9 2 x

ATTACHMENT -B-1

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
## INMATE STATEMENT FORM

Form.: 7101 R-A
Eff.:9/14/18
Ref.: Dir. 3376R-A

| Inmate's Name: | Book & Case #: | NYS ID #: |
|---|---|---|
| Alexander Williams Jr | 141.180.1632 | 0189788SL |

| Facility: | Housing Area: | Date of Incident: | Date Submitted: |
|---|---|---|---|
| GRVC | 2a | 10/13/2022 | 10/13/2022 |

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

Grievance: on oct 12, 2022 at approximately 11:30am I was rear cuffed By ESU for reasons unknown. I currently have (2) front cuff medical orders 1) from bellevue hospital, and 1) from GRVC. this order is persuant to recently having stomach surgery, as a Result my stomach has been in severe pain, I have been vomiting and direaha.

Action Requested by Inmate: to please be handled in accordance with medical orders

**Please read below and check the correct box:**

| | | |
|---|---|---|
| Do you agree to have your statement edited for clarification by OCGS staff? | Yes ☐ | No ☒ |
| Do you need the OCGS staff to write the grievance for you? | Yes ☐ | No ☒ |
| Have you filed this grievance with a court or other agency? | Yes ☐ | No ☒ |
| Did you require the assistance of an interpreter? | Yes ☐ | No ☒ |

| Inmate's Signature: | Date of Signature: |
|---|---|
| Alexander Williams Jr | 10/13/2022 |

FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

| TIME STAMP | Grievance Reference # | Category: |
|---|---|---|
| 2022 OCT 14 P | 595-396. | Medical |
| | Office of Constituent and Grievances Services Coordinator/Officer Signature: COO - Byrne #18249 | |

EXHIBIT-25

# DIRECTIVE

## THE CITY OF NEW YORK
## DEPARTMENT OF CORRECTION

| SUBJECT | | | | |
|---|---|---|---|---|
| [ ] NEW  [ ] INTERIM  [X] REVISED | **RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS** | | | |
| EFFECTIVE DATE 03/11/13 | TERMINATION DATE  /  / | | | |
| CLASSIFICATION # 4518R-B | SUPERSEDES 4518R-A | DATED 08/30/04 | APPROVED FOR WEB POSTING  YES [ ]  NO [X] | DISTRIBUTION D | PAGE 1 OF 12 PAGES |
| RECOMMENDED FOR APPROVAL BY REVIEW BOARD MEMBER | | AUTHORIZED BY THE COMMISSIONER | | |
| | | *City of Rinning Cor.* *Thea Sawio* | | |
| SIGNATURE  DORA B. SCHRIRO, CHIEF OF DEPARTMENT | | SIGNATURE  EVELYN A. MIRABAL, CHIEF OF DEPARTMENT | | |



### I.  PURPOSE

This directive is being promulgated to delineate the policy and procedures relative to due process and transporting of inmates identified as weapon users or possessors (Red ID), and for inmates who have possessed scalpels, hobby knives, razor blades, or other dangerous instruments or exhibited violent behavior (Enhanced Restraint).

### II.  POLICY

It is the policy of the New York City Department of Correction (Department) to:

A.  Afford due process to all inmates identified with a red identification card (Red ID) due to their possession or use of a weapon, and to all inmates placed in enhanced restraints due to their having exhibited violent behavior, or having been found in possession of scalpels, hobby knives, razor blades, or other dangerous instruments.

B.  Control movement of these inmates via application of enhanced restraints and placement in a specially designated housing area as a means of protecting staff and other inmates from being attacked; and

C.  Not consider the application of restraints or placement in a specially designated housing area as a punishment but rather a means of protecting staff and other inmates from being attacked.

### III.  DEFINITIONS

A.  **Red ID status inmate:** An inmate who, because of his/her use and/or possession of a weapon while in Department custody, is issued an identification card with a red background and placed into one of the following risk code designations:

415R

| EFFECTIVE DATE 03/11/13 | SUBJECT | | PAGE 2 OF |
|---|---|---|---|
| CLASSIFICATION # 4518-B | RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS | | 12 PAGES |
| DISTRIBUTION D | APPROVED FOR WEB POSTING  ☐ YES  ☒ NO | | |



III.  **DEFINITIONS continued**

Code 3: Caught as a weapon carrier during current incarceration; or

Code 3A: Caught as a weapon carrier during current incarceration where the weapon is a scalpel, hobby knife, razor blade or other dangerous weapon as designated by the Chief of Department; or

Code 2: Used a weapon to injure other(s) within the past five years; or

Code 2A: Used a weapon to injure other(s) within the past five years where the weapon is a scalpel, hobby knife, razor blade or other dangerous weapon as designated by the Chief of Department; or

Code 1: Used a weapon to injure other(s) on two or more occasions within the past five years; or

Code 1A: Used a weapon to injure other(s) on two or more occasions within the past five years where the weapon is a scalpel, hobby knife, razor blade or other dangerous weapon as designated by the Chief of Department.

B.  Enhanced Restraint Status: Any inmate who has either exhibited violent behavior during his/her current incarceration or exhibited violent behavior during a prior incarceration within the last five years shall be placed into enhanced restraints. Violent behavior consists of the following acts:

1.  The inmate assaults or attacks staff or another inmate.

2.  The inmate causes substantial property damage and that places any person at imminent risk of harm; or

3.  The inmate attempts to assault or attack staff or another inmate and places that person at imminent risk of harm.

In addition, any inmate found in possession of a scalpel, hobby knife, razor blade, or other dangerous instrument as defined herein during his/her current or prior incarceration within the last five years may be placed into enhanced restraint status.

C.  Violent Behavior: An inmate's behavior will require him/her to be placed in Enhanced Restraint Status if (1) the inmate assaults or attacks staff or another inmate; or (2) the inmate exhibits other violent behavior that causes substantial property damage and that places any person at imminent risk of harm; or (3) the inmate, exhibiting violent behavior, attempts to assault or attack staff or another inmate and places that person at imminent risk of harm.



418R

418R

| EFFECTIVE DATE 03/11/13 | SUBJECT | |  |
|---|---|---|---|
| CLASSIFICATION # 451BR-B | RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS | | |
| DISTRIBUTION D | APPROVED FOR WEB POSTING   YES [ ]   NO [X] | PAGE 3 OF 12 PAGES | |



### III.  DEFINITIONS continued

**D.** Scalpel: A small, light, usually straight knife containing an extremely sharp blade, often used in surgical and anatomical operations and dissections, or for other purposes. For purposes of the Directive, "Scalpel" includes scalpel blades.

**E.** Hobby Knife: A small light knife commonly sold in arts and craft and hardware stores for various uses. Hobby knives may have a retractable blade. For purposes of this Directive, "Hobby Knife" shall include hobby knife blades.

**F.** Razor Blade: A sharp-edged instrument used especially for shaving the face or trimming hair.

**G.** Other: Any other dangerous instrument identified by the Chief of Department.

### IV.  PROCEDURES

**A.** Red ID Status Designation

    1.  Placement in Red ID Status based on a current infraction

        a.  Whenever an inmate is found to be in possession of a weapon or using a weapon, the reporting staff member shall notify his/her immediate supervisor and prepare an inmate infraction report as required by Directive 6500 (Inmate Disciplinary Due Process). The supervisor shall conduct an immediate investigation relative to the facts and circumstances surrounding the incident. If, in the judgment of the supervisor conducting the investigation, the facts support a finding that the inmate possessed or used a weapon and disciplinary action is warranted, the involved inmate(s) shall be immediately escorted by that supervisor to the main intake area to have his/her identification card changed to a Red ID. Furthermore, if, in the judgment of the supervisor, immediate placement in Red ID status is warranted, the designation shall be made pursuant to this section. Upon completion of the area supervisor's review of all facts and circumstances relative to the determination to place an inmate into Red ID status, he/she shall complete the "Notice of Authorization for Initial Placement in Red ID Status" (attached hereto, form #457BA) if he/she finds that such placement is warranted.

| EFFECTIVE DATE 03/11/13 | SUBJECT | | |
|---|---|---|---|
| CLASSIFICATION # 4618R-B | RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS | |  |
| DISTRIBUTION D | APPROVED FOR WEB POSTING    YES [ ]    NO [X] | PAGE 4 OF 12 PAGES | |



**IV. PROCEDURES** continued

This Notice directs a hearing and review of such placement by a departmental Hearing Officer (Adjudication Captain) within 72 hours of service of the "Notice of Authorization for Initial Placement in Red ID Status" on the inmate, excluding weekends and holidays. If unforeseen circumstances prevent compliance with this time period, the hearing shall be held as soon as practicable. When this 72-hour period is exceeded, the Hearing Officer shall document the reasons for such non-compliance on the "Notice of Hearing Determination for Red ID and/or Enhanced Restraint Status" (form #4518C).

   b.   The investigating supervisor will indicate on the "Report of Inmate Infraction," the "Inmate's Notice of Infraction," and the "Notice of Authorization for Initial Placement in Red ID Status," that, based on the facts and circumstances made known to the investigating supervisor, the inmate's identification card has been changed to that of a Red ID Status inmate. The "Notice of Authorization for Initial Placement in Red ID Status inmate" is attached hereto. The completed "Report of Inmate Infraction" shall then be submitted to the on-duty Tour Commander for his/her review.

   c.   Upon receipt of the completed "Report of Inmate Infraction," the on-duty Tour Commander shall review the "Report of Inmate Infraction," to ensure that it is complete and complies with agency procedures, and that the investigating supervisor has annotated his/her investigation to indicate the inmate's new Red ID Status. The annotation of the investigation shall be written on the "Inmate's Notice of Infraction" and the "Notice of Authorization for Initial Placement in Red ID Status," which are to be served on the inmate immediately upon change of status.

   d.   After reviewing the "Report of Inmate Infraction," the on-duty Tour Commander shall initial the "Report of Inmate Infraction" and forward it to the facility security office for processing.

2.   Placement in Red ID Status based on Prior History

   a.   An inmate's designation as a Red ID Status inmate in a prior period of incarceration may be reactivated if a review of his/her prior history reveals that the inmate used a weapon to injure other(s) within the past five (5) years. The Area Supervisor performing the review shall serve the inmate with a copy of the "Notice of Authorization for Initial Replacement of Red ID Status" immediately upon approval from the Deputy Warden for Security, or designee, of the change of status.

418R



| 416R | | |
|---|---|---|
| **EFFECTIVE DATE** **03/11/13** | **SUBJECT** | |
| **CLASSIFICATION #** **4518R-B** | **RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS** |  |
| **DISTRIBUTION** **D** | **APPROVED FOR WEB POSTING** ☐ YES  ☒ NO | **PAGE 5 OF** **12 PAGES** |

## IV.   PROCEDURES continued

B.   Enhanced Restraint Status Placement

1.   Initial Placement

a.   The area supervisor or a designated supervisor shall place into immediate Enhanced Restraint Status any inmate who either exhibits violent behavior during his/her current incarceration or exhibited violent behavior during a prior incarceration within the last 5 years, upon completion of the following steps:

   i.   All facts and circumstances relative to the exhibition of violent behavior, during either the inmate's current incarceration or previous incarceration(s), shall be reviewed by the area supervisor or a designated supervisor in order to determine if placement in Enhanced Restraint Status is appropriate and warranted.

   ii.   Upon completion of the area supervisor's review of all facts and circumstances relative to the determination to place an inmate into Enhanced Restraint Status, he/she shall complete the "Notice of Authorization for Initial Placement in Enhanced Restraint Status" (attached hereto, form #4518B) if he/she finds that such placement is warranted. This Notice directs the immediate placement of the inmate into Enhanced Restraint Status pending a hearing and review of such placement by a departmental Hearing Officer (Adjudication Captain) within 72 hours of service of the "Notice of Authorization for Initial Placement in Enhanced Restraint Status" on the inmate, excluding weekends and holidays. If unforeseen circumstances prevent compliance with this time period, the hearing shall be held as soon as practicable. When this 72-hour period is exceeded, the Hearing Officer shall document the reasons for such noncompliance on the "Notice of Hearing Determination for Red ID and/or Enhanced Restraint Status."

   iii.   Any inmate whose placement into restraint status is authorized shall be notified in writing of such placement by completion and service of the "Notice of Authorization for Initial Placement in Enhanced Restraint Status."

b.   The area supervisor, or a designated supervisor, shall determine the level of restraint that is appropriate and warranted, as listed in the "Notice of Authorization for Initial Placement in Enhanced Restraint Status."

` 416R



| EFFECTIVE DATE **03/11/13** | SUBJECT | |
|---|---|---|
| CLASSIFICATION # **4518R-B** | **RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS** | |
| DISTRIBUTION **D** | APPROVED FOR WEB POSTING ☐ YES ☒ NO | PAGE **6** OF **12** PAGES |



## IV.   PROCEDURES continued

C.   Placement in Red ID and Enhanced Restraint Status with a Code 3A, 2A or 1A Designation.

If an inmate is designated as Code 3A, 2A or 1A then the inmate shall be immediately designated to receive both Red ID and Enhanced Restraint status and shall with the prior approval of the Assistant Chief of Security be transferred to a specially designated housing area. All inmates in this housing area shall receive all mandated services. All inmates designated as Code 3A, 2A or 1A shall also be given notice of restriction to non-contact visits, and appropriate due process, in accordance with the procedures set forth in Directive 2007R-B, Inmate Visit Procedures.

D.   Medical Assessment of Red ID or Enhanced Restraint Status Inmates

1.   Within 24 hours of completing the Notice of Authorization for Initial Placement in Red ID Status and/or the Notice of Authorization for Initial Placement in Enhanced Restraint Status, the facility clinic shall be notified that the prisoner has been placed in such status. All inmates must receive an in-person, hands-on medical examination by the medical provider immediately following their placement into Red ID or Enhanced Restraint Status to determine whether the enhanced restraints which may include mitts are likely to cause a significant adverse medical consequence for the inmate or aggravate an inmate's existing medical condition. The medical staff shall notify the Department of Correction in writing if they determine that enhanced restraints, i.e. rear or side-cuffing, or leg shackles, are likely to cause a significant adverse medical consequence for the inmate or aggravate an inmate's existing medical condition, in which case the steps outlined in Section IV.D.3 of this Directive shall be followed.

2.   The Deputy Warden of Security is directed to ensure that, during the first week of each calendar month, the facility medical providers are afforded a current listing of all inmates housed at that facility under Red ID or enhanced restraint status. The facility medical providers will conduct a monthly medical review of all Red ID and Enhanced Restraint Status inmates to determine if there exists a medical condition or other medical problem that should preclude the inmate from being restrained in the manner determined by the Deputy Warden of Security pursuant to this directive. This assessment shall determine whether such restraints are causing a significant adverse medical consequence for the inmate or aggravating an inmate's existing medical condition.

**416R**



| EFFECTIVE DATE<br>**03/11/13** | SUBJECT<br>**RED ID STATUS AND ENHANCED<br>RESTRAINT STATUS DUE PROCESS** |  |
|---|---|---|
| CLASSIFICATION #<br>**4518R-B** | | |
| DISTRIBUTION<br>**D** | APPROVED FOR WEB POSTING<br>☐ YES  ☒ NO | PAGE **7** OF<br>**12** PAGES |

## IV.  PROCEDURES continued

3.  If medical staff render a written determination that enhanced restraints applied pursuant to this directive are causing a significant adverse medical consequence or are aggravating an existing medical condition, the facility's Deputy Warden for Security shall meet and confer with the appropriate clinic staff to select an alternative means of restraint during movement that does not adversely affect security and does not adversely impact the inmate's medical status/condition. If the Deputy Warden of Security and clinic staff are unable to formulate a satisfactory alternative means of restraint for such movement, the offices of the Assistant Chief of Emergency Services/Intelligence, the Assistant Commissioner for Health Affairs, and the Medical Director of Correctional Health Services (a division of the New York City Health and Hospitals Corporation) shall intercede to arrive at a satisfactory alternative means of restraint within one (1) business day. The alternative means of restraint of the hands may include but is not limited to handcuffs at the inmate's sides, or handcuffs in front of the inmate's body, or some other means of restraint that becomes available after the promulgation of this Directive.

E.  Due Process Hearing and Determination

1.  Within 72 hours of service of notice on an inmate of his or her placement into Red ID or Enhanced Restraint Status, a departmental Hearing Officer shall conduct a hearing for the purpose of adjudicating all pending infractions, Red ID Status, and Enhanced Restraint Status issues for that particular inmate.

2.  The hearing may be adjourned to a later date upon agreement of the Hearing Officer and the inmate. If the hearing is so adjourned, the Hearing Officer shall document the reasons for the adjournment and the inmate shall sign and consent to the adjournment on the "Notice of Hearing Determination for Red ID and/or Enhanced Restraint Status" (form #4518C).

3.  The purpose of the hearing for Red ID and/or Enhanced Restraint Status shall be to determine the appropriateness of the facility's decision to place the inmate into Red ID or Enhanced Restraint Status. For the purpose of this hearing and review, the facility's Deputy Warden of Security shall ensure that the Hearing Officer is provided with:

    i.  A copy of (1) (a) the completed "Notice of Authorization for Initial Placement in Red ID Status" if the inmate has been placed in Red ID Status, or (b) the completed "Notice of Initial Authorization for Initial Placement in Enhanced Restraint Status" if the inmate has been placed in Enhanced Restraint Status and (2) a copy of any Notice of Infraction, if available.

416R

| | EFFECTIVE DATE **03/11/13** | SUBJECT **RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS** | |
|---|---|---|---|
|  | CLASSIFICATION # **4518R-B** | |  |
| | DISTRIBUTION **D** | APPROVED FOR WEB POSTING  ☐ YES  ☒ NO | PAGE **8** OF **12** PAGES |

## IV.   PROCEDURES continued

ii.   Copies of all evidence, including videotapes where relevant, and reports and other documents relevant to the placement of the inmate into Red ID or Enhanced Restraint Status.

iii.   Copies of the inmate's history, including infractions, reports and other documents reflecting a history of placement into Red ID/Enhanced Restraint Status for inmates designated Red ID or placed in Enhanced Restraint Status based on a prior incarceration(s).

4.   An inmate has the right to assistance of a counsel substitute if the Hearing Officer deems that one is necessary under any of the following circumstances:

- the inmate is illiterate;

- the case is very complicated; or

- there is some reason, including inmate transfer, which has prevented the inmate from obtaining the assistance of witnesses or documents.

5.   An interpreter will be provided for non-English speaking inmates.

6.   Any inmate who has been placed in Red ID and/or Enhanced Restraint Status has the right to present evidence, including witness testimony at his/her due process hearing. An inmate who has been placed in Red ID and/or Enhanced Restraint Status may review the evidence against him or her at the time of the hearing. Evidence must be relevant and may not be redundant. Based on these standards the Hearing Officer will determine whether a witness is competent to testify, the conditions under which testimony will be given, and whether the evidence will be accepted. The fact that a witness is expected to testify as to facts about which testimony or written material has already been received is not a reason, by itself, to exclude the witness.

7.   During the hearing, the Hearing Officer shall determine if the inmate's placement into Red ID and/or Enhanced Restraint Status is appropriate and warranted by examining the evidence presented. In order to make such a placement, the Hearing Officer must be persuaded by a preponderance of the credible evidence (greater than 50%) that placement is appropriate and warranted.

8.   If it is determined that the placement into Red ID and/or Enhanced Restraint Status is unsupported by the evidence, the Hearing Officer shall direct the immediate revocation of such status.

416R



| EFFECTIVE DATE **03/11/13** | SUBJECT |  |
|---|---|---|
| CLASSIFICATION # **4518R-B** | **RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS** | |
| DISTRIBUTION **D** | APPROVED FOR WEB POSTING  ☐ YES  ☒ NO | PAGE 9 OF **12** PAGES |

## IV.  PROCEDURES continued

9.  In those cases where the area supervisor has authorized a level of restraint that requires the inmate to remain in enhanced restraints while at a program area or other facility activity, he/she shall ensure that the facility has provided documentation to the Hearing Officer that the violent behavior on the part of the inmate was committed on the way to, in, or on the way back from the program area or other facility activity. If it is determined that the facility has not documented or cannot document the exhibition of violent behavior on the part of the inmate while at such program/activity area, the Hearing Officer shall direct that the type of restraint status for that inmate be modified to require the removal of enhanced restraints while at a program area or other facility activity.

10.  At the conclusion of the inmate's hearing, in addition to weighing the evidence presented as to the inmate's guilt or innocence of the charge(s) presented in the Report of Infraction, the Hearing Officer shall render a determination as to the appropriateness of placing the inmate in Red ID or Enhanced Restraint Status. The hearing officer may consider at least the following factors in making this determination: the inmate's overall deportment and infraction history; the inmate's age; the circumstances of the offense, including whether the inmate acted in self-defense; and whether any weapon used was designed as a weapon (e.g. knife or shank) or not (e.g. a crutch or chair).

11.  If the Hearing Officer finds the inmate not guilty of weapons possession/ use or violent behavior based on the evidence presented, this will result in the Hearing Officer directing the Deputy Warden of Security to revoke the inmate's Red ID and/or Enhanced Restraint Status. A dismissal of the presented charges based solely on an administrative or procedural error will not prohibit the Hearing Officer from determining that the inmate's placement in Red ID and/or Enhanced Restraint Status was and remains appropriate, so long as the error did not violate the inmate's right to present evidence to the Hearing Officer. The Hearing Officer shall document this determination on the "Report of Hearing" and the "Notice of Disciplinary Hearing Disposition" as instructed in Directive 6500, if an infraction has been charged, and on the "Notice of Hearing Determination for Red ID Status and/or Enhanced Restraint Status" (attached hereto) as relevant. The Hearing Officer shall advise the inmate of such determination during the hearing and provide a written notice of determination within 72 hours of the conclusion of the hearing, excluding weekends and holidays. If unforeseen circumstances prevent compliance with this time period, the notice shall be provided as soon as practicable. When the 72-hour period is exceeded, the Hearing Officer shall document the reasons for such non-compliance on the "Notice of Hearing Determination for Red ID and/or Enhanced Restraint Status." The notice form shall advise the inmate that, within 21 calendar days of receiving such determination, he or she may appeal the determination in writing to the Deputy Warden of Security, who shall respond in writing to such appeal within 7 calendar days of the date the appeal is received.

416R



| EFFECTIVE DATE<br>**03/11/13** | SUBJECT |  |
|---|---|---|
| CLASSIFICATION #<br>**4518R-B** | **RED ID STATUS AND ENHANCED<br>RESTRAINT STATUS DUE PROCESS** | |
| DISTRIBUTION<br>**D** | APPROVED FOR WEB POSTING<br>☐ YES   ☒ NO | PAGE 10 OF<br>12  PAGES |

## IV.   PROCEDURES continued

12.   In all instances where an inmate's designation as a Red ID Status inmate based on prior history has been determined appropriate, the Hearing Officer shall advise the inmate of such determination during the hearing and provide a written notice of determination within 72 hours of the conclusion of the hearing, excluding weekends and holidays. If unforeseen circumstances prevent compliance with this time period, the notice shall be provided as soon as practicable. The notice form shall *advise* the inmate that he or she may appeal such determination in writing to the Deputy Warden of Security, who shall respond in writing to such appeal within seven (7) calendar days of the date the appeal is *received* (See IV.E.).

13.   The Hearing Officer shall document the findings of his/her review and determination as to the appropriateness of the Red ID Status based on a new infraction on the "Notice of Disciplinary Hearing Disposition," as required by Directive 6500, and "Notice of Hearing Determination for Red ID Status and/or Enhanced Restraint Status." The findings for the appropriateness of the enhanced restraint status shall be documented in the "Notice of Hearing Determination for Red ID Status and/or Enhanced Restraint Status."

The forms shall be delivered to the facility Deputy Warden of Security, who shall ensure that a copy of the appropriate form is served on the inmate within 72 hours of the conclusion of such hearing, excluding weekends and holidays. If unforeseen circumstances prevent compliance with this time period, the form shall be served on the inmate as soon as practicable. The "Notice of Hearing Determination for Red ID and/or Enhanced Restraint Status" shall advise the inmate that, (a) within 21 days, he or she may appeal such determination in writing to the facility Deputy Warden of Security, who shall respond to such appeal within seven (7) calendar days of the date the appeal is received, and (b) that he or she may at any time appeal such determination in writing to the facility Deputy Warden of Security based upon good cause with factual support, including a change in circumstances or newly available evidence.

F.   Appeals

1.   The Deputy Warden of Security shall process all submitted written appeals of an inmate's Red ID and/or Enhanced Restraint Status. The Deputy Warden of Security shall review the specifics of the inmate's appeal as well as all documented facts and circumstances surrounding the inmate's placement in the designated status. He or she shall render a written decision using the "Notice of Appeal Determination for Red ID and/or Restraint Status" (form #4518D) within seven (7) days from receiving the inmate's appeal. The Deputy Warden of Security or designee shall ensure that his/her determination regarding the inmate's appeal is delivered to the inmate within 24 hours of its issuance, excluding weekend and holidays. If unforeseen circumstances prevent compliance with this time period, the determination shall be served on the inmate as soon as practicable.

416R



| EFFECTIVE DATE **03/11/13** | SUBJECT **RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS** | |
|---|---|---|
| CLASSIFICATION # **4518R-B** | | |
| DISTRIBUTION **D** | APPROVED FOR WEB POSTING ☐ YES ☒ NO | PAGE **11** OF **12** PAGES |



## IV.  PROCEDURES continued

2.  If an inmate's appeal is denied, the Deputy Warden of Security shall advise the inmate, in writing, of the basis for his/her decision to deny the appeal on the "Notice of Determination of Appeal." That notice form shall advise the inmate that he/she may seek further review of the Red ID and/or Enhanced Restraint Status by requesting such review in writing from the Deputy Warden of Security, based upon good cause with factual support, including a change in circumstances or newly available evidence.

3.  Upon a showing of good cause (e.g. change of circumstances, newly available evidence) by any inmate in Red ID and/or enhanced restraint status, the Deputy Warden of Security shall review the specifics of the appeal and render a determination, in the manner described in section IV.F.1, above. Improved inmate conduct may be a factor in this determination. If the Department receives information that, if founded, would warrant a change in Red ID and/or Enhanced Restraint Status, the Deputy Warden for Security shall review all available information and modify the inmate's status if warranted.

G.  Periodic review

Whether or not the inmate appeals his or her designation for Red ID and/or enhanced restraint status, the Deputy Warden for Security shall review the continued appropriateness of inmates designated as 3A, 2A or 1A not less than once every four (4) weeks. A log book documenting such review shall be maintained by the Deputy Warden for Security in all facilities containing special housing units maintained for such inmates.

## V.  REFERENCES

Benjamin v. Kerik, 75 Civ. 3073, "RED ID STATUS AND RESTRAINT STATUS DUE PROCESS," dated August 08, 2000.

Benjamin v. Fraser, 75 Civ. 3073, Amended Opinion and Order," dated December 13, 2002.

## VI.  ATTACHMENTS

A.  NOTICE OF AUTHORIZATION FOR INITIAL PLACEMENT IN RED ID STATUS, form #4518A, revised 06/30/04.

B.  NOTICE OF AUTHORIZATION FOR INITIAL PLACEMENT IN ENHANCED RESTRAINT STATUS, form #4518B, revised 06/30/04.

416R



| | EFFECTIVE DATE<br>**03/11/13** | SUBJECT<br>**RED ID STATUS AND ENHANCED** |
|---|---|---|
| | CLASSIFICATION #<br>**4518R-B** | **RESTRAINT STATUS DUE PROCESS** |
| | DISTRIBUTION<br>**D** | APPROVED FOR WEB POSTING<br>☐ YES  ☒ NO | PAGE **12** OF<br>**12** PAGES |



## VI.  ATTACHMENTS continued

C.   NOTICE OF HEARING DETERMINATION FOR RED ID AND/OR ENHANCED RESTRAINT STATUS, form #4518C, revised 06/30/04.

D.   NOTICE OF APPEAL DETERMINATION FOR RED ID AND/OR ENHANCED RESTRAINT STATUS, form #4518D, revised 06/30/04.

## VII.  SUPERSEDES

A.   Directive 4518R-A, RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS, dated 6/30/04 (as amended).

B.   Any other Directive, Operations Order, Teletype, Memorandum, etc, that may be in conflict with the policies and procedures outlined herein.

## VIII.  SPECIAL INSTRUCTIONS

A.   Within ten (10) calendar days of the effective date of this order, all Commanding Officers shall implement a Command Level Order incorporating the policy and provisions outlined herein.

B.   All facility managers and supervisors shall ensure strict enforcement of the policy, guidelines and procedures noted herein.

**NYC DEPARTMENT OF CORRECTION**
**NOTICE OF AUTHORIZATION**
**FOR INITIAL PLACEMENT IN RED ID STATUS**

Form # 4512A   Rev. 06/30/04   Ref. Dir. # 4512A-A

Facility:                          Date:                Book & Case No.:

Inmate Name (Last/First):                              NYSID Number:

Date of Event:      Location:           Time:          Infraction No. (If applicable):

Basis for Placement:  ☐ Current Infraction   ☐ Prior History

Description of event:  Include: Date, Time, Location and specific description of action alleged   ☐ Notice of Infraction, attach if available

☐ Incident Involved Possession of a Weapon
☐ Incident Involved Use or Attempted Use of a Weapon

**RIGHT TO HEARING:**

You are entitled to a hearing for this placement within 72 hours after you are served with this notice.
At your hearing you have the following rights:

1. Right to appear personally;
2. Right to make statements;
3. Right to present relevant and non-redundant evidence; and
4. Right to present relevant and non-redundant witness.

Within seventy-two (72) hours after your hearing is concluded, you will receive a copy of the "Notice of Hearing Determination for Red/ID and/or Enhanced Restraint Status".

Interpreter Requested:   ☐ Yes   ☐ No       If yes, specify language: _____

Counsel Substitute Requested:   ☐ Yes   ☐ No         Witness Requested:   ☐ Yes   ☐ No

| Witness Name (Print) | Number | Location |
|---|---|---|
|  |  |  |
|  |  |  |

| I certify that I received a copy of this notice: | Inmate's Signature: | Date: | Time: |
|---|---|---|---|

| Served by (Print Name, Rank and Shield #): | Signature of Server: |
|---|---|

Distribution:
ORIGINAL To: DEPUTY WARDEN OF SECURITY     COPIES To : 1 - INMATE  2 - INMATE's LEGAL FOLDER  3 - CLINIC

# NYC DEPARTMENT OF CORRECTION
## NOTICE OF AUTHORIZATION FOR INITIAL
### PLACEMENT IN ENHANCED RESTRAINT STATUS



Form # 4512B   Rev. 06/30/04   Ref. Dir. # 4512B-A

| Facility: | Date: | Book & Case No.: |
|---|---|---|

| Inmate Name (Last/First): | NYSID Number: |
|---|---|

| Housing Area: | Charges: |
|---|---|

| Date of Event: | Location: | Time: |
|---|---|---|

**Basis for Placement:** ☐ Current Incident   ☐ Prior History

Description of event: Include: Date, Time, Location and specific description of action alleged ☐ Notice of Infraction, attach if available

_____

_____

_____

_____

_____

**Check all that apply:** ☐ Assault/Attempted Assault on ☐ Staff or ☐ Inmate     Weapons Used: Yes ☐     No ☐

Injuries: ☐ Yes   ☐ No     Specify: _____

☐ Substantial Property Damage:

It is determined that the inmate shall be restrained as follows:

☐ Security Mitts and handcuffs shall be applied during movement to and from all service areas or places of escort.

☐ Security Mitts, handcuffs and waist chain shall be applied during movement to and from all service areas or places of escort

☐ Security Mitts, handcuffs and waist chain shall be applied during movement to and from all service areas or places of escort and during the following activity/program: _____

☐ Leg Irons with above.

| Authorizing Supervisor's Name/Signature: | Date: |
|---|---|

**RIGHT TO HEARING:** You are entitled to a hearing for this placement within 72 hours after you are served with this notice. At your hearing you have the following rights:

1. Right to appear personally;
2. Right to make statements;
3. Right to present relevant and non-redundant evidence; and
4. Right to present relevant and non-redundant witness.

Interpreter Requested:   ☐ Yes   ☐ No     If yes, specify language: _____

Counsel Substitute Requested:   ☐ Yes   ☐ No     Witness Requested:   ☐ Yes   ☐ No

| Witness Name (Print) | Number | Location |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

Within seventy-two (72) hours after your hearing is concluded, you will receive a copy of the "Notice of Hearing Determination for Red/ID and/or Enhanced Restraint Status".

| I certify that I received a copy of this notice: | Inmate's Signature: | Date: | Time: |
|---|---|---|---|

| Served by (Print Name, Rank and Shield #): | Signature of Server: |
|---|---|

**Distribution:**

ORIGINAL To: DEPUTY WARDEN OF SECURITY     COPIES To : 1 - INMATE   2 - INMATE's LEGAL FOLDER   3 - CLINIC

**NYC DEPARTMENT OF CORRECTION**
**NOTICE OF HEARING DETERMINATION**
**FOR RED ID AND/OR ENHANCED RESTRAINT STATUS**

☐ **RED ID STATUS**
☐ **ENHANCED RESTRAINT STATUS**

Form # 4518C
Rev. 04/26/04
Ref. Dir. # 4518E-A

| Facility: | Date: | Book & Case No.: |
|---|---|---|

| Inmate Name (Last/First): | NYSID Number: |
|---|---|

| Date of Event: | Location: | Time: |
|---|---|---|

**CHECK ALL THAT APPLY:**

☐ Red ID Placement:
☐ Incident Involved Possession of a Weapon
☐ Incident Involved Use or Attempted Use of a Weapon

☐ Enhanced Restraint Placement:
☐ Assault/Attempted Assault on  ☐ Staff or  ☐ Inmate
Injuries:  ☐ Yes  ☐ No   Specify: _____
☐ Substantial Property Damage

☐ Hearing Delayed  ☐ Adjourned
Reason:

Inmate's Signature for Adjournment: _____  Date: _____

Findings of Fact/Reason for Determination:

The following reports and evidence were reviewed:

☐ Infractions
☐ Injury Reports
☐ Arrest Records
☐ Securing Orders

☐ Incident Reports
☐ Use of Force Reports
☐ Witness Reports
☐ Other: _____

☐ I.D. Preliminary Report
☐ Evidence Voucher
☐ Pre-Sentence Report

**HEARING DECISION:** As a result of the activities described above, you were placed in Red ID Status and/or Enhanced Restraint Status. (Check all appropriate boxes)

☐   It has been determined that you were in violation of departmental rules and therefore your ☐ Red ID Status
☐ Enhanced Restraint Status is continued.

☐   It has been determined that you were not in violation of departmental rules and therefore your ☐ Red ID Status
☐ Enhanced Restraint Status is revoked.

☐   It has been determined that enhanced restraints during facility/program activity (Specify) _____
is ☐ Continued ☐ Removed  Reason: _____

Hearing Officer (Name and Signature):                        Date:

Delayed Service of Determination ☐  Reason:

| I certify that I received a copy of this notice: | Inmate's Signature: | Date: | Time: |
|---|---|---|---|

| Served by (Print Name, Rank and Shield #): | Signature of Server: |
|---|---|

**RIGHT TO APPEAL:** Within 21 days of receipt of this determination, you may appeal your Red ID status and/or Enhanced Restraint Status placement by writing to the Deputy Warden of Security who shall respond within 7 days of the day the appeal is received. You may seek further review of your Red ID Status and/or Enhanced Restraint Status placement at any time by writing to the Deputy Warden of Security and providing documented good cause evidence such as a change of circumstances or newly available evidence.

Distribution:
ORIGINAL To: INMATE   COPIES To : 1 - INMATE's LEGAL FOLDER  2 - COPY TO DEPUTY WARDEN of SECURITY




# NYC DEPARTMENT OF CORRECTION
## NOTICE OF APPEAL DETERMINATION FOR RED ID AND/OR ENHANCED RESTRAINT STATUS

☐ **RED ID STATUS**
☐ **ENHANCED RESTRAINT STATUS**

Form # 4518D
Rev. 06/30/04
Ref. Dir. # 4518R-A

| Facility: | Date: | Book & Case No.: |
|---|---|---|
| Inmate Name (Last/First): | | NYSID Number: |
| Date of Event: | Location: | Time: |

Basis for Determination:

---

**Check all that apply:**

RED ID PLACEMENT: ☐ Incident Involved Possession of a Weapon
☐ Incident Involved Use or Attempted Use of a Weapon

ENHANCED RESTRAINT PLACEMENT: ☐ Assault or Attack on ☐ Staff or ☐ Inmate

| Weapon Used: | ☐ Yes | ☐ No |
|---|---|---|
| Injuries: | ☐ Yes | ☐ No, Specify: _____ |
| Substantial Property Damage: | ☐ Yes | ☐ No |

---

**Check the appropriate box:**

As a result of the activities described above, you were placed in ☐ Red ID Status and/or ☐ Enhanced Restraint Status. Your appeal of that status has been considered and the following determination has been made:

☐ It has been determined that you **were not** in violation of departmental rules and therefore your Red ID Status and/or Enhanced Restraint Status is revoked.

☐ It has been determined that you **were** in violation of departmental rules and therefore your Red ID Status and/or Enhanced Restraint Status is continued.

☐ It has been determined that after a review of the good cause evidence presented by you, your status will/will not (circle one) be revoked.

Reason:

---

| Inmate's Signature: | Date: | Time: |
|---|---|---|
| Deputy Warden of Security (Print Name): | Deputy Warden of Security (Signature): | Date: |

* You may seek further review of your Red ID Status and/or Enhanced Restraint Status placement by writing to the Deputy Warden of Security and providing documented good cause evidence such as a change of circumstances or newly available evidence.

Distribution:
ORIGINAL To: INMATE - COPIES To : 1 - INMATE's LEGAL FOLDER , 2 - DEPUTY WARDEN OF SECURITY

EXHIBIT-26

# STATE OF NEW YORK

_____

2836

2021-2022 Regular Sessions

# IN SENATE

January 25, 2021

_____

Introduced  by  Sen. SALAZAR -- read twice and ordered printed, and when
   printed to be committed to the Committee on Crime Victims,  Crime  and
   Correction

AN  ACT  to amend the correction law, in relation to restricting the use
   of segregated confinement and  creating  alternative  therapeutic  and
   rehabilitative confinement options

   **The  People  of the State of New York, represented in Senate and Assem-
   bly, do enact as follows:**

1      Section 1. Subdivision 23 of section 2 of the correction law, as added
2   by chapter 1 of the laws of 2008, is amended to read as follows:
3      23. "Segregated confinement" means the [disciplinary]  confinement  of
4   an  inmate  in [a special housing unit or in a separate keeplock housing
5   unit.  Special housing units and separate  keeplock  units  are  housing
6   units that consist of cells grouped so as to provide separation from the
7   general  population,  and may be used to house inmates confined pursuant
8   to the disciplinary procedures described in  regulations]  **any  form  of
9   cell  confinement  for  more  than seventeen hours a day other than in a
10   facility-wide emergency or for  the  purpose  of  providing  medical  or
11   mental  health  treatment.  Cell  confinement that is implemented due to
12   medical or mental health treatment shall be within a  clinical  area  in
13   the  correctional  facility  or  in  as  close proximity to a medical or
14   mental health unit as possible**.
15      § 2. Section 2 of the correction law is  amended  by  adding  two  new
16   subdivisions 33 and 34 to read as follows:
17      **33.  "Special  populations"  means any person: (a) twenty-one years of
18   age or younger; (b) fifty-five years of age or older; (c) with a  disa-
19   bility  as defined in paragraph (a) of subdivision twenty-one of section
20   two hundred ninety-two of the executive law; or (d) who is pregnant,  in
21   the  first  eight  weeks  of the post-partum recovery period after giving
22   birth, or caring for a child in a correctional institution  pursuant  to
23   subdivisions two or three of section six hundred eleven of this chapter.**

EXPLANATION--Matter in **_italics_** (underscored) is new; matter in brackets
                        [-] is old law to be omitted.
LBD00393-02-1

S. 2836                              3

 1  committee  consisting  of  the  facility's highest ranking mental health
 2  clinician, the deputy superintendent for security, and the deputy super-
 3  intendent for program services, or their equivalents. Any such recommen-
 4  dation  shall  be reviewed by the joint central office review committee.
 5  The administrative process described in this clause shall  be  completed
 6  within  [~~fourteen~~]  **seven** days  of  the  initial assessment, and if the
 7  result of such process is that the inmate should be removed from  segre-
 8  gated  confinement  **or  a  residential  rehabilitation unit**, such removal
 9  shall occur as soon as practicable, but in no event more  than  seventy-
10  two hours from the completion of the administrative process. **Pursuant to**
11  **paragraph  (h) of this subdivision, nothing in this section shall permit**
12  **the placement of an incarcerated person with serious mental illness into**
13  **segregated confinement at any time, even for the purposes of assessment.**
14      (D) If an inmate with a serious mental  illness  is  not  diverted  or
15  removed to a residential mental health treatment unit, such inmate shall
16  be  **diverted  to  a  residential  rehabilitation unit and** reassessed by a
17  mental health clinician within fourteen days of the  initial  assessment
18  and at least once every fourteen days thereafter.  After each such addi-
19  tional  assessment,  a recommendation as to whether such inmate should be
20  removed from [~~segregated confinement~~] **a residential rehabilitation  unit**
21  shall  be made and reviewed according to the process set forth in clause
22  (C) of this subparagraph.
23      (E) A recommendation or determination whether to remove an inmate from
24  segregated confinement **or a residential rehabilitation unit**  shall  take
25  into  account the assessing mental health clinicians' opinions as to the
26  inmate's mental condition and treatment needs, and shall also take  into
27  account  any  safety  and  security concerns that would be posed by the
28  inmate's removal, even if additional restrictions  were  placed  on  the
29  inmate's  access  to  treatment,  property,  services or privileges in a
30  residential mental health treatment unit. A recommendation  or  determi-
31  nation  shall direct the inmate's removal from segregated confinement **or**
32  **a residential rehabilitation unit** except in  the  following  exceptional
33  circumstances:   (1)  when  the  reviewer finds that removal would pose a
34  substantial risk to the safety of the inmate  or  other  persons,  or  a
35  substantial 'threat  to the security of the facility, even if additional
36  restrictions were placed on the inmate's access to treatment,  property,
37  services or privileges in a residential mental health treatment unit; or
38  (2)  when  the  assessing  mental  health clinician determines that such
39  placement is in the inmate's best interests based on his or  her  mental
40  condition  and  that removing such inmate to a residential mental health
41  treatment unit would be detrimental to his or her mental condition.  Any
42  determination  not  to remove an inmate with serious mental illness from
43  segregated confinement **or a residential  rehabilitation  unit**  shall  be
44  documented in writing and include the reasons for the determination.
45      (iii)  Inmates  with  serious  mental  illness who are not diverted or
46  removed from [~~segregated confinement~~] **a residential rehabilitation  unit**
47  shall  be  offered a heightened level of **mental health** care, involving a
48  minimum of [~~two~~] **three** hours [~~each day, five  days  a  week,~~] **daily** of
49  out-of-cell therapeutic treatment and programming. This heightened level
50  of care shall not be offered only in the following circumstances:
51      (A)  The  heightened level of care shall not apply when an inmate with
52  serious mental illness does not, in the reasonable judgment of a  mental
53  health  clinician,  require  the heightened level of care. Such determi-
54  nation shall be documented with a written statement of the basis of such
55  determination and shall be reviewed by the Central New York  Psychiatric
56  Center clinical director or his or her designee. Such a determination is

1   within any sixty day period.  At these limits, he or she must be
2   released from segregated confinement or diverted to a separate residen-
3   tial rehabilitation unit. If placement of such person in segregated
4   confinement would exceed the twenty-day limit and the department estab-
5   lishes that the person committed an act defined in subparagraph (ii) of
6   paragraph (k) of this subdivision, the department may place the person
7   in segregated confinement until admission to a residential rehabili-
8   tation unit can be effectuated. Such admission to a residential rehabil-
9   itation unit shall occur as expeditiously as possible and in no case
10  take longer than forty-eight hours from the time such person is placed
11  in segregated confinement.
12  (j) (i) All segregated confinement and residential rehabilitation
13  units shall create the least restrictive environment necessary for the
14  safety of incarcerated persons, staff, and the security of the facility.
15  (ii) Persons in segregated confinement shall be offered out-of-cell
16  programming at least four hours per day, including at least one hour for
17  recreation. Persons admitted to residential rehabilitation units shall
18  be offered at least six hours of daily out-of-cell congregate program-
19  ming, services, treatment, and/or meals, with an additional minimum of
20  one hour for recreation. Recreation in all residential rehabilitation
21  units shall take place in a congregate setting, unless exceptional
22  circumstances mean doing so would create a significant and unreasonable
23  risk to the safety and security of other incarcerated persons, staff, or
24  the facility.
25  (iii) No limitation on services, treatment, or basic needs such as
26  clothing, food and bedding shall be imposed as a form of punishment. If
27  provision of any such services, treatment or basic needs to an individ-
28  ual would create a significant and unreasonable risk to the safety and
29  security of incarcerated persons, staff, or the facility, such services,
30  treatment or basic needs may be withheld until it reasonably appears
31  that the risk has ended. The department shall not impose restricted
32  diets or any other change in diet as a form of punishment. Persons in a
33  residential rehabilitation unit shall have access to all of their
34  personal property unless an individual determination is made that having
35  a specific item would pose a significant and unreasonable risk to the
36  safety of incarcerated persons or staff or the security of the unit.
37  (iv) Upon admission to a residential rehabilitation unit, program and
38  mental health staff shall administer assessments and develop an individ-
39  ual rehabilitation plan in consultation with the resident, based upon
40  his or her medical, mental health, and programming needs. Such plan
41  shall identify specific goals and programs, treatment, and services to
42  be offered, with projected time frames for completion and discharge from
43  the residential rehabilitation unit.
44  (v) An incarcerated person in a residential rehabilitation unit shall
45  have access to programs and work assignments comparable to core programs
46  and work assignments in general population. Such incarcerated persons
47  shall also have access to additional out-of-cell, trauma-informed thera-
48  peutic programming aimed at promoting personal development, addressing
49  underlying causes of problematic behavior resulting in placement in a
50  residential rehabilitation unit, and helping prepare for discharge from
51  the unit and to the community.
52  (vi) If the department establishes that a person committed an act
53  defined in subparagraph (ii) of paragraph (k) of this subdivision while
54  in segregated confinement or a residential rehabilitation unit and poses
55  a significant and unreasonable risk to the safety and security of other
56  incarcerated persons or staff, the department may restrict such person's

1  department and the office of mental health shall  promulgate  rules  and
2  regulations pertaining to this clause;
3    (B)  compelling  or  attempting  to compel another person, by force or
4  threat of force, to engage in a sexual act;
5    (C) extorting another, by force or threat of force,  for  property  or
6  money;
7    (D)  coercing  another,  by  force  or threat of force, to violate any
8  rule;
9    (E) leading, organizing, inciting, or  attempting  to  cause  a  riot,
10  insurrection, or other similarly serious disturbance that results in the
11  taking  of a hostage, major property damage, or physical harm to another
12  person;
13    (F) procuring deadly weapons or other dangerous contraband that  poses
14  a serious threat to the security of the institution; or
15    (G)  escaping,  attempting  to escape or facilitating an escape from a
16  facility or escaping or attempting to  escape  while  under  supervision
17  outside such facility.
18    For  purposes  of this section, attempting to cause a serious disturb-
19  ance or to escape shall only be determined to have occurred if there  is
20  a  clear  finding  that  the  inmate  had  the intent to cause a serious
21  disturbance or the intent to escape and had completed  significant  acts
22  in  the  advancement  of  the attempt to create a serious disturbance or
23  escape. Evidence of withdrawal or abandonment of a plan to cause a seri-
24  ous disturbance or to escape shall negate a finding of intent.
25    (iii) No person may be placed in segregated confinement or a  residen-
26  tial  rehabilitation  unit  based  on  the same act or incident that was
27  previously used as the basis for such placement.
28    (iv) No person may be held in segregated  confinement  for  protective
29  custody.  Any unit used for protective custody must, at a minimum,
30  conform to requirements governing residential rehabilitation units.
31    (l) All hearings to determine if a person may be placed in  segregated
32  confinement  shall  occur  prior to placement in segregated confinement
33  unless a security supervisor, with written approval of a facility super-
34  intendent or designee, reasonably believes the person fits the specified
35  criteria for segregated confinement in subparagraph  (ii)  of  paragraph
36  (k)  of  this  subdivision.  If  a  hearing does not take place prior to
37  placement, it shall occur as soon as reasonably practicable and at  most
38  within  five  days  of  such placement unless the charged person seeks a
39  postponement of the hearing. Persons at such hearings shall be permitted
40  to be represented by any attorney or law student, or by any paralegal or
41  incarcerated person unless the department reasonably disapproves of such
42  paralegal or incarcerated person based upon objective  written  criteria
43  developed by the department.
44    (m)  (i)  Any  sanction  imposed  on an incarcerated person requiring
45  segregated confinement shall run while the person is  in  a  residential
46  rehabilitation  unit  and  the  person shall be discharged from the unit
47  before or at the time such sanction expires. If  a  person  successfully
48  completes  his  or  her rehabilitation plan before the sanction expires,
49  the person shall have a right to be discharged from the unit  upon  such
50  completion.
51    (ii) If an incarcerated person has not been discharged from a residen-
52  tial  rehabilitation unit within one year of initial admission to such a
53  unit or is within sixty days of a fixed or tentatively approved date for
54  release from a correctional facility, he or she shall have a right to be
55  discharged from the unit unless he or she committed  an  act  listed  in
56  subparagraph  (ii)  of  paragraph  (k) of this subdivision within the prior

1   **in the past sixty days; (ix) number of days in segregated confinement;**
2   **(x) a list of all incidents resulting in sanctions of segregated**
3   **confinement by facility and date of occurrence; (xi) the number of**
4   **incarcerated persons in segregated confinement by facility; and (xii)**
5   **the number of incarcerated persons in residential rehabilitation units**
6   **by facility.**
7   § 6.  Section 138 of the correction law is amended by adding a new
8   subdivision 7 to read as follows:
9   **7. De-escalation, intervention, informational reports, and the with-**
10  **drawal of incentives shall be the preferred methods of responding to**
11  **misbehavior unless the department determines that non-disciplinary**
12  **interventions have failed, or that non-disciplinary interventions would**
13  **not succeed and the misbehavior involved an act listed in subparagraph**
14  **(ii) of paragraph (k) of subdivision six of section one hundred thirty-**
15  **seven of this article, in which case, as a last resort, the department**
16  **shall have the authority to issue misbehavior reports, pursue discipli-**
17  **nary charges, or impose new or additional segregated confinement sanc-**
18  **tions.**
19  § 7. Subdivision 1 of section 401 of the correction law, as amended by
20  chapter 1 of the laws of 2008, is amended to read as follows:
21  1.   The commissioner, in cooperation with the commissioner of mental
22  health, shall establish programs, including but not limited to residen-
23  tial mental health treatment units, in such correctional facilities as
24  he or she may deem appropriate for the treatment of mentally ill inmates
25  confined in state correctional facilities who are in need of psychiatric
26  services but who do not require hospitalization for the treatment of
27  mental illness. Inmates with serious mental illness shall receive thera-
28  py and programming in settings that are appropriate to their clinical
29  needs while maintaining the safety and security of the facility.
30  **The conditions and services provided in the residential mental health**
31  **treatment units shall be at least comparable to those in all residential**
32  **rehabilitation units, and all residential mental health treatment units**
33  **shall be in compliance with all provisions of paragraphs (i), (j), (k),**
34  **and (l) of subdivision six of section one hundred thirty-seven of this**
35  **chapter. Residential mental health treatment units that are either resi-**
36  **dential mental health unit models or behavioral health unit models shall**
37  **also be in compliance with all provisions of paragraph (m) of subdivi-**
38  **sion six of section one hundred thirty-seven of this chapter.**
39  **The residential mental health treatment units shall also provide the**
40  **additional mental health treatment, services, and programming delineated**
41  **in this section.** The administration and operation of programs estab-
42  lished pursuant to this section shall be the joint responsibility of the
43  commissioner of mental health and the commissioner. The professional
44  mental health care personnel, and their administrative and support
45  staff, for such programs shall be employees of the office of mental
46  health. All other personnel shall be employees of the department.
47  § 8. Subparagraph (i) of paragraph (a) of subdivision 2 of section 401
48  of the correction law, as added by chapter 1 of the laws of 2008, is
49  amended to read as follows:
50  (i) In exceptional circumstances, a mental health clinician, or the
51  highest ranking facility security supervisor in consultation with a
52  mental health clinician who has interviewed the inmate, may determine
53  that an inmate's access to out-of-cell therapeutic programming and/or
54  mental health treatment in a residential mental health treatment unit
55  presents an unacceptable risk to the safety of inmates or staff. Such
56  determination shall be documented in writing and **such inmate shall be**

S. 2836                            11

```
 1     § 10. Subdivision 6 of section 401 of the correction law,  as  amended
 2   by chapter 20 of the laws of 2016, is amended to read as follows:
 3     6.   The department shall ensure that the curriculum for new correction
 4   officers, and other new department staff who  will  regularly  work  in
 5   programs providing mental health treatment for inmates, shall include at
 6   least   eight   hours   of   training about the types and symptoms of mental
 7   illnesses, the goals of  mental  health  treatment,  the  prevention  of
 8   suicide  and  training  in  how to effectively and safely manage inmates
 9   with mental illness. Such training may be  provided  by  the  office  of
10   mental  health  or  the justice center for the protection of people with
11   special needs. All department staff who are transferring into a residen-
12   tial mental health treatment unit shall receive a minimum of eight addi-
13   tional hours of such training, and eight hours  of  annual  training  as
14   long as they work in such a unit. All security, program services, mental
15   health and medical staff with direct inmate contact shall receive train-
16   ing  each  year  regarding identification of, and care for, inmates with
17   mental illnesses. The department shall provide  additional  training  on
18   these  topics  on  an  ongoing basis as it deems appropriate.  All staff
19   working in a residential mental health treatment unit shall also receive
20   all training mandated in paragraph (n) of subdivision six of section one
21   hundred thirty-seven of this chapter.
22     § 11. Section 401-a of the correction law is amended by adding  a  new
23   subdivision 4 to read as follows:
24     4.  The  justice  center  shall assess the department's compliance with
25   the provisions of sections two,  one  hundred  thirty-seven,  and  one
26   hundred  thirty-eight of this chapter relating to segregated confinement
27   and residential rehabilitation units and shall issue a public report, no
28   less than annually, with recommendations to the department and  legisla-
29   ture,  regarding  all  aspects of segregated confinement and residential
30   rehabilitation units in state correctional facilities including but  not
31   limited  to  policies and practices concerning: (a) placement of persons
32   in segregated confinement  and  residential  rehabilitation  units;  (b)
33   special  populations;  (c) length of time spent in such units; (d) hear-
34   ings and procedures; (e) programs, treatment and conditions of  confine-
35   ment in such units; and (f) assessments and rehabilitation plans, proce-
36   dures and discharge determinations.
37     § 12.  Section 45 of  the correction law is amended by adding a new
38   subdivision 18 to read as follows:
39     18. Assess compliance of local correctional facilities with the  terms
40   of paragraphs  (h), (i), (j), (k), (l), (m), (n) and (o) of subdivision
41   six of section one hundred thirty-seven of this chapter. The  commission
42   shall issue a public report regarding all aspects of segregated confine-
43   ment  and  residential rehabilitation units at least annually with recom-
44   mendations to local correctional facilities, the governor, the  legisla-
45   ture, including but not limited to policies and practices regarding: (a)
46   placement  of persons; (b) special populations; (c) length of time spent
47   in segregated confinement and residential treatment units; (d)  hearings
48   and procedures; (e) conditions, programs, services, care, and treatment;
49   and (f) assessments, rehabilitation plans, and discharge procedures.
50     § 13. Section 500-k of the correction law, as amended by chapter 2 of
51   the laws of 2008, is amended to read as follows:
52     § 500-k. Treatment of inmates. 1. Subdivisions five and six of section
53   one hundred thirty-seven of this chapter, except paragraphs (d) and  (e)
54   of subdivision six of such section, relating to the treatment of inmates
55   in  state  correctional facilities, are applicable to inmates confined in
56   county jails; except that the report required by paragraph (f) of subdi-
```

EXHIBIT-27

ALEXANDER WILLIAMS  B&C#1411801632
G.R.V.C.
09-09 HAZEN STREET
QUEENS NEW YORK  11370

RE: COURT ORDER LOCKDOWN APPEAL          NOV 01 ,2022

EXECUTIVE OFFICER OF O.S.I.U.
11-15 HAZEN STRET
EAST ELMHURST NEW YORK 11370

DEAR EXECUTIVE OFFICER OF OSIU:

  I am writing to appeal your decision to continue my court order
lockdown clasification inclduing the 23 hours of being locked in a cell.

  The basis of this appeal is the HALT ACt signed into law on January
25, 2021 and went into law on Janurary 23, 2022.

  I have also enclosed a copy of said bill for your reading.

  The bill is designed to abolosih any form of segregagted confinement
and defined this as being any form of confiment to a cell for more than
seventenn hours a day for 15 days consecutive at a time.

  With the understanding that you may be under the beleif that since
a Judge has given DOC a lcokdown order stating diffrent in my case, please
be reminded that no judge can over ride a New York state Bill.

  When revieewing this Bill enclosed you wil find that there is
no exception listed/mentioned within said bill for the Court ordered
Classification.

  I appeal your decision and ask that you investigate this matter
to ensure that the contiuation of my confiement meets New York State
and New York City Correction Laws.

  I look forward to hearing back from you soon as I am awware of
the seven business days time frame that governs your respones time.

DATED: NOVEMBER 09, 2022
   QUENS NEW YORK 11370

           ALEXANDER WILLIAMS

SWORN TO BEFORE ME THIS 09
DAY OF NOVEMBER 2022

NOTARY PUBLIC

DERRICK FULTON
COMMISSIONER OF DEEDS CITY OF NEW YORK
BRONX COUNTY
LIC.# 0-03968
COMM. EXP. JULY 01, 2024

EXHIBIT-28

## STATEMENT OF WITNESS:

I MAKE THIS STATEMNT UNDER THE PENALTY OF PERJURY AND TO THE BEST OF MY KNOWLDGE STATE THAT EVERYTHING MENTIONED
HEREIN SAID STATEMENT IS TRUE AND EXACT AS TO THE EVENTS OF JANU 7, 2023.

ON Jan 7, 2023 I did witness from my cell inmate Alexander Williams
standing in the middle of his cell after one of the SRT members rushed
in and placed a mask on thier head and ordered him to do so. I also witnessed
Mr Williams standing in the middle of his cell for a elonged period of
time under these orderes.

Durring this time period I was awaiting to get search but was watching
T.V. and notice some of the SRT female holding the camera standing in front of
cell with her back tworss me looking at Mr Williams convcersing with other
SRT team members and smiling. From what I could see Mr Williams was apperently
under duress and was in pain it seemed in his arms and feet and was not
enjoying what was being done to him.

At times where I did witness Mr Williams move I saw one of the
SRT guys with the number 65on his back vest turning the lights on to make
sure that Mr Willaims was still standing in tyhe middle of his cell floor
and Laughing at Mr Williams. I also witness the K9 oficer doing the same.

Later when my cell was being search I was told by one of the SRT
team mebers who I am unable to ID due to them all wearing balck mask and
no name tag or badge that they were going to keep coming until the guy
across from me stopp with his lawsuit against Cheif Lemon and that I was
to pass along that message and they would not mess up my cell.

When I agreed to do so my cell was not trashed or even messed up at
all  and in excahnge I informed Mr Williams of what I was told and over
heard.

Kwaine Thompson (3491901450)

EXHIBIT-29



HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel*

**THE CITY OF NEW YORK**
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, N.Y. 10007

NICOLETTE PELLEGRINO
*Assistant Corporation Counsel*
Phone: (212) 356-2338
Fax: (212) 356-3509
npellegr@law.nyc.gov

December 22, 2022

VIA E.C.F.
Honorable Katharine H. Parker
United States Magistrate Judge
Southern District of New York

    Re:    Alexander Williams Jr. v. City of New York, et al., 22-CV-3819 (PGG) (KHP)

Your Honor:

        I am an Assistant Corporation Counsel in the Special Federal Litigation Division of the New York City Law Department and the attorney representing defendants the City of New York ("City"), New York City Department of Correction ("DOC") Deputy Warden ("DW") Tiffany Morales, Assistant Deputy Warden ("ADW") Tyneka Greene, Officer Preston Ritter, Officer Keesia Leitch,[1] Officer Tiffany Walker, and Officer Kevin Young (collectively, "Defendants") in this is matter.[2] Defendants write to: (a) provide an update concerning the service of "Dr. Nicholas" (see Dkt. No. 22); (b) respectfully request a sixty day extension of time to (i) respond to the Second Amended Complaint from January 3, 2023, to March 6, 2023,[3] (ii) serve initial document requests and interrogatories from January 3, 2023, to March 6, 2023,[2] (iii) respond to initial document requests from February 3, 2023, to April 4, 2023, (iv) complete fact depositions from April 28, 2023, to June 27, 2023, (v) serve subpoenas requesting documents from third-parties from April 14, 2023, to June 13, 2023, (vi) complete fact discovery from May 12, 2023, to July 11, 2023, and (vii) respond to Local Civil Rule 33.2 requests from January 3, 2023, to March 6, 2023[2]; and (c) respectfully request a corresponding adjournment of the February 1, 2023 Case Management Conference. Furthermore, Defendants respectfully request that the Court *sua sponte* grant corresponding extensions of time, including but not limited to the time to respond to the Complaint, from January 3, 2023, to March 6, 2023, for defendants Captain Islam, DW Jonnelle Shivraj,[1] Officer Coxson, Chief Charlton Lemon, Captain Fedir Merenych, Dr. Nicholas,[1] Karen Powell,[1] and Deputy Warden Joanne Matos.[4]

---

[1] Upon information and belief, the proper spelling of "Officer Leech," "DW Shifraj," "Katherine Powell," and "Dr. Nicholas," is Officer Keesia Leitch, DW Jonelle Shivraj, Karen Powell, and Physician Assistant ("PA") Nicolas Frantz respectively.

[2] This case has been assigned to Assistant Corporation Counsel Mary Jane Anderson, who is not yet admitted to the New York State Bar. Ms. Anderson is handling this matter under my supervision and may be reached at (212) 356-2415 or maanders@law.nyc.gov.

[3] Sixty days from January 3, 2023, is March 4, 2023. However, because March 4, 2023, is a Saturday, in accordance with the Federal Rules of Civil Procedure, this request results in an extension of time until March 6, 2023.

[4] At this time, this Office only represents the City, DW Morales, ADW Greene, Officer Ritter, Officer Walker, Officer Leitch, and Officer Kevin Young, and does not represent the other individual defendants.

Furthermore, as also detailed in Defendants' October 27, 2022 Letter, an extension of time is also necessary to afford this Office an adequate opportunity to make representation decisions concerning the fourteen individually named defendants. This Office must determine, pursuant to Section 50-k of the New York General Municipal Law and based on a review of the case, whether it will represent them. (See Dkt. No. 45.) However, in addition to the fact that the Second Amended Complaint is one hundred and fifty pages long and involves various individual defendants, requiring the receipt and review of multiple documents, there are also other factors necessitating an extension of time for this Office to complete its determination concerning representation for the individual defendants. For example, in addition to the above-mentioned scheduling difficulties, PA Frantz must first be served before this Office can determine whether it may represent him. In addition, another defendant is no longer employed by DOC, and this Office is still in the process of attempting to make contact with them. The requested extension of time will afford this Office an adequate opportunity to, *inter alia*, receive and review the relevant materials to determine representation of all defendants, appropriately meet with each defendant, and ensure that PA Frantz is properly served. Thus, Defendants respectfully request a sixty day extension of time to respond to the Second Amended Complaint from January 3, 2023, to March 6, 2023.

In addition, Defendants respectfully contend that the filing of one responsive pleading would benefit the Court and the parties as it would minimize the need to cite to multiple responses. Moreover, having one response would avoid any potential confusion that may arise with respect to the defendants' claims and defenses. Thus, for the reasons detailed above and in the interest of judicial economy, Defendants respectfully request that the Court also, *sua sponte,* extend the time for all defendants who are not currently represented by this Office to respond to the Second Amended Complaint from January 3, 2023 to March 6, 2023.

In consideration of the above and the requested extension of time to respond to the Second Amended Complaint, the Defendants further respectfully request a corresponding (a) adjournment of the February 1, 2023 Case Management Conference, and (b) an extension of time of all other currently scheduled deadlines, as detailed below:

| Deadline | Current Deadline | Proposed New Deadline |
|---|---|---|
| Provide Local Civil Rule 33.2 responses. | January 3, 2023 | March 6, 2023 |
| Serve initial document requests and interrogatories. | January 3, 2023 | March 6, 2023 |
| Respond to initial document requests. | February 3, 2023 | April 4, 2023 |
| Serve subpoenas requesting documents from third parties. | April 14, 2023 | June 13, 2023 |
| Complete fact depositions. | April 28, 2023 | June 27, 2023 |
| Completion of fact discovery. | May 12, 2023 | July 11, 2023 |

Defendants thank the Court for its consideration.

Respectfully submitted,

3

EXHIBIT-30

415R



## THE CITY OF NEW YORK
## DEPARTMENT OF CORRECTION

# DIRECTIVE



| [ ] NEW | [ ] INTERIM | [X] REVISED | SUBJECT | | |
|---|---|---|---|---|---|
| **EFFECTIVE DATE**<br>03/11/13 | | *TERMINATION DATE<br>/   / | **RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS** | | |
| **CLASSIFICATION #**<br>4518R-B | **SUPERSEDES**<br>4518R-A | **DATED**<br>06/30/04 | **APPROVED FOR WEB POSTING**<br>☐ YES  ☒ NO | **DISTRIBUTION**<br>D | **PAGE 1**<br>**OF**<br>**12 PAGES** |
| RECOMMENDED FOR APPROVAL BY REVIEW BOARD MEMBER | | | AUTHORIZED BY THE COMMISSIONER | | |
| *Evey A. Mirabal Cos* | | | *Dora Schriro* | | |
| EVELYN A. MIRABAL, CHIEF OF DEPARTMENT   SIGNATURE | | | DORA B. SCHRIRO | | SIGNATURE |

## I.   PURPOSE

This directive is being promulgated to delineate the policy and procedures relative to due process and transporting of inmates identified as weapon users or possessors (Red ID), and for inmates who have possessed scalpels, hobby knives, razor blades, or other dangerous instruments or exhibited violent behavior (Enhanced Restraint).

## II.   POLICY

It is the policy of the New York City Department of Correction (Department) to:

A.   Afford due process to all inmates identified with a red identification card (Red ID) due to their possession or use of a weapon, and to all inmates placed in enhanced restraints due to their having exhibited violent behavior, or having been found in possession of scalpels, hobby knives, razor blades, or other dangerous instruments.

B.   Control movement of these inmates via application of enhanced restraints and placement in a specially designated housing area as a means of protecting staff and other inmates from being attacked; and

C.   Not consider the application of restraints or placement in a specially designated housing area as a punishment but rather a means of protecting staff and other inmates from being attacked.

## III.   DEFINITIONS

A.   Red ID status inmate: An inmate who, because of his/her use and/or possession of a weapon while in Department custody, is issued an identification card with a red background and placed into one of the following risk code designations:

416R




| EFFECTIVE DATE **03/11/13** | SUBJECT | |
|---|---|---|
| CLASSIFICATION # **4518R-B** | **RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS** | |
| DISTRIBUTION **D** | APPROVED FOR WEB POSTING ☐ YES ☒ NO | PAGE **2** OF **12** PAGES |

### III. DEFINITIONS continued

    **Code 3:** Caught as a weapon carrier during current incarceration; or

    **Code 3A:** Caught as a weapon carrier during current incarceration where the weapon is a scalpel, hobby knife, razor blade or other dangerous weapon as designated by the Chief of Department; or

    **Code 2:** Used a weapon to injure other(s) within the past five years; or

    **Code 2A:** Used a weapon to injure other(s) within the past five years where the weapon is a scalpel, hobby knife, razor blade or other dangerous weapon as designated by the Chief of Department; or

    **Code 1:** Used a weapon to injure other(s) on two or more occasions within the past five years; or

    **Code 1A:** Used a weapon to injure other(s) on two or more occasions within the past five years where the weapon is a scalpel, hobby knife, razor blade or other dangerous weapon as designated by the Chief of Department.

**B.** Enhanced Restraint Status: Any inmate who has either exhibited violent behavior during his/her current incarceration or exhibited violent behavior during a prior incarceration within the last five years shall be placed into enhanced restraints. Violent behavior consists of the following acts:

    **1.** The inmate assaults or attacks staff or another inmate;

    **2.** The inmate causes substantial property damage and that places any person at imminent risk of harm; or

    **3.** The inmate attempts to assault or attack staff or another inmate and places that person at imminent risk of harm.

    In addition, any inmate found in possession of a scalpel, hobby knife, razor blade, or other dangerous instrument as defined herein during his/her current or prior incarceration within the last five years may be placed into enhanced restraint status.

**C.** Violent Behavior: An inmate's behavior will require him/her to be placed in Enhanced Restraint Status if (1) the inmate assaults or attacks staff or another inmate; or (2) the inmate exhibits other violent behavior that causes substantial property damage and that places any person at imminent risk of harm; or (3) the inmate, exhibiting violent behavior, attempts to assault or attack staff or another inmate and places that person at imminent risk of harm.

**416R**



| EFFECTIVE DATE **03/11/13** | SUBJECT **RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS** | |
|---|---|---|
| CLASSIFICATION # **4518R-B** | | |
| DISTRIBUTION **D** | APPROVED FOR WEB POSTING ☐ YES ☒ NO | PAGE 3 OF **12** PAGES |



## III.   DEFINITIONS continued

**D.**   Scalpel: A small, light, usually straight knife containing an extremely sharp blade, often used in surgical and anatomical operations and dissections, or for other purposes.  For purposes of the Directive, "Scalpel" includes scalpel blades.

**E.**   Hobby Knife: A small light knife commonly sold in arts and craft and hardware stores for various uses.  Hobby knives may have a retractable blade.   For purposes of this Directive, "Hobby Knife" shall include hobby knife blades.

**F.**   Razor Blade: A sharp-edged instrument used especially for shaving the face or trimming hair.

**G.**   Other: Any other dangerous instrument identified by the Chief of Department.

## IV.   PROCEDURES

**A.**   Red ID Status Designation

    **1.**   Placement in Red ID Status based on a current infraction

        **a.**   Whenever an inmate is found to be in possession of a weapon or using a weapon, the reporting staff member shall notify his/her immediate supervisor and prepare an inmate infraction report as required by Directive 6500 (Inmate Disciplinary Due Process). The supervisor shall conduct an immediate investigation relative to the facts and circumstances surrounding the incident. If, in the judgment of the supervisor conducting the investigation, the facts support a finding that the inmate possessed or used a weapon and disciplinary action is warranted, the involved inmate(s) shall be immediately escorted by that supervisor to the main intake area to have his/her identification card changed to a Red ID. Furthermore, if, in the judgment of the supervisor, immediate placement in Red ID status is warranted, the designation shall be made pursuant to this section. Upon completion of the area supervisor's review of all facts and circumstances relative to the determination to place an inmate into Red ID Status, he/she shall complete the "Notice of Authorization for Initial Placement in Red ID Status" (attached hereto, form #4518A) if he/she finds that such placement is warranted.

**416R**



| EFFECTIVE DATE **03/11/13** | SUBJECT | | |
|---|---|---|---|
| CLASSIFICATION # **4518R-B** | **RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS** | | |
| DISTRIBUTION **D** | APPROVED FOR WEB POSTING ☐ YES ☒ NO | PAGE 4 OF **12** PAGES | |

## IV. PROCEDURES continued

This Notice directs a hearing and *review* of such placement by a departmental Hearing Officer (Adjudication Captain) within 72 hours of *service* of the "Notice of Authorization for Initial Placement in Red ID Status" on the inmate, excluding weekends and holidays. If unforeseen circumstances prevent compliance with this time period, the hearing shall be held as soon as practicable. When this 72-hour period is exceeded, the Hearing Officer shall document the reasons for such non-compliance on the "Notice of Hearing Determination for Red ID and/or Enhanced Restraint Status" (form #4518C).

b. The investigating supervisor will indicate on the "Report of Inmate Infraction," the "Inmate's Notice of Infraction," and the "Notice of Authorization for Initial Placement in Red ID Status" that, based on the facts and circumstances made known to the investigating supervisor, the inmate's identification card has been changed to that of a Red ID Status inmate. The "Notice of Authorization for Initial Placement in Red ID Status" is attached hereto. The completed "Report of Inmate Infraction" shall then be submitted to the on-duty Tour Commander for his/her review.

c. Upon receipt of the completed "Report of Inmate Infraction," the on-duty Tour Commander shall review the "Report of Inmate Infraction" to ensure that it is complete and complies with agency procedures, and that the investigating supervisor has annotated his/her investigation to indicate the inmate's new Red ID Status. The annotation of the investigation shall be written on the "Inmate's Notice of Infraction" and the "Notice of Authorization for Initial Placement in Red ID Status," which are to be served on the inmate immediately upon change of status.

d. After reviewing the "Report of Inmate Infraction," the on-duty Tour Commander shall initial the "Report of Inmate Infraction" and forward it to the facility security office for processing.

2. Placement in Red ID Status based on Prior History

a. An inmate's designation as a Red ID Status inmate in a prior period of incarceration may be reactivated if a review of his/her prior history reveals that the inmate used a weapon to injure other(s) within the past five (5) years. The Area Supervisor performing the review shall serve the inmate with a copy of the "Notice of Authorization for Initial Replacement of Red ID Status" immediately upon approval from the Deputy Warden for Security, or designee, of the change of status.

416R




| EFFECTIVE DATE 03/11/13 | SUBJECT | |
|---|---|---|
| CLASSIFICATION # 4518R-B | **RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS** | |
| DISTRIBUTION D | APPROVED FOR WEB POSTING ☐ YES ☒ NO | PAGE 5 OF 12 PAGES |

## IV.   PROCEDURES continued

B.   Enhanced Restraint Status Placement

1.   Initial Placement

a.   The area supervisor or a designated supervisor shall place into immediate Enhanced Restraint Status any inmate who either exhibits violent behavior during his/her current incarceration or exhibited violent behavior during a prior incarceration within the last 5 years, upon completion of the following steps:

i.   All facts and circumstances relative to the exhibition of violent behavior, during either the inmate's current incarceration or previous incarceration(s), shall be reviewed by the area supervisor or a designated supervisor in order to determine if placement in Enhanced Restraint Status is appropriate and warranted.

ii.   Upon completion of the area supervisor's review of all facts and circumstances relative to the determination to place an inmate into Enhanced Restraint Status, he/she shall complete the "Notice of Authorization for Initial Placement in Enhanced Restraint Status" (attached hereto, form #4518B) if he/she finds that such placement is warranted. This Notice directs the immediate placement of the inmate into Enhanced Restraint Status pending a hearing and review of such placement by a departmental Hearing Officer (Adjudication Captain) within 72 hours of service of the "Notice of Authorization for Initial Placement in Enhanced Restraint Status" on the inmate, excluding weekends and holidays. If unforeseen circumstances prevent compliance with this time period, the hearing shall be held as soon as practicable. When this 72-hour period is exceeded, the Hearing Officer shall document the reasons for such noncompliance on the "Notice of Hearing Determination for Red ID and/or Enhanced Restraint Status."

iii.   Any inmate whose placement into restraint status is authorized shall be notified of such placement by completion and service of the "Notice of Authorization for Initial Placement in Enhanced Restraint Status."

b.   The area supervisor, or a designated supervisor, shall determine the level of restraint that is appropriate and warranted, as listed in the "Notice of Authorization for Initial Placement in Enhanced Restraint Status."



| 416R | EFFECTIVE DATE **03/11/13** | SUBJECT **RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS** | |
|---|---|---|---|
| | CLASSIFICATION # **4518R-B** | | |
| | DISTRIBUTION **D** | APPROVED FOR WEB POSTING ☐ YES ☒ NO | PAGE 6 OF **12** PAGES |



## IV.   PROCEDURES continued

**C.**   Placement in Red ID and Enhanced Restraint Status with a Code 3A, 2A or 1A Designation.

If an inmate is designated as Code 3A, 2A or 1A then the inmate shall be immediately designated to receive both Red ID and Enhanced Restraint status and shall with the prior approval of the Assistant Chief of Security be transferred to a specially designated housing area. All inmates in this housing area shall receive all mandated services. All inmates designated as Code 3A, 2A or 1A shall also be given notice of restriction to non-contact visits, and appropriate due process, in accordance with the procedures set forth in Directive 2007R-B, Inmate Visit Procedures.

**D.**   Medical Assessment of Red ID or Enhanced Restraint Status Inmates

**1.**   Within 24 hours of completing the Notice of Authorization for Initial Placement in Red ID Status and/or the Notice of Authorization for Initial Placement in Enhanced Restraint Status, the facility clinic shall be notified that the prisoner has been placed in such status. All inmates must receive an in-person, hands-on medical examination by the medical provider immediately following their placement into Red ID or Enhanced Restraint Status to determine whether the enhanced restraints which may include mitts are likely to cause a significant adverse medical consequence for the inmate or aggravate an inmate's existing medical condition. The medical staff shall notify the Department of Correction in writing if they determine that enhanced restraints, i.e. rear or side-cuffing, or leg shackles, are likely to cause a significant adverse medical consequence for the inmate or aggravate an inmate's existing medical condition, in which case the steps outlined in Section IV.D.3 of this Directive shall be followed.

**2.**   The Deputy Warden of Security is directed to ensure that, during the first week of each calendar month, the facility medical providers are afforded a current listing of all inmates housed at that facility under Red ID or enhanced restraint status. The facility medical providers will conduct a monthly medical review of all Red ID and Enhanced Restraint Status Inmates to determine if there exists a medical condition or other medical problem that should preclude the inmate from being restrained in the manner determined by the Deputy Warden of Security pursuant to this directive. This assessment shall determine whether such restraints are causing a significant adverse medical consequence for the inmate or aggravating an inmate's existing medical condition.

**416R**



| EFFECTIVE DATE **03/11/13** | SUBJECT **RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS** | |  |
|---|---|---|---|
| CLASSIFICATION # **4518R-B** | | | |
| DISTRIBUTION **D** | APPROVED FOR WEB POSTING ☐ YES ☒ NO | PAGE **7** OF **12** PAGES | |

## IV.   PROCEDURES continued

3.   If medical staff render a written determination that enhanced restraints applied pursuant to this directive are causing a significant adverse medical consequence or are aggravating an existing medical condition, the facility's Deputy Warden for Security shall meet and confer with the appropriate clinic staff to select an alternative means of restraint during movement that does not adversely affect security and does not adversely impact the inmate's medical status/condition. If the Deputy Warden of Security and clinic staff are unable to formulate a satisfactory alternative means of restraint for such movement, the offices of the Assistant Chief of Emergency Services/Intelligence, the Assistant Commissioner for Health Affairs, and the Medical Director of Correctional Health Services (a division of the New York City Health and Hospitals Corporation) shall intercede to arrive at a satisfactory alternative means of restraint within one (1) business day. The alternative means of restraint of the hands may include but is not limited to handcuffs at the inmate's sides, or handcuffs in front of the inmate's body, or some other means of restraint that becomes available after the promulgation of this Directive.

E.   Due Process Hearing and Determination

1.   Within 72 hours of service of notice on an inmate of his or her placement into Red ID or Enhanced Restraint Status, a departmental Hearing Officer shall conduct a hearing for the purpose of adjudicating all pending infractions, Red ID Status, and Enhanced Restraint Status issues for that particular inmate.

2.   The hearing may be adjourned to a later date upon agreement of the Hearing Officer and the inmate. If the hearing is so adjourned, the Hearing Officer shall document the reasons for the adjournment and the inmate shall sign and consent to the adjournment on the "Notice of Hearing Determination for Red ID and/or Enhanced Restraint Status" (form #4518C).

3.   The purpose of the hearing for Red ID and/or Enhanced Restraint Status shall be to determine the appropriateness of the facility's decision to place the inmate into Red ID or Enhanced Restraint Status. For the purpose of this hearing and review, the facility's Deputy Warden of Security shall ensure that the Hearing Officer is provided with:

i.   A copy of (1) (a) the completed "Notice of Authorization for Initial Placement in Red ID Status" if the inmate has been placed in Red ID Status, or (b) the completed "Notice of Initial Authorization for Initial Placement in Enhanced Restraint Status" if the inmate has been placed in Enhanced Restraint Status and (2) a copy of any Notice of Infraction, if available.

**416R**



| EFFECTIVE DATE **03/11/13** | SUBJECT |  |  |
|---|---|---|---|
| CLASSIFICATION # **4518R-B** | **RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS** |  | |
| DISTRIBUTION **D** | APPROVED FOR WEB POSTING ☐ YES ☒ NO | PAGE 8 OF **12** PAGES | |



## IV.   PROCEDURES continued

    ii.   Copies of all evidence, including videotapes where relevant, and reports and other documents relevant to the placement of the inmate into Red ID or Enhanced Restraint Status.

    iii.   Copies of the inmate's history, including infractions, reports and other documents reflecting a history of placement into Red ID/Enhanced Restraint Status for inmates designated Red ID or placed in Enhanced Restraint Status based on a prior incarceration(s).

4.   An inmate has the right to assistance of a counsel substitute if the Hearing Officer deems that one is necessary under any of the following circumstances:

- the inmate is illiterate;

- the case is very complicated; or

- there is some reason, including inmate transfer, which has prevented the inmate from obtaining the assistance of witnesses or documents.

5.   An interpreter will be provided for non-English speaking inmates.

6.   Any inmate who has been placed in Red ID and/or Enhanced Restraint Status has the right to present evidence, including witness testimony at his/her due process hearing. An inmate who has been placed in Red ID and/or Enhanced Restraint Status may review the evidence against him or her at the time of the hearing. Evidence must be relevant and may not be redundant. Based on these standards the Hearing Officer will determine whether a witness is competent to testify, the conditions under which testimony will be given, and whether the evidence will be accepted. The fact that a witness is expected to testify as to facts about which testimony or written material has already been received is not a reason, by itself, to exclude the witness.

7.   During the hearing, the Hearing Officer shall determine if the inmate's placement into Red ID and/or Enhanced Restraint Status is appropriate and warranted by examining the evidence presented. In order to make such a placement, the Hearing Officer must be persuaded by a preponderance of the credible evidence (greater than 50%) that placement is appropriate and warranted.

6.   If it is determined that the placement into Red ID and/or Enhanced Restraint Status is unsupported by the evidence, the Hearing Officer shall direct the immediate revocation of such status.

**416R**



| EFFECTIVE DATE<br>**03/11/13** | SUBJECT | | |
|---|---|---|---|
| CLASSIFICATION #<br>**4518R-B** | **RED ID STATUS AND ENHANCED**<br>**RESTRAINT STATUS DUE PROCESS** | |  |
| DISTRIBUTION<br>**D** | APPROVED FOR WEB POSTING<br>☐ YES   ☒ NO | PAGE 9 OF<br>12 PAGES | |

## IV.  PROCEDURES continued

9.  In those cases where the area supervisor has authorized a level of restraint that requires the inmate to remain in enhanced restraints while at a program area or other facility activity, he/she shall ensure that the facility has provided documentation to the Hearing Officer that the violent behavior on the part of the inmate was committed on the way to, in, or on the way back from the program area or other facility activity. If it is determined that the facility has not documented or cannot document the exhibition of violent behavior on the part of the inmate while at such program/activity area, the Hearing Officer shall direct that the type of restraint status for that inmate be modified to require the removal of enhanced restraints while at a program area or other facility activity.

10.  At the conclusion of the inmate's hearing, in addition to weighing the evidence presented as to the inmate's guilt or innocence of the charge(s) presented in the Report of Infraction, the Hearing Officer shall render a determination as to the appropriateness of placing the inmate in Red ID or Enhanced Restraint Status. The hearing officer may consider at least the following factors in making this determination: the inmate's overall deportment and infraction history; the inmate's age; the circumstances of the offense, including whether the inmate acted in self-defense; and whether any weapon used was designed as a weapon (e.g. knife or shank) or not (e.g. a crutch or chair).

11.  If the Hearing Officer finds the inmate not guilty of weapons possession/ use or violent behavior based on the evidence presented, this will result in the Hearing Officer directing the Deputy Warden of Security to revoke the inmate's Red ID and/or Enhanced Restraint Status. A dismissal of the presented charges based solely on an administrative or procedural error will not prohibit the Hearing Officer from determining that the inmate's placement in Red ID and/or Enhanced Restraint Status was and remains appropriate, so long as the error did not violate the inmate's right to present evidence to the Hearing Officer. The Hearing Officer shall document this determination on the "Report of Hearing" and the "Notice of Disciplinary Hearing Disposition" as instructed in Directive 6500, if an infraction has been charged, and on the "Notice of Hearing Determination for Red ID Status and/or Enhanced Restraint Status" (attached hereto) as relevant. The Hearing Officer shall advise the inmate of such determination during the hearing and provide a written notice of determination within 72 hours of the conclusion of the hearing, excluding weekends and holidays. If unforeseen circumstances prevent compliance with this time period, the notice shall be provided as soon as practicable. When this 72-hour period is exceeded, the Hearing Officer shall document the reasons for such non-compliance on the "Notice of Hearing Determination for Red ID and/or Enhanced Restraint Status." The notice form shall advise the inmate that, within 21 calendar days of receiving such determination, he or she may appeal the determination in writing to the Deputy Warden of Security, who shall respond in writing to such appeal within 7 calendar days of the date the appeal is received.

416R



| EFFECTIVE DATE **03/11/13** | SUBJECT | |
|---|---|---|
| CLASSIFICATION # **4518R-B** | **RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS** | |
| DISTRIBUTION **D** | APPROVED FOR WEB POSTING ☐ YES ☒ NO | PAGE **10** OF **12** PAGES |



## IV.   PROCEDURES continued

12.   In all instances where an inmate's designation as a Red ID Status inmate based on prior history has been determined appropriate, the Hearing Officer shall advise the inmate of such determination during the hearing and provide a written notice of determination within 72 hours of the conclusion of the hearing, excluding weekends and holidays. If unforeseen circumstances prevent compliance with this time period, the notice shall be provided as soon as practicable. The notice form shall *advise* the inmate that he or she may appeal such determination in writing to the Deputy Warden of Security, who shall respond in writing to such appeal within seven (7) calendar days of the date the appeal is *received* (See IV.E.).

13.   The Hearing Officer shall document the findings of his/her review and determination as to the appropriateness of the Red ID Status based on a new infraction on the "Notice of Disciplinary Hearing Disposition," as required by Directive 6500, and "Notice of Hearing Determination for Red ID Status and/or Enhanced Restraint Status." The findings for the appropriateness of the enhanced restraint status shall be documented in the "Notice of Hearing Determination for Red ID Status and/or Enhanced Restraint Status."

The forms shall be delivered to the facility Deputy Warden of Security, who shall ensure that a copy of the appropriate form is served on the inmate within 72 hours of the conclusion of such hearing, excluding weekends and holidays. If unforeseen circumstances prevent compliance with this time period, the form shall be served on the inmate as soon as practicable. The "Notice of Hearing Determination for Red ID and/or Enhanced Restraint Status" shall advise the inmate that, (a) within 21 days, he or she may appeal such determination in writing to the facility Deputy Warden of Security, who shall respond to such appeal within seven (7) calendar days of the date the appeal is received, and (b) that he or she may at any time appeal such determination in writing to the facility Deputy Warden of Security based upon good cause with factual support, including a change in circumstances or newly available evidence.

F.   Appeals

1.   The Deputy Warden of Security shall process all submitted written appeals of an inmate's Red ID and/or Enhanced Restraint Status. The Deputy Warden of Security shall review the specifics of the inmate's appeal as well as all documented facts and circumstances surrounding the inmate's placement in the designated status. He or she shall render a written decision using the "Notice of Appeal Determination for Red ID and/or Restraint Status" (form #4518D) within seven (7) days from receiving the inmate's appeal. The Deputy Warden of Security or designee shall ensure that his/her determination regarding the inmate's appeal is delivered to the inmate within 24 hours of its issuance, excluding weekend and holidays. If unforeseen circumstances prevent compliance with this time period, the determination shall be served on the inmate as soon as practicable.

416R



| EFFECTIVE DATE<br>**03/11/13** | SUBJECT<br>**RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS** | |
|---|---|---|
| CLASSIFICATION #<br>**4518R-B** | | |
| DISTRIBUTION<br>**D** | APPROVED FOR WEB POSTING<br>[ ] YES   [X] NO | PAGE **11** OF<br>**12** PAGES |



## IV.   PROCEDURES continued

2.   If an inmate's appeal is denied, the Deputy Warden of Security shall advise the inmate, in writing, of the basis for his/her decision to deny the appeal on the "Notice of Determination of Appeal." That notice form shall advise the inmate that he/she may seek further review of the Red ID and/or Enhanced Restraint Status by requesting such review in writing from the Deputy Warden of Security, based upon good cause with factual support, including a change in circumstances or newly available evidence.

3.   Upon a showing of good cause (e.g. change of circumstances, newly available evidence) by any inmate in Red ID and/or enhanced restraint status, the Deputy Warden of Security shall review the specifics of the appeal and render a determination, in the manner described in section IV.F.1. above. Improved inmate conduct may be a factor in this determination. If the Department receives information that, if founded, would warrant a change in Red ID and/or Enhanced Restraint Status, the Deputy Warden for Security shall review all available information and modify the inmate's status if warranted.

G.   Periodic review

Whether or not the inmate appeals his or her designation for Red ID and/or enhanced restraint status, the Deputy Warden for Security shall review the continued appropriateness of inmates designated as 3A, 2A or 1A not less than once every four (4) weeks. A log book documenting such review shall be maintained by the Deputy Warden for Security in all facilities containing special housing units maintained for such inmates.

## V.   REFERENCES

Benjamin v. Kerik, 75 Civ. 3073, "RED ID STATUS AND RESTRAINT STATUS DUE PROCESS," dated August 08, 2000.

Benjamin v. Fraser, 75 Civ. 3073, Amended Opinion and Order," dated December 13, 2002.

## VI.   ATTACHMENTS

A.   NOTICE OF AUTHORIZATION FOR INITIAL PLACEMENT IN RED ID STATUS, form #4518A, revised 06/30/04.

B.   NOTICE OF AUTHORIZATION FOR INITIAL PLACEMENT IN ENHANCED RESTRAINT STATUS, form #4518B, revised 06/30/04.

416R



| EFFECTIVE DATE **03/11/13** | SUBJECT **RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS** | |
| CLASSIFICATION # **4518R-B** | | |
| DISTRIBUTION **D** | APPROVED FOR WEB POSTING ☐ YES ☒ NO | PAGE **12** OF **12** PAGES |



## VI.  ATTACHMENTS continued

C.  NOTICE OF HEARING DETERMINATION FOR RED ID AND/OR ENHANCED RESTRAINT STATUS, form #4518C, revised 06/30/04.

D.  NOTICE OF APPEAL DETERMINATION FOR RED ID AND/OR ENHANCED RESTRAINT STATUS, form #4518D, revised 06/30/04.

## VII.  SUPERSEDES

A.  Directive 4518R-A, RED ID STATUS AND ENHANCED RESTRAINT STATUS DUE PROCESS, dated 6/30/04 (as amended).

B.  Any other Directive, Operations Order, Teletype, Memorandum, etc. that may be in conflict with the policies and procedures outlined herein.

## VIII.  SPECIAL INSTRUCTIONS

A.  Within ten (10) calendar days of the effective date of this order, all Commanding Officers shall implement a Command Level Order incorporating the policy and provisions outlined herein.

B.  All facility managers and supervisors shall ensure strict enforcement of the policy, guidelines and procedures noted herein.

# NYC DEPARTMENT OF CORRECTION
## NOTICE OF AUTHORIZATION
## FOR INITIAL PLACEMENT IN RED ID STATUS

Form # 4518A   Rev. 06/28/04   Ref. Dir. # 4518R-A

**Facility:** | **Date:** | **Book & Case No.:**

**Inmate Name (Last/First):** | **NYSID Number:**

**Date of Event:** | **Location:** | **Time:** | **Infraction No. (If applicable):**

**Basis for Placement:** ☐ Current Infraction ☐ Prior History

**Description of event:** Include: Date, Time, Location and specific description of action alleged ☐ Notice of Infraction, attach if available

_____
_____
_____
_____
_____
_____
_____

☐ Incident Involved Possession of a Weapon
☐ Incident Involved Use or Attempted Use of a Weapon

**RIGHT TO HEARING:**

You are entitled to a hearing for this placement within 72 hours after you are served with this notice.
At your hearing you have the following rights:

1. Right to appear personally;
2. Right to make statements;
3. Right to present relevant and non-redundant evidence; and
4. Right to present relevant and non-redundant witness.

Within seventy-two (72) hours after your hearing is concluded, you will receive a copy of the "Notice of Hearing Determination for Red/ID and/or Enhanced Restraint Status".

**Interpreter Requested:** ☐ Yes ☐ No   If yes, specify language: _____

**Counsel Substitute Requested:** ☐ Yes ☐ No   **Witness Requested:** ☐ Yes ☐ No

| Witness Name (Print) | Number | Location |
|---|---|---|
| | | |
| | | |
| | | |

| I certify that I received a copy of this notice: | Inmate's Signature: | Date: | Time: |
|---|---|---|---|

| Served by (Print Name, Rank and Shield #): | Signature of Server: |
|---|---|

**Distribution:**
ORIGINAL To: DEPUTY WARDEN OF SECURITY   COPIES To : 1 - INMATE  2 - INMATE's LEGAL FOLDER  3 - CLINIC

**NYC DEPARTMENT OF CORRECTION**
**NOTICE OF AUTHORIZATION FOR INITIAL**
**PLACEMENT IN ENHANCED RESTRAINT STATUS**

Form # 4518B   Rev. 04/28/04   Ref. Dir. # 4518B-A

| Facility: | Date: | Book & Case No.: |
|---|---|---|

| Inmate Name (Last/First): | NYSID Number: |
|---|---|

| Housing Area: | Charges: |
|---|---|

| Date of Event: | Location: | Time: |
|---|---|---|

**Basis for Placement:** ☐ Current Incident   ☐ Prior History

**Description of event:** Include: Date, Time, Location and specific description of action alleged   ☐ Notice of Infraction, attach if available

_____
_____
_____
_____
_____

**Check all that apply:** ☐ Assault/Attempted Assault on  ☐ Staff or  ☐ Inmate      Weapons Used: Yes ☐   No ☐

Injuries: ☐ Yes  ☐ No      Specify: _____

☐ Substantial Property Damage:

It is determined that the inmate shall be restrained as follows:

☐ Security Mitts and handcuffs shall be applied during movement to and from all service areas or places of escort.

☐ Security Mitts, handcuffs and waist chain shall be applied during movement to and from all service areas or places of escort

☐ Security Mitts, handcuffs and waist chain shall be applied during movement to and from all service areas or places of escort and during the following activity/program: _____

☐ Leg Irons with above.

| Authorizing Supervisor's Name/Signature: | Date: |
|---|---|

**RIGHT TO HEARING:** You are entitled to a hearing for this placement within 72 hours after you are served with this notice. At your hearing you have the following rights:

1. Right to appear personally;
2. Right to make statements;
3. Right to present relevant and non-redundant evidence; and
4. Right to present relevant and non-redundant witness.

| Interpreter Requested: | ☐ Yes  ☐ No | If yes, specify language: _____ |
|---|---|---|

Counsel Substitute Requested:  ☐ Yes  ☐ No      Witness Requested:  ☐ Yes  ☐ No

| Witness Name (Print) | Number | Location |
|---|---|---|
| | | |
| | | |
| | | |

Within seventy-two (72) hours after your hearing is concluded, you will receive a copy of the "Notice of Hearing Determination for Red/ID and/or Enhanced Restraint Status".

| I certify that I received a copy of this notice: | Inmate's Signature: | Date: | Time: |
|---|---|---|---|

| Served by (Print Name, Rank and Shield #): | Signature of Server: |
|---|---|

**Distribution:**
ORIGINAL To: DEPUTY WARDEN OF SECURITY      COPIES To : 1 ~ INMATE  2 - INMATE's LEGAL FOLDER  3 - CLINIC

**NYC DEPARTMENT OF CORRECTION**
**NOTICE OF HEARING DETERMINATION**
**FOR RED ID AND/OR ENHANCED RESTRAINT STATUS**

- [ ] **RED ID STATUS**
- [ ] **ENHANCED RESTRAINT STATUS**

Form # 6518C
Rev. 06/30/04
Ref. Dir. # 6518B-A

| Facility: | Date: | Book & Case No.: |
|---|---|---|

| Inmate Name (Last/First): | NYSID Number: |
|---|---|

| Date of Event: | Location: | Time: |
|---|---|---|

**CHECK ALL THAT APPLY:**

- [ ] **Red ID Placement:**
  - [ ] Incident Involved Possession of a Weapon
  - [ ] Incident Involved Use or Attempted Use of a Weapon

- [ ] **Enhanced Restraint Placement:**
  - [ ] Assault/Attempted Assault on [ ] Staff or [ ] Inmate
  - Injuries: [ ] Yes  [ ] No   Specify: _____
  - [ ] Substantial Property Damage

- [ ] Hearing Delayed  [ ] Adjourned
Reason:
_____

Inmate's Signature for Adjournment: _____ Date: _____

Findings of Fact/Reason for Determination:
_____
_____
_____
_____

The following reports and evidence were reviewed:

- [ ] Infractions
- [ ] Incident Reports
- [ ] I.D. Preliminary Report
- [ ] Injury Reports
- [ ] Use of Force Reports
- [ ] Evidence Voucher
- [ ] Arrest Records
- [ ] Witness Reports
- [ ] Pre-Sentence Report
- [ ] Securing Orders
- [ ] Other: _____

**HEARING DECISION:** As a result of the activities described above, you were placed in Red ID Status and/or Enhanced Restraint Status. (Check all appropriate boxes)

- [ ] It has been determined that you were in violation of departmental rules and therefore your [ ] Red ID Status [ ] Enhanced Restraint Status is continued.

- [ ] It has been determined that you were not in violation of departmental rules and therefore your [ ] Red ID Status [ ] Enhanced Restraint Status is revoked.

- [ ] It has been determined that enhanced restraints during facility/program activity (Specify) _____ is [ ] Continued [ ] Removed  Reason: _____

| Hearing Officer (Name and Signature): | Date: |
|---|---|

| Delayed Service of Determination [ ]  Reason: |
|---|
| _____ |

| I certify that I received a copy of this notice: | Inmate's Signature: | Date: | Time: |
|---|---|---|---|

| Served by (Print Name, Rank and Shield #): | Signature of Server: |
|---|---|

**RIGHT TO APPEAL:** Within 21 days of receipt of this determination, you may appeal your Red ID status and/or Enhanced Restraint Status placement by writing to the Deputy Warden of Security who shall respond within 7 days of the day the appeal is received. You may seek further review of your Red ID Status and/or Enhanced Restraint Status placement at any time by writing to the Deputy Warden of Security and providing documented good cause evidence such as a change of circumstances or newly available evidence.

Distribution:
ORIGINAL To: INMATE   COPIES To : 1 - INMATE's LEGAL FOLDER  2 - CERTIFIED INMATE

## NYC DEPARTMENT OF CORRECTION
## NOTICE OF APPEAL DETERMINATION FOR RED ID AND/OR ENHANCED RESTRAINT STATUS

☐ RED ID STATUS
☐ ENHANCED RESTRAINT STATUS

Form # 461ED
Rev. 05/2004
Ref. Dir. # 4519B-A

| Facility: | Date: | Book & Case No.: |
|---|---|---|
| Inmate Name (Last/First): | | NYSID Number: |
| Date of Event: | Location: | Time: |

**Basis for Determination:**

**Check all that apply:**

RED ID PLACEMENT: ☐ Incident Involved Possession of a Weapon
☐ Incident Involved Use or Attempted Use of a Weapon

ENHANCED RESTRAINT PLACEMENT: ☐ Assault or Attack on ☐ Staff or ☐ Inmate

| Weapon Used: | ☐ Yes | ☐ No |
|---|---|---|
| Injuries: | ☐ Yes | ☐ No, Specify: _____ |
| Substantial Property Damage: | ☐ Yes | ☐ No |

**Check the appropriate box:**

As a result of the activities described above, you were placed in ☐ Red ID Status and/or ☐ Enhanced Restraint Status. Your appeal of that status has been considered and the following determination has been made:

☐ It has been determined that you were not in violation of departmental rules and therefore your Red ID Status and/or Enhanced Restraint Status is revoked.

☐ It has been determined that you were in violation of departmental rules and therefore your Red ID Status and/or Enhanced Restraint Status is continued.

☐ It has been determined that after a review of the good cause evidence presented by you, your status will/will not (circle one) be revoked.

**Reason:**

| Inmate's Signature: | Date: | Time: |
|---|---|---|
| Deputy Warden of Security (Print Name): | Deputy Warden of Security (Signature): | Date: |

\* You may seek further review of your Red ID Status and/or Enhanced Restraint Status placement by writing to the Deputy Warden of Security and providing documented good cause evidence such as a change of circumstances or newly available evidence.

**Distribution:**
ORIGINAL To: INMATE - COPIES To : 1 - INMATE's LEGAL FOLDER , 2 - DEPUTY WARDEN OF SECURITY

EXHIBIT-31

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

LLOYD K. GARRISON    (1946-1991)
RANDOLPH E. PAUL    (1946-1956)
SIMON H. RIFKIND    (1950-1995)
LOUIS S. WEISS    (1927-1950)
JOHN F. WHARTON    (1927-1977)

WRITER'S DIRECT DIAL NUMBER

(212) 373-3975

WRITER'S DIRECT FACSIMILE

(212) 492-0975

WRITER'S DIRECT E-MAIL ADDRESS

cwan@paulweiss.com

UNIT 5201, FORTUNE FINANCIAL CENTER
5 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT, BEIJING 100020, CHINA
TELEPHONE (86-10) 5828-6300

SUITES 3601 – 3606 & 3610
36/F, GLOUCESTER TOWER
THE LANDMARK
15 QUEEN'S ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, UNITED KINGDOM
TELEPHONE (44 20) 7367 1600

535 MISSION STREET, 24TH FLOOR
SAN FRANCISCO, CA 94105
TELEPHONE (628) 432-5100

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
JUSTIN ANDERSON
ALLAN J. ARFFA
JONATHAN H. ASHTOR
ROBERT A. ATKINS
SCOTT A. BARSHAY
PAUL M. BASTA
LYNN B. BAYARD
JOSEPH J. BIAL
DANIEL J. BELLER
H. CHRISTOPHER BOEHNING
BRIAN BOLIN
ANGELO BONVINO
JAMES L. BROCHIN*
GERALD BRANT
ROBERT A. BRITTON
WALTER F. BROWN*
SUSANNA M. BUERGEL
JESSICA S. CAREY
JOHN F. CARLIN
DAVID CARMONA
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
YAHONNES CLEARY
REBECCA S. COCCARO
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
THOMAS V. DE LA BASTIDE III
MEREDITH R. DEARBORN*
ARIEL J. DECKELBAUM
KAREN L. DUNN
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
HARRIS FISCHMAN
VICTORIA S. FORRESTER
HARRIS B. FREIDUS
MANUEL S. FREY
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
NEIL GOLDMAN
MATTHEW B. GOLDSTEIN
ROBERTO J. GONZALEZ*
CATHERINE L. GOODALL
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
BRIAN S. GRIEVE
UDI GROFMAN
BRUCE A. GUTENPLAN
MELINDA HAAG*
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
IAN H. HAZLETT
BRIAN S. HERMANN
JOSHUA HILL, JR.
MICHELE HIRSHMAN
JARRETT R. HOFFMAN
ROBERT HOLO
CHRISTOPHER HOPKINS
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
WILLIAM A. ISAACSON*
JAREN JANGHORBANI
BRIAN M. JANSON
JEH C. JOHNSON
MATTHEW B. JORDAN
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
ROBERT A. KILLIP
BRIAN KIM
KYLE J. KIMPLER
JEFFREY L. KOCHIAN
ALEXIA D. KORBERG
ALAN W. KORNBERG
DANIEL J. KRAMER
BRIAN KRAUSE

CAITH KUSHNER
KAISA KUUSK
DAVID K. LAKHDHIR
GREGORY F. LAUFER
BRIAN C. LAVIN
XIAOYU GREG LIU
RANDY LUSKEY*
LORETTA E. LYNCH
JEFFREY D. MARELL
MARCO V. MASOTTI
DAVID W. MAYO
ELIZABETH R. McCOLM
JEAN M. McLOUGHLIN
ALVARO MENDELSBERG
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
BRAD R. OKUN
SUNG PAK
CRYSTAL L. PARKER
LINDSAY B. PARKS
ANDREW M. PARLEN
DANIELLE C. PENNIALL
CHARLES J. PESANT
JESSICA E. PHILLIPS*
AUSTIN B. POLLET*
VALERIE E. RADWANER
JEFFREY J. RECHER
CARL L. REISNER
LORIN L. REISNER
JEANNIE S. RHEE
WALTER G. RICCIARDI
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JUSTIN ROSENBERG
JACQUELINE P. RUBIN
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY B. SAMUELS
PAUL L. SANDLER
AARON J. SCHLAPHOFF
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
BRIAN SCRIVANI
KYLE T. SEIFRIED
KANNON K. SHANMUGAM*
SURAH SHIM
CULLEN L. SINCLAIR
AUDRA J. SOLOWAY
SCOTT M. SONTAG
JOSHUA N. SOVEN*
MEGAN SPELMAN
ROBERT Y. SPERLING
EVITAYO ST. MATTHEW-DANIEL
SARAH STASNY
AIDAN SYNNOTT
BRETTE TANNENBAUM
RICHARD C. TARLOWE
DAVID TARR
MONICA K. THURMOND
DANIEL J. TOAL
LAURA C. TURANO
CONRAD VAN LOGGERENBERG
KRISHNA VEERARAGHAVAN
JEREMY M. VEIT
LIZA M. VELAZQUEZ
MICHAEL VOGEL
RAMY J. WAHBEH
JOHN WEBER
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
SAMUEL J. WELT
LINDSEY L. WIERMA
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
ADAM WOLLSTEIN
JULIA TARVER MASON WOOD
STACI YABLON
JORDAN E. YARETT
BOSKO VUCIC
KAYE N. YOSHINO
TRACEY A. ZACCONE
TAURIE M. ZEITZER
KENNETH S. ZIMAN
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

December 21, 2022

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY-CLIENT COMMUNICATION**

Alexander Williams
Book & Case Number: 1411801632
George R. Vierno Center
09-09 Hazen Street
East Elmhurst, NY 11370

*Re: Williams v. City of New York, No. 1:19-cv-03347-LJL-JLC (S.D.N.Y.)*

Dear Mr. Williams,

As you know, I will be taking over from Eric Abrams as your point of contact at Paul, Weiss for our weekly calls.  In terms of scheduling, I am generally available from 9:30am to 2:00pm on Wednesdays—it would be great if you could call at the earliest possible time within this window.  My cell is (815) 616-2873, and I can also be reached at (212) 373-3975.  I look forward to speaking with you, and please do not hesitate to let me know if you have any questions.

Sincerely,
Christie Wan

EXHIBIT NO -32

 **DRNY** DISABILITY RIGHTS NEW YORK

 www.drny.org    mail@drny.org    800-993-8982

# **ATTORNEY-CLIENT PRIVILEGED**

Alexander Williams (BC 1411801632)
West Facility
16-06 Hazen Street
East Elmhurst, NY 11370

December 6, 2022

Dear Mr. Williams,

I hope this letter finds you well. I am following up on our recent call and to explain the scope of services that Disability Rights New York (DRNY) has agreed to perform for you.

During our call, you discussed concerns about a court-ordered 23 hour lockdown and the conditions of your imprisonment, including but not limited to the number of hours you remain on lockdown, the lack of windows and ventilation in your cell, the lack of access to the disability coordinator, the lack of access to the law library, and lack of access to medical care, specifically as it relates to the podiatrist and physical therapist. I have contacted your attorneys and your daughter's mother, who emailed me a copy of the court order and your medical records. I will continue to investigate and will advise you of DRNY's next steps in a follow up call with you. I will request a video visit with you for the week of 12/12/22.

I have attached three HIPAA releases for you to sign and initial as well as an OMH form. Please send those back to me in the self-addressed stamped envelope as soon as possible. *PLEASE DO NOT FORGET TO INITIAL SECTION 9(a) and (b)* in the HIPAA form.

Please note, DRNY has not agreed to take additional actions on your behalf or to represent you in any appeals that may be available. If DRNY subsequently agrees to represent you further, a new letter of engagement or a written retainer agreement will describe such representation.

DRNY has not assessed any matters other than those listed above and therefore has not advised you regarding of rights and remedies regarding other matters. Certain remedies, such as filing a lawsuit, complaint, charge, appeal or other legal proceeding, have strict deadlines which may apply and therefore you should immediately contact another attorney to discuss any other matters on which DRNY is not advising or representing you. If you have any questions about anything contained in this updated letter of engagement, please feel free to give me a call at 929-699-3578 or email me at Sabina.Khan@drny.org

Sincerely,

*Sabina Khan*

Sabina Khan, Esq.
PAIMI Staff Attorney

Encl: DRNY Grievance Policy; HIPAA Forms

EXHIBIT NO - 33



**HON. SYLVIA O. HINDS-RADIX**
*Corporation Counsel*

### THE CITY OF NEW YORK
# LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

**ANDREW B. SPEARS**
*Assistant Corporation Counsel*
Phone: (212) 356-3159
Fax: (212) 356-1148
aspears@law.nyc.gov

December 30, 2022

**VIA ECF**
Hon. Katherine H. Parker
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

        Re:    <u>Williams, Jr. v. City of New York, et al.</u>
               21 Civ. 1083 (PGG) (KHP)

Your Honor:

       I am the Assistant Corporation Counsel assigned to represent defendant the City of New York in the above-referenced matter. Pursuant to the Court's Order dated November 4, 2022 (ECF No. 114), the undersigned writes to provide the Court with an update as to the status of this Office's efforts to assume representation of the individual defendants that remain in this matter following Your Honor's Report and Recommendation on defendants' motion to dismiss the Second Amended Complaint ("SAC"), and to respectfully request that defendants' deadline to respond to the SAC be held in abeyance, pending the final disposition of defendants' motion to dismiss.

       By way of background, on November 8, 2021, defendants filed a motion to dismiss the SAC. (ECF Nos. 73–74). On August 5, 2022, Your Honor recommended that defendants' motion be granted in part and denied in part. (See ECF No. 101). Thereafter, on November 3, 2022, the parties convened for a case management conference. (See ECF No. 114). At the conference, the undersigned advised the Court that this Office had previously undertaken legal representation of the individual defendants only for the limited purpose of filing the motion to dismiss the SAC, and that this Office must now undertake to assess and assume full representation of the individual defendants that remain in this matter.[1] As such, Your Honor set a January 13, 2023 deadline for

---

[1] Judge Gardephe has not yet issued a final order regarding defendants' motion to dismiss. Nevertheless, based on Your Honor's Report and Recommendation, as well as the Court Orders dated June 1, 2022 and August 5, 2022 (ECF Nos. 96, 102), the undersigned is proceeding as though only the following defendants remain in this action: Andrei Blake, Andrew Hickson, Antonio Graves, Cathy Le Fleur, Debbie Palmer-Campbell, Johanny Ramirez, Jonathan Coulthurst, Joseph Day, Julius Lawrence, Kevin Young, Preston Ritter, Rekiel Reid, Robin Sharma, Sherma Dunbar, Tyliek Dyches, Tyrone Carter, Fanny Vallejo, Willie McNeil, and Wilson Rodriguez.

EXHIBIT NO -34

| CORRECTION DEPARTMENT CITY OF NEW YORK | | | |
|---|---|---|---|
| | **GEORGE R. VIERNO CENTER** | | |
| | **COMMAND LEVEL ORDER** | | |

| ORDER NUMBER: **#13/21** | SECTION: **SECURITY** | { X } NEW { } REVISED | SUBJECT: COURT ORDERED LOCKDOWN INMATES | AREAS ALL STAFF |
|---|---|---|---|---|
| EFFECTIVE DATE: **07/19/21** | { } ADMINISTRATION { } PROGRAMS { X } SECURITY | PAGE 1 OF 6 | REFERENCE: Facility Generated | |
| AUTHORIZED BY THE COMMANDING OFFICER **JEAN RENE, WARDEN** | | SIGNATURE | | |

## I.   PURPOSE

This command level order is to establish policy and procedures for the Care, Custody and Control of the inmates under Court Order lockdown status.

## II.   POLICY

It shall be the policy of the George R. Vierno Center to comply with the mandates of all Court Orders dealing with inmates housed in this facility. Additionally, the restrictions imposed on "Lockdown Status" inmates by the Court supercedes any rights these inmates may ordinarily have under the Minimum Standards.

## III.   PROCEDURES

The inmates housed in Court Ordered lock-down areas shall be governed by the following:

a. Twenty-three (23) hour lock-in, feed -in status.
b. Inmates housed in Court Ordered Lock-Down areas will be allowed to possess the following property in their cell:

1. One (1) Bible
2. Three (3) Magazines
3. Three (3) Books
4. One (1) Bar of Soap
5. One (1) Container of Shampoo
6. One (1) Toothbrush
7. One (1) Toothpaste
8. One (1) Plastic Cup
9. One (1) Towel
10. Deodorant



| CORRECTION DEPARTMENT CITY OF NEW YORK | GEORGE R. VIERNO CENTER |
|---|---|
| **COMMAND LEVEL ORDER** | ORDER NUMBER # 13/21 |
| **EFFECTIVE DATE: 07/19/21** / **SUBJECT: COURT ORDERED LOCKDOWN INMATES** | PAGE    2 OF  6 PAGES |



## IV.    PROCEDURES (CONTINUED)

### Special Security Procedures

a.   Inmates in lock-down status shall not be removed from their cells unless a Captain is present.  AT NO TIME WILL MORE THAN ONE (1) INMATE BE ALLOWED OUT OF HIS CELL AT ANY ONE TIME.

b.   Whenever a Court Ordered Lock-Down inmate is removed from the housing area, he shall be restrained in leg irons, waist chains and mitts.  The inmate shall be under one-on-one observation of a Correction Officer to assure no communication with any other inmate(s), verbally, in writing or through hand signs.

c.   During the day tour (0700x 1500 hours) and under the supervision of a Captain these inmates shall be strip-searched, and their property carefully searched daily.  Theses searches will be recorded on a Random Search Form.

d.   Inmates shall always dress in jumpsuits , unless going to court for trail.

e.   Inmates housed in Court Ordered Lock -In areas shall not be allowed to refuse to be produced in court.

f.   The Court Ordered inmates shall not be permitted to refuse to attend court because of complaints of health problems unless the physician examine this defendant certifies in writing that the attendance of this defendant in court would likely result in serious impairment to this defendant's health.  In this event, this information shall be immediately transmitted to the Central Operations Desk at (718) 546-1384.

g.   The Court Ordered inmate's accompany card shall be kept in the CMC box in the General office.

### Program /Inmate Services

Law Library/Outgoing Mail

Inmates will make all request for Law Library materials in writing.  These requests will be forwarded to the Security Office who will obtain copies of the requested materials and place same in the inmate's blue storage bin.

1.   The assigned Captain will collect all letters written by the inmate.  The Captain will turn the mail over to the Security Office.  Under no circumstances will any inmate in Court Ordered Lockdown  status be permitted to send out any written correspondence or any other type of communication.



| CORRECTION DEPARTMENT CITY OF NEW YORK | GEORGE R. VIERNO CENTER |
|---|---|
| **COMMAND LEVEL ORDER** | **ORDER NUMBER # 13/21** |
| EFFECTIVE DATE: 07/19/21 | SUBJECT: COURT ORDERED LOCKDOWN INMATES | PAGE   3 OF  6 PAGES |



## V.   PROCEDURES (CONTINUED)

**Telephone Calls and Visit Privileges:**

1. The court ordered inmates are barred from Visits and Telephone calls to anyone other than their attorney of record.  These numbers are listed in each inmate's court order folder.
2. All calls will be placed between the hours of 1330-1430 hours and 1630-1730 hours.
3. The Correction Officer assigned to the post shall make the telephone call using a P.I.N. Number which will be changed weekly by Security.  Inmates are not allowed to know the P.I.N. numbers.  The Correction Officer shall maintain a log of each attorney called. Such a log will detail the following information for each attempted call:

    a.   Date and Time call requested
    b.   Time call was placed
    c.   Whether or not contact was made with the Attorney
    d.   Time call ended.

**Inmate Showers**

Inmates will be afforded a ten-minute shower, a day.  The showers are to be recorded in a shower logbook.  As stated earlier, a Captain shall be present when the inmate is removed from his cell to the shower and again when he is returned from the shower to his cell.  All shower activity shall be logged in the Housing Area Logbook.

**Incoming Mail**

Any incoming mail for inmates housed in court ordered areas will be forwarded to the GRVC Security Office.  No mail shall be forwarded to these inmates until approved by the Commanding Officer or his/her designee.

**Commissary**

The only items inmates housed in court ordered areas may purchase from commissary are:

1. Soap            4. Toothpaste
2. Shampoo     5. Paper
3. Deodorant



| CORRECTION DEPARTMENT CITY OF NEW YORK | GEORGE R. VIERNO CENTER |
|---|---|
| **COMMAND LEVEL ORDER** | ORDER NUMBER # 13/21 |
| EFFECTIVE DATE: 07/19/21 | SUBJECT: COURT ORDERED LOCKDOWN INMATES | PAGE    4 OF  6 PAGES |



## VI.    PROCEDURES (CONTINUED)

Custodial staff assigned to the housing area will complete the Commissary request form for the inmate. This shall prevent subject from communicating with commissary help. All commissary products will be thoroughly searched prior to giving them to the intended inmate. Appropriate logbook entries shall be made relative to the delivery of this service.

### Social Service

All request for Social Services shall be forwarded to the Security Office. At no time will these inmates have any contact with Social Service personnel. Additionally, at no time will interview slips be forwarded to any Service area.

### Religious Services

If these inmates request religious services, the Chaplain will be called to visit them. However, the Chaplain will first be instructed that he/she may not:

1.  Communicate on the inmate's behalf with anyone other than the Warden, the Security Office, or the Court -appointed Special Master.
2.  Convey any written messages from these inmates to anyone else.
3.  May not give anything to or receive anything from these inmates.

### Medical/Mental Health Services

Any necessary medical or mental health services are to be provided to these inmates in the housing area. They will not be removed to go to the Clinic unless it is physically impossible to provide them with necessary medical services in the cell/housing area. Mental Health services, if required, will be provided to them in the housing area, not the clinic.

<u>If the inmate must be removed to the Clinic for medical services, he shall be escorted by a Correction officer and a Captain and kept separate from all other inmates in such a manner as to assure that he is unable to communicate in any manner with other inmates.</u>

Medical Staff who come to see these inmates in the housing area should first be instructed that they may not:



| CORRECTION DEPARTMENT CITY OF NEW YORK | GEORGE R. VIERNO CENTER |
|---|---|
| **COMMAND LEVEL ORDER** | **ORDER NUMBER # 13/21** |
| **EFFECTIVE DATE: 07/19/21** | **SUBJECT: COURT ORDERED LOCKDOWN INMATES** | **PAGE   5 OF  6 PAGES** |



## VII.   PROCEDURES (CONTINUED)

1. Communicate on the inmate's behalf with anyone other than the Warden or the Security Office.
2. Convey any written messages.
3. May not give anything to or from these inmates unless the item is necessary to provide medical services (i.e. medical supplies, medication).

### Hospital Runs

If the inmate requires hospitalization, he is to be treated and outposted at Bellevue Hospital as a medical emergency.  In the event of a medical emergency, the inmate is to be transported to the nearest hospital.

### Inmate Recreation

Inmates housed in the Court Ordered area may be afforded recreation in accordance with the details delineated in the court order or as amended in a separate memo.  These stipulations shall be reflected in the posted "Recreation Schedule".  A Captain shall be present when the inmate is removed from his cell and returned to his cell, following the recreation period.  While at recreation these inmates shall be separated from all other inmates verbally, in writing or through hand signals.   These inmates will be restrained in waist chains handcuffs and mitts whenever they are out of their cells for recreation.

Appropriate logbook entries shall be made relative to delivery of this service.

## CELL AREA ACCESS AND SUPERVISION

1. Civilian personnel (i.e. Chaplain and Medical Staff) must always enter the cell area accompanied by a Supervisor.
2. The area Captain will conduct at least three (3) tours of inspection in the court ordered inmates cell area during each tour of duty.
3. The on-duty Tour Commander will conduct at least one (1) tour of inspection during each tour of duty.  He/she is responsible for ensuring that the provisions of this order are fully complied with.

## LEGAL JUSTIFICATION

1. This order is justified as per Supreme Court Order.



| | | |
|---|---|---|
| **CORRECTION DEPARTMENT CITY OF NEW YORK** | | **GEORGE R. VIERNO CENTER** |
| **COMMAND LEVEL ORDER** | | **ORDER NUMBER # 13/21** |
| EFFECTIVE DATE: 07/19/21 | SUBJECT: COURT ORDERED LOCKDOWN INMATES | PAGE   6 OF  6 PAGES |



**PREPARED BY:**

JONELLE SHIVRAJ, Deputy Warden for Security

**REVIEWED BY:**

LISA BARNABY, Deputy Warden for Administration

JOANNE MATOS, Deputy Warden for Programs/Operations

TIFFANY MORALES, Deputy Warden for Enhanced Supervision Housing

CEX                                    EXHIBIT NO-35

 

# OPERATIONS SECURITY INTELLIGENCE UNIT

## CMC SYNOPSIS

| COD #: | INCIDENT LOCATION: | INCIDENT DATE: | AREA: | INCIDENT TYPE |
|--------|--------------------|--------------------|-------|---------------|



**COD NARRATIVE:**

# CMC #11/19
# COURT ORDERED LOCKDOWN

| INMATE: | WILLIAMS, ALEXANDER |
|---------|---------------------|
| B&C #: | 1411801632 |
| NYSID #: | 01897858L |
| DOB: | 08-FEB-81 |
| SRG AFFILIATION: | N/A |
| SET (IF ANY): | N/A |
| SRG RANK (IF ANY): | N/A |
| AKA/NICKNAME: | N/A |
| ICR: | NO |
| RED ID: | NO |
| SEPARATION ORDERS: | N/A |

## RESTRAINT DETERMINATION

| X | CMC RESTRAINTS/ BLACK BOX |
|---|---------------------------|
| | Security mitts, handcuffs and waist chain shall be applied during movement TO and FROM all service areas or place of escort. |
| | Security mitts, handcuffs and waist chain shall be applied during movement TO and FROM all service areas or place of escort and during the following activity: |
| X | Leg Irons with above |

EXHIBIT NO -36

# 1A CMC RESTRIANT MOVEMENT

1. Cano Christopher 8952200296/13552006J
   **CMC FULL-SET UP ERS/RESTRAINTS/RED-ID**

2. Forrest Trevor 3492002023/15028515J
   **CMC SET-UP FOR OUTER FACILITY TRANSPORT**

3. Francis Walesa 4412102576/15276376H
   **CMC SET-UP FOR OUTER FACILITY TRANSPORT**

4. Reyes Daquan 4411804847/11638139L
   **CMC FULL-SET UP ERS/RESTRAINTS/RED-ID**

5. Thompson Kwaine 3491901450/07289661Q
   **CMC SET-UP FOR OUTER FACILITY TRANSPORT**

6. Torres Ricky 1412001935/12922994Q
   **CMC FULL SET-UP ERS/RESTRAINTS/RED-ID**

7. Williams Alexander 1411801632/01897858L
   **CMC SET-UP FOR OUTER FACILITY TRANSPORT**

EXHIBIT NO -37

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-----------------------------------------------------------------------X
KWAINE THOMPSON,

                                        Plaintiff,

                -against-

CITY OF NEW YORK, CAPTAIN DAVIS, BADGE
NUMBER UNKNOWN, AND CORRECTION
OFFICER "JOHN DOE", BADGE NUMBER
*UNKNOWN, the name "John Doe" being fictitious,
as the true name is presently unknown, and intended to
be the individual whether Warden/Deputy Warden/Assistant
Deputy Warden/Commander/Chief/Assistant Chief/
Supervisor/Correction Officer responsible for supervising,
overseeing, and monitoring the housing of inmates subject
to a 23-hour per day Lockdown Court Order in George
R. Vierno Center from November 1, 2021 to date,*

                                        Defendants.
-----------------------------------------------------------------------X

Index No.:
Date Purchased:

Plaintiff designates Bronx
County as the place of trial

Basis of venue is place
of occurrence.

**SUMMONS**

To the above named Defendants:

        YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a
copy of your answer, or, if the complaint is not served with this summons, to serve a notice of
appearance, on the Plaintiff's Attorneys within 20 days after the service of this summons,
exclusive of the day of service (or within 30 days after the service is complete if this summons is
not personally delivered to you within the State of New York); and in case of your failure to
appear or answer, judgment will be taken against you by default for the relief demanded in the
complaint.

Dated: White Plains, New York
        December 22, 2022

                                        TRACIE A. SUNDACK & ASSOCIATES, L.L.C
                                        Attorneys for Plaintiff
                                        KWAINE THOMPSON
                                        180 South Broadway - Suite 306
                                        White Plains, New York 10605
                                        (914) 946-8100

Defendant's address:

CITY OF NEW YORK                        CAPTAIN DAVIS,
100 Church Street                       BADGE NUMBER UNKNOWN
New York, New York 10007                George R. Vierno Center
                                        09-09 Hazen Street
                                        East Elmhurst, New York 11370

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
------------------------------------------------------------------------X
KWAINE THOMPSON,

                        Plaintiff,                            Index No.:

       -against-

CITY OF NEW YORK, CAPTAIN DAVIS, BADGE
NUMBER UNKNOWN, AND CORRECTION
OFFICER "JOHN DOE", BADGE NUMBER
UNKNOWN, *the name "John Doe" being fictitious,*
*as the true name is presently unknown, and intended to*
*be the individual whether Warden/Deputy Warden/Assistant*    **VERIFIED COMPLAINT**
*Deputy Warden/Commander/Chief/Assistant Chief/*
*Supervisor/Correction Officer responsible for supervising,*
*overseeing, and monitoring the housing of inmates subject*
*to a 23-hour per day Lockdown Court Order in George*
*R. Vierno Center from November 1, 2021 to date,*

                    Defendants.
------------------------------------------------------------------------X

       Plaintiff KWAINE THOMPSON, by and through his attorneys, TRACIE A. SUNDACK

& ASSOCIATES, L.L.C., complaining of Defendants CITY OF NEW YORK, CAPTAIN

DAVIS, BADGE NUMBER UNKNOWN, and CORRECTION OFFICER "JOHN DOE",

BADGE NUMBER UNKNOWN, *the name "John Doe" being fictitious, as the true name is*

*presently unknown, and intended to be the individual whether Warden/Deputy Warden/Assistant*

*Deputy Warden/Commander/Chief/Assistant Chief/Supervisor/Correction Officer responsible for*

*supervising, overseeing, and monitoring the housing of inmates subject to a 23-hour per day*

*Lockdown Court Order in George R. Vierno Center from November 1, 2021 to date,* respectfully

alleges, as follows:

     1. At all relevant times Defendant CITY OF NEW YORK was, and still is, a municipal

corporation duly organized and existing under and by virtue of the laws of the State of New

York.

     2. That at all times hereinafter mentioned Defendant CITY OF NEW YORK maintained,

and still maintains, the New York City Department of Correction, including all the correction

officers thereof, a duly authorized corrections/penal department, authorized to perform all

functions of a corrections/penal department as per the applicable sections of the New York State Penal Law, acting under the direction, control and supervision of the aforementioned municipal corporation CITY OF NEW YORK.

3. At all relevant times Defendant CAPTAIN DAVIS, BADGE NUMBER UNKNOWN, was employed by Defendant CITY OF NEW YORK.

4. At all relevant times Defendant CAPTAIN DAVIS, BADGE NUMBER UNKNOWN, acted within the scope of his employment as a correction officer.

5. At all relevant times Defendant CAPTAIN DAVIS, BADGE NUMBER UNKNOWN, was acting under the color and pretense of the statutes, ordinances, regulations, customs, and usages of the City and State of New York and under the authority of his office as a correction officer for said city and state.

6. At all relevant times Defendant CORRECTION OFFICER "JOHN DOE", BADGE NUMBER UNKNOWN, *the name "John Doe" being fictitious, as the true name is presently unknown, and intended to be the individual whether Warden/Deputy Warden/Assistant Deputy Warden/Commander/Chief/Assistant Chief/Supervisor/Correction Officer responsible for supervising, overseeing, and monitoring the housing of inmates subject to a 23-hour per day Lockdown Court Order in George R. Vierno Center from November 1, 2021 to date* (hereinafter CORRECTION OFFICER "JOHN DOE", BADGE NUMBER UNKNOWN) was employed by Defendant CITY OF NEW YORK.

7. At all relevant times Defendant CORRECTION OFFICER "JOHN DOE", BADGE NUMBER UNKNOWN, acted within the scope of his employment as a correction officer.

8. At all relevant times Defendant CORRECTION OFFICER "JOHN DOE", BADGE NUMBER UNKNOWN, was acting under the color and pretense of the statutes, ordinances, regulations, customs, and usages of the City and State of New York and under the authority of his office as a correction officer for said city and state.

9. At all relevant times Plaintiff KWAINE THOMPSON was an inmate in the care, custody, and control of the New York City Department of Correction, and was incarcerated under

Book and Case Number 349-19-01450.

10. At all relevant times, Plaintiff KWAINE THOMPSON was housed in Building No. 2 in the George R. Vierno Center (09-09 Hazen Street, East Elmhurst, New York 11370).

11. At all relevant times, Plaintiff KWAINE THOMPSON was a practicing Muslim.

12. At all relevant times, Plaintiff KWAINE THOMPSON was subject to a 23-hour per day Lockdown Court Order.  Upon information and belief, the terms of said Order mandated that Plaintiff KWAINE THOMPSON be provided one-hour of recreation time each day.

13. Upon information and belief, from November 1, 2021 and continuing until the present time, Defendants CITY OF NEW YORK, CAPTAIN DAVIS, BADGE NUMBER UNKNOWN, and CORRECTION OFFICER "JOHN DOE", BADGE NUMBER UNKNOWN, have repeatedly and consistently failed to provide Plaintiff KWAINE THOMPSON with his mandated one-hour of daily recreation time.

14. The failure of Defendants CITY OF NEW YORK, CAPTAIN DAVIS, BADGE NUMBER UNKNOWN, AND CORRECTION OFFICER "JOHN DOE", BADGE NUMBER UNKNOWN, to provide the court mandated recreation time caused Plaintiff KWAINE THOMPSON to be confined to his cell for days at a time causing significant physical and emotional distress.

15. In addition during this period of time Plaintiff KWAINE THOMPSON was denied the opportunity to practice his religion.

16. During the complained of period, Plaintiff KWAINE THOMPSON repeatedly informed New York City Department of Correction employees that he was not being afforded his mandated one-hour of recreation time in violation of the Lockdown Court Order and in violation of New York City Department of Correction policy, procedure, rules, directives and guidelines.

17. As a result of the foregoing acts of Defendant CITY OF NEW YORK, its agents, servants and/or employees including, but not limited to, Defendants CAPTAIN DAVIS, BADGE NUMBER UNKNOWN, and CORRECTION OFFICER "JOHN DOE", BADGE NUMBER UNKNOWN, Plaintiff KWAINE THOMPSON sustained physical injuries, suffered emotional

distress, embarrassment, humiliation, and was deprived of his constitutional rights.

18. On January 24, 2022, within 90 days of the happening of the incident, but more than 30 days prior to the commencement of this action, Plaintiff KWAINE THOMPSON duly presented, served, and filed a Notice of Claim, in writing, upon Comptroller of Defendant CITY OF NEW YORK setting forth the name and post office address of claimant and claimant's attorney; the nature of the claim, the time when, the place where, and the manner in which the claim arose.

19. More than 30 days have elapsed since service of said Notice of Claim and payment or adjustment thereof has been neglected or refused on behalf of Defendants CITY OF NEW YORK, CAPTAIN DAVIS, BADGE NUMBER UNKNOWN, and CORRECTION OFFICER "JOHN DOE", BADGE NUMBER UNKNOWN.

20. The municipal hearing in this matter was held on April 1, 2022.

21. This action is commenced within one year and ninety days after the cause of action arose.

22. This action falls within one or more of the exceptions set forth in CPLR §1602

## AS AND FOR A FIRST CAUSE OF ACTION
## NEGLIGENCE

23. Plaintiff KWAINE THOMPSON repeats, reiterates, and realleges each and every paragraph of this complaint and further alleges:

24. Defendant CITY OF NEW YORK its agents, servants and employees, including Defendants CAPTAIN DAVIS, BADGE NUMBER UNKNOWN, and CORRECTION OFFICER "JOHN DOE", BADGE NUMBER UNKNOWN, negligently, carelessly and recklessly performed their correctional duties in that they failed to use such care in the performance of their correctional duties as a reasonably prudent correction officer would have used under similar circumstances; failed to properly supervise inmates in their care, control and custody; negligently, carelessly, and recklessly denied Plaintiff his daily one-hour of recreation time mandated in the Lockdown Court Order; negligently, carelessly, and recklessly failed to allow Plaintiff the opportunity to practice his faith; negligently, carelessly, and recklessly housed

Plaintiff in a manner which violated the terms of the Lockdown Court Order and/or the rules, regulations and/or directives of the New York City Department of Correction; negligently, carelessly, and recklessly failed to exercise due care, diligence and forbearance so as to have avoided this occurrence and the injuries to Plaintiff; and in that Defendant CITY OF NEW YORK, its agents, servants and employees, including Defendants CAPTAIN DAVIS, BADGE NUMBER UNKNOWN, and CORRECTION OFFICER "JOHN DOE", BADGE NUMBER UNKNOWN, were otherwise careless, reckless and negligent.

25. The resulting injuries to mind and body therefrom, were caused wholly and solely by reason of the negligence of Defendant CITY OF NEW YORK, its agents, servants and employees, including Defendants CAPTAIN DAVIS, BADGE NUMBER UNKNOWN, and CORRECTION OFFICER "JOHN DOE", BADGE NUMBER UNKNOWN, without any negligence on the part of the Plaintiff.

26. By reason of the aforesaid, Plaintiff KWAINE THOMPSON was injured in the mind and body, still suffers and upon information and belief, will continue to suffer great physical and mental pain, and was rendered sick, sore, lame and disabled and so remains, was incapacitated from his usual occupation and will, upon information and belief, be so incapacitated in the future, and has expended diverse sums of money in an effort to cure himself of said injuries and to extricate himself from the indignities and humiliation foisted upon him by the actions of the Defendants, their agents, servants and employees, and upon information and belief, will expend further sums in that direction, and the Plaintiff has been otherwise damaged.

### AS AND FOR A SECOND CAUSE OF ACTION
### DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

27. Plaintiff KWAINE THOMPSON repeats, reiterates and realleges each and every paragraph of this complaint and further alleges:

28. All of the aforementioned acts of Defendants CITY OF NEW YORK, CAPTAIN DAVIS, BADGE NUMBER UNKNOWN, and CORRECTION OFFICER "JOHN DOE", BADGE NUMBER UNKNOWN, were carried out under color of state law.

29. All of the aforementioned acts deprived Plaintiff KWAINE THOMPSON of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Eight and Fourteenth Amendments to the Constitution of the United States of America, in violation of 42 U.S.C. § 1983.

## AS AND FOR A THIRD CAUSE OF ACTION
## UNDER NEW YORK STATE LAW

30. Plaintiff KWAINE THOMPSON repeats, reiterates and realleges each and every paragraph of this complaint and further alleges:

31. All of the aforementioned acts of Defendants CITY OF NEW YORK, CAPTAIN DAVIS, BADGE NUMBER UNKNOWN, and CORRECTION OFFICER "JOHN DOE", BADGE NUMBER UNKNOWN, deprived Plaintiff KWAINE THOMPSON of rights guaranteed to him by the New York State Constitution and were in violation of the laws of New York State, and were effected for the ulterior purpose of causing Plaintiff KWAINE THOMPSON to be unlawfully deprived of his liberty and civil rights.

## AS AND FOR A FOURTH CAUSE OF ACTION
## NEGLIGENT HIRING AND RETENTION

32. Plaintiff KWAINE THOMPSON repeats, reiterates, and realleges each and every paragraph of this complaint and further alleges:

33. Defendant CITY OF NEW YORK was careless and reckless in hiring and retaining as and for its employee Defendants CAPTAIN DAVIS, BADGE NUMBER UNKNOWN, and CORRECTION OFFICER "JOHN DOE", BADGE NUMBER UNKNOWN, in that said Defendant employees lacked the experience, deportment and ability to be employed by Defendant CITY OF NEW YORK; in that Defendant CITY OF NEW YORK failed to exercise due care and caution in its hiring practices, and in particular, in hiring the Defendant employees who lacked the mental capacity and the ability to function as employees of Defendant CITY OF NEW YORK; in that the defendant employees lacked the maturity, sensibility and intelligence to be employed by Defendant CITY OF NEW YORK; in that Defendant CITY OF NEW YORK knew of the lack of ability, experience, deportment and maturity of said defendant employees

when they hired them; and in that Defendant CITY OF NEW YORK, its agents, servants and/or employees were otherwise careless, negligent and reckless.

34. Defendant CITY OF NEW YORK knew, or should have known in the exercise of reasonable care, the propensities of Defendants CAPTAIN DAVIS, BADGE NUMBER UNKNOWN, and CORRECTION OFFICER "JOHN DOE", BADGE NUMBER UNKNOWN, to engage in the wrongful conduct heretofore alleged in this Complaint.

## AS AND FOR A FIFTH CAUSE OF ACTION
## NEGLIGENT TRAINING AND SUPERVISION

35. Plaintiff KWAINE THOMPSON repeats, reiterates, and realleges each and every paragraph of this complaint and further alleges:

36. The failure of Defendant CITY OF NEW YORK to adequately train, supervise, discipline or in any way control the behavior of Defendants CAPTAIN DAVIS, BADGE NUMBER UNKNOWN, and CORRECTION OFFICER "JOHN DOE", BADGE NUMBER UNKNOWN, in the exercise of their employment functions, and the failure to enforce the laws of the State of New York and the regulations of Defendant CITY OF NEW YORK is evidence of the reckless lack of cautious regard for the rights of the public including Plaintiff KWAINE THOMPSON. Further, the Defendants exhibited a lack of that degree of due care which prudent and reasonable individuals would show.

37. The failure of Defendant, CITY OF NEW YORK, to train, supervise, discipline or in any other way control Defendants CAPTAIN DAVIS, BADGE NUMBER UNKNOWN, and CORRECTION OFFICER "JOHN DOE", BADGE NUMBER UNKNOWN, in the exercise of their employment functions and the failure to enforce the laws of the State of New York and the regulations of Defendant CITY OF NEW YORK was carried out willfully, wantonly, maliciously and with such reckless disregard for the consequences as to display a conscious disregard for the dangers of harm and injury to the citizens of New York, including Plaintiff KWAINE THOMPSON.

## AS AND FOR A SIXTH CAUSE OF ACTION
### *RESPONDEAT SUPERIOR* LIABILITY

38. Plaintiff KWAINE THOMPSON repeats, reiterates, and realleges each and every paragraph of this complaint and further alleges:

39. Defendant CITY OF NEW YORK is vicariously liable for the acts of its employees and agents who were on duty and acting in the scope of their employment when they engaged in the wrongful conduct described herein.

40. As a result of the foregoing, Plaintiff KWAINE THOMPSON is entitled to compensatory damages in the sum of One Million Dollars ($1,000,000.00) and is further entitled to punitive damages against the individual Defendants in the sum of Two Million Dollars ($2,000,000.00)

**WHEREFORE** Plaintiff KWAINE THOMPSON demands judgment against Defendants CITY OF NEW YORK, CAPTAIN DAVIS, BADGE NUMBER UNKNOWN, and CORRECTION OFFICER "JOHN DOE", BADGE NUMBER UNKNOWN, jointly and severally, in the amount of One Million Dollars ($1,000,000.00) in compensatory damages and Two Million Dollars ($2,000,000.00) in punitive damages, plus reasonable attorney's fees, costs and disbursements of this action.

Dated: White Plains, New York
     December 22, 2022

               TRACIE A. SUNDACK & ASSOCIATES, L.L.C.
               Attorneys for Plaintiff
               KWAINE THOMPSON
               180 South Broadway - Suite 306
               White Plains, New York 10605
               (914) 946-8100

## ATTORNEY'S VERIFICATION

STATE OF NEW YORK       )

                              ) SS.:

COUNTY OF WESTCHESTER    )

     I, the undersigned, an attorney admitted to practice in the Courts of the State of New York, state:

     That I am the attorney of record for the Plaintiff in the within action.

     That I have read the foregoing SUMMONS and COMPLAINT and know the contents thereof; the same is true to my own knowledge, except for the matters therein alleged to be on information and belief, and as to those matters I believe them to be true. The reason this Verification is made by me and not by the Plaintiff is that Plaintiff resides outside the County where your affirmant maintains her office. The grounds of my belief as to all matters not stated upon my own knowledge are as follows: files maintained by my office and conversations with Plaintiff.

     I affirm that the foregoing statements are true, under the penalties of perjury.

Dated: White Plains, New York
       December 22, 2022

                                                 _____

                                              TRACIE A. SUNDACK

EXHIBIT NO -38

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES

Form.: 7102R
Eff.: 8/23/19
Ref.: Dir. 3376R-A

### DISPOSITION FORM

| Grievance Reference #: **622177** | Date Filed: **01/24/2023** | Facility: **GRVC – 1A** |
|---|---|---|
| Inmate Name: **Williams, Alexander** | Book and Case#: **1411801632** *NYSID#* **01897858L** | Category: **Recreation** |

From OCGS Inmate Statement Form, print or type short description of grievance:

Recreation was not afforded to me on Jan, 2023, Jan 18,2023, Jan 19, 2023, Jan 20th , 2023, Jan 21,2023. I was never given hearing or notice for Rec neglect.

Action Requested by Inmate:

Please provide recreation in accordance with my Court order.

### STEP 1: FORMAL RESOLUTION

Check one box: ■ Grievance        ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

OCGS investigated and it has been revealed that housing area 1A was not afforded Recreation on the dates in question. Your claim is substantiated and was forwarded to the Warden's Office for investigation/resolution.

### CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution  ☐ No   ☒ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date: 1/23/23 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature: *Mr. Parris* | Date: 01/24/2023 |
|---|---|

EXHIBIT NO -39

ATTACHMENT - C

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES

Form.: 7102R
Eff.: 8/23/19
Ref.: Dir. 3376R-A

## DISPOSITION FORM

| Grievance Reference #: **622124** | Date Filed: **01/24/2023** | Facility: **GRVC – 1A** |
|---|---|---|
| Inmate Name: **Alexander Williams** | Book and Case#: 1411801632 *NYSID#* 1411801632 | Category: **Housing** |

From OCGS Inmate Statement Form, print or type short description of grievance:

Attached herein to this Grievance is three affidavits submitted to the Federal Court where DOC Granted a facility -wide separation from Captain Ganious. I am being threatened and other issues and ask that the separation be honored before commencement of litigation.

Action Requested by Inmate:

To be removed from GRVC back to West facility in Accordance with DOC separation Orders.

### STEP 1: FORMAL RESOLUTION

Check one box: ■ Grievance    ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

OCGS informed Mr. Williams, Alexander that as per DOC Directive 3376R-A.II.5-6 "Housing Placement" submissions do not fall under the purview of OCGS and that his complaints/concerns have been forwarded to the Warden's Office and OSIU for investigation/resolution.

### CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☒ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date: 1/27/23 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature: *Mr. Parris* | Date: 01/24/2023 |
|---|---|

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------- x

Alexander Williams,

                              Plaintiff              **DECLARATION OF
                                                     ORVILLE JAMES**

            -against-
                                                     Index No.: 3347/19
City of New York et al.,

                              Defendant.

----------------------------------------------------------------- x

Orville James hereby affirms under penalty of perjury as follows:

1.      I am currently employed by the New York City Department of Correction
("DOC") as a Correction Officer working in Segregated Housing Intake at the George R. Vierno
Center ("GRVC"). I have been employed by DOC since 2008. My duties include working in an
area that screens detainees from restricted housing units who are being transported to others
locations such as for court production.

2.      On October 18, 2022, I was working at SEG intake at GRVC. Mr. Williams was
brought to this area before being brought to Court.

3.      I was not aware that Mr. Williams had commenced a lawsuit against Captain
Mathis or any other member of the Department. I did not hear or observe any Department
employee threaten, abuse or harasss Mr. Williams on October 18, 2022 or any other day. Nor
did I hear any Department employee mention or make reference to any lawsuit that Mr. Williams
had brought against the Department or any Department employee.

November 10, 2022

                                                     **ORVILLE JAMES**

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

Alexander Williams,

                          **Plaintiff**

                -against-

City of New York et al.,

                       **Defendant.**

-------------------------------------------------------------------- x

**DECLARATION OF
RICARDO MALDONADO**

Index No.: 3347/19

Ricardo Madonado hereby affirms under penalty of perjury as follows:

    1.    I am currently employed by the New York City Department of Correction ("DOC") as a Correction Officer working in Segregated Housing Intake at the George R. Vierno Center ("GRVC"). I have been employed by DOC since 2012. My duties include working in an area that screens detainees from restricted housing units who are being transported to others locations such as for court production.

    2.    On October 18, 2022, I was working at SEG intake at GRVC. Mr. Williams was brought to this area before being brought to Court.

    3.    I was not aware that Mr. Williams had commenced a lawsuit against Captain Mathis or any other member of the Department. I did not threaten, abuse or harasss Mr. Williams on October 18, 2022 or any other day. I did not refer to any lawsuit brought by Mr. Williams on October 18, 2022 or at any time.

    4.    On October 18, 2022, Mr. Williams was transported to Court without incident.

                                       **RICARDO MALDONADO**

November 10, 2022

1

EXHIBIT NO - 40

**NYC
HEALTH+
HOSPITALS**

| **PATIENT NAME**: ALEXANDER WILLIAMS | **FACILITY**:  GRVC |
|---|---|
| **NYSID**:      01897858L | **BOOKCASE#**:  1411801632 |

## DEPARTMENT OF CORRECTION

## NOTIFICATION OF PATIENT'S ADA CONSIDERATIONS

### Type of ADA Considerations:

### Disabilities:

### Assistive Device #1: Cane

**Device #1 Start Date:** 01/23/2023  **Device 1 End Date:** 01/31/2025

### Assistive Device #2:

**Device #2 Start Date:**   **Device #2 End Date:**

### Assistive Device #3:

**Device #3 Start Date:**   **Device #3 End Date:**

### External Medical Devices:

_Signature_

Ordering Provider: **Larry Blackmore PA**
Print Name/Date/Time: **January 23, 2023 2:40 PM**
Printed By: **Blackmore PA, Larry**

DOC Signature/Shield Number

### If MO Housing Required:

_Facility Name_

Dorm: _____        Cell: _____

Date

EXHIBIT NO - 41

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES

Form.: 7102R
Eff.: 8/23/19
Ref.: Dir. 3376R-A

## DISPOSITION FORM

| Grievance Reference #:<br>**620695** | Date Filed:<br>**01/18/2023** | Facility:<br>**GRVC – 1A** |
|---|---|---|
| Inmate Name:<br>**Williams, Alexander** | Book and Case#:<br>**1411801632 *NYSID#* 01897858L** | Category:<br>**Medical** |

From OCGS Inmate Statement Form, print or type short description of grievance:

On Jan 18th , 2023 at 9:20. I informed Officer Marden 13720 that I was having asthma attack and chest pain and asked for a medical emergency. This Officer Log it in book but never contacted medical.

Action Requested by Inmate:

Please stop retaliation and not following medical rules and Reg.

### STEP 1: FORMAL RESOLUTION

Check one box: ■ Grievance    ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

OCGS informed Mr. Williams, Alexander as per NYCH&H Correctional Health Services this matter has been forwarded to Patient Relations for review and handling. In addition, this matter has been forwarded to the GRVC Medical Team as well as the Warden's Office.

### CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐ I request to appeal the resolution of this grievance to the Commanding officer.

Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding  Officer.  You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.

| Inmate's Signature: | Date: 1/27/23 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature:<br>*Mr. Parris* | Date:<br>01/19/2023 |
|---|---|

EXHIBIT NO -42

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES

### DISPOSITION FORM

Form.: 7102R
Eff.: 8/23/19
Ref.: Dir. 3376R-A

| Grievance Reference #:<br>**620711** | Date Filed:<br>**01/18/2023** | Facility:<br>**GRVC – 1A** |
|---|---|---|
| Inmate Name:<br>**Williams, Alexander** | Book and Case#:<br>**1411801632 *NYSID#* 01897858L** | Category:<br>**Religion** |

From OCGS Inmate Statement Form, print or type short description of grievance:

Upon returning to facility on Jan 16th, 2023, my property was held and searched outside of my presence and on Jan 17TH 23. When it was return, I notice that my Torah and all of my Jewish heritage was missing. A blue Gideon issued bible was left. Also missing were my Asthma pumps (2) of them and I was not given any voucher along with my legal papers that were missing.

Action Requested by Inmate:

Please return Torah, please change Court Order to include other religious text other than Bible.

### STEP 1: FORMAL RESOLUTION

Check one box: ■ Grievance    ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

OCGS informed Mr. Williams, Alexander that as per DOC Directive 3376R-A.II.5-6 "Religion" submissions do not fall under the purview of OCGS and that his complaints/concerns have been forwarded to the Facility Commanding Officer for investigation/resolution.

### CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution  ☐ No  ☑ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date: 1/23/23 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature:<br>*Mr. Perris* | Date:<br>01/19/2023 |
|---|---|

EXHIBIT-43



Jennifer Jones Austin, Chair
Stanley Richards, Vice-Chair
Robert L. Cohen, M.D.
Felipe Franco
James Perrino
Michael J. Regan
Steven M. Safyer, M.D.
Jacqueline Sherman

Margaret Egan
*Executive Director*

**BOARD OF CORRECTION**
**CITY OF NEW YORK**
1 CENTRE STREET, RM 2213
NEW YORK, NY 10007
212 669-7900 (Office)

October 26, 2020

Alexander Williams
1411801632
Manhattan Detention Complex
125 White Street, 9 North
New York, NY 10013

RE: Central Office Review Committee Recommendation

Dear Mr. Williams:

On October 8, 2020, the New York City Board of Correction ("BOC" or the "Board") received your grievance appeal, via the Department of Correction (DOC)'s Central Office Review Committee (CORC). Your original August 30, 2020 grievance states that you would like a tablet. On October 21, 2020, you stated to me that you requested a tablet solely in order to do legal research via Lexis Nexis. You appealed your initial grievance disposition on September 16, 2020. You rejected the Division Chief's disposition on September 28, 2020 and appealed to the DOC Central Office Review Committee (CORC). The Board of Correction is not a member of the CORC however, we are entitled to make a recommendation on each CORC appeal, pursuant to DOC Directive 3376R-A (eff. 12/10/18) re "Inmate Grievance Procedures."[1]. We have accepted your appeal for review.

Based upon a review of the facts and circumstances underlying your appeal – including a review of relevant records, an interview of you, and communication with the Assistant District Attorney on your criminal case and your defense counsel – the Board recommends that DOC grant your appeal. DOC should provide you access to legal research materials in the Manhattan Detention Complex law library or, if this is not possible, via a Lexis Nexis kiosk in your housing area or a tablet that has Lexis Nexis capabilities but no ability to communicate with other people or other devices. As confirmed by the Assistant District Attorney prosecuting your case, the court's January

---

[1] DOC Directive # 3376R-A affords the Board the opportunity to submit its recommendation to the CORC regarding the proper resolution of the appeal of your grievance (Section IX(B), p. 19).

1

22, 2020 Order restricting conditions of your confinement does not limit your access to law library, Lexis Nexis, or legal research materials.

Additionally, DOC's Command Level Order (CLO) governing your housing area does not comply with Minimum Standards. While DOC must limit your conditions of confinement in response to a court order, DOC must comply with all Minimum Standards that are not limited by such order.   Instead, in this case, it appears DOC has placed blanket restrictions on each person in your housing area without regard to each person's specific court order. The Board recommends DOC rescind this CLO and address each person's conditions individually, pursuant to each specific court order.

Minimum Standards
The BOC Minimum Standard 1-08(f)(4) requires DOC grant you access to the Law Library for two hours per day on each day that the Law Library is open. On October 21, 2020, you reported to me that DOC has denied you access to the Law Library since January 2019 when you were moved to Manhattan Detention Complex.[2] While you are able to use a typewriter in a vacant cell in your housing area, you report that you have not had access to a legal research database or legal research books. Instead, DOC requires you request specific materials that you want, and a DOC staff member will make copies for you. This practice violates the Board of Correction's Minimum Standard 1-08.

Court Order
On January 22, 2020, Judge Vincent Del Giudice issued an order limiting the conditions of your confinement. This court order does not limit your access to Law Library under Minimum Standard 1-08. In an October 22, 2020 email, the prosecutor in your case, Assistant District Attorney Ernest Chin wrote:

> The Court's Order does not limit the defendant's access to legal research, the law library or anything related to research. His access to a tablet for the sole purpose of legal research would be permissible, provided the tablet does not have access to dialing out or email.[3]

Manhattan Detention Complex Command Level Order
DOC's response to your grievance attaches Manhattan Detention Complex CLO #104/19 re "Court Ordered Lockdown Inmates." The CLO requires that people in custody, "make all requests for Law Library materials in writing. These requests will be forwarded to the Security Office who will obtain copies of the requested materials and place same in the [person in custody's] blue storage bin." As stated above, your court order does not require such limitation, so this DOC policy is in violation of Minimum Standard 1-08.

While not the subject of this particular grievance, the CLO appears to violate Minimum Standards in a number of other areas that are not subject to your Court Order. For example, the CLO states: "Any necessary medical or mental health services are to be

---

[2] You previously reported this issue to Board staff and Board staff met with jail leadership to develop a solution however, jail leadership did not provide you access to legal research capabilities as a result of this meeting.
[3] Email attached as Exhibit 1.

2

provided to these [people in custody] in the housing area. They will not be removed to go to the Clinic unless it is physically impossible to provide them with necessary medical services in the cell/housing area." Unless required by a person's Court Order, this requirement violates: (1) Minimum Standard 3-02(b)(4) which states, "Correctional personnel shall never prohibit, delay, or cause to prohibit or delay an inmate's access to care or appropriate treatment. All decisions regarding need for medical attention shall be made by health care personnel." and (2) Minimum Standard 3-06(b)(5) which states, "Medical treatments or physical examinations shall not occur outside of appropriate treatment areas….except as needed in the event of an acute medical emergency."

An additional example of where the CLO is out of compliance with Minimum Standards is its limits on personal hygiene. The CLO only allows three showers per week while Minimum Standard 1-03(b)(1) requires DOC to provide daily showers.

Emergency Executive Order 100
On March 16, 2020, Mayor Bill de Blasio signed Emergency Executive Order No. 100 in response to the COVID-19 pandemic. The Executive Order remains in effect. Among other provisions, the Executive Order suspends Minimum Standard 1-08 regarding Law Library.[4] The Executive Order directs the DOC Commissioner to "take all appropriate steps to facilitate alternative methods for detainees to…access the law library." During the pandemic, DOC has provided law library services to most people in custody using a process similar to the one available to you per CLO 104/19: a person in custody requests materials from the Law Library, Law Library staff process the request, and provide the materials back to the person in custody.

While the Board notes that the Minimum Standard regarding Law Library is currently suspended, DOC's limitations on your legal research predate the Executive Order.

Tablets and Law Library Kiosks
DOC reports that the current tablet configuration could allow you to communicate with DOC social services staff and/or outside service providers, in potential violation of your court order. DOC also reports that it does not know if it is possible to provide a tablet that does not have communication capabilities.

In other restrictive housing areas, such as Enhanced Supervision Housing and Secure Unit, the Board allows DOC to provide law library services in the housing area via a kiosk and law library staff visiting the unit, rather than in the law library. The law library kiosk is located in a vacant cell in the housing area and allows people in custody to search the Lexis Nexis database.

Conclusion
For the reasons detailed above, the Board recommends that the CORC grant your appeal. Your Court Order does not limit your access to Law Library or legal research materials under Board of Correction Minimum Standard 1-08. DOC should provide you access to the Law Library at Manhattan Detention Complex. If this is not possible, DOC should

[4] Attached as Exhibit 2

3

provide you access to Lexis Nexis in your housing area via a kiosk or a tablet. When you are moved to a new jail in advance of the closing of Manhattan Detention Complex, DOC should ensure that you have access to law library in any jail you are moved to.

In so far as DOC now limiting your access to Law Library due to the ongoing pandemic, this may be acceptable due to Executive Order 100 however, limits on your access to Law Library that predate March 16, 2020 are in violation of the Minimum Standards.

By copy of this letter to DOC's Chief of Department, General Counsel, and the Office of Constituent and Grievance Services, the Board has informed DOC of its recommendation.

Sincerely,

Bennett Stein
Director of Policy and Communications

cc:    **DOC**
       Hazel Jennings, Chief of Department
       Heidi Grossman, General Counsel
       Yanique Calvert, Office of Constituent and Grievance Services (OCGS)

       **BOC**
       Margaret Egan, Executive Director
       Kate McMahon, Deputy General Counsel
       Nashla Rivas Salas, Senior Research Director
       Michele Ovesey, General Counsel
       Emily Turner, Acting Deputy Executive Director
       Rahzeem Gray, CSRS II

4

**UNITED STATES POSTAL SERVICE®**

PRIORITY
M...
EXP...



RDC 07   10007

U.S. POSTAGE PAID
PME 3 DAY
LONG ISLAND CITY, NY
11105
APR 03 23
AMOUNT
**$37.40**
R2305M148341-12

PRIORITY MAIL EXPRESS
POSTAGE REQUIRED

Please Recycle

PRESS FIRMLY TO SEAL

...LING
...ELOPE
...MESTIC AND
...TIONAL USE



...IS USPS.COM/PICKUP

free Package Pickup,
the QR code.

S.COM/PICKUP

**UNITED STATES POSTAL SERVICE®**   PRIORITY MAIL EXPRESS®

EI 570 759 729 US

CUSTOMER USE ONLY
FROM: (PLEASE PRINT)    PHONE ( )
Alexander Williams
14180162Z
09-09 Hazen St
Queens NY 11371

DELIVERY OPTIONS (Customer Use Only)
☐ SIGNATURE REQUIRED
☐ No Saturday Delivery
☐ Sunday/Holiday Delivery Required

TO: (PLEASE PRINT)    PHONE ( )
Pro-se Intake unit
united states District ct
500 pearl st
New york NY
1 0 0 0 7

☒ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
☒ $100.00 insurance included.

PEEL FROM THIS CORNER



RECEIVED
APR - 5 2023
PRO SE OFFICE

PAYMENT BY ACCOUNT (if applicable)
USPS® Corporate Acct. No.    Federal Agency Acct. No. or Postal Service™ Acct. No.

ORIGIN (POSTAL SERVICE USE ONLY)
☐ 1-Day   ☐ 2-Day   ☐ Military   ☐ DPO
PO ZIP Code **11105**   Scheduled Delivery Date **4-4-23**   Postage **$37.40**
Date Accepted **4-3-23**   Scheduled Delivery Time **9:00 PM**   Insurance Fee / COD Fee
Time Accepted **10:13** ☐ AM ☐ PM   Return Receipt Fee / Live Animal Transportation Fee
Special Handling/Fragile   Sunday/Holiday Premium Fee
Weight **10 lb 30 oz** ☐ Flat Rate   Acceptance Employee Initials **1G**   Total Postage & Fees **$37.40**

DELIVERY (POSTAL SERVICE USE ONLY)
Delivery Attempt (MM/DD/YY)   Time ☐ AM ☐ PM   Employee Signature
Delivery Attempt (MM/DD/YY)   Time ☐ AM ☐ PM   Employee Signature

LABEL 11-B, MAY 2021   PSN 7690-02-000-9996




PRESS FIRMLY TO SEAL



PS10000000005   EP13C July 2020
OD: 11.625 x 15.125



**UNITED STATES POSTAL SERVICE®**

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express® shipments. Misuses may be a violation of federal law. This package is not for resale. EP13C © U.S. Postal Service; July 2020; All rights reserved.

DuPont™ Tyvek®
Protect What's Inside.™